**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Case No. 1:18-cv-614(LOG/MSN) |
| | ) |
| FAIRFAX COUNTY SCHOOL BOARD, | ) **JURY TRIAL DEMANDED** |
| | ) |
| *Defendant.* | ) |
| | ) |

## FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff Jane Doe, through counsel, states the following as her Complaint against the Fairfax County School Board:[1]

## INTRODUCTION

1.      This is a civil rights case brought by Jane Doe, a student in Fairfax County Public Schools ("FCPS"), who, at age 16, was sexually assaulted by an older FCPS student on a bus during the first night of a five-day Oakton High School band trip.

2.      Although at least two students reported the sexual assault to FCPS administrators and employees soon after it happened, FCPS ignored these reports during the remainder of the trip

---

[1]      This First Amended Complaint and Demand for Jury Trial is filed pursuant to the Court's Order for Plaintiff to file an amended complaint that substitutes the party in interest. *See* DE #20. The pleading updates the parties and limited other facts (*e.g.*, Plaintiff's age and the fact that she graduated from high school) but does not change substantive allegations or requests for relief from the original complaint in accordance with the terms and spirit of the Court Order instructing the filing of an amended complaint.  Plaintiff intends to file soon a motion for leave to file a Second Amended Complaint pursuant to Fed. R. Civ. P. 15, which will clarify and revise the relief sought in light of Plaintiff's graduation from high school.

and never once checked in with Jane Doe to offer or provide assistance, explain her rights and options, or ensure that she and other students on the trip were safe.

3.       On the band trip, FCPS did not take any action to ensure Doe's safety, provide necessary medical attention or counseling or otherwise respond to the reported sexual assault. FCPS waited until the students returned to Oakton High School to speak with Doe, and the actions it eventually took further traumatized Jane Doe.

4.       After Jane Doe confirmed that she had been sexually assaulted on the band trip, FCPS employees told her she might be disciplined for what had occurred, interrogated her with victim-blaming questions, and discouraged her from reporting the sexual assault to the police—all without informing her parents.  Indeed, school officials never informed Jane Doe's parents that she had reported being sexually assaulted, instead leading them to believe that their daughter might be punished for engaging in consensual sexual activity during the band trip.

5.       School officials conducted a hasty, slipshod investigation of the incident and did not inform Jane Doe or her parents of the result. Though FCPS ultimately did not discipline Jane Doe, it became obvious that school officials did not impose any meaningful consequences on her assailant, as he continued to attend band class as if nothing had happened and was given an award by the school a few short months after assaulting Doe.

6.       FCPS also failed to offer or provide Jane Doe with the support she needed to feel safe at school, where she continued to attend band class in close proximity to her assailant.

7.       As a result of FCPS's failure to take meaningful and appropriate action to address her sexual assault, Jane Doe struggled academically, emotionally, and physically for the remainder of the school year.  She continues to struggle with the aftermath of the sexual assault and the school's failure to take appropriate action to help her.

8.      FCPS's failure to respond promptly and adequately to reports that Jane Doe was sexually assaulted by another FCPS student constitutes sex discrimination, in violation of Title IX of the Education Amendments of 1972 ("Title IX").

9.      FCPS's discrimination against Jane Doe is part of its history of ignoring or minimizing student-on-student sexual harassment.  In November, 2014, FCPS entered into a Resolution Agreement with the U.S. Department of Education's Office for Civil Rights ("OCR") to resolve a student's sexual harassment complaint under Title IX.  Pursuant to the Resolution Agreement, FCPS agreed to make a series of significant changes to its policies, procedures, and practices to comply with Title IX.  Despite this commitment, and despite facing more OCR investigations of Title IX sexual harassment complaints since 2014, FCPS breached the Resolution Agreement and continues to violate Title IX.

10.     As the tenth largest school division in the country, FCPS's deliberate indifference to student-on-student sexual harassment is subjecting a large population of students, including Jane Doe, to a hostile educational environment based on sex.

11.     As the entity that manages and operates FCPS, Defendant Fairfax County School Board is responsible for FCPS's Title IX violations.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the laws of the United States. Specifically, Plaintiff asserts a claim under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, *et seq*.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Fairfax County School Board resides within this Court's judicial district and a substantial part of the events or omissions giving rise to the claims occurred within this district.

## PARTIES

14.     Plaintiff Jane Doe ("Doe") is an 18-year-old female who resides with her parents, Jane Roe and John Doe, in Fairfax County, Virginia.  Jane Doe attended Oakton High School, part of Fairfax County Public Schools.

15.     Defendant Fairfax County School Board ("FCSB") is a public school board that is responsible for overseeing the operation and management of the public education system of Fairfax County Public Schools ("FCPS").

16.     Defendant FCSB is the body corporate for FCPS and is vested with all the powers and charged with all the duties, obligations, and responsibilities imposed upon FCPS.

17.     Defendant FCSB is the public body "that governs [the] school division" of FCPS, within the meaning of Va. Code Ann. § 22.1-1, VA. Const., Art. VIII, § 7 ("The supervision of schools in each school division shall be vested in a school board"), Va. Code Ann. § 22.1-28 ("supervision of schools in each school division shall be vested in a school board"), and Va. Code Ann. § 22.1-71 (stating that the "school board" is the "body corporate" with the power to "sue" and "be sued").

18.     As the corporate body for FCPS, Defendant FCSB is a recipient of federal financial assistance within the meaning of 20 U.S.C. § 1681(a).

## APPLICABLE LAW AND POLICY

19.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20.     Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides:

. . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

21.     In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Supreme Court held that a recipient of federal funds violates Title IX and is subject to a private damages action, where the funding recipient is "deliberately indifferent" to known acts of student-on-student sexual harassment.

22.     The Court in *Davis* held that a plaintiff in a student-on-student harassment case may prevail in a Title IX damages action against a school district where: a) the school district is deliberately indifferent to known sexual harassment; b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to educational opportunities or benefits provided by the school; and c) the school exercised substantial control over the harasser and the context in which the harassment occurred. *Davis*, 526 U.S. at 645-46, 650.

## FACTUAL ASSERTIONS

23.     Jane Doe currently is a senior honors student at Oakton High School, set to graduate in June, 2018.  She is an active member of Oakton's band.

### *Jane Doe's Sexual Assault*

24.     In March, 2017, Oakton participated in a band exhibition in Indianapolis, Indiana. The trip was set for five days and required travel and overnight stays.

5

25.     On or about March 8, 2017, during the first night of the trip, a male senior Oakton student (hereinafter referred to as "Assailant") sat next to Doe on the bus trip to Indianapolis. Assailant said he was cold, so Doe grabbed a blanket and he covered them with it.

26.     When it was dark on the bus, Assailant started to touch Doe without her consent, moving his hand up her leg toward her crotch.  Doe tried to block his hand with her arms to get him to stop, but he pressed on, getting more aggressive.  He grabbed Doe's hand, pulled down his pants, and put her hand on his penis.  When she pulled her hand away, he pulled it back to his penis.  Assailant held her hand on his genitals, forcing her to rub his penis.  He also forced his hand down Doe's pants, penetrated her with his fingers, and grabbed her breasts.

27.     Doe was shocked, scared, and humiliated by what Assailant was doing to her. Frozen with fear, Doe suffered in silence.

28.     While the sexual assault was happening, chaperones and an FCPS teacher were on the bus.  Assailant's mother was a chaperone on the trip.

29.     After the assault, Doe was traumatized and sick for the remainder of the trip.  She had difficulty sleeping and eating, and was unable to keep any food down.  Unsure where to turn, Doe told friends she trusted (Students A, B, C, and D) that Assailant forced her to engage in sexual activity and did things to her that she did not want him to do.  Doe asked her friends not to tell anyone about the assault.  Doe avoided Assailant as much as she could, staying close to the students to whom she reported the sexual assault.

***FCPS's Failure to Take Prompt and Appropriate Action on Reports of the Sexual Assault***

30.      Upon information and belief, at least two of the students Doe told about the incident recognized the seriousness of what had happened to Doe and promptly told FCPS's administrators or employees.

31.     For example, on or about March 9, 2017, Doe told Student A what Assailant had done to her on the bus the night before.  Upon information and belief, Student A saw how upset Doe was and promptly reported it to Assistant Principal Michelle Taylor.

32.     Taylor was an administrator on the trip and the Supervisor for Oakton's Fine Performing Arts program.  Taylor was also the supervisor of Dr. Jamie VanValkenburg, Director of Bands, and was one of the administrators responsible for discipline and student affairs on band trips.  Before the band trip, Taylor spoke to the students about Oakton and FCPS's code of conduct and the consequences of engaging in misconduct on overnight school trips.

33.     Upon information and belief, after hearing Student A's report of Doe's sexual assault, Taylor told Student A that she would inform VanValkenburg of the incident and take the necessary next steps to address it.

34.     Neither Taylor, VanValkenburg, nor any other employee of FCPS took steps to address the reported assault with Doe during the remainder of the trip.

35.     Upon information and belief, neither Taylor, VanValkenburg, nor any other administrator interviewed or followed up with Student A after she reported Assailant's sexual assault of Doe.

36.     Doe also told Student B, who was not on the trip, about what Assailant did to her on the bus and asked Student B not to tell anyone.  Student B appreciated the seriousness of the situation and felt it was important to report the assault to a school official.

37.     Upon information and belief, Student B reported the incident to Student B's math teacher, Laura Kelly, on the morning of March 10.  Kelly told Student B that she needed to report it to the school, and she did so that day.

38.     Doe also told Student C about the incident while on the trip.

39.     Upon information and belief, Student C told a parent of the assault on Doe when Student C returned home from the trip.  Student C's parent called VanValkenburg that evening to inform him that Student C had reported that Doe had been sexually assaulted on the band trip.

40.     Despite these reports, no FCPS administrator or employee contacted Doe during the trip or on the evening the band returned home to ask about the sexual assault or to make sure she was okay.  Nor did any FCPS administrator or employee contact Doe's parents to inform them of these reports.

41.     Although administrators knew about the assault as early as Thursday, March 9, they said nothing to Doe or Assailant during the trip.

42.     Oakton had an important music exhibition on March 10 in which Assailant played a significant role.

43.     After more than two days of feeling emotionally and physically ill from the trauma she had experienced, on March 11, Doe told VanValkenburg that she was not feeling well, could not eat, and was throwing up.  VanValkenburg dismissed her and offered no aid or remedy.

44.     Oakton designates an individual to serve as a caregiver for students who feel sick on overnight trips.  No administrator, employee, or chaperone referred Doe to the caregiver or directed the caregiver to contact Doe.

### FCPS's Improper Response to Doe's Report of the Sexual Assault

45.     FCPS did not take action to speak with Doe regarding reports of her sexual assault until the band returned to Oakton.

46.     On Monday, March 13, 2017, Oakton school counselor Alyson Calvello came to one of Doe's classes and, in front of her peers, asked to speak with her.  Doe had no prior

experience or interaction with Calvello.  Once removed from class, Calvello took Doe down to the administrative offices and into a small office with a round table.

47.     After a few minutes, Oakton's Director of Student Services and Assistant Principal Jennifer Hogan came into the room and asked Doe if she knew why she was there.  When she said she did not know, Hogan said, "well, we have a report that you engaged in sexual activity on the bus."  Doe began to describe what happened, telling the story of her sexual assault and becoming increasingly upset.  After Doe told Hogan that Assailant forced himself on her and forced her to touch him, Hogan gave Doe a sheet of paper and told her she had to prepare a written statement.

48.     At no point did Hogan inform Doe that she could speak with her parents or that she did not have to provide a written statement.

49.     Doe wrote a statement about the assault, which included, "I moved my hand away but he moved my hand back onto his genitals. I was so shocked and scared that I did not know what to say or do. He then started to move his hands towards me and I tried to block him but he still put his hands up my shirt and down my pants."

50.     Doe offered three students' names that she suggested Hogan speak with as part of her investigation, highlighting that the most important person to speak with was Student D because she was the friend who spent the most time with her after the assault.

51.     Still scared and crying uncontrollably, Doe asked Hogan if she was going to get in trouble for what happened.  Instead of clearly dismissing the proposition and assuring Doe that she would not be punished for reporting a sexual assault, Hogan said, "I don't know, we'll have to see."  Hogan then left Doe in the room with Calvello for approximately an hour-and-a-half.

52.     When Ms. Hogan returned, she brought with her Oakton Safety and Security Specialist Wally Baronyk.  Hogan introduced Baronyk as someone who was knowledgeable about legal issues and knew what could happen in a court of law.

53.     Doe had not interacted with Baronyk in the past; she had only seen him removing students from a classroom for disciplinary issues.

54.     Baronyk started the interview by asking Doe if her parents were planning to take legal action related to the incident.  Surprised by the question and his abrupt, aggressive tone, she said she did not know, but probably not.  At the time, Doe had not told her parents about the sexual assault and she was still too traumatized to think past anything but her ongoing distress.  Baronyk told her that "nothing would happen if you try to go to court."  He also told Doe that if she went to court she would lose, it would be a waste of money, and "the most that could happen to [Assailant] is being charged with battery."

55.     Baronyk continued to ask a series of accusatory questions in an aggressive tone and stood above where Doe was sitting throughout the interview, in an intimidating and overbearing manner that only aggravated Doe's emotional distress.

56.     Baronyk pressed Doe on meaningless details of the report she provided to Hogan.  For example, he implied that she was lying about the sexual assault because, before the assault, she wore Assailant's hat to keep warm and offered him a blanket when he said he was cold.  Baronyk also questioned her about Assailant's girlfriend, implying that Doe made up the assault because she was jealous of their relationship.

57.     When Doe again explained the details of the sexual assault, Baronyk asked why she didn't scream.  Doe explained that she was shocked, did not know what to do, and said she would

"feel embarrassed on a bus with 60 or 70 people." Baronyk responded, "Well how do you feel now?"

58. Doe continued to cry throughout the interview. Before it ended, she asked again if she was going to get in trouble. Hogan said, "I don't know" and that she was going to call Jane Roe, Doe's mother, "because I assume you'd be more comfortable with your mom knowing first than your dad." Hogan then sent Doe back to class.

59. At no point in the initial interview or any time afterward did any administrator of FCPS tell Doe that she did not do anything wrong, or that she should feel comfortable reporting incidents of sexual violence without fear of punishment or retaliation.

60. While the school attempted to notify Roe, Doe called her father, John Doe. The possibility of being punished for reporting the sexual assault was so traumatizing to Doe that, when she called her father to tell him what was happening, she said through tears, "I'm going to get suspended and this is going to ruin my life." Doe was crying so hard that she had difficulty explaining to her father what was happening, so John Doe left work for Oakton to figure out what was going on.

61. On March 13, 2017, John Doe met with Hogan. He told Hogan that Doe was inconsolable and incoherent when she called, and that she mentioned something about sexual touching and a suspension. Hogan told him that the school was going to do an investigation and that there may be disciplinary action that could include suspension. John Doe asked if his daughter could be suspended and Hogan said "yes."

62. Hogan told John Doe that the school needed to get its facts together and that the principal, John Banbury, would make any decisions regarding the outcome. When John Doe attempted to ask additional questions, Hogan kept repeating, "We need to investigate."

63.     Hogan did not explain that Doe had reported a sexual assault nor did she share any details of her interview with her.  She did not notify John Doe that his daughter had prepared a written statement or ask his permission to continue to interview Doe.  The school did not notify Doe's parents that their daughter had written and signed a statement about what happened on the band trip until several days later.

64.     John Doe left the meeting believing that Hogan's reference to an investigation and Principal Banbury's "decision" involved whether to punish Doe for sexual activity.  It was not until Jane Roe and John Doe were able to speak with Doe about what happened that they learned it was reports of their daughter's sexual assault on the band trip six days earlier that prompted her meeting with Hogan.

***FCPS's Continued Failure to Respond Adequately to Doe's Sexual Assault***

65.     FCPS's hostile treatment of Doe extended beyond the initial interview, where the administrators failed to properly investigate her sexual assault, failed to offer or provide academic support to Doe, and instead demeaned Doe.

66.     On March 16, 2017, Jane Roe and John Doe met with Hogan and Alyson Calvello to further discuss Doe's sexual assault and seek information about Doe's future at the school.  When Roe referred to the incident as a sexual assault, Hogan shut her down and refused to characterize the incident as a sexual assault.  When asked about the school's procedures for addressing and investigating sexual assault, Hogan said the school did not have procedures in place for that type of misconduct.  She said the school has a process for handling when students getting caught engaging in consensual sexual activity during school activities.

67.     Hogan reported to Roe and John Doe that the school security officer, Baronyk, listened to both students and concluded that this was a "he said, she said" case.  Hogan said that

the school had no legal obligations or liability here.  Hogan told them that "this is something that the school cannot be sued on" and that Baronyk, who is knowledgeable in this area, said that the school did everything it needed to do, so the school could not get in trouble.

68.     At the time of this meeting, only three days had passed since school officials first spoke with Doe to "investigate" her sexual assault.

69.     Jane Roe and John Doe found Hogan's comments disturbing because Hogan and the school seemed concerned only about the school's potential exposure to liability, not the safety of its students.

70.     When Roe asked Hogan if Assailant would be disciplined for what he did, Hogan said she could not answer that question, but that Assailant "needed to learn some manners."

71.     When Roe asked about discipline again in a later conversation, Hogan said "his mother will deal with him" and that he would be gone after the semester (because Assailant was then a senior).  Roe took this to mean it was the school's position that Doe would be forced to interact with Assailant, not because school officials believed he was not responsible for sexual assault, but because he would soon graduate.

72.     Hogan also told Jane Roe that the family did not have a right to know about any discipline imposed on the assailant.

73.     The school's investigation was done hastily and was shut down by the administration before all facts could be uncovered.  As a result, FCPS could not make a fully informed decision, including what potential corrective action to take and how to ensure Doe's safety.

74.     Upon information and belief, when the student that Doe listed as a key witness, Student D, approached Michelle Taylor on Friday, March 17, 2017, to tell her that she would like

to give a statement regarding the assault, Taylor turned her away and said the investigation was completed.

75.     FCPS never provided Doe or her parents with updates on the investigation into her report of sexual assault or the outcome of the investigation.  It was only after the passage of time with no obvious consequences for Assailant that Doe deduced Oakton had decided not to discipline him for the sexual assault.

76.     School officials also refused to provide Doe with the support she needed to avoid contact with Assailant and feel safe at school.

77.     For example, prior to the assault, Doe sat close to Assailant in band.  She found it unbearable to be so close to him after the sexual assault.  First, Jane Roe asked Hogan if Assailant would be removed from band.  Hogan said no and told Roe that her daughter's options were to quit band or leave the band room when Assailant was present.

78.     With no other option, Doe sat in a room adjacent to the classroom, alone and isolated, during practices.

79.     Pushed out of the one activity that Roe loved, she became increasingly sad and withdrawn.  Her parents recognized that the isolation was hurting her and pushed the band director, VanValkenburg, to rearrange the band seating arrangement so that Doe could be involved in band without sitting in close proximity to Assailant.

80.     It was only after their advocacy that Doe was integrated back into the band and was able to practice with the other students.  Even then, Doe felt humiliated and uncomfortable, knowing that students noticed her absence and feeling like she was only allowed back in the room because the band director was forced to do so.

81.     As a result of FCPS's failure to take any meaningful action to address her sexual assault, Doe struggled academically, physically, and emotionally for the remainder of the school year.  Band was once a place where Doe felt safe, comfortable, and welcomed.  After the assault and the school's unreasonable response, band became a reminder of the betrayal and depression she experienced when FCPS let her down.

82.     Doe's emotional distress was greatly exacerbated when VanValkenburg gave Assailant a significant award at the band's end-of-year celebration in June 2017.  The awards ceremony is a significant event; band members, their families, and school officials are invited to attend.  VanValkenburg knew about Doe's report of sexual assault and still gave Assailant an award reserved for the band member with exceptional skill and personal leadership.

83.     Doe was distraught and had to leave the room upon hearing the news.

84.     When the ceremony ended, Doe approached VanValkenburg to confront him about his decision to give Assailant the award.  Doe asked him how he could give Assailant an award after knowing what he did to her.  VanValkenburg told her that he was a good musician and that the award was not based on his character.  When Doe pressed him to explain his decision and referred to the other talented seniors to whom he could have bestowed the award, seniors who were not accused of sexual assault, VanValkenburg did not have an answer.  After stuttering for several minutes, he ultimately walked away from Doe.

85.     VanValkenburg continues to dismiss Doe and treat her adversely compared to before her reported assault.

86.     Doe spent the summer of 2017 focusing on her mental health and attempting to recover from the damage of the sexual assault and FCPS's response to her report of the assault.

While she made progress, her feelings of upset and betrayal flooded back when band started again in August, 2017.

87.     VanValkenburg's treatment of Doe is a constant reminder of her assault and FCPS's betrayal of her and its bad faith in responding to her assault.  For example, in the fall of 2017, Doe and another student auditioned for a solo.  It was obvious that Doe out-performed the other student, who made a noticeable error in the middle of his audition by playing the wrong notes.  Still, VanValkenburg gave the other student the solo.

88.     Upon information and belief, the student who was awarded the solo had not reported sexual assault or been involved in a complaint under Title IX.

89.     In another example, Doe asked VanValkenburg for permission to use a larger area to practice for sectionals because the section had outgrown the room.  He yelled at her and told her to make do with the room they had.  A few minutes later, another student made the same request and it was granted.

90.     Upon information and belief, the student who was granted the request had not reported sexual assault or been involved in a complaint under Title IX.

91.     FCPS's response to Doe's sexual assault was flawed at every stage of the process:

a.  FCPS did not inform Doe's parents before questioning her regarding her sexual assault;

b.  FCPS did not tell her that she could decline the demand to provide a written statement;

c.  FCPS did not offer Doe any meaningful help or support after learning of the sexual assault;

d. FCPS did not inform her of her rights under Title IX or her options to move forward, including the option to file a Title IX complaint with the school or have the school do an investigation to determine whether to hold her assailant responsible;

e. FCPS did not tell her she was entitled to accommodations to help her deal with the trauma and stay on track academically;

f. FCPS did not tell Jane Roe or John Doe that their daughter reported being sexually assaulted, even when the school called them to notify them of the incident;

g. FCPS did not notify Doe or her parents that it completed its investigation; and

h. FCPS did not share any definitive results from the investigation.

92. Instead of providing Plaintiff information about her rights under Title IX, FCPS intimidated her and actively discouraged her and her parents from pursuing any complaint.

93. FCPS did nothing but allow Doe to flounder in the days and weeks following her assault and put the onus on her parents to plead for support to help mitigate the damage being done to her education and emotional wellbeing.

94. FCPS's actions and inactions made Doe vulnerable to further sexual harassment by her assailant.

***FCPS's Systematic Non-Compliance with Title IX***

95. FCPS's response to Doe's sexual assault is consistent with its failure to address well-known and longstanding deficiencies in its policies, practices, and procedures for addressing sexual harassment and assault.

96. In September, 2012, a parent and her daughter filed a complaint with OCR asserting that FCPS violated the law by failing to promptly and appropriately respond to the student's concerns of ongoing sexual harassment by other students at school.

97.     To resolve the complaint, FCPS entered into a Resolution Agreement with OCR in 2014.  Under that Agreement, FCPS agreed to take prompt and robust action to comply with Title IX, including: 1) overhauling its sexual harassment policies and procedures; 2) notifying students and parents of their rights under the law; 3) maintaining full information on policies, procedures, and FCPS's Title IX coordinator in an accessible format and forum; and 4) implementing training and education programs.

98.     Nearly four years later, upon information and belief, FCPS has failed to fulfill its responsibilities under the 2014 agreement. For example, the sexual harassment policies FCPS agreed to create and distribute do not appear to exist, are not readily accessible online, and were not distributed to parents or students.

99.     Nor has FCPS properly trained its administrators and teachers how to handle complaints of sexual harassment or assault.

100.    When Doe's parents asked about the school's process for addressing sexual assaults, Hogan told them that the school had no process for handling complaints of sexual harassment or assault.

**COUNT ONE**
**Discrimination in Violation of Title IX**
**20 U.S.C. § 1681 et seq.**

101.    Plaintiff incorporates by reference all preceding paragraphs, as if set out here in full.

102.    Plaintiff Jane Doe experienced sexual assault at the hands of another student of FCPS.

103.    Doe and other students reported the sexual assault to FCPS administrators and employees.

104.   FCPS was obligated to address these reports because student-on-student sexual assault is a form of sex discrimination prohibited by Title IX.

105.   Doe's sexual assault was severe, pervasive, objectively offensive, and created a hostile educational environment for Doe based on her sex.

106.   FCPS had actual knowledge that Jane Doe experienced sexual assault based on multiple reports from students and a first-hand report by Jane Doe.

107.   The individuals with actual knowledge of Doe's sexual assault, including Michelle Taylor and Jennifer Hogan, had the authority and ability to investigate and take corrective action to address the sexual assault.

108.   FCPS was further obligated to address these reports under Title IX because FCPS had substantial control over the student who sexually assaulted Jane Doe, as well as the context in which the assault occurred—during a school band trip.

109.   By its acts and omissions, FCPS was deliberately indifferent to Doe's sexual assault and created a hostile educational environment for her.  FCPS's deliberate indifference included, without limitation:

    a.  Failing to timely address other students' reports of the assault on an overnight school trip;

    b.  Ignoring Doe's notable distress during a school trip when FCPS had notice of a sexual assault;

    c.  Forcing Doe to spend the five-day school trip in close proximity to her assailant;

    d.  Leaving the alleged assailant on the trip without any inquiry to determine his responsibility for the reported sexual assault or to secure Doe's safety and ensure she was not vulnerable to further assault by her assailant;

    e.   Conducting a sham investigation, turning away witnesses, and failing to notify Doe or her parents about the final outcome of the investigation;

    f.   Failing to take disciplinary action against Doe's assailant;

    g.   Threatening Doe with possible punishment for reporting sexual assault;

    h.   Failing to notify Doe or her parents of Doe's rights under Title IX;

    i.   Isolating Doe from her school activities instead of providing accommodations that would permit her to continue her education in a safe environment;

    j.   Berating her as she reported her assault, implying she was lying, and criticizing her for not screaming when the assault happened;

    k.   Intimidating her and her parents from further pursuing her legal rights; and

    l.   Failing to create, implement, distribute, and enforce sexual harassment policies and procedures in compliance with Title IX, despite being on notice of the need to do so for more than three years before Doe's sexual assault.

110.    FCPS's actions and inactions caused Doe to undergo harassment and make her liable or vulnerable to it.

111.    FCPS's deliberate indifference to Doe's sexual assault deprived her of access to educational opportunities and benefits provided by FCPS.

112.    As a direct and proximate result of FCPS's violation of Doe's rights under Title IX, Doe has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and expenses for past and future medical and psychological care.

## PRAYER FOR RELIEF

WHEREFORE, the premises considered, Plaintiff respectfully prays that this Honorable Court:

1. Enter judgment in favor of Plaintiff Jane Doe on her claim for discrimination under Title IX;

2. Enter judgment against Defendant Fairfax County School Board;

3. Declare Defendant Fairfax County School Board's conduct in violation of Title IX of the Education Amendments of 1972.

4. Award Plaintiff compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiff's expenses incurred as a consequence of the sexual assault and Fairfax County School Board's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by Fairfax County School Board; and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

5. Award injunctive relief to be determined at trial requiring Fairfax County School Board to comply with Title IX;

6. Award Plaintiff pre-judgment and post-judgment interest;

7. Award Plaintiff her court costs and expenses, including attorneys' fees, pursuant to 42 U.S.C. § 1988(b); and

8. Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Jane Doe demands a trial by jury on all issues contained herein.

Date: July 26, 2018                         Respectfully submitted,

                                            ATES LAW FIRM, P.C.

                                             /s/ John R. Ates
                                            John R. Ates (VSB #71697)
                                            1800 Diagonal Road,  Suite 600
                                            Alexandria, Virginia 22314
                                            703-647-7501 (tel)
                                            703-229-6430 (fax)
                                            j.ates@ateslaw.com

                                            PUBLIC JUSTICE, P.C.

                                             /s/ Adele P. Kimmel
                                            Adele P. Kimmel (admitted *pro hac vice*)
                                            1620 L Street NW, Suite 630
                                            Washington, DC 20036
                                            (202) 797-8600 (tel)
                                            (202) 232-7203 (fax)
                                            akimmel@publicjustice.net

                                            CORREIA & PUTH, PLLC

                                             /s/ Linda M. Correia
                                            Linda M. Correia (admitted *pro hac vice*)
                                            Lauren A. Khouri (admitted *pro hac vice*)
                                            1400 16th Street NW, Suite 450
                                            Washington, D.C. 20036
                                            (202) 602-6500 (tel)
                                            (202) 602-6501 (fax)
                                            lcorreia@correiaputh.com
                                            lkhouri@correiaputh.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2018, I filed the foregoing using the CM/ECF system, which will send electronic notice of this filing to Defendant's counsel of record:

Sona Rewari
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Email: srewari@HuntonAK.com
*Counsel for Defendant*

/s/ *John R. Ates*
John R. Ates (VSB #71697)
Ates Law Firm, P.C.
1800 Diagonal Road
Suite 600
Alexandria, Virginia 22314
703-647-7501 Telephone
703-229-6430 Fax
j.ates@ateslaw.com