**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 1:18-cv-614 (LOG/MSN) |
| | ) |
| FAIRFAX COUNTY SCHOOL BOARD, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...........................................................................................1

II.     STATEMENT OF UNDISPUTED FACTS ...............................................2

        A.      The Practices and Procedures for Oakton Band Field Trips....................3

        B.      Doe and Smith Decide to Sit Together on the Bus ..................................4

        C.      Doe Tells Multiple Students About the Bus Incident ..............................6

        D.      Oakton Personnel Receive Reports of the Bus Incident From Third-Parties
                Who Heard About It..................................................................................9

        E.      Hogan Initiates an Interview with Doe ..................................................14

        F.      Hogan and Baranyk Interview Smith......................................................16

        G.      Hogan and Baranyk Meet With Doe Together .......................................17

        H.      Hogan Looks for Potential Eyewitnesses ...............................................18

        I.      Oakton Administration Concludes Its Investigation and Decides
                Not to Discipline Doe or Smith ..............................................................20

        J.      Doe Is Offered Academic and Non-Academic Supports and Counseling...........21

        K.      Doe's Participation in Band after the Indianapolis Trip ........................23

        L.      Doe and Her Parents Decline Counseling Services Through Oakton...................24

III.    ARGUMENT ...............................................................................................26

        A.      A School System Is Only Liable for Student-on-Student Harassment If It
                Was Deliberately Indifferent to Known Acts of Sexual Harassment. ..................26

        B.      The School Board's Response to the March 8, 2017 Sexual Encounter Was
                Not Clearly Unreasonable in Light of the Known Circumstances. ......................28

                1.      The School Board's Investigation Was Not Clearly Unreasonable As a
                        Matter of Law. ............................................................................28

                2.      Doe Was Not Barred from Access to Educational Benefits or
                        Opportunities..............................................................................29

IV.     CONCLUSION............................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown,*
520 U.S. 397 (1997)..........................................................................................27

*Stiles ex rel. D.S. v. Grainger Cty., Tenn.,*
819 F.3d 834 (6th Cir. 2016) ..........................................................................27

*Davis v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999)................................................................................ *passim*

*Doe v. Bd. of Educ. of Prince George's Cty.,*
605 F. App'x 159 (4th Cir. 2015) ...............................................................27, 28

*Fitzgerald v. Barnstable Sch. Comm.,*
504 F.3d 165 (1st Cir. 2007), *rev'd on other grounds,* 555 U.S. 246 (2009) .........................29

*Gebser v. Lago Vista Indep. Sch. Dist.,*
524 U.S. 274 (1998)..........................................................................................26

*I.F. v. Lewisville Indep. Sch. Dist.,*
915 F.3d 360 (5th Cir. 2019) ......................................................................27, 28

*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.,*
511 F.3d 1114 (10th Cir. 2008) ......................................................................29

*M.D. v. Bowling Green Indep. Sch. Dist.,*
709 F. App'x 775 (6th Cir. 2017) ...................................................................28

*Maher v. Iowa State Univ.,*
915 F.3d 1210 (8th Cir. 2019) .......................................................................28

*Roe v. St. Louis Univ.,*
746 F.3d 874 (8th Cir. 2014) ..........................................................................28

*Ross v. Univ. of Tulsa,*
859 F.3d 1280 (10th Cir. 2017) .....................................................................28

*S.B. v. Bd. of Educ. of Harford Cty.,*
819 F.3d 69 (4th Cir. 2016) ......................................................................26, 27

**Statutes**

20 U.S.C. § 1681(a) .........................................................................................26

Va. Code § 22.1-279.6 ...............................................................................................3

# I. <u>INTRODUCTION</u>

A school system may be liable for damages under Title IX for improperly handling instances of student-on-student sexual harassment only if it is "deliberately indifferent to known acts of harassment." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). The school system is not responsible for the misconduct of its students, but rather, "its *own* decision to remain idle in the face of known student-on-student harassment in its schools." *Id.* at 633. To be deliberately different, its response or lack of response must be "clearly unreasonable in light of the known circumstances." *Id.* at 642.

Plaintiff Jane Doe graduated from high school in 2018. She claims that, when she was a high school junior, the Fairfax County School Board was deliberately indifferent in its investigation and handling of a sexual encounter that occurred between her and a high school senior, Jack Smith, while the two were sitting together under a blanket on a bus ride during an overnight band trip.

Because there is no evidence that the school system remained idle or acted in a clearly unreasonable manner, summary judgment is appropriate. First, school officials acted thoughtfully and promptly in their investigation of the sexual encounter, which Doe asked her friends not to report. School officials' interviews and credibility assessments of Doe and Smith established that the sexual activity had occurred, but did not establish that the activity was nonconsensual. Smith described a clearly consensual encounter; Doe's account matched Smith's in many key respects, though she said she did not think it was consensual. Both agreed that the majority of the fifteen to twenty minutes involved her hand rubbing his genitals. No one else saw what happened under the blanket. Under the circumstances, it was not clearly unreasonable for school officials to conclude that they could not determine that the encounter was nonconsensual.

Second, school officials acted responsibly and reasonably in their treatment of Doe when she returned to school after the trip. They offered extensive academic support and counseling, although she and her parents declined the counseling. The school also rearranged the seating in the advanced band class that Doe and Smith shared. Doe had no further contact with Smith through his graduation in 2017. She continued to excel at school, graduating in 2018 with a GPA of 4.184, and obtaining early admission to her first-choice college.

In situations involving charges of student-on-student harassment, a public school system owes obligations not only to the accuser but also to the accused. The School Board made a considerable effort to balance Doe's and Smith's rights and to act in a manner that was fair to both students. Doe no doubt feels strongly that the school system should have tipped the scales in her favor, but Title IX does not demand such partiality. *See Davis*, 526 U.S. at 649 (noting that "it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims").

Because the undisputed facts show that the school system did not act in a clearly unreasonable manner, Doe cannot prevail on her "deliberate indifference" claim. So summary judgment should be granted and the case dismissed.

## II. STATEMENT OF UNDISPUTED FACTS[1]

1. Doe graduated from Oakton High School (Oakton), which is part of the Fairfax County Public Schools (FCPS) on June 8, 2018. Smith graduated from Oakton on June 15, 2017. Ex. 2, Jt. Stip. of Uncontested Facts ¶¶ 1, 3, 6.

2. During the 2016-17 school year, Doe and Smith were members of Oakton's Symphonic band. Oakton's band program has three levels, with Symphonic being the top band.

---

[1] For the Court's ease of reference, the chart at Exhibit 1 provides a "who's who" of all the individuals referenced in this Statement of Undisputed Facts.

*Id.* ¶¶ 2, 6; Ex.3, Dep. of J. VanValkenburg, at 30:19-31:4.

## A.    The Practices and Procedures for Oakton Band Field Trips

3. Oakton's bands typically take a number of field trips each year. Some include overnight stays. *Id.* at 36:9-37:15.

4. VanValkenburg meets with students and parents before each overnight trip, during which meeting he usually references FCPS' code of student conduct—the Student Rights & Responsibilities (SR&R). He also requires parents and students to sign a form which includes a web-link to the SR&R. *Id.* at 41:20-42:8; Ex. 4, Dep. of John Doe, at 125:4-127:7.

5. The SR&R is contained in FCPS Regulation 2601, which is updated annually and disseminated to parents and students at the start of each school year in a "family guide" booklet. At the start of each school year, students are given a shortened "quick guide" to the SR&R; direct instruction on the SR&R which includes a video on the SR&R and a separate voiced-over PowerPoint video on sexual harassment and bullying; and for high school students, a quiz. Students are given another review session at the start of the second semester, which includes viewing the same voiced-over PowerPoint on sexual harassment. Ex. 5, Dep. of M. Panarelli, at 12:2-13:8; Ex. 6.[2]

6. FCPS field trip guidelines recommend one chaperone per ten students, but the Oakton band usually takes more chaperones on its trips. The chaperones are generally parents. Ex. 3, at 56:11-57:1, 97:22-98:8; Ex. 7, Dep. of M. Taylor, at 110:12-22.

7. During the summer of 2016, the Symphonic band (the "band") was invited to participate in the Music for All National Festival, a prestigious national festival to be held in Indianapolis, Indiana, in March 2017. Ex. 3, at 75:5-13, 76:1-13.

---

[2] The Code of Virginia requires school boards to adopt a code of student conduct, and to disseminate the code to students, their parents, and school personnel. Va. Code § 22.1-279.6.

8. During the 2016-17 school year, assistant principal Michelle Taylor was the Oakton administrator responsible for the band program. FCPS did not require that an administrator go on overnight trips, but VanValkenburg would sometimes ask Taylor to go on band trips because she had previously been an assistant band director. Ex. 7, at 34:20-35:9, 36:19-37:8, 110:12-111:4, 112:14-113:2.

9. VanValkenburg invited Taylor to go to the Indianapolis festival and to participate in the band's performance as a guest conductor. Taylor traveled by airplane to Indianapolis and stayed in a different hotel from the band during the festival. *Id.* at 44:4-5, 120:18-121:7.

10. Doe and her father attended the parent and student meeting before the Indianapolis trip. Students and parents were given a 29-page slide presentation that discussed the trip rules and regulations, logistics, and the itinerary; it also identified the six parent-chaperones. Ex. 8, Dep. of Jane Doe, at 216:5-19; Ex. 3, at 99:18-100:6; Ex. 9.

11. The group departed Oakton during the afternoon on March 8, 2017, with the plan to spend the night at a hotel in Columbus, Ohio, and to complete the travel to Indianapolis the next day, March 9. Ex. 8, at 213:22-214:6, 219:11-17; Ex. 3, at 95:20-97:1; Ex. 10.

**B.    Doe and Smith Decide to Sit Together on the Bus**

12. When the trip began on March 8, Doe and Smith were "friends."  Doe described him as someone whom she has known "pretty much my entire life" and in whom she had been romantically interested a couple of years earlier. Ex. 8, at 180:16-22, 185:5-8.

13. A few months before the Indianapolis trip, Doe had asked Smith to help her with her A.P. Physics class, and Smith did. Earlier in the same academic year, Smith escorted Doe to Oakton's Homecoming. Smith did nothing inappropriate towards Doe on those occasions. Ex. 8, at 181:21-183:1; 183:14-184:1, 185:1-4.

14.   At the start of the bus trip, Doe chose a seat in the back, next to her friend K.D., and across the aisle from Smith and another male student, C.C. Before getting off the bus for dinner in Ohio, Smith asked Doe if he could sit next to her on the bus after dinner, and she said that would be "fine." Doe and Smith chose to get their dinners at the same place, and they sat together during dinner.  Ex. 8, at 219:18-220:8, 221:5-222:7, 222:13-22, 224:5-225:4.

15.   When they got back on the bus, Doe returned to the same seat where she had been sitting—a window seat on the left side, two rows from the back of the bus—and Smith took the seat next to her, as they had discussed. Doe took Smith's beanie hat and wore it on her head. Smith asked Doe for her blanket, and she took out her blanket and gave it to him. He placed the blanket over both of them, covering them both from the tops of their shoulders to past their knees. *Id.* at 225:1-226:1, 230:13-231:1, 231:10-233:5.

16.   Doe's and Smith's seats were separated by a moveable armrest, which was in the up position when she returned to her seat after dinner. At no point during the remainder of the trip did Doe try to put down that armrest. *Id.* at 227:2-11.

17.   It was very quiet on the bus. As far as Doe could tell, everyone was asleep, including K.D., who was seated directly across the aisle from Smith, and C.C., who was seated next to K.D. in the window seat. *Id.* at 226:5-11, 235:7-21.

18.   While seated next to Smith, Doe put her head on his shoulder, and "maybe like two minutes" later, Smith put his hand on Doe's leg. *Id.* at 234:2-235:3.

19.   Doe and Smith had sexual contact for at least fifteen minutes. That contact included Doe's hand rubbing Smith's penis for at least ten minutes. *Id.* at 243:11-12, 14, 253:14-21.

20.   Doe and Smith dispute what the sexual contact entailed, and who did what to whom. Doe says that Smith forced her to rub his penis, by placing his right hand over hers and moving

her hand onto his genitals, and then when she stopped rubbing his penis, taking her hand again and putting it back on to his penis. She also claims that Smith, without her consent, simultaneously placed his left hand under her t-shirt and touched her breasts, and also inserted his hand in her pants and digitally penetrated her vagina. Smith denies that he forced Doe to do anything, and also denies that he touched her breasts or genitals. Ex. 8, at 247:13-21, 251:18-252:5; Ex. 11, Dep. of J. Smith, at 78:6-8, 92:1-10.

21.  While the sexual contact was occurring, neither Doe nor Smith said anything to the other. Doe did not try to stand up at any time during the sexual activity. Doe also did not try to remove the blanket. The blanket remained in place, over their shoulders and knees, while the sexual contact was occurring. Ex. 8, at 232:19-233:1, 237:5-6, 254:6-13.

22.  As far as Doe could tell, no one sitting around her woke up while the sexual contact was occurring. *Id.* at 253:22-254:1, 4-5.

23.  Smith ejaculated. He got up and went to the bathroom for about five minutes, while Doe remained in her seat. He returned to the seat, and they continued to sit together for the remainder of the ride to the hotel, which lasted thirty more minutes. Ex. 11, at 119:1-8; Ex. 8, at 245:21-246:6, 259:8-18.

## C.      Doe Tells Multiple Students About the Bus Incident

24.  Doe did not tell either of her parents about what had happened with Smith, though she communicated with each of them on more than one occasion over the course of the five-day trip. *Id.* at 280:8-281:15.

25.  Doe spoke to multiple students about the incident while on the band trip, asking each of them not to tell anyone else, including her parents or VanValkenburg. *Id.* at 278:19-279:8.

26.  Doe told a male schoolmate, A.K., who was not on the band trip, what happened with Smith and that it was not consensual. She did not ask A.K. to do anything, and she told

A.K. not to tell anyone. *Id.* at 261:12-18, 262:1-4, 263:9-15, 279:9-14.

27. Doe told K.D. about what had happened with Smith on Thursday, March 9, and K.D. expressed surprise because Smith had a girlfriend. Doe had not known about Smith's girlfriend, and after learning about her from K.D., Doe thought that Smith had "cheated on" his girlfriend with her. *Id.* at 263:16-20, 272:12-273:10.

28. Doe told another student, V.S., later that afternoon, and also told her about Smith's girlfriend. *Id.* at 263:21-264:4, 274:7-9.

29. On Thursday night, as the band was traveling within Indianapolis on the bus, Doe asked C.C. to switch seats with her so she could sit next to Smith. The students were not assigned seats, and Doe, K.D., Smith, and C.C. were all sitting in the same seats in which they had sat during the first leg of the trip the day before. Once seated next to Smith, Doe told him that "he needed to tell his girlfriend that he had cheated on her." Smith "groaned about it," but "he eventually agreed to." The conversation lasted about two minutes. Later that night, Doe got a text from Smith that he had told his girlfriend. *Id.* at 276:11-277:4.

30. Doe told two more students, B.M., and E.J., on Thursday and Friday, March 10, respectively. Four other students also heard about what happened between Doe and Smith from the friends whom Doe herself had told directly, and all of them came to talk to Doe about it during the trip. *Id.* at 264:1-22, 266:4-267:9, 274:10-12.

31. Doe is not aware of any person who heard about it from Smith. *Id.* at 271:15-17.

32. While at a shopping mall in Indianapolis, on Friday, March 10, Doe and B.M. saw Smith holding hands with his girlfriend. The girlfriend was a student at another school, and she was attending the festival with her school's band. Doe discussed with her friends that Smith "clearly" had not told his girlfriend, even though he had told Doe that he was going to tell his

girlfriend "that he had cheated on her." *Id.* at 273:11-15, 275:15-276:2.

33. The same evening, Doe sent text messages to A.K. about seeing Smith and his girlfriend holding hands at the mall, expressing her disbelief that he had, in fact, told his girlfriend. Ex. 8, at 320:8-20.

34. The next morning, Doe saw Smith's girlfriend in the hotel during breakfast. Doe did not know her, but she approached the girl and told her that "Smith had cheated on her and that he wasn't a good person." Ex. 8, at 321:7-20.

35. Doe attended every event on the band's detailed itinerary for the Indianapolis trip, except the student social on Thursday night. VanValkenburg did not permit the students to attend the social. Ex. 8, at 282:17-293:11; *see* Ex. 10.

36. Doe was aware that a chaperone is usually assigned to transport and hand out medications to students who need them during a trip. During the Indianapolis trip, Doe went to a chaperone to get her prescription medication, but she did not seek any medical attention from that chaperone. Ex. 8, at 154:16-156:11; Ex. 4, at 119:8-121:8.

37. Doe appears smiling in photographs taken before the band's festival performance on Friday morning, during dinner on Friday evening, and during and after a banquet on Saturday night. Ex. 8, at 294:13-300:7.

38. The band left Indianapolis around 8 a.m. on Sunday, March 12, and returned to Oakton around 6 p.m. that evening. On the ride back, Doe again chose to sit in the same seat in which she had sat on March 8—two rows from the back, next to K.D., and directly across the aisle from Smith and C.C. Ex. 8, at 293:9-294:9.

39. Doe's father picked her up from Oakton that Sunday. He also took her to school the next morning, Monday, March 13, 2017, on time, and he did not notice anything unusual about

Doe that morning. Ex. 4, at 168:20-170:9.

**D.** **Oakton Personnel Receive Reports of the Bus Incident From Third-Parties Who Heard About It**

40. By Monday morning, Oakton personnel were aware that something sexual had occurred between Doe and Smith on the bus. At 9:56 p.m., on Thursday, March 9, VanValkenburg sent a text to Taylor informing her that V.S. had just him that there had been some "funny business" between Doe and Smith on the bus, that Smith had "put himself on" Doe, and that Doe "was not into it." He said that Doe had asked V.S. not to tell anyone because she was embarrassed. Ex. 3, at 107:1-19; Ex. 7, at 125:8-126:2, 127:2-8.

41. Because any kind of sexual behavior during school or school-sponsored trips is regarded as inappropriate conduct under the SR&R, VanValkenburg believed he had to report this information to his administrator, Taylor. Ex. 3, at 109:19-110:20.

42. Taylor could not reach VanValkenburg that night, so she spoke to him the next morning, as they were preparing to go warm up for the band's performance. She told him that she would speak to V.S. herself that afternoon. Taylor paid particular attention to Doe and V.S. that morning, "checking in visually" to see if anything seemed different or not normal. She observed Doe in multiple locations through the course of that morning and afternoon. Ex. 7, at 13:20-17:2, 17:20-18:3, 19:5-20:6, 21:3-10, 22:16-23:10, 25:6-26:4, 13-18.

43. While Taylor was in the concert hall that afternoon, Taylor missed a call from Oakton's Safety & Security Specialist, Wally Baranyk. Ex. 7, at 150:20-151:8.

44. A short while earlier, Doe's friend, A.K., had told his math teacher, Laura Kelly, at Oakton that "one of his friends had gone on the band trip and that [the friend] had told him that another student, while on the band trip, had forced her to do hand stuff." He did not provide any names. He indicated that he was not sure that his friend wanted to report this yet and that he

wanted to respect her privacy. He asked Kelly's advice on what to do. Kelly told him, among other things, that Kelly herself would need to report it to the school. Ex. 12, Dep. of L. Kelly, at 45:22-46:14, 52:8-53:6, 53:22-54:5, 55:2-56:4.

45. Kelly did not perceive A.K. as being concerned for Doe's safety. *Id.* at 88:8-10.

46. After speaking to A.K., Kelly went directly to Baranyk and relayed what A.K. had told her. Baranyk indicated that he would speak to A.K. Kelly learned from A.K. later that day that he had been called down to the security office immediately after Kelly had spoken to Baranyk. Ex. 12, at 60:19-62:1, 68:7-69:8.

47. After missing Baranyk's call, Taylor texted one of the Safety & Security Assistants, Kathleen Sefchick, and the Fairfax County Police officer stationed in Oakton as the School Resource Officer (SRO), Darryl Estess. She asked why Baranyk was trying to reach her. Sefchick and Estess informed her that there had been a report of a "sex act on one of your buses" but "no names yet." Ex. 7, at 155:1-8.

48. Officer Estess believed the matter would not be within his jurisdiction as a Fairfax County Police officer because it had not occurred in Fairfax County. Ex. 13, Dep. of D. Estess, at 27:19-29:4.

49. On Friday afternoon, when the band returned from the concert hall in Indianapolis and was going to get changed to go to dinner, Taylor approached V.S. and arranged to speak privately with V.S. at the shopping mall where the group was going after dinner. Ex. 7, at 18:8-19:4, 127:17-128:18; *see* Ex. 10, at FCSB-DOE-013210.

50. After dinner that night, Taylor spoke with V.S. in a secluded part of the food court at the mall, and V.S. told her about sexual activity involving Smith and Doe on the bus. Ex. 7, at 127:17-128:3, 128:19-129:5, 129:18-130:20, 131:10-15.

51. Taylor's account of their conversation differs from V.S.'s. Both agree, however, that Taylor told V.S. that she would look into it, and V.S. did not ask Taylor to do anything. *Id.*; Ex. 7, at 131:2-9, 138:10-11; Ex. 14.

52. That Friday night, Taylor phoned the principal of Oakton High School, John Banbury, who was her direct supervisor. She relayed to him that (a) two students had sat together on the bus; (b) the male student had asked the female student for a blanket, (c) the female student had gotten her blanket; (d) they covered themselves up with the blanket; and (e) the female student had stroked the male student's penis. Ex. 7, at 113:15-22, 139:22-140:12; Ex. 15, Dep. of J. Banbury, at 103:5-104:16.

53. Banbury understood that the incident had not been disclosed to Taylor by either of the two students involved, but rather, by a friend of the female student who had indicated to Taylor "that these two students had hooked up and then went on about the boy having a girlfriend and that's what [the friend] seemed most upset about." Ex. 15, at 104:19-106:7.

54. Taylor and Banbury discussed whether to talk to Doe during the trip about what had happened, or wait until the students were back at the school. Banbury told Taylor to monitor Doe and that unless Doe appeared to be withdrawing, or any new information came to light, they would look into it after the group returned to Oakton. Ex. 7, at 140:20-141:12; Ex. 15, at 131:13-18, 132:7-11.

55. Banbury did not ask or want Taylor to approach Doe about the encounter while they were still on the trip. His rationale was: Doe had not been the one who brought it to their attention; V.S. "had not said anything along the lines of, my friend asked me to report or you need to talk to my friend;" he did not know anything about Doe, her parents, or the relationship between them; Taylor did not have with her in Indianapolis any of the "support pieces" that were

available at the school, including counselors, a social worker, and a psychologist, and in their absence, he did not want to put Doe in the position of having to talk about sexual activity that Doe had not brought forward herself. *Id.* at 106:8-107:14, 110:9-11, 111:7-15, 126:22-127:5, 127:9-128:3, 129:20-130:9, 131:13-21.

56. Banbury was aware that FCPS has had a number of student suicides over the years, and he had heard news stories about people committing suicide after being "outed on something sexual." Also, when Banbury was 20 years old, his close family friend had committed suicide after she had gotten in trouble at school and been sent home. In thinking through situations with students, Banbury's practice had been to make sure that he had in place whatever supports he could to ensure that something similar did not happen with one of his students. *Id.* at 127:9-129:10, 234:13-236:6.

57. Taylor had received training on the signs that could indicate that a student is "going through something," which included "withdrawing from activities, being unable to participate in activities, being isolated, crying, being upset." Ex. 16, Dep. of R. 30(b)(6) Designee M. Taylor, at 39:10-12, 39:17-40:2.

58. Taylor did not observe Doe exhibiting any of those signs during the trip. Nor did she receive any reports of "any behavioral changes or concerns" about Doe from VanValkenburg or any of the chaperones who were supervising the band students during a "very full schedule" that afforded the students very little unsupervised time. *Id.* at 36:13-21, 37:7-12, 37:16-38:1.

59. Because of what V.S. had said to him, VanValkenburg paid more attention to Doe and Smith than he would have otherwise during the trip. Ex. 3, at 124:4-16.

60. On Sunday night, after the students had returned to Oakton, VanValkenburg sent Taylor a text message, stating that the lead parent-chaperone, E.J.'s mother, had texted him that

they had an "urgent" situation, which the chaperone compared to an incident a couple of years earlier in which a male student had been accused of nonconsensual sexual activity; VanValkenburg understood the message to mean that E.J. had told her mother about Doe and Smith. Ex. 3, at 140:7-141:3.

61. Taylor was still in Indianapolis. She sent an email on Sunday night to Banbury and two other Oakton assistant principals asking that one of the assistant principals speak to Doe on Monday morning. Ex. 7, at 159:13-19, 165:4-9; Ex. 17.

62. The two assistant principals included the one to whom Doe was assigned for discipline matters, and Jennifer Hogan. Taylor sent the email to Hogan because of Hogan's background in counseling. Ex. 7, at 167:3-168:8.

63. Hogan's counseling background included: a Master of Education degree in Guidance and Counseling, nine years as a high school counselor, and one year as the director of student services at a middle school where she had overseen all the school counselors. Ex. 18, Dep. of J. Hogan, at 10:19-11:11,13:18-14:6, 22:13-23:2.

64. As an administrator, Hogan was also trained annually on how to investigate issues of student misconduct and allegations of harassment and bullying. Banbury, Taylor, and Hogan all felt that Hogan would be the best person to talk to Doe about what had happened on the bus. *Id.* at 26:20-27:16, 27:21-29:10, 33:17-35:12, 49:1-50:15, 87:8-21, 88:4-10; Ex. 7, at 167:3-168:8; Ex. 15, at 123:10-124:11.

65. Hogan had not had any prior interactions with either Doe or Smith. Neither student had a prior disciplinary record. Ex. 18, at 81:10-82:1, 241:7-9; Ex. 4, at 40:11-14.

66. Taylor and Hogan spoke by phone on Sunday night. Hogan understood from her discussion with Taylor that there was some question as to whether Doe had been a willing

participant in the sexual activity on the bus. Her plan was to talk to Doe to find out what had happened. Ex. 7, at 166:12-167:2; Ex. 18, at 84:20-85:7, 91:3-92:1.

67.  On Monday morning, Hogan spoke to Banbury, and recommended that she have a female counselor, Alyson Calvello, sit in during the interview with Doe. Hogan thought that Doe would feel more comfortable talking in front of a counselor of the same gender, instead of another administrator or the male counselor to whom Doe was assigned. *Id.* at 92:2-93:15.

68.  Calvello, too, had not had any prior interactions with Doe. As a counselor, Calvello's duties included meeting with students for academic issues, and being available to talk to students about any social or emotional issues. She would also work with the school's social worker and psychologist on student issues. But she did not issue discipline to students. Ex. 19, Dep. of A. Calvello, at 24:22-25:8, 35:19-36:19, 41:7-42:8, 43:2-12, 64:14-18.

**E.    Hogan Initiates an Interview with Doe**

69.  Around 11:30 a.m. on Monday, March 13, Calvello brought Doe from band class to Hogan's office. Hogan interviewed Doe with Calvello in the room. Calvello did not ask any questions or say anything during the interview. Ex. 8, at 300:12-20, 304:2-5.

70.  Hogan took notes during the interview, but Calvello did not. Calvello's role was to serve as a support for Doe in case she got emotional, started crying, or felt uncomfortable. Ex. 19, at 84:13-85:7, 85:12-86:1, 108:17-22.

71.  Hogan asked Doe about what happened on the bus. In relaying what had occurred, Doe described herself as having been "stuck in a situation that she wasn't sure how to get out of."  She also spoke about Smith having a girlfriend. Near the end of that meeting, Doe asked Hogan whether she was going to be in trouble. She understood from Hogan's response that any discipline would be decided by the principal, Banbury. Ex. 8, at 301:7-14, 302:3-7, 304:12-15.

72.  Hogan provided Doe a form on which Doe wrote a statement that she understood

Banbury and Hogan would review in deciding whether Doe would be disciplined. The form had pre-printed at the top: "I understand that I have the choice of providing or not providing a statement about what happened. I am choosing to provide a written statement." Ex. 8, at 304:16-18, 305:15-21, 309:6-12; Ex. 20.

73. FCPS does not require its students to provide a written statement to receive academic accommodations, counseling services, or emotional supports at school. Student statements are used only as part of student disciplinary procedures. Ex. 15, at 232:3-233:9, 233:15-22.

74. Student statements are discussed in the SR&R. Under "Disciplinary Procedures and Sanctions," the SR&R explains that "[i]n disciplinary cases, all students have the right to due process and to fair procedures in determining facts and imposing sanctions," that "[a] student, including a witness, may be asked to write his or her version of what happened so each can record the information in his or her own words," that "the student will be informed that the written statement is voluntary," and "[i]n the event that a school administrator has reason to believe that the student has committed an offense that would result in a referral to the Division Superintendent, the school administrator shall make reasonable efforts to notify the student's parents as soon as practicable and before asking the student to write or sign a statement about the offense," with some limited exceptions. Ex. 16, at FCSB-DOE-014965.

75. Under the SR&R, principals are authorized to issue school-based consequences, and to suspend a student for up to ten days, after notice and an opportunity to be heard, with a right to appeal the suspension to the Division Superintendent. More serious discipline such as long-term suspension, reassignment to another school, or a recommendation for expulsion to the School Board, requires a referral from the principal to the Division Superintendent, whose Hearings Office conducts student disciplinary hearings. *Id.* at FCSB-DOE-014965-72.

76. Student statements are sent to the Superintendent's Hearings Office as part of due process for the disciplined student, but the student witnesses' names are redacted from the statements. Student-witnesses also do not appear to testify at the disciplinary hearing of the student facing discipline. Ex. 15, at 233:15-234:12.

77. After meeting with Doe, Hogan left the room. Cavello stayed with Doe, and they talked about "general" things. Ex. 8, at 135:17-136:6, 310:1-8; Ex. 19, at 87:12-88:6.

**F.    Hogan and Baranyk Interview Smith**

78. After Hogan's interview with Doe, Hogan and Baranyk interviewed Smith together. Ex. 18, at 120:3-21.

79. Baranyk had previously worked for 27 years in the Fairfax County Police Department, where he had risen in the ranks from a patrol officer to deputy chief. He had been the head of security at Oakton since 2003. Ex. 21, Dep. of W. Baranyk, at 12:10-12, 12:17-13:5.

80. Smith admitted to Hogan and Baranyk that he and Doe had sexual contact on the bus. He said Doe had initiated it, but he participated in it, for about ten minutes. He said that Doe had gotten the blanket, that her head was on his shoulder while the sexual activity was occurring, that she was wearing his hat, that there was nothing forceful, and she had made "no effort to go away" or indicate that she did not want to do it. Ex. 18, at 125:21-127:14, 130:8-131:11.

81. Baranyk asked Smith if he had ejaculated, and he said yes. Smith said after that, he went to the bathroom and came back and sat down next to Doe. She put her head back on his shoulder, and he went to sleep. *Id.* at 127:22-128:3, 132:18-133:18.

82. Hogan found Smith "truthful" and "honest." The information he provided made it seem "credible" that, as an 18-year-old boy, he would have perceived Doe as a willing participant in the sexual activity. To Hogan, Smith seemed "dumbfounded" and "stunned" by the suggestion that Doe may not have consented. *Id.* at 128:4-129:6, 130:18-131:11.

83.  Smith was asked to provide a written statement, and he did. Ex. 18, at 153:9-12.

**G.      Hogan and Baranyk Meet With Doe Together**

84.  Hogan and Baranyk went back to Hogan's office and spoke to Doe together, with Calvello still present. Hogan introduced Baranyk to Doe. Baranyk asked Doe if she intended to file charges against Smith, and Doe responded no. Ex. 8, at 310:12-311:10.

85.  Baranyk told Doe that if she changed her mind, the school had an SRO who could talk to her and support her, but that any charges would have to be filed in the jurisdiction where the event had occurred, not in Virginia. Ex. 18, at 161:22-162:10.

86.  Hogan and Baranyk had learned from Estess earlier that day that if Doe chose to press charges, it would have to be in the state where the incident had occurred and the Fairfax County Police would not be investigating the incident. Ex. 18, at 205:22-207:11.

87.  Baranyk asked Doe further questions about what had happened on the bus with Smith. He asked Doe if she had stroked Smith's penis, and she said yes. He asked for how long, and she said for fifteen to twenty minutes. He asked whether Smith had touched Doe, and she said he had. Ex. 8, at 311:18-315:6; Ex. 18, at 164:14-166:8, 168:5-170:4, 171:3-172:9.

88.  He confirmed with Doe some details that Smith had given in his interview: that she was wearing Smith's hat, that she had put her head on Smith's shoulder, that he had left the seat to go to the bathroom, and that she had not said anything to anyone on the bus or tried to move her seat while he was gone. Ex. 18, at 125:21-127:14, 128:4-15, 130:8-131:11, 132:18-133:4.

89.  Doe stated that both she and Smith had been wrong—Smith was wrong for touching her when he had a girlfriend, and she was wrong for allowing it to happen and not stopping him. Ex. 18, at 171:3-10; *see* Ex. 22.

90.  Baranyk asked whether the sexual contact was consensual, and Doe responded that she did not think so. Ex. 18, at 171:15-172:9.

91. The meeting lasted no more than ten or fifteen minutes, and Doe went to class. Ex. 18, at 172:10-13.

92. Hogan took notes during both meetings with Doe, and during the meeting with Smith. Ex. 18, at 96:18-20, 107:4-9, 109:6-120:2, 138:5-144:13; *see* Ex. 22 and Ex. 23.[3]

**H.  Hogan Looks for Potential Eyewitnesses**

93. Doe and Smith were each asked in their interviews if there were any people who could have seen what occurred on the bus. Ex. 18, at 131:22-132:8, 177:12-18.

94. Doe identified K.D. and C.C. as sitting near them on the bus. She did not say that either K.D. or C.C. had seen anything. She told Hogan to talk to B.M. because Doe had told B.M. about what had happened. Ex. 8, at 220:2-8, 224:17-22, 313:8-314:12.

95. Smith, too, identified K.D. and C.C. as having been seated near him and Doe. Ex. 18, at 132:3-8.

96. Hogan tried to call K.D. down for an interview on Monday, March 13, but K.D. was absent from school that day. Ex. 18, at 145:3-14.

97. C.C. and B.M. were present, and they were both interviewed that day. One of them had seen Doe get a blanket and had seen her wearing Smith's hat. The other had not seen any part of Doe's and Smith's interaction. *Id.* at 147:6-148:1, 148:14-17, 149:22-151:8, 152:3-12.

98. Hogan told Doe and Smith during their interviews that she would be calling their parents. That afternoon, Hogan phoned both Doe's and Smith's mothers. She spoke to Smith's mother, but had to leave a voicemail for Doe's mother. Ex. 18, at 156:6-19, 179:18-20.

---

[3] In gathering documents for production in this lawsuit in 2018, the School Board searched for, but was unable to locate, copies of the statements written by Doe and Smith in its files. A copy of Doe's statement, however, has been produced by Doe. In Smith's March 2019 deposition in this case, he testified to what he had written in his statement. Hogan still had her notes, and they were produced during discovery. Ex. 18, at 71:14-73:8, 74:14-75:13, 76:4-13; Ex. 16, at 73:13-22, 75:8-18; Ex. 11, at 67:1-68:1.

99. Hogan advised Smith's mother that Smith and a female student were involved in sexual activity on the bus during the band trip, that the female student was now saying that she was stuck in a situation that she did not know how to get out of, that the school was investigating, and that Banbury would make a decision on discipline. She said that Smith should not talk to anyone about what had happened on the bus. Ex. 18, at 182:11-14.

100. After leaving Hogan's office, Doe contacted her father by phone. She was very upset and "the only thing she could really focus on [was] that she was going to get expelled and it was going to ruin the rest of her life." She told him that she could not tell him why she thought she was in trouble because it was "too embarrassing," but finally revealed that it involved "sexual touching with another student on the trip." Ex. 4, at 170:10-171:14.

101. Doe's father went to Oakton, where he met with Hogan. Hogan confirmed that a sexual encounter had occurred between Doe and another student, that they were investigating, and that the investigation would be referred to the principal to decide what would happen next. Doe's father asked several times whether Doe could be suspended, and he understood from Hogan's response that it was a possibility. Ex. 4, at 173:11-175:4.

102. Hogan told Doe's father that Calvello had been in the meetings with Doe and that Doe's assigned counselor and the school psychologist were also available to her. Ex. 18, at 186:17-187:3.

103. After school ended that day, Hogan briefed Banbury. Ex. 18, at 194:11-197:1.

104. Hogan understood that in order to issue a disciplinary consequence to a student under the SR&R, the administrator has to be 51% sure that the misconduct actually occurred. Hogan was sure that sexual activity had occurred between Smith and Doe, but she did not believe that it was 51% likely that Doe's participation was nonconsensual. Hogan believed that

Smith and Doe both could be given a disciplinary consequence for engaging sexual activity on a school-sponsored trip which was against the SR&R. But she believed that Doe had felt stuck "in a situation that she did not know how to get out of and it would be more beneficial to her" if they provided her support in how "to be able to get out of situations that come up, whether it be sexual or [otherwise]." Ex. 18, at 29:2-10, 35:1-12, 194:11-197:8, 219:1-6.

105. After sitting in on, and listening to, just Doe's interviews, Calvello also was not sure whether the incident had been nonconsensual. Ex. 19, at 74:2-11, 107:17-108:9.

106. Baranyk, who had been in Smith's interview and Doe's second interview, believed that circumstances indicated that Doe had voluntarily participated in the sexual activity. He thought that the elements of a sexual assault were not present, and neither were the elements of sexual harassment under the SR&R. But he believed that there had been inappropriate behavior on both students' parts under the SR&R. Ex. 21, at 90:20-91:16, 92:21-93:14, 98:5-10.

107. Doe admitted in her deposition that, when she met with Hogan, she had not realized in her own mind what had occurred between her and Smith was an "assault," though she did believe at the time that it was nonconsensual. Ex. 8, at 334:14-22, 335:22-336:16.

108. In deciding what to do, Hogan and Banbury did not think that it would be fair to discipline only Smith for engaging in inappropriate touching on the bus, and not Doe, when the touching appeared to have been mutual. Ex. 18, at 196:3-197:1; Ex. 15, at 168:13-18.

I.  **Oakton Administration Concludes Its Investigation and Decides Not to Discipline Doe or Smith**

109. By the end of the day on March 13, 2017, Banbury and Hogan were leaning toward a decision that neither Doe nor Smith would be disciplined. Ex. 18, at 197:11-198:4.

110. School was cancelled on Tuesday, March 14, 2017, because of snow. That day, Doe's parents emailed Hogan and asked to meet with her and Calvello. Hogan offered to meet

with them on March 16. She advised that a school psychologist was available for Doe. Ex. 4, at 182:20-183:7; Ex. 24.

111. On the morning of March 15, 2017, K.D.'s mother emailed Taylor and indicated that she understood that K.D. was going to be interviewed about an event that had occurred between two students on the band trip. She informed Taylor that K.D. had not witnessed the event but only heard about it after the fact, and that she did not want K.D. interviewed without her parents. Taylor responded that they would have spoken to K.D. as a potential witness, but they did not need to interview her. Ex. 7, at 203:3-13; Ex. 25.

112. On the afternoon of March 15, 2017, Doe learned that Oakton administration had called her father and informed him that she was not going to be suspended for the sexual encounter on the bus. Ex. 8, at 329:2-5, 9-12.

**J.    Doe Is Offered Academic and Non-Academic Supports and Counseling**

113. On Thursday, March 16, 2017, Doe's parents met with Hogan and Calvello. By the end of that meeting, both parents understood that Doe was not going to be disciplined for what had occurred on the bus.  Ex. 4, at 193:2-9, 201:11-202:8; Ex. 26, Dep. of J. Roe, at 251:10-21.

114. Among the things they also discussed during the March 16, 2017 meeting, was providing Doe support in the school environment, and Hogan also offered non-academic counseling services for Doe. Ex. 4, at 197:11-199:1.

115. On March 17, 2017, Calvello sent an email to all of Doe's teachers, copying Hogan and Doe's school counselor and Doe's parents. Her email said that Doe "has been going through a difficult time recently and we are trying to support her here at school as best we can," and she asked that the teachers "please help her out in the classroom by giving her some extra time to turn in assignments or possibly excuse any non-essential assignments and allow her to make up/take new assessments as she is ready." Her email also asked them to contact Calvello if they

had "any questions or concerns" and to also let her or Grausz know if they see Doe "struggling in class academically or emotionally." Ex. 27; Ex. 8, at 46:15-48:16.

116. Doe or her mother thereafter requested academic accommodations for Doe in three of her classes, A.P. English, A.P. Physics, and Honors Pre-Calculus. Doe had already been receiving private tutoring in the latter two. Doe believes that her teachers in all three classes were kind to her after the Indianapolis trip, and she is not claiming that any of them failed to provide her any academic support or accommodations. Ex. 8, at 37:6-20, 39:1-40:11, 50:19-51:18, 59:17-60:8, 68:16-20, 74:14-16.

117. The accommodations that Doe received from her A.P. Physics and Honors Pre-Calculus teachers included ones that they did not give to any other student that year (A.P. Physics) or ever (Honors Pre-Calculus). Doe's grades in both classes were higher in the third and fourth quarters of the academic year, than they had been in the first two quarters. Ex. 28, Dep. of M. Nouristani, at 36:7-37:2, 45:3-47:2; Ex. 29, Dep. of M. London, at 19:8-21:8.; Ex. 30.

118. Doe's teacher in A.P. English, Molly Brady, also was "always there" for her if she needed to talk, and "was accommodating" if Doe need an extension or help. Brady said yes to Doe's request to be her teaching assistant for the next year. Ex. 8, at 57:9-58:14.

119. According to Doe, she did not need accommodations from her teachers in three classes, A.P. U.S. Government, Sports Entertainment & Marketing, and Latin 3. She received A's in all three subjects during the third and fourth quarters of the 2016-17 academic year. And she is not claiming that her teachers in those classes should have done something for her that they did not do. Ex. 8, at 59:8-16, 66:13-20, 74:17-75:6; Ex. 30.

120. Doe received A's each quarter in Symphonic band, called "Advanced Band" on her transcript. Ex. 8, at 88:13-18; Ex. 30.

**K.**     **Doe's Participation in Band after the Indianapolis Trip**

121. Once they returned from the band trip on March 12, 2017, Doe had no contact with Smith thereafter, including through his graduation on June 15, 2017. Ex. 8, at 180:8-11.

122. Doe and Smith had one class together that year, Symphonic or Advanced Band. There was only one Symphonic band at Oakton, and all members were in the same Advanced Band class. Doe wanted Smith removed from that class, which would have meant that he would not be in Symphonic. But Hogan would not agree to do that. Ex. 8, at 88:19-89:3, 98:10-99:17.

123. Smith had been in Symphonic since his sophomore year. He had made the District Band every year and All-State Band the last two years of high school. Ex. 11, at 15:3-16:6, 16:22-17:7, 17:16-18:1.

124. In emails sent on March 20 and 21, Doe's mother told Hogan and VanValkenburg that Doe was "extremely uncomfortable" being in band class with Smith and stating that Doe had her parents' "complete support and permission to leave and/or be absent from band and find a different spot within the school where she can simply do her homework." Ex. 31.

125. At the time, Doe's seat in band was behind Smith's. Smith was not doing anything that made Doe uncomfortable; it was "[j]ust his presence." Ex. 8, at 93:16-94:3.

126. After her mother's March 20 and 21 emails, Doe was permitted to stay in the practice room instead of going to band class. Her father then asked VanValkenburg to rearrange the band seating, and VanValkenburg did so, on March 30, 2017. Once VanValkenburg rearranged the band seating, Doe started coming to band class instead of staying in the practice room. Because the class met on alternating days, Doe would have had just three band classes between March 20 and 30. Ex. 8, at 89:4-90:8, 93:16-21, 98:13-99:6, 104:4-105:7, 105:19-22; Ex. 4, at 241:18-21; Ex. 32.

127. At the end of the year, Doe tried out for drum major in band. VanValkenburg and

Taylor usually attend, but they do not make the selections. Doe asked VanValkenburg that Taylor not be present for her tryout, and Taylor did not attend. Ex. 8, at 106:11-107:20, 110:2-8.

128. Doe also tried out for section leader in band at the end of her junior year. Section leaders are selected by VanValkenburg, and Doe was chosen. Doe also ran for Band Council at the end of her junior year. She was elected vice-president. Ex. 8, at 110:20-111:13, 112:2-113:6.

129. In June 2017, Doe left the band's annual banquet in tears because Smith received the director's award. Each year, "the seniors get awards" at the banquet, and while she is "sure" that Smith met the criteria for the award, she "didn't think it mattered." She talked to VanValkenburg for twenty minutes that night about "how it wasn't acceptable to give" Smith an award. Ex. 8, at 114:17-118:2.

## L.      Doe and Her Parents Decline Counseling Services Through Oakton

130. During the March 16, 2017, meeting with Doe's parents, Hogan had discussed emotional counseling services and supports for Doe, including having Calvello check in on Doe. Ex. 4, at 197:20-198:5; Ex. 19, at 129:3-131:18.

131. In her email on March 21, 2017, however, Doe's mother informed Hogan that she and Doe's father did not want Doe "brought into any additional meetings without our prior permission and without [her parents] being with her." Ex. 31.

132. Hogan also told Doe and her parents about the availability of the school psychologist on multiple occasions, including Hogan's March 13, 2017 meeting with Doe; Hogan's email to both of Doe's parents on March 14, 2017; her meeting with Doe's parents on March 16, 2017; and Hogan's email and a phone call with Doe's mother on March 21, 2017, in which Hogan asked for permission to have the psychologist check in on Doe. Ex. 18, at 177:22-178:10, 186:20-187:3, 230:14-231:19; 237:21-238:9, 266:6-267:9.

133. Doe's mother, however, never gave permission for the school psychologist to speak

to Doe. Ex. 26, at 241:13-242:1.

134. Doe's mother also informed Hogan, during their call on March 21, 2017, that she and Doe's father were going to be providing their own counseling services for Doe, and they did not want Oakton to provide emotional counseling for Doe. Ex. 18, at 237:21-238:9, 266:6-267:9; Ex. 26, at 241:13-242:8.

135. After the call, Hogan advised Calvello that, at Doe's parents' instruction, Calvello was not to check in on Doe. Ex. 18, at 266:6-267:9; Ex. 33.

136. Doe herself did not want to speak to the school psychologist, Calvello, or any counselors at Oakton. Ex. 8, at 134:5-137:11.

137. After March 21, 2017, Doe and her parents did not contact Hogan, Taylor, or Calvello again. Ex. 8, at 110:2-19, 136:21-137:11, 318:7-8; Ex. 26, at 292:4-294:5; Ex. 4, at 217:12-218:4.

138. The SR&R booklet advised families, among other things: (a) to first contact their principal about any concerns about the decisions of school personnel, but also advises that they may contact their Regional Assistant Superintendent; (b) that complaints regarding "barriers to equal opportunity" can be addressed to the director of the Office of Equity and Employee Relations (EER); (c) that the director of EER has been designated to handle inquiries and complaints under various nondiscrimination policies, including Title IX; and (d) about the contact information for each of them. Ex. 6, at FCSB-DOE-014931.

139. Doe and her parents never contacted: (a) Banbury; (b) the new Interim Principal who came to Oakton in April 2017, when Banbury was promoted to Executive Principal; (c) the Regional Assistant Superintendent; or (d) the EER Director/Title IX Coordinator. Ex. 8, at 175:8-176:21, 178:5-178:17; Ex. 4, at 133:17-136:1; Ex. 26, at 262:22-273:8.

140.  Doe finished the 2016-17 school year with a GPA of 4.125. She was absent for two days of school that entire year. Ex. 8, at 34:1-35:9; Ex. 34.

141.  Doe was taking two college-level (A.P.) courses her junior year. During her senior year, she took three. She graduated from Oakton on June 8, 2018, with a cumulative GPA of 4.184. Ex. 8, at 32:16-33:1, 35:10-36:8; Ex. 34.

142.  In November or December 2017, Doe was admitted early-decision to her first-choice college, William & Mary. She is currently enrolled in her second semester there. Ex. 8, at 17:10-13, 30:15-21; Ex. 26, at 159:10-160:4.

143.  Doe is not aware of any prior incidents of sexual activity involving Smith that were claimed to be nonconsensual. She is not claiming in this case that the School Board should have known that the March 8, 2017, incident was going to happen before it occurred. Ex. 8, at 144:13-16, 18, 148:4-10.

## III.   ARGUMENT

### A.   A School System Is Only Liable for Student-on-Student Harassment If It Was Deliberately Indifferent to Known Acts of Sexual Harassment.

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination" under any federally-funded education program or activity. 20 U.S.C. § 1681(a). Because the statute is an exercise of Congress' Spending Power, recipients can be found liable under Title IX only for their *own* misconduct. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998); *Davis,* 526 U.S. at 640; *S.B. v. Bd. of Educ. of Harford Cty.,* 819 F.3d 69, 75 (4th Cir. 2016).

*Davis* established that a school can be liable in damages under Title IX for student-on-student harassment only if it was "deliberately indifferent to known acts of harassment." 526 U.S. at 642. The school's response, or lack thereof, to known acts of peer harassment must have

been "***clearly unreasonable in light of the known circumstances***." *Id.* at 648 (emphasis added). The deliberate indifference must "at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645. Actionable student-on-student harassment must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633.

"Deliberate indifference" is a "high standard" that precludes liability in all but "limited circumstances." *Id.* at 648. It is calibrated to ensure that schools are not held liable "for the misconduct of their *students,* but only for their '*own* decision to remain idle in the face of known student-on-student harassment'—'intentional conduct that violates the clear terms of the statute.'" *S.B.*, 819 F.3d at 75 (citing and quoting *Davis*, 526 U.S. at 640, 641, 642 (emphases in original).

*Davis'* deliberate indifference standard "sets a high bar for plaintiffs to recover under Title IX." *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016). Simple or even heightened negligence will not suffice. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997). A school's negligent failure to learn of or react to its students' independent actions is not enough. *S.B.*, 819 F.3d at 75 (citing *Davis*, 526 U.S. at 642-43). Nor is it enough to show "negligent delays, botched investigations of complaints due to the ineptitude of investigators, or responses that most reasonable persons could have improved upon." *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019) (internal quotations omitted); *see Doe v. Bd. of Educ. of Prince George's Cty.*, 605 F. App'x 159, 168 (4th Cir. 2015) (rejecting theory that sought to impose Title IX liability based on school's failure to discover full extent of pattern of sexual harassment because it would require the court to "substitute a negligence standard for the deliberate indifference standard").

*Davis* instructs courts to refrain from "second-guessing the disciplinary decisions made by school administrators," who are ***not*** required to "engage in particular disciplinary action" in response to reported harassment. 526 U.S. at 648. It also teaches that Title IX does not give victims or their parents the right to make particular remedial demands. *Id.* at 649. Instead, schools "enjoy flexibility in responding to student-on-student harassment and 'may tailor their responses to the specific circumstances.'" *I.F.*, 915 F.3d at 369.

The *Davis* Court recognized that courts, in appropriate cases, can "identify a response as not 'clearly unreasonable' as a matter of law." *Davis,* 526 U.S. at 649. And courts routinely do.[4]

**B.** **The School Board's Response to the March 8, 2017 Sexual Encounter Was Not Clearly Unreasonable in Light of the Known Circumstances.**

Here, too, the Court can readily find that the School Board's response was not clearly unreasonable as a matter of law.

**1.** **The School Board's Investigation Was Not Clearly Unreasonable As a Matter of Law.**

The School Board's response to the single sexual encounter of March 8, 2017, was swift and considered. Staff and administrators at Oakton received some information about the incident on March 10, from Doe's friends, while Doe and Smith were still in Indianapolis. SUF ##40-50 Oakton administrators, Banbury and Taylor, considered, and decided not to interview Doe about

---

[4] *E.g.., I.F.,* 915 F.3d at 366 (school district's response to student's allegation of rape by two students and harassment not clearly unreasonable as a matter of law); *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) (university's response to student's allegation of sexual assault by fellow student not clearly unreasonable as matter of law); *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1283 (10th Cir. 2017) (university's response to report of student-on-student sexual assault not clearly unreasonable as a matter of law ); *M.D. v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 777-78 (6th Cir. 2017) (school district's response to sexual assault of student not clearly unreasonable as a matter of law); *Prince George's Cty. Sch. Bd.*, 605 F. App'x. at 167-68 (school board's response to student-on-student sexual harassment not clearly unreasonable as a matter of law); *Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014) (university's response to student's report of rape by another student not clearly unreasonable as a matter of law).

the incident during the Indianapolis trip. SUF ##54-56. They did not have the same support resources there that existed at Oakton, and the information from Doe's friends was that she was embarrassed and did not want them to tell anyone. *Id.* Taylor looked for, but did not observe Doe exhibiting any signs of withdrawal during the trip. SUF ##57-58. Doe participated in all activities in which the band participated for the rest of the weekend. SUF #35.

On March 13, the first school day after the students returned, Hogan interviewed Doe and Smith. SUF ##69-72, 78-92. Their accounts of what occurred were similar in many respects, except that Doe said she did not think the activity had been consensual on her part. SUF ##80, 87-92. Smith's reading of the encounter as fully consensual was credible; there were no other eyewitnesses. SUF ##17, 21, 22, 82, 93-97.

On these facts, neither the investigation, nor the decision not to discipline Smith, were clearly unreasonable. "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents. The test is objective—whether the institution's response, evaluated in light of the known circumstances, is so deficient as to be clearly unreasonable." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007) (affirming summary judgment on Title IX claim where school's investigation was unable to conclude that student had been sexually assaulted), *rev'd on other grounds,* 555 U.S. 246 (2009); *see also, e.g., Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.,* 511 F.3d 1114, 1121-24 (10th Cir. 2008) (summary judgment on Title IX peer harassment claim where school relied on police investigation of off-campus sexual assaults which found mixed evidence of consensual and non-consensual acts, and did not independently interview or discipline alleged perpetrators); *supra,* note 4.

**2.      Doe Was Not Barred from Access to Educational Benefits or Opportunities**.

The actions taken by the School Board were also effective to ensure that Doe was not

barred from access to any educational opportunity or benefit.

Doe had no contact with Smith after she returned from Indianapolis on March 12 through his graduation from Oakton on June 15, 2017. SUF #121. The only context in which Doe still saw Smith was their band class. Doe wanted to have him removed from the class because she felt uncomfortable by his presence, but there was only one Symphonic band and it met in only one class. SUF #122. Removing him from the class would have been punitive. So Doe was initially given permission to sit out from the class. SUF #126. A few days later, the band director rearranged the band's seating arrangement to separate Doe and Smith. *Id*. Doe returned to band class, and successfully pursued leadership positions for the next semester. SUF ## 126-28.

The school system repeatedly offered Doe counseling services. SUF# 132. Doe and her parents chose not to accept them. SUF #131-37. The school system also provided Doe academic accommodations. SUF ##114-15. In two of her most challenging advanced academic classes, Doe received accommodations that, in one class, were not given to any student that year, and in the other, ever given to any student before or since. SUF ##116-18. Doe's grades in those classes for the last two quarters of that academic year rose higher than they had been before. SUF #118. Doe finished the year with a GPA of 4.125, took an even more challenging course load for the next year, and graduated on time in June 2018 with a cumulative GPA of 4.184. SUF ##140-41. She was admitted early-decision to her first choice college, William and Mary. SUF #142.

No reasonable juror could find that the School Board chose to remain idle in the face of known acts of sexual harassment against Doe, or that its response to the March 8 sexual encounter was clearly unreasonable based on the known circumstances.

## IV.    CONCLUSION

For all of these reasons, the Court should grant summary judgment in favor of the School Board, and dismiss the Amended Complaint.

Respectfully submitted,


FAIRFAX COUNTY SCHOOL BOARD


By:_____/s/_____
Sona Rewari (VSB No. 47327)
Andrea R. Calem (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington DC 20037
Telephone: (202) 955-1974
Facsimile: (703) 918-4018
srewari@huntonak.com
acalem@huntonak.com
*Counsel for Defendant*
*Fairfax County School Board*


## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.


_____/s/_____
Sona Rewari (VSB No. 47327)

**INDEX OF EXHIBITS TO DEFENDANT'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Description |
|---------|-------------|
| 1 | Chart of Individuals identified in Brief and their Roles |
| 2 | Joint Stipulation of Uncontested Facts |
| 3 | Excerpts of Deposition of J. VanValkenburg |
| 4 | Excerpts of Deposition of John Doe |
| 5 | Excerpts of Deposition of M. Panarelli |
| 6 | 2016-17 Student Rights & Responsibilities Booklet |
| 7 | Excerpts of Deposition of M. Taylor |
| 8 | Excerpts of Deposition of Jane Doe |
| 9 | Presentation to Students and Parents re: Music for All Festival |
| 10 | Indianapolis Trip Itinerary |
| 11 | Excerpts of Deposition of J. Smith |
| 12 | Excerpts of Deposition of L. Kelly |
| 13 | Excerpts of Deposition of D. Estess |
| 14 | Declaration of V.S. |
| 15 | Excerpts of Deposition of J. Banbury |
| 16 | Excerpts of Deposition of R. 30(b)(6) Designee M. Taylor |
| 17 | March 12, 2017 Email from M. Taylor to J. Hogan et. al. |
| 18 | Excerpts of Deposition of J. Hogan |
| 19 | Excerpts of Deposition of A. Calvello |
| 20 | Jane Doe's Written Statement |
| 21 | Excerpts of Deposition of W. Baranyk |
| 22 | Hogan's Notes of Jane Doe Interviews |

| 23 | Hogan's Notes of Jack Smith Interview |
|----|----------------------------------------|
| 24 | March 14-15, 2017, Emails amongst John Doe, Jane Roe and J. Hogan |
| 25 | March 15, 2017, Emails between M. Taylor and J. Davis |
| 26 | Excerpts of Deposition of J. Roe |
| 27 | March 17, 2017, Email from A. Calvello to M. Brady, et al. |
| 28 | Excerpts of Deposition of M. Nouristani |
| 29 | Excerpts of Deposition of M. London |
| 30 | 11th Grade Report Card for Jane Doe |
| 31 | March 20-21, 2017, Emails amongst J. VanValkenburg, Jane Roe, et al. |
| 32 | March 30, 2017, Email from Jane Roe to J. VanValkenburg |
| 33 | Email from J. Hogan to A. Calvello |
| 34 | FCPS Secondary School Transcript for Jane Doe |