**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| JANE DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:18-cv-614 (LOG/MSN) |
| ) | |
| FAIRFAX COUNTY SCHOOL BOARD, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF JANE DOE'S MEMORANDUM
IN SUPPORT OF HER MOTION FOR SANCTIONS**

Plaintiff Jane Doe asserts that she was sexually assaulted by an older Fairfax County Public School student, Jack Smith, on a bus during the first night of a five-day school-sponsored band trip in March 2017. Doe contends that, in response to reports of that assault, Defendant Fairfax County School Board ("School Board") violated Title IX when it conducted a clearly inadequate—and at times insulting and abusive—investigation, left her on the band trip without assessing her well-being or safety, isolated her from the classroom, and treated her with hostility, all of which caused Doe to struggle academically, emotionally, and physically, and so undermined and detracted from her educational experience that it effectively deprived her of an equal access to her education, in violation of Title IX.

From the inception of this lawsuit, the School Board has denied that it had knowledge of a sexual assault. *See* Dkt. #25, Def. Ans. to First Am. Compl. ¶¶ 1-7, 26. The School Board claims Doe and the multiple students and parent who reported what had occurred between Doe and Smith were all reporting "a sexual encounter," not a sexual assault. *Id.*; *see also* Dkt. # 148, Def. Mem.

in Supp. of Mot. for Summ. Judgment at 9-10 ¶¶ 40, 50, 53. On this basis—that Doe is telling a different story of sexual assault than what she reported to the school—the School Board goes so far as to suggest it is entitled to an affirmative defense of "doctrines of unclean hands and estoppel." Dkt. #25 at 18 ¶ 6. In moving for summary judgment, the School Board claims its response to the reports was "swift and considered," and "school officials acted thoughtfully and promptly in their investigation of the sexual encounter." The School Board relies on its claimed actions during and after the band trip to investigate what happened between Doe and Smith to show that, as a matter of law, it was not deliberately indifferent to Doe's rights under Title IX. *See id*. at 1, 28. Therefore, Defendant's contemporaneous documentation related to its response and investigation are essential to resolution of the parties' dispute. Indeed, Virginia law requires Defendant to retain such records for at least 3 years, which also is reflected in Defendant's policy on retention of such records. *See* Exs. 1-3.

Discovery has revealed that the School Board destroyed *every* formal statement captured during its investigation, including the written statements of Jane Doe, Jack Smith, and two witnesses. Sworn testimony has revealed that school security personnel took notes when a teacher and a student each separately reported that Doe was "*forced* to do sexual things" while on the band trip, yet Defendant failed to preserve those notes. Likewise, the School Board failed to follow its policy of documenting the incident and the investigation in Fairfax County Public School's Bullying and Harassment Management System ("BHMS"), a system of electronically stored information ("ESI") specifically designed to capture and preserve these types of documents. *See, e.g.*, Ex. 4, Dep. of School Board, Rule 30(b)(6) witness M. Taylor, 18:5-19:4 ("on reflection once Jane Doe's mother classified it as a sexual assault on her meeting with Ms. Hogan on Thursday,

March 16th, 2017 it should have been entered into BHMS").[1] With no question that it failed to preserve relevant documents that it knew it should have preserved, the School Board should not be allowed to rely on its investigation in moving for summary judgment and at trial, and the jury should be instructed regarding the consequences of spoliation. For these reasons and others discussed herein, Plaintiff respectfully requests her Motion for Sanctions be granted.

## RELEVANT BACKGROUND

Plaintiff Doe asserts that Jack Smith sexually assaulted her on the bus during a school-sanctioned band trip on March 8, 2017. Once off the bus and safe in her hotel room that night, Jane Doe told her friend "that Jack Smith grabbed her hand and put it on his penis, that she tried to pull away, and Smith grabbed it again and made her touch him. Doe said she was in shock and scared. She said she did not want it to happen and that she wasn't feeling good about it. I could tell from her tone that she was clearly shaken up and upset by what had happened. [S]he told me that she was not feeling well and that she was not sleeping or eating." Ex. 5, Decl. of A.K., ¶¶ 5-6. Worried about Doe, the friend (who was not on the band trip and still at Oakton High School in Virginia) told his math teacher, Laura Kelly, on March 10, 2017, that "my friend was forced to do sexual things by another student." *Id.* ¶ 8; *see also* Ex. 6, Dep. of L. Kelly, 52:8-57:13.

Kelly then "immediately walked to the security office to talk to Wally Baranyk, who is the head of security" at Oakton High School. Ex. 6 at 60:19-61:3. Kelly told Baranyk that a student was "*forced to do* hand stuff with another student while on the band trip. . . . He asked me if by hand stuff I meant something sexual, to which I said yes. [Baranyk] took [handwritten] notes."

---

[1] In fact, Defendant was on notice of an assault no later than March 9, 2017, a student (V.S.) reported to the band director that Smith "put himself on" Doe and she "was not into it." reported an assault. *See* Ex. 23.

3

*Id.* at 61:8-62:4 (emphasis added). No notes from this interview have been produced by the School Board in discovery.

After speaking with Ms. Kelly, Baranyk spoke with A.K. directly. A.K. told Baranyk and two other members of the security team about what he had told Kelly. The student told the three members of Oakton's security team "that one of my friends was sexually assaulted on the bus on the way to Indianapolis for the band trip. I remember saying the words 'sexual assault.' They asked if it involved consensual sexual activity and I said no." Ex. 5 at ¶ 9. No notes from this interview have been produced by the School Board in discovery though requested by Doe.

Similarly, the School Board failed to preserve written statements provided by two students who interacted with Doe during the four days that elapsed between the report of the assault on March 9, 2017, and the school administrators' first conversation with Doe on the following Monday, March 13, 2017. While on the trip in Indianapolis, a friend, B.M., noticed that Doe "was not eating and was not acting like herself. She was much quieter than usual and not engaging in conversation." Ex. 7, Decl. of B.M. ¶ 4. When B.M. asked Doe what was wrong, Doe told her that "Jack Smith touched her and made her touch him and she did not want it to happen." *Id.* at ¶ 5. At the time of discovery in this case, although B.M. cannot remember "the specific actions of Jack Smith," she does remember her reaction to Doe's story and demeanor:

> I was shocked and upset. I knew that Smith had a problem with unwanted sexual harassment through SnapChat, but I was shocked and upset that it became physical against one of my friends. I also worried about Doe because she was noticeably upset by Smith's actions. . . . Because I could see that Doe was visibly upset and earnest in the way she spoke with me, I don't think anyone who spoke with Doe could have thought she was just telling a story about a sexual encounter with Smith. Doe did not want it to happen and she was upset. There was no question in my mind that what had happened between Doe and Smith was bad. When we returned to school after the Indianapolis trip, a school administrator asked me to provide a written statement on what I observed during the band trip. *I typed out a statement on the computer in Oakton High School's security office*. The school did not give me a copy.

4

*Id*. at ¶¶ 6-9 (emphasis added). B.M. provided a written statement to Defendant. *Id*. A second student, C.C., who was sitting near Jane Doe and Jack Smith on the bus, and spoke with Jane Doe about what happened during the band trip, provided a written statement. Ex. 8, Dep. of J. Hogan, 72:22-76:20. Neither written statement was produced by the School Board in discovery though requested by Doe.

The School Board also failed to produce the statement written by Jack Smith regarding the bus incident. Jack Smith "wrote [his statement] on the computer that was in the [security] room" in what Smith recalls as a blank Word document, not a form. Ex. 9, Dep. of J. Smith, 64:9-65:12. In the written statement, Smith testified during his deposition that he wrote about asking Doe to sit next to him and described the sexual contact. *Id.* at 67:2-68:22. The School Board did not produce this statement in discovery though requested by Doe, admitting it was destroyed, as described below.

The only contemporaneous written statement available in discovery is Doe's statement, but only because Doe preserved it. Doe's mother requested a copy days after the school solicited it from Doe and maintained it. Plaintiff produced the document in discovery. *See* Ex. 10. Though requested by Doe, the School Board *did not* produce a copy of Doe's statement, which states that Jack Smith "move[d] my hands closer to his genitals and then pulled down his pants. I moved my hand away but he moved my hand back onto his genitals. I was so shocked and scared that I did not know what to say or do. He then started to move his hand towards me and I tried to block him but he still put his hands up my shirt and down my pants." *Id.* Despite the clear signs of unwanted sexual contact ("I moved my hand away," "shocked and scared," "I tried to block him"), the School Board still claims that Doe did not report a sexual assault and that it did not investigate it as an assault or recognize it as anything other than consensual sexual contact until Doe's mother used

5

the words "sexual assault" in a meeting with the school after the investigation had concluded. Ex. 4 at 18:19-19:4. Further, as noted above, the School Board's position ignores that a teacher and a student reported an assault on March 9, 2017, for days before Doe and Smith were interviewed. The School Board destroyed Doe's written statement, as discussed below, and did not produce it in discovery.

Also missing from the School Board's discovery production are text messages between Michelle Taylor, then-Assistant Principal of Oakton High School, and John Banbury, the then-Principal. Other testimony and emails give a fair indication that at least one text message was sent and may have cast a light on events more favorable to Plaintiff than to Defendant. For example, Taylor was in Indianapolis with the band, and while there on March 10 (the same day the teacher and student reported the assault to school security officials), spoke with a student directly about what occurred between Smith and Doe. *See* Ex. 11. The student told Taylor that "Smith forced Doe to put her hands on him and that Doe was pulling her hands away and pushing his hands out of her shirt, but he kept putting his hands down her pants and up her shirt." *Id.* ¶ 7. Taylor also spoke with Baranyk after his March 10 interviews with Kelly and A.K., and then spoke with Banbury to share the reports. Taylor told Banbury that "that there had been a sexual event on the bus . . . she described [that] . . . [t]wo students were sitting together and the male student asked the female student for a blanket or if she had a blanket." Ex. 12, Dep. of J. Banbury, 104:5-16. Later, Taylor sent an email asking about how many inches of snow Oakton was expecting that week, and Banbury responded, "[h]ow many inches under the blanket or on the ground?"—the Principal of Oakton High School callously mocking "the girl was stroking the kid's penis under the blanket." *Id.* at 204:17-20; Ex. 13. Apparently finding Banbury's ridicule funny, Taylor responds via email,

"I sure am going to miss you in a few weeks."[2] *Id.* FCSB-DOE-14593. In response to another email about the incident, Banbury wrote to Taylor and states, "[t]his answers my question from *the text*." Ex. 14 (emphasis added). No text messages between Banbury and Taylor were produced by the School Board in this case, although other text messages from Taylor during this timeframe were produced.

The School Board knew litigation was possible and had a duty to preserve documents and ESI from the first report of the assault. Indeed, at their first interview of Doe on Monday, March 13, 2017, when she returned from the band trip, Oakton administrators affirmatively raised the potential legal consequences of the incident. Assistant Principal Jennifer Hogan introduced Baranyk to Doe at the outset of the meeting "as some security officer who knew about the law and he was going to tell me whether or not I could file any charges against Jack Smith." Ex. 15, Dep. of Doe T 310:16-311:12 (Baranyk had been informed of the assault on March 10 by Kelly.) Baranyk acknowledges that he told Doe that if she wanted to pursue legal action, she "would have lacked establishing the jurisdiction of origin. We don't even know where the incident happened. Was it in Ohio? Was it in one of the states between Virginia and Ohio? And I believe Darrell [Estess, School Resource Officer] explained that, I want to say, to both the student and the parents that, without establishing a jurisdiction of origin, seeking a criminal offense, even if one occurred, would be nearly impossible." Ex. 16, Dep. of W. Baranyk at 99:11-101:21. With respect to the

---

[2] Taylor's other contemporaneous correspondence reflects the same level of disregard. In response to Kelly and A.K.'s reports that Doe felt forced to engage in sexual activity, Taylor and Oakton security personnel joke about "one time at band camp," a reference to a movie called American Pie, which is a comedy about four teenage boys entering into a pact to lose their virginity by prom night. *See* Ex. 25. The quote "one time at band camp" refers to a high school female character who tells stories about sex and masturbation at band camp. Ex. 26 at Taylor 153:14-159:1; *see also* American Pie (1999), IMDb, https://www.imdb.com/title/tt0163651/ (last visited May 9, 2019). One of Taylor's other text messages raises completeness concerns. *See* Ex. 27.

7

School Board's actions, Hogan said that "the school had no liability in this situation, that it was a he said, she said situation and . . . in [Baranyk's] experience and opinion there was nothing else that her parents could do." Ex. 17, Dep. of John Doe 298:19-299:20.

As this Court is also familiar, Fairfax County Public Schools entered into a Resolution Agreement with the U.S. Department of Education ("DOE") Office for Civil Rights in 2014 after a student who was sexually harassed filed a discrimination complaint against the school district. *See* Ex. 18. Under the agreement, FCPS agreed to take prompt and robust action to comply with Title IX, which led to the creation of the Bullying and Harassment Management System ("BHMS"). BHMS is used to track *allegations* of bullying and harassment, created in response to an explicit concern by DOE that allegations with no imposed discipline were not well documented and falling through the cracks.

> [T]his system was created when the Office for Civil Rights, US Department of Education came in and did an investigation. While we were not found to have violated anyone's rights, DOE raised some concerns with how we document and track what happens in the UNFOUNDED cases. The whole idea is to provide you one place to capture the information that you have shared, record those dates and times, house the information, track the steps and hard work[.]

Ex. 19 (emphasis in original).

Per Fairfax County Public Schools' policy, a school administrator is required to utilize BHMS when the investigation into allegations of bullying or harassment is finished, but encouraged to do it from the very start because the system is "a tool for ensuring thorough investigations and documentation." Ex. 20, Dep. of School Board, Rule 30(b)(6), witness M. Panarelli, 64:21-66:16. Administrators are trained to uploaded investigation documents into BHMS, where records "will be kept for five years . . . They are told that any investigative records such as student interviews or those things should be uploaded into the bullying and harassment management system." *Id*. at 96:19-99:13. This was the practice throughout FCPS, including

Oakton High School, during the 2016-2017 school year when Smith sexually assaulted Doe. Ex. 21, Dep. of School Board, Rule 30(b)(6) witness, J. Lane, 23:5-17. Had the policy been followed, the records of the reports of the assault and investigation of it in March 2017 should have been retained through March 2022.

In addition to the School Board's requirement that administrators use BHMS, the School Board also is bound by state legal and policy mandates to maintain documents related to bullying and harassment. FCPS has two relevant policies regarding records management and under each policy, documents related to the incident between Jane Doe and Jack Smith should have been maintained for at least three years, but more likely five years. *See* Ex. 1 at 52-53, Ex. 2 at 66. The two policies implement the requirements of the Virginia Public Records Act, § 42.1-76, which similarly required the School Board to maintain records related to the incident between Doe and Smith for at least three years. Ex. 3 at 4.

Jane Doe asserts that Jack Smith sexually assaulted her in March 2017. Smith graduated from Oakton High School in June 2017, and Doe graduated in June 2018. Documents were created as part of the investigation into the sexual assault in March 2017. Plaintiff Doe first contacted the School Board on April 30, 2018, notifying the School Board of her concerns that it violated her rights under Title IX in the way it responded to actual knowledge of her sexual assault. Doe filed this lawsuit on May 23, 2018.

## LEGAL STANDARD

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *Silvestri v. GMC*, 271 F.3d 583, 590 (4th Cir. 2001). The Court has broad discretion to impose sanctions for spoliation that should be "designed to: (1) deter parties from engaging in spoliation;

(2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and[,] (3) restore 'the prejudiced party to the same position he [or she] would have been in absent the wrongful destruction of evidence by the opposing party.'" *Jenkins v. Woody*, Civil Action No. 3:15cv355, 2017 U.S. Dist. LEXIS 9581, *32-33 (E.D. Va. Jan. 21, 2017) (citations omitted, brackets in original). This authority derives from the Court's "inherent power to control the judicial process and litigation." *Silvestri*, 271 F.3d at 590. For a court to impose a sanction under its inherent power, the party seeking sanctions must show: "(1) [t]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) [t]he destruction or loss was accompanied by a culpable state of mind; and (3) [t]he evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009).

Separately, Rule 37(e) of the Federal Rules of Civil Procedure governs the Court's authority to levy sanctions against a party that destroys or fails to preserve electronically stored information. "If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may order measures to cure the prejudice to another party. Fed. R. Civ. P. 37(e). If "the party acted with the intent to deprive another party of the information's use in the litigation [the court] may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." *Id.* In order for a party to show that it acted in good faith, meaning it did not intend to deprive another party of information in litigation, "a party needs to act affirmatively to prevent the system from destroying or altering information, even if such destruction would occur

10

in the regular course of business." *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372, 378 (D. Conn. 2007). Thus, a movant must satisfy four threshold requirements before a court decides if any spoliation sanction is appropriate under Rule 37: (1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery.

## ARGUMENT

The School Board's spoliation of the best contemporaneous evidence of information provided to school officials about Doe and Smith in March 2017 warrants sanctions. *See* Fed. R. Civ. P. 37(e); *Jenkins v. Woody*, No. 3:15cv355, 2017 U.S. Dist. LEXIS 9581, at *33-34 (E.D. Va. Jan. 21, 2017).

First, under the Court's inherent authority or under Rule 37, the School Board had an obligation to preserve the documents at issue as of March 9, 2017, the date the assault was reported to school officials. Indeed, Taylor and Principal Banbury discussed what to do about the assault the next day on March 10, choosing to remain idle rather than interviewing students on the band trip or inquiring of Doe's condition or providing interim measures to separate Doe and Smith to ensure Doe's safety.

The School Board should have preserved the statements and notes in anticipation of litigation. Here, the School Board had notice of a potential legal claim from when it first learned of Smith's assault of Doe, at the earliest, and knew of her actual legal claim within 13 months of March 2017, at the latest. The School Board knew from the time the incident occurred that litigation was possible. FCPS policy and training indicates as such, directing administrators to "[r]ecord the details, capture what you told the parents, what you spoke with witnesses about. If you took notes, don't hold them back or 'save them' for if [you are] questioned, upload them into

11

the system." Ex. 22 at FCSB-DOE-000785. Several texts exchanged among school personnel show that Defendant should have reasonably anticipated litigation: the first report from Band Director VanValkenburg to Assistant Principal Michelle Taylor that a student that Smith "put himself on" Doe and Doe "was not into it," Ex. 23; VanValkenburg's text to Taylor, "we have an urgent [student name] situation or worse," referring to a female student who reported sexual assault by a male student a few years prior, Ex. 24 at JV 138:14-145:6. Furthermore, it affirmatively raised the possibility of Doe suing the school in its first meeting with her, telling her and her parents that "the school has no liability in this situation." Likewise, school officials should reasonably have known that the evidence may be relevant to any related litigation. Again, FCPS training warns school officials of this possibility; "[g]iven the state requirement[s], documentation in BHMS will provide principals and schools with proof of compliance." Ex. 19 at FCSB-DOE-001530. The documents should have been properly preserved from the moment the School Board began looking into a disciplinary issue, whether or not it understood the issue to be a "sexual encounter" or a sexual assault. *Jenkins v. Woody*, Civil Action No. 3:15cv355, 2017 U.S. Dist. LEXIS 9581, at *38 (E.D. Va. Jan. 21, 2017) (finding duty to preserve material reasonably expected to be relevant to any related action).

The School Board also should have preserved the information because Virginia law and district-wide policy require student records are to be maintained for a minimum of three years after a student's graduation. *See* Ex. 1-3. The events at issue in this case began in March 2017. Jack Smith graduated in June 2017 and Jane Doe graduated in June 2018. Therefore, at the very minimum, the statements and handwritten notes should have been maintained until June of 2020.

Second, looking at sanctions under either this Court's inherent authority or Rule 37, there is no dispute that school officials destroyed or failed to preserve the statements of Jane Doe and

Jack Smith, two other witness statements, and notes from Baranyk's interview of Laura Kelly, all created on or after March 9, 2017. *Silvestri*, 271 F.3d at 590. Multiple witnesses testified about the creation of those documents. It is also reasonable to infer that the School Board destroyed notes from Baranyk's interview with A.K. on March 10, 2017. In his deposition, Baranyk testified that he did not remember his interview with Kelly or A.K., Ex. 16 at 64:10-66:2, but given Kelly's testimony that Baranyk took notes during her interview with him and Hogan's testimony that Baranyk routinely took notes, Ex. 8 at 149:6-16, it is reasonable to infer he also took notes during his meeting with A.K. and those, too, were destroyed.

Third, the loss was due to a failure to take reasonable steps to preserve ESI under Rule 37 standards, or with a culpable state of mind under the court's inherent authority test. Multiple witnesses, including the School Board, testified that documents related to bullying and harassment—regardless of whether the accusations are considered founded or unfounded—should have been maintained in the BHMS online system. Although the School Board acknowledges the documents related to the incident between Doe and Smith should have been uploaded in BHMS, Ex. 4 at 18:5-17, they never were, Ex. 8 at 37:7-43:22. Though requested by Doe in discovery, the documents have not been produced by the School Board. In fact, the School Board testified that it does not have the paper copy of the documents, nor does it have a BHMS file related to the incident. *See* Ex. 21 at 27:9-33:6.

The written statements and handwritten interview notes may be considered ESI because the School Board's own policies require that documents related to investigations into allegations of sexual harassment be uploaded and preserved in BHMS. BHMS is a "systematic process of reporting, investigating, and intervening in alleged cases of student to student Bullying and Sexual or Discriminatory Harassment" with the goal of documenting and reporting all allegations to which

FCPS administrators have knowledge. Ex. 22 at FCSB-DOE-000778. BHMS was designed exactly for cases like Doe's where the School Board claims it was unable to substantiate her assertion of sexual assault; BHMS "was created when the Office for Civil Rights, US Department of Education came in and did an investigation. . . . DOE raised some concerns with how [FCPS] document[s] and track[s] what happens in the UNFOUNDED cases." Ex. 19 at FCSB-DOE-001529. Information in BHMS is maintained for five years. Ex. 20 at 96:19-99:13

The School Board failed to take reasonable steps to preserve the documents under Rule 37 and acted with the requisite intent for sanctions to issue under the court's inherent authority. In discovery, the School Board acknowledged that these documents should have been in the BHMS system, which would have maintained them for five years—which in this case would be until March 2022. The School Board testified that the documents were "not put into the bullying and harassment system although on reflection once Jane Doe's mother classified it as a sexual assault on her meeting with Ms. Hogan on Thursday, March 16th, 2017 it should have been entered into BHMS, captured into BHMS." Ex. 4 at 18:5-17. *Jenkins*, 2017 U.S. Dist. LEXIS 9581, at *39 (granting motion for sanctions where defendant failed to follow its normal procedure for storing and preserving data, and as a result, the information was not available in discovery). Moreover, as noted above, the statements and handwritten notes should have been maintained until June of 2020 because Virginia law requires it, as does district-wide policy implementing that legal requirement. Sanctions are warranted when a party destroys evidence contrary to its obligations under law or regulation. *See Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001) ("even if the documents were destroyed days after the search ended and before anyone had wind of Byrnie's 'concerns,' Cromwell was still required by federal regulations implementing Title VII and the Americans with Disabilities Act to retain all records pertaining to employment

14

decisions for a period of two years"); *EEOC v. LA Weight Loss,* 509 F. Supp. 2d 527, 539 (D. Md. 2007) (where, as here, the employer was required by law to retain the employee's records, bad faith that might otherwise be required, need not be shown to permit an adverse inference . . . The only other requirement is that the party seeking the inference show that the destroyed records were relevant to the party's claim or defense").

Here, the School Board also failed to maintain any other electronic or hard copy file outside of its formal BHMS system. "[T]here are some hard copies that are kept, you know, as related to discipline or if somebody did not upload a copy [into BHMS] then sometimes that statement might be placed there or just summarized in that file. So, yes, there were other files that had information in them." Ex. 21 at 31:3-32:11. The School Board has "looked in every records room that we have at Oakton High School" and found nothing. *Id.* The School Board also checked its other student records database and found nothing. *Id.* The School Board attempted to search the computer in the security office, but found that it, too, was destroyed, without taking adequate precautions to preserve the data on it. "[T]hat computer was very outdated and very slow so at the beginning of this school year [2018-2019] our technology support person reimaged that computer wiping the hard drive clean to try to make it go faster and then when that did not work we -- that computer was just very old so we removed it and we put a brand new computer in the security office." *Id.* at 41:8-17.

Given the multiple bases—law, regulation, policy, foreseeable litigation—for the School Board's obligation to maintain the destroyed or lost records, the Court may infer an intent to deprive under Rule 37(e). *Ala. Aircraft Indus. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017) (finding circumstantial evidence of an "intent to deprive" when the party's spoliation is "unexplained, blatantly irresponsible behavior"); *Moody v. CSX Transp.*, Inc., 271 F. Supp. 3d

410, 431 (W.D.N.Y. 2017) (finding an intent to deprive when "defendants allowed the original data on the event recorder to be overwritten, and destroyed or recycled Lewandowski's laptop without ever confirming that the data had been preserved in another repository"); *Paisley Park Enters. v. Boxill*, No. 17-cv-1212 (WMW/TNL), 2019 U.S. Dist. LEXIS 34518, at *22 (D. Minn. Mar. 4, 2019) ("There need not be a 'smoking gun' to prove intent.") (internal citation omitted). "[A] party's conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2). Whether the spoliator affirmatively destroys the data, or passively allows it to be lost, is irrelevant; it is the spoliator's state of mind that logically supports the adverse inference." *Ungar v. City of N.Y.*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018) (citing *Moody*, 271 F.Supp.3d at 431).

Lastly, the documents are directly relevant to this case and warrant sanctions under this Court's inherent authority, and sanctions are warranted under Rule 37 because the evidence cannot be restored or replaced in discovery. The School Board argues as part of its motion for summary judgment (and presumably will at trial) that as a matter of law, its "[s]taff and administrators at Oakton received some information about the incident" between Doe and Smith, and responded "thoughtfully and promptly," relying on testimony of school personnel more than 30 months' after the events and after suit has been filed to try to establish that its response was not "clearly unreasonable in light of the known circumstances." *See* Dkt. #148 at 1, 28-29; *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). A central issue in this case is the substance of the information the School Board received to put it on actual notice of a sexual assault and whether a jury may find that its response matched the severity of the situation. The prejudice to Plaintiff Doe resulting from the School Board's failure to preserve the written student statements and notes

16

created by school personnel—the best and only contemporaneous evidence of the "known circumstances" of its investigation in March 2017—is clear and grave.

Contemporaneous documentation is invaluable to a jury weighing the credibility of witnesses before it. The relevance of these documents and the prejudice to Plaintiff because of the destruction is palpable, particularly in light of the School Board's defenses that they purportedly only knew about a "sexual encounter," not assault. The relevance of the contemporaneous documents, as the best evidence of the "known circumstances" to which the School Board responded to assist the jury in determining whether the response was unreasonable is unmistakable. Kelly testified that she told Baranyk that a student was "forced to" engage in sexual activity on the band trip; Baranyk testified that he did not remember speaking with Kelly. Baranyk's contemporaneous notes are lost because of the School Board's failure to preserve them and are relevant to this action and the School Board's dispositive motion. A.K. testified that he reported a sexual assault to three security personnel, which included Baranyk, and explicitly told them of a "sexual assault" and it was not consensual; the School Board denied A.K.'s report contained such substance. *See* Dkt. #25 at ¶ 37 ("denies that Student B 'reported' to Ms. Kelly what had happened or who was involved"). Any notes of that meeting are lost because of the School Board's failure to preserve them and are directly relevant to this action and the School Board's dispositive motion. B.M. testified that she understood Doe to be reporting a sexual assault and she believed no one who spoke with Doe would have thought she was just telling a story of a "sexual encounter;" B.M.'s formal statement is lost because the School Board failed to preserve and the statement is relevant to this action and the School Board's dispositive motion. Finally, the correspondence between Assistant Principal Taylor and Principal Banbury, as well as between Taylor and school security personnel, reflect a shocking level of insensitivity and triviality upon learning that a

student felt forced to engage in sexual activity during the band trip. The destruction of text messages between Taylor and Banbury regarding Doe and Smith are similarly relevant to Doe's claims. *See Zbylski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1171 (D. Colo. 2015) (issuing sanctions in Title IX case where "Plaintiff has been deprived of at least contemporaneous notes made by Defendant Dierberger that reflected her knowledge of the allegations of misconduct"). Given the extraordinary relevance of the documents and the extreme prejudice to Plaintiff Doe from their knowing destruction by Defendant, sanctions are warranted here. This case mirrors the circumstances in *Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011), where the D.C. Circuit found that destroyed interview notes were relevant to a Title VII claim because the agency had defended its non-selection of the plaintiff based on her purportedly poor performance during an interview. *Id.* at 312. The court explained that "the notes might have undermined [the] claim that the [selectee] exhibited more knowledge of the job than [the plaintiff] did and might also have confirmed [the plaintiff's] assertion that [the selecting official] asked her different questions than he asked of the men he interviewed." *Id.* Just like in *Talavera*, the School Board relies on its investigation, including its "interviews and credibility assessments of Doe and Smith," as evidence that its response was not clearly unreasonable in light of the known circumstances. Dkt. #148 at 1. The School Board destroyed Smith and Doe's statements, as well as the statements of the other students whom it interviewed as part of its investigation and "credibility assessment." These actions warrant sanctions.

## CONCLUSION

For the aforementioned reasons, and under all of the circumstances reflecting the School Board's destruction or failure to preserve contemporaneous documents that were relevant evidence of "the known circumstances" in March 2017, Plaintiff Doe respectfully requests that her Motion

for Sanctions be granted and that the Court (1) find that the statements of Jane Doe, Jack Smith, C.C., and B.M., and the handwritten notes of the interview with Laura Kelly were not preserved; (2) find that notes of the interview with A.K. and text messages between Michelle Taylor and John Banbury existed and were not preserved; (3) preclude the School Board from arguing on summary judgment, motions *in limine*, or at trial that its investigation into the March 2017 incident was not clearly unreasonable in light of the known circumstances to the extent it relies on testimony or documents regarding its interviews with Jane Doe, Jack Smith, B.M., C.C, A.K., and Laura Kelly because the written statements or interview notes were not preserved; (4) allow Plaintiff to present evidence at trial that the School Board destroyed relevant evidence; and (5) instruct the jury that it should or may consider such evidence to infer that the spoliated materials would be detrimental to the case of the School Board and that the jury should or may consider such evidence when assessing Defendant's intent and knowledge.

Date: May 17, 2019

Respectfully submitted,

ATES LAW FIRM, P.C.

*/s/ John R. Ates*_____
John R. Ates (VSB #71697)
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
703-647-7501 (tel)
703-229-6430 (fax)
j.ates@ateslaw.com

PUBLIC JUSTICE, P.C.

*/s/ Adele P. Kimmel*_____
Adele P. Kimmel (admitted *pro hac vice*)
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600 (tel)
(202) 232-7203 (fax)
akimmel@publicjustice.net

CORREIA & PUTH, PLLC

*/s/ Linda M. Correia*_____
Linda M. Correia (admitted *pro hac vice*)
Lauren A. Khouri (admitted *pro hac vice*)
1400 16th Street NW, Suite 450
Washington, D.C. 20036
(202) 602-6500 (tel)
(202) 602-6501 (fax)
lcorreia@correiaputh.com
lkhouri@correiaputh.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2019, I filed the foregoing using the CM/ECF system, which will send electronic notice of this filing to Defendant's counsel of record:

Sona Rewari
Andrea Calem
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
srewari@hunton.com
ACalem@hunton.com
*Counsel for Defendant*

*/s/ John R. Ates*_____
John R. Ates (VSB #71697)
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
703-647-7501 (tel)
703-229-6430 (fax)
j.ates@ateslaw.com