# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-614 (LOG/MSN) |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF JANE DOE'S
## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

During an overnight school-sanctioned event, a male Fairfax County Public Schools' student sexually assaulted a female FCPS student, Jane Doe. In response to several student reports of the assault, adult school administrators chose to sit idle, belittle, demean, and mock Doe. Through their woefully inadequate response, the school administrators claim to have come to the conclusion that the two merely engaged in mutual inappropriate touching. However, the administrators deliberately chose to ignore Doe's escalating physical and emotional distress, berate Doe as she described the assault, threaten Doe with disciplinary action, turn away witnesses, ignore evidence of the assailant's misconduct, remove Doe from the classroom, disregard Doe's safety concerns, destroy critically-relevant documents, and place Doe's assailant on a pedestal. The School Board now claims it is entitled to escape liability under Title IX as a matter of law. To the contrary, it is the School Board's response, and not Jack Smith's or Jane Doe's behavior, is at issue in this case. Doe's plentiful, compelling evidence of Defendant's wrongful acts and omissions firmly establishes a genuine dispute of material facts for resolution by a jury.  Defendant's deliberate indifference barred Doe's ability to fully access the benefits of its educational programs and activities. Summary judgment is inappropriate and Defendant's motion should be denied.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

On March 8, 2017, Jack Smith sexually assaulted Jane Doe on a school bus headed for a band festival with Oakton High School's symphonic band. Smith initiated sexual contact, rubbing Jane Doe's legs. "He then proceeded to move [her] hands closer to his genitals and then pulled down his pants. [Doe] moved [her] hand away but he moved [her] hand back onto his genitals. [Doe] was so shocked and scared that [she] did not know what to say or do." Ex. 1. "I tried to block him but he still put his hands up my shirt and down my pants." *Id*. Doe was "squirming in

my seat," "visibly uncomfortable," "shifted my body from facing forward to kind of facing towards

the side and kind of moved -- like scooted away from him as much as I could," and when he

grabbed her hand and put it on his penis, Doe pulled her hand away. Ex. 2, Dep. of Jane Doe at

236:15-247: 21. After she pulled her hand away, Doe described Smith's actions:

> [H]e grabbed my hand again and forced me to rub his penis by putting his hand over
> my hand, putting it on his penis, and forcing me to rub it. . . . He eventually got to my
> pants and I had my arm covering like my waist, so he couldn't go down my pants. . . .
> he got around my arm and went down my pants and penetrated my vagina.

*Id.* As this was happening, Doe was shocked and scared. "I was frozen. I had no idea what to do.

I was pretty much paralyzed. My brain had basically just shutdown." *Id.* at 257:18-258:11.[1]

Once off the bus and safe in her hotel room, that same night, Doe called her close friend

A.K. (who remained in Virginia) to tell him what happened. *Id.* at 261:15-262:6. Doe told A.K.:

> Jack Smith grabbed her hand and put it on his penis, that she tried to pull away, and
> Smith grabbed it again and made her touch him. I could tell from her tone that she was
> clearly shaken up and upset by what had happened. [S]he told me that she was not
> feeling well and that she was not sleeping or eating.

Ex. 3, Decl. of A.K., ¶¶ 5-6.  The next day, Thursday, March 9, 2017, when the students arrived

in Indianapolis, Doe told her friend V.S. that "Smith forced Doe to pleasure him and Smith put his

hand up Doe's shirt and grabbed her hand and put it down his pants. Smith held his hand over

Doe's hand to make her touch his penis . . . Doe had taken Smith's hand out of her shirt and pants

and he just kept putting it back in her pants and up her shirt." Ex. 4, Decl. of V.S., ¶ 4. V.S. "knew

that it was wrong" and after speaking with Doe, told Band Director Jamie VanValkenburg ("Dr.

V") what happened, indicating she wanted to speak with Michelle Taylor because Taylor was the

highest-level administrator on the trip. *Id.* ¶ 6. Taylor then was an Assistant Principal at Oakton

---

[1] Def. SUF ¶¶ 12, 13, 15-17 (immaterial); ¶ 14 , 19-21, 23 (disputed). Ex. 2, 222:13-223:16.

High School, with supervisory authority over Oakton's arts programs, including band. Ex. 5 at 57:12-58:17.

Dr. V texted Taylor at 9:56pm on March 9, stating that V.S. "just told me that there was some funny business on the bus. [Jack Smith] put himself on [Jane Doe] or something like that. [Jane] was not into it. [Jane] told [V.S.] not to tell anyone, that she was embarrassed. Please advise." *Id.* at 107:1-108:22; Ex. 6. Taylor told Dr. V that she would look into the issue. Ex. 5 at 117:16-118:9. Dr. V took no other action.[2] *Id.* at 119:22-125:1. Taylor did not take action to speak with V.S. the night she received the text, either. She did not take action the next morning.

While Taylor continued to enjoy the festival, A.K. was back at Oakton and "worried about Doe because she was very upset and still on the band trip with Smith," so he reported what happened to his math teacher, Laura Kelly, on March 10. Ex. 3 ¶ 7-8. A.K. was sad and nervous, telling Kelly that "one of his friends had gone on the band trip and that she had told him that another student, while on the band trip, had forced her to do hand stuff." Ex. 7 at 52:8-54:11. Kelly understood A.K. to be reporting a sexual assault and "immediately walked to the security office to talk to Wally Baranyk, who is the head of security" at Oakton. *Id.* at 59:6-61:3. Kelly reported the assault to Baranyk, telling him a student was "forced to do hand stuff with another student while on the band trip. . . . He asked [Kelly] if by hand stuff [she] meant something sexual, to which [Kelly] said yes." *Id.* at 61:8-62:4. Def SUF ¶ 45, 46 (disputed, partially immaterial).

Baranyk then interviewed A.K. with two other members of the security team about what he had told Kelly. Ex. 3 ¶ 9. Two security staff involved in Doe's case were Darrell Estess, Oakton's School Resource Office, and Kathleen Sefchick. Ex. 9. A.K. reported to them "that one

---

[2]     "I probably paid more attention to [Smith] and [Doe] than I would have previously, but other than that, not really.  I mean, the trip was kind of rolling, so..." Ex. 5 at 124:10-13; *see also id.* at 75:5-82:16, Ex. 8. Def. SUF ¶¶ 24-25, 29, 31-39, 41, 48 (immaterial).

of my friends was sexually assaulted on the bus on the way to Indianapolis for the band trip. I remember saying the words 'sexual assault.'" A.K. told them Doe did not consent. Ex. 3 ¶ 9.

Baranyk called Taylor around 2:00p.m. on March 10. Ex. 10. Taylor did not answer and instead texted Baranyk, Estess, and Sefchick to ask if it was an emergency. Ex. 9. Both Sefchick and Estess responded there was no emergency, and told Taylor there was a "[s]exual act on the bus." *Id.* They then began mocking the situation, asking Taylor if she was attending "a lovely concert" and joking about "[o]ne time on a band trip," referring to the quote "one time at band camp" from the movie American Pie, a comedy about four teenage boys entering into a pact to lose their virginity and a quote which refers to a high school female character who tells stories about sex and masturbation at band camp.[3] After this text exchange, Taylor spoke with Baranyk. Ex. 11 at 150:11-152:20. Taylor joined in, never saying the "jokes" were inappropriate.

After having alarms raised by two different students, Taylor decided to speak with V.S. at the end of the day on March 10. Ex. 11 at 125:11-127:19; Ex. 12 at FCSB-DOE-13210. V.S. recalls telling Taylor in the conversation that "Smith forced Doe to put her hands on him and that Doe was pulling her hands away and pushing his hands out of her shirt, but he kept putting his hands down her pants and up her shirt. I told Ms. Taylor that Smith penetrated her with his fingers. I told Ms. Taylor that Smith forced Doe to jack him off[.]" Ex. 4 ¶ 7. V.S. recalls that Taylor asked her "why Doe did not stand up or verbally say no." *Id.* at ¶ 8. *But see* Ex. 11 at 128:19-133:4

After Taylor spoke with V.S., she called the principal of Oakton High School, John Banbury. *Id.* at 139:22-141:6. Taylor told Banbury about her conversation with V.S., including that Doe touched Smith's penis under a blanket on the bus, and they discussed "talking to [Doe]

---

[3]    Taylor 153:14-159:1; *see also* American Pie (1999), International Movie Database (IMDb), https://www.imdb.com/title/tt0163651/ (last visited May 9, 2019).

over the trip or waiting until Monday when we were back at school." *Id.* 128:19-131:9; Ex. 13 at 104:5-106:18. Banbury told Taylor to observe Doe, and absent new information, to wait until the students returned to Oakton to deal with it. *Id.* After that, Taylor took no actions. *Id.* She did not check in on Doe or take any efforts to ensure Smith and Doe were separated. Taylor could not observe Doe throughout the trip because she was not staying in the same hotel as the students. Still, she did not direct any other teacher or chaperone to keep an eye on Doe or tell the students how to get in touch with her if an issue came up. *Id.* 120:12-123:9; 144:4-145:12; Ex. 14. Instead, they continued to mock the assault. For example, Taylor sent an email to a few teachers and Principal Banbury asking about how many inches of snow Oakton was expecting that week with news of an impending snow storm. Ex. 15. Banbury responded to Taylor, "[h]ow many inches under the blanket or on the ground?"; a comment he admits he made "[b]ecause the girl was stroking the kid's penis under the blanket." Ex. 13 at 204:17-20. Apparently finding the ridicule funny, Taylor responds, "I sure am going to miss you in a few weeks." Ex. 15.

Meanwhile, Doe was struggling emotionally and physically. Doe had a "stomachache and [was] throwing up and not eating and not sleeping []from my anxiety of what had happened." Ex. 2 at 153:5-156:21. After two days of illness, Doe approached Dr. V to ask for help. "I went up to him on Saturday and I told him that I wasn't feeling well, that I wasn't eating and I was throwing up, and he just dismissed me." *Id.* Dr. V "acknowledged that I told him [I was sick] and then he just went on and talked to someone else without even like telling me to go to the nurse or anything like that." While the adults were ignoring Doe's immediate health needs, the students noticed Doe's worsening condition and were concerned about her changed demeanor. K.D., who Doe told about the assault on March 9 (the morning after it happened), said Doe seemed "uncomfortable and was really shaken up" and "looked like she was going to cry." Ex. 16 ¶ 4. She said "Doe

seemed like she was miserable, both physically and emotionally," throughout the whole band trip. *Id.* ¶ 6. V.S., who was sharing a room with Doe, noticed that she was having trouble sleeping and was visibly upset. Ex. 4 ¶ 9. B.M., another student on the trip, noticed that Doe was not eating and not acting like herself during group meals, a difference so stark that B.M. asked Doe what was going on and Doe told her about what had happened with Smith. Ex. 17 ¶¶ 4-5.[4]

By March 10, two students and two teachers had reported the occurrence of a sexual assault to several different school administrators and security personnel, and by March 11, Doe had told Dr. V directly that she was feeling ill. Yet the officials failed to call Doe's parents or offer Doe assistance or take any action to ensure her safety during the trip or on the bus ride back to Oakton. On March 12, Dr. V sent Taylor a text message to tell her that he had just been contacted by another person, this time a parent, about what Smith did to Doe. E.J., Doe's friend and a band member, saw "Doe was visibly upset and I was shocked and upset, too. . . . As soon as I walked in the door at home on Sunday after returning from the Indianapolis trip, I spoke to my mother. I was crying and I told my mother that Doe had been sexually assaulted." Ex. 33 at ¶¶ 7-8. E.J.'s mother then contacted Dr. V and Dr. V sent Taylor a message stating, "FYI [K.J.] has texted me, saying we have an urgent [student name] situation or worse, and she wants me to call her. I'm assuming her daughter told her about [Smith/Doe]. I was not going to respond at this time but thought you should know.  If you want me to respond, please tell me what to say." Ex. 6. The "[student name] situation" in K.J.'s message referred to a band student who reported a sexual assault the previous year, telling Dr. V they had a similar situation "or worse." Ex. 5 at 138:14-145:6.

Although Taylor had learned no new information from this text message, she wrote to Assistant Principals Colleen Eddy and Jennifer Hogan, saying "[a]s you are both aware there was

---

[4] Def. SUF ¶¶ 54-58, 66 (immaterial, disputed); ¶ 36 (disputed), *see* Doe 153:10-155:17.

a potential issue on the band trip. Apparently, there was an actual issue . . . I heard from a parent this evening." Ex. 18. Taylor was still in Indianapolis and asked that they speak with Doe on Monday. *Id.* Taylor and Hogan spoke briefly on the phone that night, but aside from a quick check-in, Taylor did not give Hogan a recounting of what she heard from V.S. or from Baranyk regarding his interviews with Laura Kelly and A.K. *See* Ex. 19; Ex. 20 at 198:8-200:12.[5]

On Monday, March 13, 2017, Hogan and a school counselor, Alyson Calvello, first met with Doe in Hogan's office. Ex. 21 at 62:14-66:19. Hogan claims she started the meeting by introducing herself and saying Doe "wasn't in trouble," and asked her what happened on the Indianapolis trip. Ex. 20 at 94:13-97:20. Hogan recalls that Doe explained that she felt like "she was stuck in a situation she didn't know how to get out of"—a situation that she did not believe was consensual. Hogan 97:8-100:19. Hogan asked Doe "did you do anything to try to stop him?" Doe said "I blocked him" and Hogan asked "how many times?" *Id.* at 97:14-100:19. Hogan testified that when she asked Doe if she wanted Smith to touch her (or a question to that effect), Doe responded "[t]hat she didn't want a relationship and that he had a girlfriend." *Id.* at 101:17-102:13. The only specific details Calvello remembers about Hogan's interview of Doe is Hogan's answer to Doe's question about the possibility she would be disciplined.[6]

Hogan did not tell Doe that providing a written statement was voluntary; "Ms. Hogan told me that I had to provide a written statement." Ex. 2 at 149:11-18, 151:9-11. Doe wrote:

> I moved my hands away but he moved my hand back onto his genitals.  I was so shocked and scared that I did not know what to say or do. . .  I tried to block him but he still put his hands up my shirt and down my pants.

---

[5]     Def. SUF ¶¶ 60-61 (immaterial, disputed as incomplete).
[6]     Def. SUF ¶¶ 70-75 (disputed), 76 (immaterial).

Ex. 1. School Board policy does not mandate a student provide a statement, Ex. 20 at 50:22-51:17, but actually prohibits administrators from telling students that they must provide a statement and requires that they explicitly tell students that it is voluntary. Ex. 22 (video); Ex. 2, 172:19-173-6.

Hogan left Doe sitting in her office while she interviewed Jack Smith and two witnesses, C.C. and B.M. Ex. 2 at 148:11-149:9. After more than an hour and a half, Hogan came back into the room with Wally Baranyk, Oakton's Head of Security. Hogan and Baranyk read Doe's written statement before they started questioning her. Ex. 20 at 159:19-160:20. Baranyk has a background in law enforcement, and for that reason, Hogan did not question Baranyk's interview style and let him take the lead asking Doe questions. *Id.* at 156:12-159:18. Hogan introduced Baranyk to Doe, saying "he was like some security officer who knew about the law and he was going to tell me whether or not I could file any charges against Jack Smith." Ex. 2 at 310:12-311:5. With this introduction, Baranyk told Doe if she filed a lawsuit about this incident, she would lose; "He told me that there was no way I could file a sexual assault charge against him and then he said the closest I could get to getting him in trouble was filing a battery charge against him." *Id.* 316:9-17.

Baranyk asked Doe a series of questions that she found intimidating and accusatory, as if she was to blame for what transpired. *Id.* at 361:2-22. Baranyk told Doe "that it was likely that nothing would happen to Jack Smith even if I had tried to bring a case to court." *Id.* In response to one of Baranyk's "blame the victim" questions (why Doe did not scream), Doe said "I was on a bus full of 60 of my closest friends and I would have been embarrassed, [and Baranyk] said to me, well, how do you feel now?" *Id.* at 314:2-317:2. Baranyk's physical presence and demeanor was as threatening as his questions: "he was just like very aggressive and intimidating. He was either sitting very close to me or standing over me the entire time. He was getting very animated and very loud. I just felt very uncomfortable with the situation, especially just talking to someone that

I didn't know and who was treating me so poorly. . . . He was just raising his voice a lot." *Id.* Doe spent the interview distraught, "crying even more when Mr. Baranyk was there just because I was so shocked that someone could be so aggressive to someone who is just trying to tell their story." *Id.* at 362:9-364:2.

Doe attempted to return to class and then promptly left when students noticed she had been crying, going to the bathroom to call her father. John Doe "receive[d] a phone call from my daughter in the afternoon. She was sobbing and hyperventilating, having a hard time talking. And the only thing she could really focus on is that she was going to get expelled and it was going to ruin the rest of her life." Ex. 23 at 170:10-172:18.

After experiencing the School Board's hostile treatment on March 13, Doe recounted the experience to her parents the next day. Her father testified that "[o]ne of the things that [Doe] had talked about was the meeting that she had when it was Ms. Hogan, the counselor, and the security guy. And how she was in a room with two of them, the counselor and Ms. Hogan, and how they kept asking her a lot of questions, intimidating questions and how she could be in trouble and then they brought the security guy in and apparently she said asked questions and made statements that were quietly intimidating like, are your parents going to sue us. This is something that is a he said, she said, it's something that it would be hard to prove in a court of law. He's had experience in situations like this and there's nothing that your parents can do. And that's when it came out that she had written a statement." *Id.* at 187:5-188:1.

The school's treatment of Doe stands in stark contrast to its treatment of Smith. Hogan did not introduce Baranyk as someone with law enforcement experience, and neither Hogan nor Baranyk raised the potential for school discipline or legal action. Ex. 24 at 47:6-14, 49:3-19. Smith said the administrators zeroed in on Doe's behavior, in particular, "they were interested about the

fact that she was wearing my hat." *Id.* at 44:19-21. Smith found Baranyk straightforward and did not question whether Baranyk believed what he was saying. *Id.* Baranyk found Smith "very confident, straightforward, wasn't intentionally trying to hide any of the facts surrounding the case," Ex. 41, 136:1-138:12, although Smith later admitted he lied to them. Ex. 24 at 43:7-44:13.

While Doe thought she was going to be expelled, Smith did not know he was the subject of an investigation into serious misconduct. No administrator told Smith he was accused of committing a code of conduct violation or that Doe found his advances unwelcome. It was not until a week after the school concluded its investigation when Smith learned from a friend that "someone on the robotics team has been saying that you assaulted someone on the band trip." *Id.* at 32:19-34:14. That was the first time he understood Doe felt like he forced her. *Id.* 62:8-11. Smith assumed that the school was looking into what happened because they engaged in sexual activity during a school event, *Id.* 93:3-94:17, a critical error which was easy to espouse given the school did not capture the finding or outcome of the investigation in writing (or ever share the outcome or details of the investigation with Doe or her parents, in general, writing or otherwise).[7] Ex. 23.

The School Board's listless approach to Smith smacks of deliberate indifference, particularly when matched with its failure to respond to other reports and witnesses who came to the school with information about Doe and Smith. For example, a student emailed her counselor on March 13—the same day the school was interviewing Doe and Smith—stating that "I need to talk to you immediately . . . I've heard some things that happened between two of my band classmates on the Indianapolis band trip this past weekend. . . . Since my sophomore year the boy involved has been sending explicit content to her over snapchat, trying to convince her to become sexually involved with him. This is not something he should be allowed to get away with and she

---

[7] SUF ¶ 104 (disputed); Ex. 13, 171:10-18 ("51 percent?" "No percentages were ever discussed.").

needs someone to stand up for her." Ex. 25-27. The counselor forwarded Taylor the email, marking it as a "high importance" email. *Id.* Taylor did not respond to the student or the counselor, so the counselor followed up via email again. When Taylor again did not respond, after a day past, the counselor forwarded the email to Hogan. *Id.* Still, neither Hogan nor Taylor spoke with the student as part of the school's investigation. Ex. 28 at 78:15-83:14; Ex. 11 at 138:14-139:21. No school official asked Smith about his sending explicit material via Snapchat.  Ex. 24 at 84:16-19.

The School Board similarly disregarded K.D, the student Doe told administrators would have the most information. Ex. 2 at 364:3-12. When K.D. returned home from the trip, she expected school administrators to want to speak with her and she told her parents. Ex. 16 ¶ 7. Her mother emailed Dr. V, Taylor, and a school counselor on March 15, expressing her encouragement of her daughter to speak with them, and asked that if they wanted to interview K.D. that one of her parents be present. Ex. 29. When K.D. approached Taylor about providing a statement, Taylor lied to her and "told me that my mom didn't want the school to talk to me." Ex. 16 ¶¶ 8-10.

School officials similarly ignored Jane Roe's pleas for help as Doe's emotional distress increased and her feeling of safety at school decreased. The school made no effort whatsoever to separate Smith and Doe. The school did not direct Smith to avoid contact with Doe, Ex. 24 at 59:9-60:3, and did not raise a question to either Doe or Smith about their shared class time. As Doe's emotional well-being deteriorated, on March 20, 2017, Jane Roe wrote to Hogan and Dr. V, stating "[Jane] has expressed that she is extremely uncomfortable being in the same classroom with the male student, and we want to know what can be done or what is being done to make her feel safe." Ex. 30. Roe later and suggested that while the school figured out the best course of action, Doe "leave and/or be absent from band and find a different spot within the school where she can simply do her homework." Ex. 31. Hogan responded but ignored and never addressed Jane Roe's question

regarding "what is being done to make [Doe] feel safe." Instead, she asked whether the school counselor could check in on Doe. When Roe pushed, Hogan said Doe "could simply drop" the class because Smith was not going to be removed from the classroom, and the school was not going to take actions to separate Doe and Smith, because Smith was "a senior and graduating in a couple of months anyway, so [Doe] was just going to have to deal with it until then." Ex. 23 at 98:7-99:14; Ex. 32 at 287:10-290:1. As a result, Doe sat in a side practice room during class instead of participating with the group.[8]

Doe's removal from the classroom immediately after reporting a sexual assault was noticed by her peers. *See* Ex. 33 ¶11 ("I noticed that for a while Doe was not in band, but Smith was still there. For me, I felt like it should have been the other way around because Doe did not do anything wrong."); Ex. 16 ¶ 11("I was shocked by the way Dr. V handled the situation, seeing that Doe was put in a practice room by herself during band class while Smith continued participating with the band as if nothing happened."). Doe hoped Dr. V would "make [band] a safer environment, an environment where I felt more comfortable," but the only action Dr.V took was initiated by John Doe—moving Doe's seat 10 feet to the left in the same room—and still left Doe feeling uncomfortable. Ex. 2 at 92:19-94:12. Doe felt forced into an unbearable choice:

> I was still around my perpetrator and I still -- it was the fact that I was even in the same area as him that made me feel unsafe, but I went back, because I felt -- I just felt so isolated from my friends and I felt like I was losing friends. And the worst thing for me to do was to be isolated from the people who actually believe me.

*Id.* at 357:5-358:5. "[Doe's] joy at school and in life has always been band, so not being there anymore this year would be horrible for her, but being in the same room as the male student is horrible for her as well." Ex 34. It was so upsetting for Doe to be around Smith that she felt

---

[8]      Def. SUF ¶¶ 110-112, 121-122, 125-126 (disputed), ¶ 123 (immaterial).

compelled to isolate herself from friends that had any interaction with Smith. For example, a few weeks after Indianapolis, "Doe told [K.D., one of her closest friends,] it was too upsetting to be around Smith and to be friends with people who continued to interact with him." Ex. 16.

Although the school ignored her past outreach, Jane Roe kept seeking help on behalf of her daughter. On May 18, 2017, Roe wrote to Dr. V again: "Dr. Vanvalkenburg, [Jane] cannot handle seeing the male in band class. [Jane] is not the one who should have to leave the class. He should have been made to leave months ago." Ex. 35. He did not respond to Roe, nor did he forward the email to another administrator or teacher to handle. Ex. 5 at 198:5-199:18. Doe's ongoing distress caused by the continued presence of Smith went unaddressed.

Shortly thereafter, at Oakton's annual banquet for the band, Dr. V awarded Smith the "Director's Award" and Doe left the banquet in tears. Ex. 2 at 115:-15-118:18. Dr. V was in shock because he had never seen Jane Doe so upset. Ex. 5 at 205:16-211:8. Doe and her family were not the only ones who saw the award as an endorsement of Smith's conduct. "Smith won the award that is given to a student who is a good musician and a good person. I was surprised that Dr. VanValkenburg gave Jack Smith that award given what he did to Jane Doe. I thought by giving Jack Smith the award, the school showed that it did not care about Jane Doe." Ex. 4 ¶¶ 12-13. "Dr. VanValkenburg gave Jack Smith an award, which in my opinion, felt like it was Dr. V condoning Smith's actions." Ex. 33 ¶ 13. Even Dr. V acknowledged that he gave Smith "one of the bigger musicianship awards" and sent Taylor a text message after the awards ceremony, stating "I see what it looks like to [Doe and her family], but there's no denying he's one of the best musicians in the band." Ex. 36. The award considered an awardee's character; Dr. V explained, "I mean, would I give it to a felon? Probably not." Ex. 5 at 210:5-212:16.[9]

---

[9] Def. SUF ¶¶ 129 (disputed)

After the band trip, Doe felt like Dr. V was targeting her.  Ex. 2 at 127:14-129:22, 359:3-20. "He would call me out in front of a bunch of people. He would yell at me." For example, in the summer 2017, "both [Doe] and [her male] friend auditioned for a solo . . . He stopped in the middle of playing and he was completely out of tune. Three or four people told me that I had done better because they could hear it and [Dr. V] gave the solo to my friend. And then one day, I asked [Dr. V] if our section could get moved because we had 13 people and we were in a tiny area and another section with four people had a bunch of space that they didn't need, so when I asked him if we could get moved, he just yelled at me and told me to go back to sectionals. And then my friend . . . asked him a minute later if we could get moved and he let us move." *Id.* at 129:8-22.

After the assault and the school's response, Doe no longer looked forward to band class and activities, and those around her observed a noticeable shift in her commitment to the educational activity she once loved. A.K. said, "Smith's sexual assault and the school's response negatively affected Doe in ways different than other issues I have seen her confront. . . . I observed Doe avoiding band as much as she could. Especially after Dr. V gave Jack Smith an award at the end of the year banquet, Doe became and remained upset with Dr. V and it affected her demeanor and desire to participate in band." Ex. 3 ¶ 12-13; *see also* Ex. 33 ¶ 15.  Although Doe had been playing saxophone since she was 10 years old, she no longer plays the instrument or participates in a band.  "[A]fter the trip and after dealing with Dr. V and everything, there is nothing that really brought me joy about music.  It just brings back a lot of bad things that I don't want to relive, so the thing I loved the most turned into the thing I hated the most." Ex. 2 at 351:18-359:8.[10]

---

[10] Def. SUF ¶¶ 130, 132-134, 136-143 (immaterial); 131, 135 (dispute). *See* Ex. 23 at 207:17-208:9, 296:11-298:8.

The School Board has an established procedure for addressing issues of discipline and student safety; a process which FCPS employees did not follow after Doe's sexual assault. On previous occasions when male band members were the targets of unwanted sexual behavior or well-being concerns, the school's response differed. Ex. 5 at 43:8-67:7. Before Indianapolis, the school hosted a meeting with the students and parents. At that meeting, "we go over the student conduct and rules and expectations." Ex. 5 at 41:4-43:7. The presentation repeats at multiple points that students are expected to comply with school rules, and if caught breaking the rules, will be sent home via "C.O.D." procedures. *See, e.g.*, Ex. 14 at 14219 (form that parents and students must sign, which states, "[s]tudents who engage in behaviors or activities that violate the FCPS Student Rights and Responsibilities [(SR&R)] policies or who go outside designated boundaries may be dismissed" from the trip and requires parents to indicate mode of transport, should their child be dismissed (offering bus, train, plane)).  Ex. 37.  The presentation also encourages students to bring blankets for sleeping on the bus. Ex. 14 at FCSB-DOE-014237.[11]

## LEGAL STANDARD

Summary judgment is inappropriate unless the movant "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court "must view the evidence in the light most favorable to" the non-movant. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)). The non-movant's "evidence is to be believed, and all justifiable inferences are to be drawn in [her] favor," and the court may not make credibility determinations. *Jacobs*, 780 F.3d 562, 569 (citing *Tolan*, 134 S. Ct. at 1866); *see also Hunt v. Cromartie*, 526 U.S.

---

[11] Def. SUF ¶¶ 3, 6, 8, 11 (immaterial); 4, 5, 9 (disputed). *See* Ex. 5 at 41:20-42:8; Ex. 11 at 118:8-123:9; Ex. 38, 39 ("I'm in my happy place here."); Ex. 2 at 145:3-20.

541, 552 (1999)). On a motion for summary judgment, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150-51 (2000).

Title IX of the Education Amendments of 1972 protects students from sex-based discrimination that interferes with equal participation in education, which may include student-on-student sexual harassment when it is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school. 20 U.S.C. § 1681(a); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 632 (1999). A school is liable under Title IX when it is deliberately indifferent to known acts of sexual harassment, which means its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 641, 653. A school need not "fully appreciate[] the harmful consequences of that discrimination" or act "maliciously" for its response to be deliberately indifferent. *Vance*, 231 F.3d at 259-60. Whether a school acted with deliberate indifference "will often be a fact-laden question" and one that should be based on the totality of the circumstances. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 457 n.12 (5th Cir. 1994); *Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, 341 F. Supp. 3d 793, 807 (S.D. Ohio 2018).

"[C]ourts have found that the deliberate indifference or clearly unreasonable standard 'does not lend itself well to a determination by the Court on summary judgment,' and have permitted the claim to go to the jury if the plaintiff advanced some evidence in support." *Jane Doe A v. Green*, 298 F. Supp. 2d 1025, 1037 (D. Nev. 2004) (quoting *Hart v. Paint Valley*, 2002 U.S. Dist. LEXIS 25720, at *4 (S.D. Ohio 2002)); *Theno v. Tonganoxie Unif. Sch. Dist. No. 464*, 394 F. Supp. 2d 1299, 1311-12 (D. Kan. 2005) (finding whether the school responded adequately to known acts of harassment was an issue of fact for jury to decide at trial). "If Plaintiff is able to assert some

compelling evidence in support of her claim that [the School Board's] response to [Doe's] known harassment was unreasonable, then the determination of whether [the school's] response was *clearly* unreasonable in light of the known circumstances should be left to the fact-finder." *J.K. v. Ariz. Bd. of Regents*, No. CV 06-916-PHX-MHM, 2008 U.S. Dist. LEXIS 83855, at *52-53 (D. Ariz. Sep. 29, 2008) (emphasis in original).

## ARGUMENT

I.   **Plaintiff Jane Doe Presents Compelling Evidence From Which A Jury May Conclude The School Board Was Deliberately Indifferent To Known Acts Of Sexual Harassment.**

Here, the School Board does not dispute that it had actual knowledge of severe or pervasive harassment; moving for summary judgment only on the grounds that the School Board's response was not "clearly unreasonable in light of the known circumstances." Def. Mem. at 26-30. Where the School Board failed to act during an overnight, multiday trip, mocked Doe, berated and belittled her, willfully ignored evidence, and took affirmative steps to praise Smith in the face of Doe's ongoing distress, a jury may find the School Board acted with deliberate indifference.

A.   **The School Board's failure to take any action during the overnight, multiday band trip was clearly unreasonable in light of the known circumstances.**

The School Board asserts that its response to actual knowledge of Doe's sexual assault was "swift and considered," Def. Mem. at 28, but a jury may reject this characterization based on multiple reports and the testimony of Defendant's own witnesses.  By Friday March 10, the school heard from two students and two teachers that Smith "put himself on [Doe] . . . [Doe] was not into it," Doe was "forced to do hand stuff . . . [which] meant something sexual" and "was sexually assaulted on the bus on the way to Indianapolis for the band trip." Ex. 6, 4, 3, Ex. 7 at 61:8-62:4. Both students knew that it required immediate attention, so despite the fact that Doe asked them to keep it confidential, they reported it within hours, in one case, and within a day in the other, to

school authorities.  The School Board's inaction was compounded by Dr. V ignoring Doe's request for help. Doe explained, "I went up to him on Saturday and I told him that I wasn't feeling well, that I wasn't eating and I was throwing up, and he just dismissed me." Ex. 2 at 154:4-12.

The School Board, on the other hand, did not contact Doe during the trip, did not call her parents, dismissed her when she asked for help because she was feeling ill, and took no steps whatsoever to ensure that nothing happened on the other bus rides in Indianapolis or the 10 hour bus ride back. A jury could find this sit-back-and-wait approach to a report of sexual assault amounts to deliberate indifference. *See Davis*, 526 U.S. at 654 (holding school may have been deliberately indifferent when it "made no effort whatsoever either to investigate or to put an end to the harassment").

The School Board's focus on the fact that Doe did not direct her friends to take action in response to her report of sexual assault, and that when the students reported to the school, they did not ask for the school to take any action, rings hollow. *See* Def. Mem. at 6, 11. The law rightfully does not require children to ask for specific interventions to trigger a school's obligation to address their safety concerns. A school has "actual notice" even if it receives unconfirmed reports of harassment from third parties who did not directly witness the harassment. *See J.M. ex rel. Morris*, 397 Fed. App'x 397, 452-53(10th Cir. 2010) (third-hand report from someone who did not witness the harassment sufficient); *Doe v. G-Star Sch. of the Arts, Inc.*, No. 16-cv-80446, 2017 U.S. Dist. LEXIS 74235 (S.D. Fla. May 16, 2017) (same); *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 708-09 (E.D. Pa. 2007) (same); *Doe A. v. Green*, 298 F. Supp. 2d 1025, 1032-34 (D. Nev. 2004) (same). Courts have similarly held a school's response deliberately indifferent even if the victim actively denies or does not wish to pursue claims that harassment occurred. *See Massey*, 82 F. Supp. 2d 735, 744-45 (N.D. Ohio 2000); *Doe No. 60*, WL 2119557, at *7; *Nelson v. Almont*

*Cmty. Sch.*, 931 F. Supp. 1345, 1357-58 (E.D. Mich. 1996). Doe's friends—unlike the school— recognized the seriousness of what occurred and immediately reported it to multiple school officials, and other students at the earliest opportunity reported it to their parents. A jury may find that the School Board was unreasonable in failing to act with similar urgency.

Although the School Board attempts to downplay the extent to which it was aware of a problem while Doe was on the trip—framing its knowledge as "some information about the incident," Def. Mem. 28—a mere allegation triggers the school's duty to investigate, determine credibility of the assertions, and take remedial actions. A school cannot stick its head in the sand and claim it did not know the severity or seriousness of the issue. For example, in *Doe v. Forest Hills School District*, the school district moved for summary judgment, arguing it did not have actual notice of the harassment because "the allegations were never substantiated." *Doe v. Forest Hills Sch. Dist.*, No. 1:13-cv-428, 2015 U.S. Dist. LEXIS 175321, at *34 (W.D. Mich. Mar. 31, 2015). The court held this argument was "unavailing and circular," stating "a school cannot conduct a sub-par investigation and then claim that it did not know about harassment because its investigation did not turn up proof beyond peradventure to support the charges. Courts consider whether acts of harassment were "known" for the purpose of determining whether the school was on notice that there was a *potential* issue." *Id.* (emphasis added); *see also T.C. ex rel. S.C. v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:17-cv-01098, 2019 U.S. Dist. LEXIS 76032, at *40 (M.D. Tenn. May 6, 2019) (summary judgment denied "school district turned a blind eye" to harassment).

The School Board's suggestion that Taylor's inaction on the trip was reasonable because she "did not have the same support resources there that existed at Oakton" is senseless when viewed in light of the school's past actions. Def. Mem. 29. Taylor had exactly the scope of

resources Dr. V had when he addressed allegations on other overnight trips when male students were the targets or otherwise at risk. Ex. 5 st 120:20-123:11. In fact, on at least six occasions where Oakton's band was on an overnight trip, school administrators received information about a student's wellbeing or alleged misconduct and took swift action while on the trip. *Id.* 43:8-47:3; 49:3-51:9; 64:7-67:7. These incidents ranged from catching a student riding a mechanical bull to missing curfew to sexual harassment allegations by a male student. *See id*.

Taylor's deliberate indifference is palpable. After receiving information from V.S., A.K., and Laura Kelly, it was only after she received information from a parent on Sunday when the students were back in Oakton that Taylor wrote to multiple administrators stating, "you are both aware there was a potential issue on the band trip. Apparently, there was an actual issue . . . I heard from a parent this evening." Ex. 18. Hogan observed Taylor's shift between receiving information from students versus a parent: "Based on the conversation she had with the student" Taylor understood "there was some type of sexual activity on the bus and that it seemed to be just two willing participants. But then later, she heard it again that maybe [Doe] didn't want to be a participant or something along those lines." *See* Ex. 20 at 83:2-85:17, 94:13-95:6. A jury may view Taylor's active abating of students' reports of sexual harassment as deliberate indifference.

A jury also could reject the School Board's attempt to bolster Taylor's response because she "received training on the signs that could indicate that a student is 'going through something,'" Def. Mem. at ¶ 57, a fact a jury may reject given Taylor disregarded signs of sexual assault that multiple children, without training, readily observed.[12] The School Board also claims that Taylor kept a close watch over Doe to ensure she was safe and monitor her wellbeing, Def. Mem. at ¶¶

---

[12]     The students did as instructed in FCPS's video. Ex. 22 ("If you are concerned that you <u>or a friend</u> are being sexually harassed, . . . you can first tell a trusted adult").

42, 53-55, a proposition a jury may discredit given the fact that Taylor did not travel with the band on the busses, was not staying in the same hotel as the students, did not ask anyone to keep an eye on Doe when she was not around, and did not check back in with Dr. V or any other chaperone to ask if they noticed anything out of the ordinary with Doe. *See* Def. Mem. ¶ 10.

The most outlandish of the School Board's factual assertions is Banbury's purported worry that if Taylor confronted Doe on the trip, Doe would be vulnerable to suicide ideation or action, given his experience of knowing a student who had "gotten into trouble at school and was sent home . . . to an empty house" and then committed suicide.  *See* Def. Mem. 12 at ¶ 56. Other than Banbury's testimony, there is no mention of this concern in any witnesses' testimony or in any school document. Ironically, at the time Banbury was purportedly concerned about Doe's physical safety, he texted a comment to Taylor about Smith's erection during the assault. *See* Ex. 13 at 201:4-204:20 ("[h]ow many inches under the blanket or on the ground?" a comment he admits he made "because the girl was stroking the kid's penis under the blanket"). A jury may reject the principal's newly expressed concern about Doe's wellbeing when coupled with his admitted mocking of her sexual assault.

Furthermore, Banbury did not know who picked Doe up from the bus after the trip or whether she went home to an empty house, and on Monday when Oakton officials did confront Doe, neither Banbury nor any administrator asked her if she would be going home to an empty house, called Doe's parents to pick her up, or in any way checked in on her to ensure she was safe or emotionally sound. *Cf. id.* at 234:12-236:6. Quite to the contrary, Hogan testified that Doe went back to class after her and Baranyk conducted their interview, Def. Mem. ¶ 91, but Doe was actually in the bathroom hyperventilating and calling her father. A jury may view the fact that Banbury took no actions to ensure Doe's safety and wellbeing on March 13, and openly mocked

the assault at the same time that he purportedly was concerned for her wellbeing, and reject his

alleged concern for suicide.

### B. The School Board's hostile and belligerent treatment of Doe during its investigation was clearly unreasonable in light of the known circumstances.

Where an institution discourages a victim from reporting the act to law enforcement or

pursuing legal action, a jury may find deliberate indifference. *S.S. v. Alexander*, 177 P.3d 724,

738 (2008); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 63-64 (1992) (may establish Title

IX liability where school administrators discouraged student from "pressing charges" against

harasser); *Doe v. Oyster River Coop. Sch. Dist.*, 992 F. Supp. 467, 481 (D.N.H. 1997) (guidance

counselor's expression of concern about lawsuits cast doubt on the reasonableness of the school's

response). Here, the school not only discouraged Doe from taking criminal action against Smith,

but also civil action against the school. One of the first questions Baranyk asked Doe was if she

intended to pursue legal action. Ex. 41 at 99:11-103:6. Baranyk told Doe "that there was no way I

could file a sexual assault charge against [Smith] and then he said the closest I could get to getting

him in trouble was filing a battery charge against him." Ex. 2 at 316:9-17. Contemporaneously,

Doe told her mother that Baranyk "told her if she took this to court, that she wouldn't win and that

the most the boy would get charged with was battery; how she asked him if her parents would take

this to court -- we didn't even know anything about anything at that point." Ex. 32 at 45:1-13.

Doe's father also recalls Hogan recounting Baranyk's opinion that "the school had no liability in

this situation."

Baranyk denies these statements, Ex. 41 at 103:15-105:14, a dispute for a jury to resolve,

but admits that the school told Doe legal action would be "nearly impossible" for her to pursue:

"We don't even know where the incident happened. Was it in Ohio? Was it in one of the states

between Virginia and Ohio? And I believe [the School Resource Officer] explained that, I want

to say, to both the student and the parents that, without establishing a jurisdiction of origin, seeking a criminal offense, even if one occurred, would be nearly impossible." *Id.* at 99:11-105:5. A jury may view Baranyk's comments as threatening and discouraging legal action, actions clearly unreasonably in light of the known circumstances.

Doe felt that Baranyk "clearly didn't believe what I had told him. He was aggressive. When he questioned me, he asked me a lot of accusatory questions. He raised his voice pretty often. He just made me feel uncomfortable. . . . I was crying even more when Mr. Baranyk was there just because I was so shocked that someone could be so aggressive to someone who is just trying to tell their story and have people believe them." Ex. 2, 359:21-362:20. Baranyk admits that he questioned Doe's veracity, thinking that she "fabricate[d] circumstances that were not factual" and asking her "[i]f you felt you were being compelled to do this, did there come a time when you felt the need to call out? to seek assistance? to raise your hand? to get up, change seats?" Ex. 41 at 85:10-96:21. A jury may find that Baranyk's questions "cast doubt on the fairness and impartiality" of an investigation where "[t]he records show no objection to these comments" from Hogan or Calvello, and Baranyk treated Smith with an air of civility missing from his interactions with Doe. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1730 (2018).

Still, Baranyk testified that Doe's account of his behavior during the interview is "90 percent contrived." Ex. 41, 207:21-209:5. The jury gets to decide which account of Doe's meeting with Baranyk is credible, with two key considerations that weigh in Doe's favor. First, Doe recalls Hogan apologizing for Baranyk's behavior at the end of the interview, telling her "I know he's an aggressive person. . . And she said I'm sorry you had to deal with that." Ex. 2 at 360:8-361:1.

Second, Baranyk's testimony expresses a clear disdain for Doe.[13] Although the School Board states that Doe and Smith's "accounts of what occurred were similar in many respects," Def. Mem. at 29, Baranyk testified that he met with Calvello and Hogan after Doe filed her lawsuit to get on the same page that Doe's lawsuit was "so fabricated that we couldn't even believe it." Ex. 41, 207:21-230:4. Baranyk also spoke with Banbury once after learning that Doe filed a lawsuit against the School Board. *Id*. A jury may find Baranyk's hostility toward Doe in March 2017 readily believable next to his open and avowed hostility toward Doe in February 2019, and may discredit any testimony from Banbury, Calvello, and Hogan once it knows that four of the School Board's witnesses discussed their recollections together after Doe filed the lawsuit.

A jury may also find that the School Board belittled the assault by making comments about "inches under the blanket" and "one time at band camp," and by telling Doe she should tolerate Smith's presence because he was graduating in a few months.  Minimizing the import of sexual assault may be indicative of deliberate indifference.  *See Jennings v. Univ. N.C.*, 482 F.3d 686, 700 (4th Cir. 2007) (university counsel told victim that "she should work out her problems directly with [her harasser]"); *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 954 (S.D. Ind. 2007) (victim told "some threats aren't as serious as others").

### C. The School Board's failure to fully investigate the issue and address Doe's continued safety concerns was clearly unreasonable in light of the known circumstances.

A jury may look at the fact that the School Board turned away witnesses, ignored the outreach of students and a parent who were concerned about Doe, and failed to follow up on

---

[13]     Baranyk disdain for Doe is so distinct he seeks to file a lawsuit against Doe and her parents: "I've identified counsel to file suit against her and her parents. I can't meet formally with that counsel until the confidentiality notice is lifted. So I've taken some steps in that direction and I'm going to pursue her and her parents."

information potentially reflecting Smith's misconduct to find that it was deliberately indifferent to Doe's rights at every turn.  Any slight inconvenience and Taylor deliberately did the opposite of what a jury might expect—and what FCPS policy directs.  Taylor's response to K.D.'s mother, who simply said she wanted to be present if they interviewed her, was "she would have been interviewed as a potential witness, however that is not necessary at this point." Ex. 29.  The School Board claims it was not deliberately indifferent because "Hogan interviewed Doe and Smith" on the first day the students returned from Indianapolis, Def. Mem. at 29, but "[t]he mere act of listening to students is not a remedy in and of itself." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689 (4th Cir. 2018).

Hogan, who was responsible for the investigation, did not speak with A.K., ask Baranyk for a recounting of what A.K. reported to Baranyk, or see any notes of their conversation. Ex. 20, 197:19-199:12. Hogan did not speak with Laura Kelly or ask Baranyk for a recounting of what she reported to him. Hogan did not speak with V.S. nor did she get a detailed recounting of what V.S. reported; no administrator spoke with V.S. again after the initial conversation she had with Taylor while on the band trip. *Id.* at 199:13-200:12. Neither Hogan, Baranyk nor Taylor spoke with K.D., the witness Doe said was the most important.  Neither Hogan, Baranyk, nor Taylor spoke with J.N., who did not even get a response to her email reporting activity that "was not fully consensual" and Smith's sexual harassment via SnapChat. *See id.* at 200:13-204:18; Ex. 25-27. No administrator responded to K.J., the parent who contacted Dr. V on Sunday, nor did anyone speak with her daughter, E.J. A jury could reasonably find a school is deliberately indifferent to reports of sex-based harassment when the school fails follow up on reports.  *See Davis*, 526 U.S. at 654; *Vance*, 231 F.3d at 261-262; *Murrell*, 186 F.3d at 1244; *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 64 (D. Me. 1999).

A "school cannot conduct a sub-par investigation" and then claim its response was sufficient because "its investigation did not turn up proof beyond peradventure to support the charges." *Forest Hills*, 2015 U.S. Dist LEXIS at *11; *see J.M. ex rel. Morris*, 397 F. App'x at 453-54 (sufficient evidence of deliberate indifference to because school "took no steps to determine the credibility of [third-hand] report"); *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1261 (11th Cir. 2010). When the School Board ignored J.N.'s email, it provided a clear example of a sub-par, clearly unreasonable investigation. A jury could find the school clearly unreasonable when it failed to follow up (or even respond) to an email reporting Smith "had a problem with unwanted sexual harassment through SnapChat." Ex. 25-27; *see also* Ex. 4 ¶ 11; Ex. 16 ¶ 13.

Furthermore, a jury may find deliberate indifference when a school conducts "a shadow procedure that failed to accurately categorize student complaints." *Doe v. Pennridge Sch. Dist.*, No. 17-3570, 2019 U.S. Dist. LEXIS 76745, at *38 (E.D. Pa. May 7, 2019) (denying summary judgment). The School Board sets a concerning distinction without a difference between "sexual assault" and the host of other descriptors that should have set off red flags for potential sexual assault before Roe's use of those exact words, all of which were ignored in the case of Doe. It is hard to grasp the magnitude of sexual harassment and assault claims that may be falling through the cracks if the School Board abdicates its duties under Title IX when students describe unwelcome sexual activity but do not use the words "sexual assault." In the case of Doe, the list of red flags is long. *See, e.g.*, Exs. 16, 3-4, 6, 16-17, 25-27, 33. A jury may find the School Board's inability to recognize potential sexual assault as clearly unreasonable in light of the known circumstances, particularly where Doe's peers (under the age of 18) were capable of recognizing unwelcome sexual contact.

The School Board's failure to document its investigation and maintain the documents it did create also reflects its deliberate indifference. In 2014, Fairfax County Public Schools entered into a Resolution Agreement with the U.S. Department of Education ("DOE") Office for Civil Rights in 2014 after a student who was sexually harassed filed a discrimination complaint against the school district. Ex. 45. Under the agreement, FCPS agreed to take prompt and robust action to comply with Title IX, which led to creation of the Bullying and Harassment Management System ("BHMS"). BHMS is designed to track allegations of bullying and harassment, created to remedy DOE's explicit concern that allegations with no imposed discipline were falling through the cracks. Ex. 40.

Training on BHMS has not resonated with the schools. As of December 2016, although the system had been in effect for three years, "about 30 schools that have never entered anything into the system and most also do not have an appropriate person identified as their Bullying and Harassment Liaison." Ex. 77. Not even Principal Banbury (now Executive Principal over FCPS Region 1) understands the purpose and importance of the system. When asked how FCPS captures issues of sexual harassment that do not result in discipline—the purpose of BHMS—Banbury testified that FCPS does not have a process for documenting such information: "A We don't. Q And from the school's perspective then it's as if it didn't happen? A Right." 78:13-80:19. This attitude of indifference infected the school's handling of Doe's case, where the only contemporaneous documents capturing any statements—witness or the parties involved—were destroyed. Ex. 44 at 27:9-33:6. A jury may view the destruction of key documents as a sign that the documents were helpful to Doe in litigation and unhelpful to the School Board.

> **D. Doe's continued safety concerns, the School Board's hostile treatment of Doe, and its deliberate bolstering of her assailant in disregard of her emotional distress barred Doe from accessing educational benefits and opportunities.**

A school is liable for damages under Title IX if it subjects a student, or makes a student vulnerable to, harassment that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. Where the school ignored Doe's ongoing emotional distress worsened by the continued presence of her assailant, and instead of addressing her requests for help, showered her assailant with praise, she readily offers facts from which a jury may find the School Board's deliberate indifference barred her access to educational opportunities and benefits.

The School Board argues that Doe was not barred from accessing her educational opportunities and benefits because "Doe had no contact with Smith" after the Indianapolis trip. Def. Mem. at 30. This is false, *see* Ex. 2, but nevertheless, potential interactions between an assailant and a victim are enough to preclude summary judgment on the question of whether an environment is sufficiently hostile to deprive the victim of access to educational opportunities provided to her at school. "[T]he continuing presence of the harasser may so alter the terms and conditions of education that the victim of harassment may be able to establish a claim for sex discrimination." *Wills v. Brown Univ.*, 184 F.3d 20, 37 (1st Cir. 1999). *See also Doe ex rel Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009) (where assailant and victim shared a class and lunch period, "jury could reasonably conclude that the circumstances were sufficiently pervasive, severe, and objectively offensive so as to detract from Mary Doe's educational experience"); *Kelly v. Yale Univ.*, No. 3:01-CV-1591 (JCH), 2003 U.S. Dist. LEXIS 4543 at *3 (D. Conn. Mar. 26, 2003) ("a reasonable jury could conclude that further encounters, of any sort, [could] . . . deprive the victim of access to educational opportunities provided by a university"); *Joyce v. Wright State Univ.*, No. 3:17-cv-387, 2018 U.S. Dist. LEXIS 100780  (S.D.

Ohio June 15, 2018) (school's actions made plaintiff vulnerable to sexual harassment " even though she never actually encountered him on campus").

A jury may also find the School Board's removal of Doe from the band classroom while Smith remained in class unaffected, evidence that her education was limited. *See, e.g.*, Ex. 33. Ironically, as a defense to its actions, the School Board argues that "removing [Smith] would have been punitive," Def. Mem. at 30, so instead, the "punitive" consequences of Doe's victimization fell on her without any school official offering or contemplating an alternative. This is consistent with the School Board's actions during the investigative process, where Doe thought "she was going to get expelled and it was going to ruin the rest of her life," Ex. 23 at 170:10-171:19, and Smith was unaware that he was even accused of any misconduct. When the school's response negatively affected the victim in ways markedly different than the assailant, a jury may find the victim's educational opportunities and benefits were affected by deliberate indifference. *Jane Doe v. Dallas Indep. Sch. Dist.*, No. 3:01-CV-1092-R, 2002 U.S. Dist. LEXIS 13014 (N.D. Tex. July 16, 2002) (victim removed from class; abuser allowed to remain).

After the school threatened Doe with discipline when she reported a sexual assault, Doe spent the remainder of her time at Oakton High school thinking "they could still retaliate against me and get me in trouble and that I had to walk on eggshells around them so I wouldn't get in any trouble." Ex. 2, 356:16-358:5. Dr. V noted a change in Doe's demeanor after March 2017, finding that Doe "was more withdrawn, you know, and quieter in class. . . . I recall from Indianapolis to the banquet, it was not what it was before, but that was because she was more withdrawn. But -- and then after the banquet she would not interact with me hardly at all, which was too bad because prior to that we had a pretty good relationship." Ex. 5 at 172:6-173:13, 216:12-218:21. Although Doe's participation in band prior to March 2017 was active and consistent, after, she avoided it as

much as she reasonably could. Her friends noticed, *see* Ex. 3, 16-17, 34, and her father emailed Dr. V to tell him Doe would not attend the Spring Jazz Trip or the graduation activity. Ex. 5 at 216:12-218:21; Ex. 42, 43. Dr. V also ignored two emails from Jane Roe stating that Doe continued to be distraught when in close proximity to Smith. *See* Ex. 34, 35. A jury may find Dr. V's observations that the March 2017 incident effected Doe's participation in band, in tandem with Doe and her parent's parallel testaments, to find that the School Board's actions barred her from accessing her educational opportunities.

Courts have also held that evidence of emotional distress as a result of the school's actions is sufficient to establish a genuine issue of material fact about whether a student's access to educational opportunities at school were affected. *See T.Z. v. City of New York*, 634 F. Supp. 2d 263, 267, 272 (E.D.N.Y. 2009) (finding genuine issue of material fact when student suffered nightmares, uncontrollable crying, loss of concentration, and other emotional distress symptoms); *Bruning*, 486 F. Supp. 2d at 917-18. Doe, who had not sought therapy before in her life, has seen a therapist since the summer of 2017, instigated by the March 2017 incident and the school's response. Doe's distress is captured in contemporaneous medical records and the testimony of her parents. John Doe explained that "it's like something in her brain turned off and she didn't seem to be able to concentrate as well after March or starting in March.  And she struggled with concentrating and doing assignments . . . it started her junior year in March and carried through her senior year." Ex. 23 at 111:12-112:20. A jury may find Doe's distress, caused by the school's actions, effectively barred her from accessing her educational opportunities and benefits.

## CONCLUSION

For the aforementioned reasons, Doe respectfully submits the School Board's Motion for Summary Judgment should be denied.

Date: May 17, 2019                       Respectfully submitted,

                                         ATES LAW FIRM, P.C.

                                         */s/ John R. Ates*
                                         John R. Ates (VSB #71697)
                                         1800 Diagonal Road, Suite 600
                                         Alexandria, Virginia 22314
                                         703-647-7501 (tel)
                                         703-229-6430 (fax)
                                         j.ates@ateslaw.com

                                         PUBLIC JUSTICE, P.C.

                                         */s/ Adele P. Kimmel*
                                         Adele P. Kimmel (admitted *pro hac vice*)
                                         1620 L Street NW, Suite 630
                                         Washington, DC 20036
                                         (202) 797-8600 (tel)
                                         (202) 232-7203 (fax)
                                         akimmel@publicjustice.net

                                         CORREIA & PUTH, PLLC

                                         */s/ Linda M. Correia*
                                         Linda M. Correia (admitted *pro hac vice*)
                                         Lauren A. Khouri (admitted *pro hac vice*)
                                         1400 16th Street NW, Suite 450
                                         Washington, D.C. 20036
                                         (202) 602-6500 (tel)
                                         (202) 602-6501 (fax)
                                         lcorreia@correiaputh.com
                                         lkhouri@correiaputh.com

                                         *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 17, 2019, I filed the foregoing using the CM/ECF system, which will send electronic notice of this filing to Defendant's counsel of record:

Sona Rewari
Andrea Calem
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
srewari@hunton.com
ACalem@hunton.com

*Counsel for Defendant*

/s/ John R. Ates_____
John R. Ates (VSB #71697)
Ates Law Firm, P.C.
1800 Diagonal Road
Suite 600
Alexandria, Virginia 22314
703-647-7501 Telephone
703-229-6430 Fax
j.ates@ateslaw.com