UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JANE DOE,

        Plaintiff,

   v.

FAIRFAX COUNTY SCHOOL BOARD,

        Defendant.

Civil No. 1:18-cv-00614-LO-MSN

## MEMORANDUM OPINION AND ORDER

Plaintiff Jane Doe ("plaintiff" or "Doe") brought the instant action against Fairfax County Public Schools ("defendant" or "FCPS") alleging sex discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"). Specifically, plaintiff alleges that she was sexually assaulted by another FCPS student, Jack Smith ("Smith"), on a bus during an overnight Oakton High School band trip. Plaintiff alleges that defendant's failure to promptly and adequately respond to reports of this incident constituted sex discrimination.

Before the Court is plaintiff's Motion for Sanctions (Dkt. No. 157). Plaintiff seeks sanctions against defendant for spoliation of certain documents, including formal witness statements, interview notes, and text messages. Defendant filed an Opposition to Motion for Sanctions (Dkt. No. 163), to which plaintiff filed a Reply in Support of her Motion for Sanctions (Dkt. No. 164). The Court heard oral argument on May 31, 2019 (Dkt. No. 165). Based on a review of the record and the pleadings, and considering the arguments made in open court, plaintiff's motion is GRANTED for the reasons that follow.

## I. Factual Background

While plaintiff was a student at Oakton High School, she attended a school-sponsored band trip to Indianapolis, Indiana. On Wednesday, March 8, 2017, during the first night of the trip, Smith sat next to plaintiff on the school bus. Def. Mtn. Summ. J. Br. (Dkt. No. 148) ¶ 15; Pl. Opp'n (Dkt. No. 160) 2-3. When it was dark, plaintiff alleges that Smith started to touch her under a blanket, without her consent. Def. Mtn. Summ. J. Br. (Dkt. No. 148) ¶ 20; Pl. Opp'n (Dkt. No. 160) 2-3. As Smith moved his hand up plaintiff's leg towards her crotch, she tried to block his hand with her arms to make him stop, but she alleges her efforts made him even more aggressive. *Id.* He grabbed her hand, pulled down his pants, and repeatedly forced her to put her hand on his genitals and rub his penis. *Id.* He further forced his hand down her pants, penetrated her with his fingers, and grabbed her breasts. *Id.*

Once plaintiff was off the bus, she called her friend, A.K. (who was in Virginia at the time), to tell him what happened. Pl. Ex. 5 (Dkt. No. 158-5) ¶¶ 4-5. The next day, on March 9, 2017, plaintiff also told her friend, V.S., about the incident. Def. Mtn. Summ. J. Br. (Dkt. No. 148) ¶ 28; Pl. Opp'n (Dkt. No. 160) 3. V.S. "knew that [what happened] was wrong" and told the Band Director, Jaime Van Valkenburg, who was also on the trip. Def. Mtn. Summ. J. Br. (Dkt. No. 148) ¶ 40; Pl. Opp'n (Dkt. No. 160) 3-4. Van Valkenburg subsequently texted Assistant Principal Michelle Taylor about the incident, as she had supervisory authority over Oakton's art program, including the band. *Id.* Taylor then called Principal John Banbury, telling him that two students sat together on the bus during the school-sponsored trip and that "the female student had stroked the male student's penis." Def. Mtn. Summ. J. Br. (Dkt. No. 148) ¶ 52; Pl. Opp'n (Dkt. No. 160) 5-6.

In addition to speaking on the phone, Taylor and Banbury also exchanged emails about the incident while the investigation into plaintiff's claim was ongoing and the students were still out of town on the band trip. *See, e.g.*, Pl. Ex. 13 (Dkt. No. 158-13) 2-3 (showing an email from Taylor to

Banbury where Taylor asked for snow predictions in Oakton, to which Banbury responded "[h]ow many inches under the blanket or on the ground?"). Inappropriate text messages were also exchanged between other school officials relating to the incident. *See* Pl. Ex. 25 (Dkt. No. 158-25) 2-3 (showing a text chain between administrators where an official reported "[p]ossibly sex act on one of your buses" and later joked "[o]ne time on a band trip," which referred to the film American Pie, in which students engaged in sexual activity during band camp).

On Friday, March 10, 2017, A.K. reported to his math teacher, Laura Kelly, that plaintiff "was forced to do sexual things by another student." Pl. Ex. 5 (Dkt. No. 158-5) ¶ 8. Pursuant to mandatory reporting requirements, Kelly immediately reported the matter to the Oakton High School Security Officer Wally Baranyk, advising him that one of A.K.'s friends "had told him that she had been forced to do hand stuff with another student while on a band trip." Pl. Ex. 6 (Dkt. No. 158-6) 60:21-61:7-10. Baranyk took handwritten notes of his conversation with Kelly. *Id.* at 61:19-20. Baranyk also spoke directly with A.K., who said that one of his friends "was sexually assaulted" on the bus during the band trip. Pl. Ex. 5 (Dkt. No. 158-5) ¶ 9.

When plaintiff returned to school on Monday, March 13, 2017, she was asked to speak with Oakton's Director of Student Services and Assistant Principal Jennifer Hogan, school counselor Alyson Calvello, and Baranyk about the incident. Def. Mtn. Summ. J. Br. (Dkt. No. 148) ¶¶ 69, 84; Pl. Opp'n (Dkt. No. 160) 8-10. The same day, plaintiff provided a written statement to FCPS. Plaintiff's friends, B.M. and C.C. (both of whom attended the band trip), also provided written statements to FCPS, as did the alleged perpetrator, Jack Smith. B.M. sat diagonally across from Smith and plaintiff on the bus and, although she did not see what happened, plaintiff told her that "Smith touched her and made her touch him and she did not want it to happen." Pl. Ex. 7 (Dkt. No. 158-7) ¶¶ 3-5. During the trip, B.M. also observed that plaintiff "was not eating and was not acting like herself." *Id.* at ¶ 4. Hogan confirmed that C.C. also provided a statement about the incident. Pl.

3

Ex. 8 (Dkt. No. 158-8) 73:4-15. Smith reported that his interaction with plaintiff was consensual—they were holding hands; she grabbed his leg and went under his sweatpants; he touched her chest; and her head was on his shoulder. Pl. Ex. 9 (Dkt. No. 158-9) 64:6-65:6, 67:6-15.

Plaintiff's father, John Doe, spoke to Hogan on March 13, 2017, after plaintiff told him what had occurred. Def. Mtn. Summ. J. Br. (Dkt. No. 148) ¶ 101; Pl. Opp'n (Dkt. No. 160) 9. Hogan reported to him that the school was going to undertake an investigation which could result in disciplinary action, including plaintiff's suspension. *Id.* Subsequently, on March 16, 2017, both of plaintiff's parents, John Doe and Jane Roe, met with Hogan and Calvello to discuss plaintiff's sexual assault claims and defendant's procedures concerning this type of claim. Def. Mtn. Summ. J. Br. (Dkt. No. 148) ¶ 113. At this meeting, they were informed that the school was not going to discipline plaintiff or Smith, which concluded the investigation. *Id.*

## II. Plaintiff's Spoliation Motion

Currently before the Court is plaintiff's Motion for Sanctions (Dkt. No. 157). In sum, plaintiff alleges that defendant failed to preserve contemporaneous, relevant documents in connection with the investigation by FCPS into her claim of sexual assault. Plaintiff argues that FCPS has relied on the adequacy of its actions during and after the band trip to investigate what happened between plaintiff and Smith to demonstrate that it was not deliberately indifferent to plaintiff's rights under Title IX. Pl. Br. (Dkt. No. 158) 2. Accordingly, plaintiff states that defendant's contemporaneous documentation related to its response and investigation are essential to the instant action. In response, defendant argues that plaintiff untimely made the instant motion for sanctions and, even if the motion is timely, FCPS did not have a duty to preserve the contemporaneous documents. For the reasons that follow, the Court finds in plaintiff's favor.

### a. Legal Standard

Plaintiff alleges defendant lost or destroyed three categories of documents, none of which were produced during discovery. First, defendant failed to preserve the formal written statements of plaintiff, her friends B.M. and C.C., and Smith. Plaintiff produced her own statement in discovery, but it was never provided by defendant.[1] Second, defendant failed to preserve Baranyk's interview notes of his interactions with Kelly and A.K. Lastly, defendant failed to produce relevant text messages between Taylor and Banbury. Plaintiff argues that text messages between Taylor and Banbury must exist, pointing to an email Banbury wrote to Taylor in response to Taylor's email about the incident that states "[t]his answers my question from *the text*."[2] Pl. Br. (Dkt. No. 158) 6-7; Pl. Ex. 14 (Dkt. No. 158-14) 2. Based on this email, plaintiff concludes that there must be more text messages that were not turned over by FCPS during discovery.

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). A court's authority to levy sanctions on a spoliation motion derives from two sources. *Goodman v. Praxiar Services, Inc.*, 632 F. Supp. 2d 494, 505 (D. Md. 2009). First, under federal law, the court has inherent power to control the judicial process and litigation, which is "necessary to redress conduct 'which abuses the judicial process.'" *Id.* (citing various circuit and district court cases); *see also Silvestri*, 271 F.3d at 590 ("The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth."). Second, under

---

[1] Plaintiff's mother requested and received a copy of her daughter's statement shortly after plaintiff was interviewed and asked to write a statement on March 13, 2017. Pl. Br. (Dkt. No. 158) 6.

[2] Plaintiff also alleges that there are other indications that Taylor and Banbury sent texts concerning the incident. For example, Taylor was on the band trip and spoke with a student directly about what occurred; Taylor spoke with Baranyk after interviewing Kelly and A.K.; Taylor told Banbury that "there had been a sexual event on the bus"; and Taylor sent various emails joking about the incident between plaintiff and Smith. Pl. Br. (Dkt. No. 158) 5.

the Federal Rules of Civil Procedure, courts may impose sanctions for spoliation that violates a court order or for the loss of electronically stored information ("ESI") that should have been preserved in the anticipation or conduct of litigation. *See id.*; Fed. R. Civ. P. 37(b), (e).

To warrant sanctions for spoliation, the court must be satisfied that (1) the spoliator had a "duty to preserve" evidence when it was destroyed or altered, (2) the destruction or loss was accompanied by a culpable state of mind, and (3) the destroyed or altered evidence was relevant to the claims or defenses of the party that sought discovery of the spoliated evidence. *Goodman*, 632 F. Supp. 2d at 509 (internal citations omitted). Here, plaintiff argues that (1) defendant had a duty to preserve the three categories of documents; (2) defendant intentionally failed to preserve or destroyed such documents; and (3) such documents are relevant to the instant action. In response, defendant argues that plaintiff's motion is untimely because it should have been filed prior to the Final Pretrial Conference in April 2019, but plaintiff waited until May 2019 to file the instant motion. Alternatively, defendant argues that plaintiff fails to prove any element of the three-part test for spoliation.

### b.    Timeliness

As a preliminary matter, defendant argues that the Court should deny plaintiff's motion as untimely. Def. Opp'n (Dkt. No. 163) 11. Defendant argues that the Court's Rule 16(b) Scheduling Order (Dkt. No. 37) states that "[a]ll motions, except summary judgment and consent motions, . . . must be noticed before the Final Pretrial Conference" on April 24, 2019. Defendant states that plaintiff was aware of the bases leading to her motion for sanctions in March 2019, during another motions hearing where she raised such concerns, as well as at the Final Pretrial Conference. Def. Opp'n (Dkt. No. 163) 11-12. Because plaintiff failed to file her motion for sanctions until May 17, 2019, defendant states this is a "transparent attempt to stave off dismissal of her claim." *Id.* at 12.

Defendant relies on *Goodman* for support that plaintiff's motion is untimely. In *Goodman*, the moving party filed a motion for sanctions "more than five months after the conclusion of discovery, and more than two months after dispositive motions had been fully briefed." 632 F. Supp. 2d at 509. The court listed several factors to consider when assessing the timeliness of a spoliation motion: (1) how long after the close of discovery the spoliation motion was filed; (2) the temporal proximity between the spoliation motion and motions for summary judgment; (3) the temporal proximity between the spoliation motion and trial, noting that courts "should be wary of any spoliation motion made on the eve of trial"; (4) whether there was any governing deadline for filing spoliation motions in the scheduling order; and (5) why the motion was not filed earlier. *Id.* (internal citations omitted). The court ultimately found that the moving party's spoliation motion was timely, relying on the justifications that dispositive motions had not been decided, the moving party did not attempt to reargue his dispositive motions, the spoliation motion was not filed on the eve of trial, and the relief granted would not reopen discovery or cause a delay in the case. *Id.*

Here, like in *Goodman*, plaintiff's motion is timely. Although the Rule 16(b) Order required non-dispositive motions to be filed prior to the Final Pretrial Conference on April 24, 2019, the other factors weigh in plaintiff's favor: the spoliation motion was filed two months after discovery closed; the motion was filed several weeks after defendant's motion for summary judgment; and trial is not set until July 29, 2019. Additionally, plaintiff argues she filed the motion promptly after defendant provided a corrected version of the 30(b)(6) deposition transcript concerning the retention or maintenance of educational and scholastic records relating to plaintiff's sexual assault claim. Plaintiff waited until after receiving the 30(b)(6) transcript on May 1, 2019 to file her motion for sanctions because the deposition concerned defendant's retention policies, which are directly at issue in the instant motion. Pl. Reply (Dkt. No. 164) 3. To alert the Court of the imminent motion for sanctions, plaintiff raised it at the Final Pretrial Conference in April 2019.

Accordingly, the Court finds that plaintiff's motion is timely filed. Defendant's motion for summary judgment was denied on June 10, 2019 (Dkt. No. 167), trial is still more than one month away, plaintiff relied on the 30(b)(6) transcript to draft her motion for sanctions, and she further alerted the Court of her upcoming motion for sanctions at the Final Pretrial Conference.

c. **Duty to Preserve**

Plaintiff argues that defendant had a duty to preserve the formal written statements, interview notes, and text messages in anticipation of litigation as of March 9, 2017, the date plaintiff's sexual assault claim was first reported to school officials. Pl. Br. (Dkt. No. 158) 11. In opposition, defendant argues that FCPS did not have a duty to preserve information until it received plaintiff's pre-suit demand letter in April 2018. Def. Opp'n (Dkt. No. 163) 14. This Court finds that the duty to preserve arose in connection with these documents as of March 2017.

The duty to preserve evidence arises "when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591. "Generally, it is the filing of a lawsuit that triggers the duty to preserve evidence," *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013); however, this duty can be triggered by pre-suit communications. Commonly, courts have found a letter threatening litigation can trigger a duty to preserve. *See, e.g.*, *Goodman*, 632 F. Supp. 2d at 502, 511 (finding the defendant's duty to preserve information was triggered when it received a letter from the plaintiff saying that he planned to "put the matter in the hands of attorneys"). Plaintiff argues that defendant's duty to preserve any documents was triggered by pre-suit communications on March 9, 2017, the date that plaintiff's sexual assault claim was first reported to school officials.

In *Broccoli v. Exhostar Communications Corp.*, 229 F.R.D. 506 (D. Md. 2005), the court found that defendant "was placed on notice of potential litigation arising out of plaintiff's allegations of sexual harassment and retaliation as early as January 2001," when the plaintiff

8

informed two of his supervisors both orally and via email of an administrator's sexually harassing behavior. *Id.* at 510-11. Therefore, defendant "was on actual notice at that time of the need to preserve all documentation relevant to [plaintiff's] complaints, including emails and personnel files." *Id.* at 511. Accordingly, the court granted plaintiff's motion for sanctions and included an adverse spoliation of evidence instruction because the court found it "indefensible" that a large corporation was unable to comply with "basic personnel procedures and related documentation were lacking." *Id.* at 512.

Like the finding in *Broccoli*, FCPS's duty to preserve started on March 9, 2017, when Oakton administrators were informed of a potential sexual assault. On that date, plaintiff told V.S. that she was sexually assaulted. Pl. Opp'n (Dkt. No. 160) 3. V.S. then reported this information to Van Valkenburg, who texted Taylor stating that V.S. told him "there was some funny business on the bus. [Smith] put himself on [Doe] or something like that. [Doe] was not into it." *Id.* at 4. (internal citations omitted). Taylor told Van Valkenburg that she would look into the issue. *Id.* At this moment, at least two FCPS officials were aware of plaintiff's sexual assault claim and FCPS should have been on notice of their duty to preserve all documents relevant to this potential claim.

The information reported to FCPS officials on March 9, 2017 led to a full investigation of plaintiff's sexual assault claim. On March 10, 2017, Baranyk interviewed both Kelly, who reported that a student was "forced to do hand stuff with another student while on a band trip," Pl. Ex. 6 (Dkt. No. 158-6) 60:21-61:3, and A.K., who reported that plaintiff "was sexually assaulted" on the bus, Pl. Ex. 5 (Dkt. No. 158-5) ¶ 9. Plaintiff was subsequently interviewed about the incident on March 13, 2017 by Hogan, Calvello, and Baranyk. Plaintiff provided a formal written statement that Smith "proceeded to move [her] hands close to his genitals and then pulled down his pants. [She] moved [her] hand away but he moved [her] hand back onto his genitals. [She] was so shocked and scared that [she] did not know what to say or do." Pl. Ex. 10 (Dkt. No. 158-10) 2. That same day,

B.M. and C.C. also provided written statements to FCPS regarding what plaintiff told them happened on the bus, with B.M. relaying that "Smith touched her and made her touch him and she did not want it to happen." *See* Pl. Ex. 7 (Dkt. No. 158-7) ¶¶ 3-5, 9. Communications between school officials at the time of the alleged incident further demonstrated their awareness of the potential severity of plaintiff's claims. For example, when a parent chaperone texted Van Valkenburg and asked to speak about plaintiff's incident, which she described as "an urgent [student name] situation or worse" (referring to a previous incident involving a different student who reported sexual assault by a male student), Van Valkenburg texted Taylor to ask how he should respond. *See* Pl. Ex. 23 (Dkt. No. 158-23) 5; Pl. Ex. 24 (Dkt. No. 158-24) 138:14-145:6.

In addition to the allegations of sexual assault reported to FCPS by multiple sources, defendant raised the possibility of litigation during meetings with plaintiff and her parents. When plaintiff directly communicated the facts of the sexual assault to FCPS on March 13, 2017, Baranyk introduced himself as someone who was knowledgeable about the law and whether plaintiff could file charges against Smith. Pl. Opp'n (Dkt. No. 160) 9 (quoting plaintiff's deposition transcript). For example, he discussed jurisdictional issues with plaintiff because it was unclear exactly where the incident had occurred. Pl. Ex. 16 (Dkt. No. 158-16) 100:9-21. He also asked plaintiff whether her parents were planning to take legal action and then told her that if she tried to go to court, "there was no way [she] could file a sexual assault charge against [Smith] . . . [and the] closest [she] could get to getting him in trouble was filing a battery charge against him." Pl. Opp'n (Dkt. No. 160) 9. On March 16, 2017, plaintiff's parents met with Hogan and Calvello to discuss FCPS' response to their daughter's allegations. Hogan reported to plaintiff's parents that FCPS had no legal obligations or liability in this situation. Pl. Ex. 17 (Dkt. No. 158-17) 299: 17-18. Based on these conversations, it is clear that defendant contemplated the possibility of litigation.

Moreover, within the last five years, FCPS established an electronic system to better handle claims similar to the type plaintiff has asserted in this case. FCPS entered into a Resolution Agreement with the United States Department of Education, Office for the Civil Rights, in 2014 to resolve sexual harassment allegations against it after a student who was sexually harassed filed a discrimination complaint against the school district. Pl. Ex. 18 (Dkt. No. 158-18) 2. The Resolution Agreement was created to "help [FCPS'] existing and future compliance with Title IX." *Id.* In response to the Resolution Agreement, FCPS created the Bullying and Harassment Management System ("BHMS"), which is designed to track allegations of bullying and harassment between students. Pl. Ex. 19 (Dkt. No. 158-19) 3. Because the Resolution Agreement raised concerns "with how [FCPS] document[ed] and track[ed] what happens in the UNFOUNDED cases," the BHMS was created as "one place to capture the information that [FCPS administrators] have shared, record those dates and times, house the information, [and] track the steps and hard work." *Id.*

Administrators were instructed "that any investigative records such as student interviews or those things should be uploaded into the [BHMS]," including administrators' notes. Pl. Ex. 20 (Dkt. No. 158-20) 99:2-13; *see also* Pl. Ex. 22 (Dkt. No. 158-22) 12 ("Record the details, capture what you told the parents, what you spoke with witnesses about. If you took notes, don't hold them back or 'save them' for if questioned, upload them into the system."). Such records are required to be maintained in the BHMS for five (5) years from the date the report was entered, per the Office of Records Management. Pl. Ex. 20 (Dkt. No. 158-20) 96:19-97:8.

Once FCPS officials became aware of plaintiff's sexual assault claim, they should have uploaded all documentary evidence into the BHMS "so if and when something is challenged," school administrators would not have to go looking for this information. Pl. Ex. 22 (Dkt. No. 158-22) 11. Defendant conceded that plaintiff's allegations of sexual assault should have been logged in the BHMS. *See, e.g.*, Taylor's Deposition, Pl. Ex. 4 (Dkt. No. 158-4) 18:9-17 (stating that the

incident between plaintiff and Smith was not put into BHMS "although on reflection[,] once [plaintiff's] mother classified it as a sexual assault on her meeting with Ms. Hogan . . . it should have been entered into BHMS, captured into BHMS."); *see also* Hogan's Deposition, Pl. Ex. 8 (Dkt. No. 158-8) 37:7-22 (stating that for student-on-student sexual harassment or assault, an administrator would place it in BHMS). Accordingly, the Court finds that defendant was on notice of a potential lawsuit arising from plaintiff's allegations of sexual assault starting on March 9, 2017 and should have preserved the four formal witness statements of plaintiff, her friends B.M. and C.C., and Smith; the interview notes of Kelly and A.K.; and the text messages between Banbury and Taylor.

Defendant next argues that even if a duty to preserve was imposed, there is scant evidence (1) that Baranyk took notes during his interview with A.K. or (2) that there were text messages between Banbury and Taylor. With respect to the interview notes, Baranyk testified that he did not recall speaking to either Kelly or A.K. *See* Pl. Ex. 16 (Dkt. No. 158-16) 64:10-66:2. Plaintiff argues that it is reasonable to infer that Baranyk took notes during his interview of A.K. given that Kelly stated that he took notes during her interview and Hogan testified that Baranyk routinely took notes. Pl. Ex. 8 (Dkt. No. 158-8) 149:11-16 (stating that Baranyk "always has his little notebook there and a pen" and that he takes notes "a lot"). The Court agrees that it is reasonable to conclude that Baranyk took notes from his interview with A.K. based on the testimony in the record.

Regarding text messages, Taylor sent an email to school officials stating that there was "an actual issue" on the band trip and that she had heard from a third person about the incident, identified plaintiff as the female student involved, and asked school officials to call plaintiff regarding the incident. *See* Pl. Ex. 14 (Dkt. No. 158-14) 2. Banbury replied to the email "Ok. This answers my question from the text." *Id.* Defendant argues that this text message does not exist because (1) FCPS produced text messages exchanged on Taylor's personal phone with school

officials and (2) Taylor testified that she did not recall texting with Banbury during that time. Def. Opp'n (Dkt. No. 163) 11. Defendant further argues that Banbury testified that he uses the word "text" and "email" interchangeably, and probably was referring to a prior email instead of a text. *Id.* Yet, defendant has failed to point to any evidence—such as a prior email—demonstrating that Banbury was actually referring to an email to Taylor and not a text message. Additionally, there is ample evidence that the school officials exchanged various texts with one another regarding the incident. *See, e.g.*, Pl. Ex. 25 (Dkt. No. 158-25) 2-3. The Court finds that it is reasonable to conclude that additional text messages between Baranyk and Taylor existed and that those texts should have been preserved.

### d. Culpable State of Mind

At the outset, there does not appear to be any dispute that defendant failed to preserve or destroyed the relevant documents. *See, e.g.*, Def. 30(b)(6) Designee Dep., Pl. Ex. 21 (Dkt. No. 158-21) 33:1-6 (stating that they did not find a bullying and harassment investigative file as to plaintiff). Instead, the issue in dispute is defendant's culpable mindset when it failed to preserve or destroyed such information. Under federal common law, "there are three possible states of mind that can satisfy the culpability requirement: bad faith/knowing destruction, gross negligence, and ordinary negligence." *Felman Production, Inc. v. Industrial Risk Insurers*, 2011 WL 4547012, at *12 (S.D. W.V. Sept. 29, 2011) (citing *Goodman*, 632 F. Supp. 2d at 518)). The level of sanctions issued against a party depends on the level of culpability. *Id.* After defendant received plaintiff's pre-suit demand letter in April 2018, it alleges that it conducted an extensive search for documents related to the investigation. Def. Opp'n (Dkt. No. 163) 6. FCPS was, however, unable to locate the contemporaneous written statements directly related to the incident.

FCPS raises several explanations for this failure. First, "Oakton was undergoing a massive renovation for which it had begun preparing months earlier" in Spring 2018. *Id.* at 8. This

renovation caused student files to be relocated at various points throughout the year. *Id.* Moreover, between March 2017 and April 2018, Oakton "had also experienced significant changes in its administrative team," including being led by three different principals during that period. *Id.* at 8. In addition, "[o]nly one of the five assistant principals who had been at Oakton during the 2016-2017 school year was still an assistant principal in April 2018." *Id.* Finally, defendant's corporate designee testified that the computer the students used to write the statements is no longer available because it "was very outdated and very slow so at the beginning of [the] school year our technology support person reimaged that computer wiping the hard drive clean to try to make it go faster" and when that did not work, they "removed it and we put a brand new computer in the security office." Pl. Ex. 21 (Dkt. No. 158-21) 41:8-42:1. Defendant does not address where the hard copies of the witness statements were physically kept[3] nor its efforts to obtain the interview notes or texts.

     Despite the clear failure of FCPS to locate critical documents, there is no explicit evidence that defendant engaged in any "advantage-seeking behavior," *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 519 (S.D. W. Va. 2014), to rise to the level of "intentional, purposeful, or deliberate conduct," *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 529 (D. Md. 2010). However, as stated above, FCPS has a history of failing to appropriately respond to students' complaints of sexual harassment. To improve its ability to respond to such complaints, it created the BHMS but completely disregarded its own protocol by failing to preserve the relevant documents in the instant action.

---

[3] Defendant also argues that because neither plaintiff nor Smith were disciplined as a result of the incident, such "statements would not necessarily have been retained in the ordinary course of business." Def. Opp'n (Dkt. No. 163) 6-7. Defendant further states that a student's discipline record is maintained in the student's electronic file in the Student Information System, which "does not include all the papers created by the school as part of the investigation" and where such files are kept within each local school "varies by the practices of the principal." *Id.* Regardless of whether the information was retained in SIS, defendant acknowledges that such information should have been entered into the BHMS, *id.* at 7 n.1, and that they failed to do so.

"Negligence, or 'culpable carelessness,' is '[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation[.]'" *Victor Stanley*, 269 F.R.D. at 529 (internal citations omitted); *see also In re Ethicon*, 299 F.R.D. at 519 (finding negligent spoliation where a party "failed to properly preserve, collect, and review evidence, resulting in the destruction of relevant materials") (internal citations omitted). Gross negligence, which is something more than carelessness, only differs from ordinary negligence in degree, "not in kind." *Victor Stanley*, 269 F.R.D. at 529. Although this Court finds no evidence that FCPS acted in bad faith, FCPS did engage in culpable, negligent conduct—bordering on grossly negligent conduct—by failing to upload the relevant documents to the BHMS *as required by its own policy*. Accordingly, the Court finds that the requisite "culpable state of mind" as articulated in *Goodman* is satisfied here.

    e.    **Relevance of Destroyed Evidence**

Lastly, plaintiff argues that the lost or destroyed documents are directly relevant to the instant action. The crux of this matter is whether FCPS conducted a reasonable investigation into plaintiff's assault allegations based on what they knew at the time of the alleged incident. Pl. Br. (Dkt. No. 158) 16. The Fourth Circuit describes the test for relevant evidence necessary to impose sanctions as that which "naturally would have been introduced into evidence." *Sampson v. City of Cambridge, Md.*, 251 F.R.D. 172, 180 (D. Md. 2008) (internal citations omitted). "The burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause." *Id.* (internal citations omitted).

Although defendant argues that plaintiff has failed to demonstrate how these documents are relevant or beneficial to the instant case, it is implausible that the formal written statements, interview notes, and text messages—which show what information defendant relied on in its

investigation and defendant's mentality during the investigation—are not relevant to the instant action. First, the written statements of both the alleged perpetrator and victim would provide their respective versions of what happened on the bus, and B.M.'s and C.C.'s written statements would provide further insight as to the incident. Second, Baranyk's notes from his interviews with Kelly and A.K. would provide other sources of information as to what was reported to school officials about the incident. Lastly, the text messages would shed light on the attitude and conduct of the FCPS administrators investigating plaintiff's claim. Although defendant argues that plaintiff was able to obtain other forms of discovery from these individuals, thereby minimizing the relevance of such documents, plaintiff correctly notes that contemporaneous evidence is the best evidence of the known circumstances to which defendant responded.

Plaintiff cites to *Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011), where the circuit court found that destroyed interview notes were relevant to a Title VII claim because the agency had defended its non-selection of the plaintiff for a position based on her alleged poor performance during an interview. *Id.* at 312. The circuit court found that "the notes might have undermined [the] claim that the [selectee] exhibited more knowledge of the job than [plaintiff] did and might also have confirmed [the plaintiff's] assertion that [the selecting official] asked her different questions than he asked of the men he interviewed." *Id.* Similarly, the documentation surrounding defendant's investigation into plaintiff's allegations in this case, including its interviews and credibility assessments of plaintiff and Smith, are inarguably relevant to demonstrate what defendant knew at the time of the investigation. Accordingly, the Court finds that the third and final prong of the *Goodman* test is also met.[4]

---

[4] As noted above, this Court's authority to impose sanctions derives from both federal law and the Federal Rules of Civil Procedure. *Goodman v. Praxiar Services, Inc.*, 632 F. Supp. 2d 494, 505 (D. Md. 2009). Because this Court finds that sanctions are warranted under the three-prong test set forth in federal law, it does not reach the question of whether defendant also violated the Federal Rules of Civil Procedure.

### III. Conclusion

For the foregoing reasons, this Court finds that defendant had a duty to preserve the lost or destroyed documents, the failure to preserve was culpably negligent, and the documents in question were relevant to the instant action. Accordingly, plaintiff's Motion for Sanctions (Dkt. No. 157) is GRANTED and it is hereby

ORDERED that the following sanctions are imposed: (a) the Court finds that the statements of plaintiff, Smith, C.C., and B.M., Baranyk's handwritten notes, and text messages between Taylor and Banbury existed and were not preserved; (b) that plaintiff shall be permitted to present evidence at trial that defendant lost or destroyed those documents; and (c) that plaintiff shall be permitted to instruct the jury that it may consider such evidence to infer that those documents would be detrimental to defendant's case and that it may consider such evidence when assessing defendant's intent and knowledge.

/s/
Michael S. Nachmanoff
United States Magistrate Judge

June 28, 2019
Alexandria, Virginia