**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-614 (LOG/MSN) |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S RULE 72(A) OBJECTIONS TO MAGISTRATE JUDGE'S ORDER IMPOSING SANCTIONS ON DEFENDANT**

Plaintiff Jane Doe respectfully opposes Defendant Fairfax County School Board's ("School Board") Objections to Magistrate Judge's Order Imposing Sanctions on Defendant, Dkt. #223 ("Def. Mem."). From the inception of this lawsuit through the Court's hearing on motions *in limine* on July 9, 2019, the School Board has denied that it had knowledge of a sexual assault. *See* Dkt. #25, Def. Ans. to First Am. Compl. ¶¶ 1-7, 26. The School Board claims Doe and the multiple students and parent who reported what had occurred between Doe and Smith were all reporting "a sexual encounter," not a sexual assault. *Id.*; *see also* Dkt. # 148, Def. Mem. in Supp. of Mot. for Summ. Judgment at 9-10 ¶¶ 40, 50, 53. On this basis—that Doe is telling a different story of sexual assault than what she reported to the school—the School Board goes so far as to suggest it is entitled to an affirmative defense of "doctrines of unclean hands and estoppel." Dkt. #25 at 18 ¶ 6. Plaintiff expects the School Board will tell the jury that its response to the reports was "swift and considered," and "school officials acted thoughtfully and promptly in their investigation of the sexual encounter." *See* Dkt. #148 at 32. As such, a central issue in this case is the substance of those reports and whether the School Board's response to those reports was

"clearly unreasonable in light of the known circumstances." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999); Dkt. #158 at 16.  The School Board's contemporaneous documentation related to its response and investigation are essential to resolution of the parties' dispute, reflecting the best evidence of what the "known circumstances" were at the time in March 2017.

Yet, discovery revealed that the School Board lost or destroyed every formal statement captured during its investigation, including the written statements of Jane Doe, Jack Smith, and two witnesses.  Sworn testimony revealed that school security personnel took notes when a teacher and a student each separately reported that Doe was "forced to do sexual things" while on the band trip, and the School Board failed to preserve those notes.  While some text messages were produced by the School Board, text messages between Principal Banbury and Michelle Taylor were not produced or preserved, when an email between the two, about Jane Doe, specifically states, "this answers the question from my text."  Dkt. #158-14.

The School Board's failure to preserve these documents is augmented by its parallel failure to follow its policy of documenting the incident and the investigation in Fairfax County Public School's Bullying and Harassment Management System ("BHMS"), a system specifically designed to capture and preserve the types of documents lost or destroyed.  *See, e.g.*, Ex. 4, Dep. of School Board, Rule 30(b)(6) witness M. Taylor, 18:5-19:4 ("on reflection once Jane Doe's mother classified it as a sexual assault on her meeting with Ms. Hogan on Thursday, March 16th, 2017 it should have been entered into BHMS").   Through implementation of BHMS, state law, School Board policy, and its own statements to Jane Doe regarding litigation, the School Board reasonably foresaw litigation as early as March 2017, and knew of its need to preserve the missing documents, and still did not.  The Magistrate Judge's Order imposing sanctions on Defendant for losing or destroying these critical documents was well-reasoned and rooted in the factual record

2

and legal precedent. *See* Dkt. #178 ("Order"). No part of the Magistrate Judge's Order is "clearly erroneous" or "contrary to law." Fed. R. Civ. P 72(a). Defendant's Rule 72(a) objections should be overruled.

## RELEVANT BACKGROUND

Jane Doe asserts that Jack Smith sexually assaulted her on March 8, 2017. Smith graduated from Oakton High School in June 2017, and Doe graduated in June 2018. Documents were created as part of the investigation into the sexual assault in March 2017. Plaintiff Doe first contacted the School Board on April 30, 2018, notifying the School Board of her concerns that it violated her rights under Title IX in the way it responded to actual knowledge of her sexual assault. Doe filed this lawsuit on May 23, 2018.

## I.    Factual Background Establishing the Existence of Spoliated Documents.

On March 8, 2017, right after the sexual assault, Doe told her friend A.K. "that Jack Smith grabbed her hand and put it on his penis, that she tried to pull away, and Smith grabbed it again and made her touch him. Doe said she was in shock and scared. She said she did not want it to happen and that she wasn't feeling good about it. I could tell from her tone that she was clearly shaken up and upset by what had happened. [S]he told me that she was not feeling well and that she was not sleeping or eating." Dkt. #158-5, Decl. of A.K., ¶¶ 5-6. Worried about Doe, the friend (who was not on the band trip and still at Oakton High School in Virginia) told his math teacher, Laura Kelly, on March 10, 2017, that "my friend was forced to do sexual things by another student." *Id.* ¶ 8; Dkt. #158-6, Dep. of L. Kelly, 52:8-57:13.

Kelly then "immediately walked to the security office to talk to Wally Baranyk, who is the head of security" at Oakton High School. Dkt. #158-6 at 60:19-61:3. Kelly told Baranyk that a student was "forced to do hand stuff with another student while on the band trip. . . . He asked me

if by hand stuff I meant something sexual, to which I said yes.  [Baranyk] took [handwritten] notes." *Id.* at 61:8-62:4 (emphasis added).  Kelly's testimony that Baranyk took notes is consistent with Assistant Principal Jennifer Hogan's testimony regarding Baranyk's routine note-taking practice: "He always has his little notebook there and a pen . . . he's taking notes a lot." Dkt. #158-8 at 149:6-16.  Baranyk does not remember meeting with Kelly at all, let alone whether or not he took notes. Dkt. #158-16 at 64:10-66:2.  Although responsive to multiple discovery requests, no notes from this interview were produced by the School Board.

After speaking with Kelly, Baranyk spoke with A.K. directly.  A.K. told Baranyk and two other members of the security team "that one of my friends was sexually assaulted on the bus on the way to Indianapolis for the band trip.  I remember saying the words 'sexual assault.'  They asked if it involved consensual sexual activity and I said no."[1] Dkt. #158-5 at ¶ 9. Just like with Kelly, Baranyk does not remember meeting with A.K. at all.  Dkt. #158-16 at 64:10-66:2. Although responsive to multiple discovery requests, no notes from this interview have been produced by the School Board.

The School Board also did not produce written statements provided by two students who interacted with Doe and Smith during the four days that elapsed between the report of the assault on March 9, 2017, and the statements from the school administrators' first conversations with Doe and Smith on Monday, March 13, 2017.  For example, while on the trip in Indianapolis, B.M. noticed that Doe "was not eating and was not acting like herself.  She was much quieter than usual and not engaging in conversation." Dkt. #158-7, Decl. of B.M. ¶ 4.  When B.M. asked Doe what

---

[1]      The day before Baranyk spoke with Kelly and A.K., the school had already learned of a potential sexual assault involving Jane Doe and Jack Smith.  On March 9, 2019, Band Director Jamie VanValkenburg sent a text message to Assistant Principal Michelle Taylor stating, that V.S. "just told me that there was some 'funny business' on the bus" and "Jack Smith 'put himself on' Jane Doe or something like that.  Jane was not into it." Dkt. #158-23.

was wrong, Doe told her that "Jack Smith touched her and made her touch him and she did not want it to happen." *Id.* at ¶ 5. During discovery in this case, although B.M. could not remember "the specific actions of Jack Smith," she did remember her reaction to Doe's story and demeanor, and her subsequent interactions with the school:

> I was shocked and upset. I knew that Smith had a problem with unwanted sexual harassment through SnapChat, but I was shocked and upset that it became physical against one of my friends. I also worried about Doe because she was noticeably upset by Smith's actions. . . . Because I could see that Doe was visibly upset and earnest in the way she spoke with me, I don't think anyone who spoke with Doe could have thought she was just telling a story about a sexual encounter with Smith. Doe did not want it to happen and she was upset. There was no question in my mind that what had happened between Doe and Smith was bad. When we returned to school after the Indianapolis trip, a school administrator asked me to provide a written statement on what I observed during the band trip. *I typed out a statement on the computer in Oakton High School's security office.* The school did not give me a copy. . . . [T]he school's attorney said that they did not have a copy of the statement, nor had they ever seen it.

*Id.* at ¶¶ 6-9, 12 (emphasis added). A second student, C.C., who was sitting near Jane Doe and Jack Smith on the bus, and spoke with Jane Doe about what happened during the band trip, also provided a written statement. Dkt. #158-8, Dep. of J. Hogan, 72:22-76:20. Although responsive to multiple discovery requests, neither written statement was produced by the School Board.

Jack Smith also provided a written statement to the School Board when it asked him about the incident on the bus between him and Doe. Smith "wrote [his statement] on the computer that was in the [security] room" in what Smith recalls as a blank Word document, not a form. Dkt. #158-9, Dep. of J. Smith, 64:9-65:12. In the written statement, Smith testified during his deposition that he wrote about asking Doe to sit next to him and described the sexual contact. *Id.* at 67:2-68:22. Despite being responsive to multiple discovery requests, the School Board did not produce Smith's statement.

The only contemporaneous written statement produced in discovery was Doe's statement, only because Doe preserved it. Doe's mother requested a copy days after the school solicited it from Doe and maintained it. Plaintiff produced the document in discovery. *See* Dkt. #158-10. Doe's written statement states that Jack Smith "move[d] my hands closer to his genitals and then pulled down his pants. I moved my hand away but he moved my hand back onto his genitals. I was so shocked and scared that I did not know what to say or do. He then started to move his hand towards me and I tried to block him but he still put his hands up my shirt and down my pants." *Id.* In complete ignorance to the signs of unwanted sexual contact in Doe's statement ("I moved my hand away," "shocked and scared," "I tried to block him") and the third-party reports made to the school, the School Board still claims that Doe did not report a sexual assault and that it did not investigate it as an assault or recognize it as anything other than consensual sexual contact until Doe's mother used the words "sexual assault" in a meeting with the school after the investigation had concluded. Dkt. #158-4 at 18:19-19:4. That said, even School Board witnesses could not entirely ignore the disconnect between its position and the only available contemporaneous record. *See* Ex. 1 at J. Hogan, 191:19-192:12 ("Q. Did you think differently after reading her written statement? A. The written statement was different than what she was saying. Yes.").[2]

Also missing from the School Board's discovery production were any text messages between Taylor, then-Assistant Principal, and Banbury, then-Principal. While Taylor was in Indianapolis with the band, on March 10 (the day A.K. was back in Virginia reporting to Baranyk), Taylor spoke with V.S. directly about what occurred between Smith and Doe. Dkt. #158-11. V.S.

---

[2]     Defendant is sticking to this defense, which is perhaps why it moved to exclude the plainly relevant evidence of A.K. reporting to Kelly and Baranyk that Doe was "sexually assaulted" by Smith. *See, e.g.*, Def. Mem. at 16 n.5 ("Although Doe did not describe or allege a sexual assault during her interviews . . . ").

told Taylor that "Smith forced Doe to put her hands on him and that Doe was pulling her hands away and pushing his hands out of her shirt, but he kept putting his hands down her pants and up her shirt." *Id.* ¶ 7. Taylor also spoke with Baranyk after his March 10 interviews with Kelly and A.K., and then spoke with Banbury to share the reports. Taylor told Banbury that "that there had been a sexual event on the bus . . . she described [that] . . . [t]wo students were sitting together and the male student asked the female student for a blanket or if she had a blanket." Dkt. #158-12, Dep. of J. Banbury, 104:5-16. Less than two days later, Taylor sent an email asking about how many inches of snow Oakton was expecting that week, and Banbury responded, "[h]ow many inches under the blanket or on the ground?"; a comment Banbury admitted referred to "the girl was stroking the kid's penis under the blanket." *Id.* at 204:17-20; Dkt. #158- 13. Taylor responds via email, "I sure am going to miss you in a few weeks." *Id.* A few hours later, after the school heard from a parent about the incident involving Doe and Smith, Taylor sent an email stating, "there was a potential issue on the band trip. Apparently, there was an actual issue." Dkt. #158-14. Banbury wrote back to Taylor and stated, "[t]his answers my question from the text." *Id.* No text message or email with a question was produced by the School Board

## II.   Factual Background Related to the School Board's Duty to Preserve Spoliated Documents.

After learning about what Smith did to Doe, the School Board's first instinct was to discuss potential litigation with Doe and her parents. During the first interview of Doe on March 13, 2017, the school affirmatively raised the potential legal consequences of the incident. For example, Hogan introduced Baranyk to Doe at the outset of the meeting "as some security officer who knew about the law and he was going to tell me whether or not I could file any charges against Jack Smith." Dkt. #158-15, Dep. of Doe, 310:16-311:12. Baranyk acknowledges that he told Doe that if she wanted to pursue legal action, she "would have lacked establishing the jurisdiction of origin.

We don't even know where the incident happened. Was it in Ohio? Was it in one of the states between Virginia and Ohio? And I believe Darrell [Estess, School Resource Officer] explained that, I want to say, to both the student and the parents that, without establishing a jurisdiction of origin, seeking a criminal offense, even if one occurred, would be nearly impossible." Dkt. #158-16, Dep. of W. Baranyk, 99:11-101:21. Then, Hogan raised with Doe's parents the possibility of litigation against the school, telling them that "the school had no liability in this situation, that it was a he said, she said situation and . . . in [Baranyk's] experience and opinion there was nothing else that her parents could do." Dkt. #158-17, Dep. of John Doe 298:19-299:20.

Regardless of explicit comments suggesting the foreseeability of litigation, the School Board is obligated by law and its own policies to maintain the records it failed to preserve here. Fairfax County Public Schools ("FCPS") entered into a Resolution Agreement with the U.S. Department of Education ("DOE") Office for Civil Rights in 2014 after a student who was sexually harassed filed a discrimination complaint against the school district. Dkt. #158-18. Under the agreement, FCPS agreed to take prompt and robust action to comply with Title IX, which led to the creation of the Bullying and Harassment Management System ("BHMS"). BHMS is used to track allegations of bullying and harassment, created in response to an explicit concern by DOE that allegations with no imposed discipline were not well documented and falling through the cracks.

> [T]his system was created when the Office for Civil Rights, US Department of Education came in and did an investigation. While we were not found to have violated anyone's rights, DOE raised some concerns with how we document and track what happens in the UNFOUNDED cases. The whole idea is to provide you one place to capture the information that you have shared, record those dates and times, house the information, track the steps and hard work[.]

Dkt. #158-19 (capitalization in original). Per FCPS's policy, a school administrator is required to utilize BHMS when the investigation into allegations of bullying or harassment is finished, but

encouraged to do it from the very start because the system is "a tool for ensuring thorough investigations and documentation." Dkt. #158-20, Dep. of School Board, Rule 30(b)(6), witness M. Panarelli, 64:21-66:16. Administrators are trained to uploaded investigation documents into BHMS, where records "will be kept for five years . . . They are told that any investigative records such *as student interviews or those things should be uploaded* into the bullying and harassment management system." *Id.* at 96:19-99:13 (emphasis added). This was the practice throughout FCPS, including Oakton High School, during the 2016-2017 school year when Smith sexually assaulted Doe. Dkt. #158-21, Dep. of School Board, Rule 30(b)(6) witness, J. Lane, 23:5-17. Had the policy been followed, the records of Doe's report and the school's investigation in March 2017 would have been retained through March 2022.

The School Board is also bound by state law mandates to maintain documents related to bullying and harassment; mandates which are explicitly reflected in its own policies.[3] FCPS policies indicated that documents related to the incident between Jane Doe and Jack Smith should have been maintained for at least three years, but more likely five years. *See* Dkt #158-1 at 52-53, Dkt #158-2 at 66. Defendant's policies track and implement the legal requirements set by the Virginia Public Records Act, which vests archival and records management for public documents

---

[3] The Court need only view FCPS's own documents to confirm this obligation: "Does FERPA control which records must be maintained as part of a student's scholastic record and how long the records must be kept? No, FERPA controls the confidentiality of and access rights to scholastic records. It does not dictate which records must be maintained and for how long. Those questions are answered by the Virginia Public Records Act, Va. Stat. Ann. §§ 42.1-76, et seq. (http://leg1.state.va.us/cgi-bin/legp504.exe?000+cod+42.1-76 ), the Management of the Student's Scholastic Record in the Public Schools of Virginia, 8 VAC 20-150-20 (http://www.doe.virginia.gov/boe/regulations/secondary_sch_transcripts/management_scholastic _records.pdf), and the Records Retention and Disposition Schedule No. 21 (http://www.lva.virginia.gov/agencies/records/sched_local/GS-21.pdf ) issued by the Library of Virginia. Chapter 8 of this manual provides information about the requirements of those laws and regulations." Dkt. #158-1 at 33; #158-3 (GS-21, Records and Retention Disposition Schedule).

in the Library of Virginia.  *See* Virginia Public Records Act, Va. Stat. Ann. § 42.1-79; Dkt. #158-3 at 4.  The Public Records Act authorizes the Library of Virginia to set rules and regulations regarding preservation and disposal of public school records.  Pursuant to that authority, the Library of Virginia requires that documents of a "Bullying/harassment investigation" be kept for 3 years after the year of the incident.  Dkt. #158-1 at 51; *see also id.* at 26 ("Hard copy records must be maintained in storage that physically protects the records and restricts access to authorized individuals. . . . Please reference FCPS Regulation 6225, FCPS Information Security Policy, for additional information").  Per these mandates, documents related to the incident between Doe and Smith should have been preserved long-past the date Doe sent the School Board her pre-litigation demand letter and her complaint in Court.

## STANDARD OF REVIEW

A magistrate judge's order should be disturbed only when the order is "clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a).  "The Fourth Circuit has held that the 'clearly erroneous' standard is deferential and that findings of fact should be affirmed unless review of the entire record leaves the reviewing court with 'the definite and firm conviction that a mistake has been committed."  *Blowers v. Lerner*, No. 1:15-cv-889-GBL-MSN, 2016 U.S. Dist. LEXIS 118773, at *14 (E.D. Va. Aug. 31, 2016) (adopting report and recommendation of Nachmanoff, J.) (quoting *Harman v. Levin*, 772 F.2d 1150, 1153 (4th Cir. 1985).  A magistrate judge's order is contrary to law when it fails to apply or misapplies relevant statues, case law, or rules of procedure.  *Id.* (citing *Attard Industries, Inc. v. U.S. Fire Ins. Co.*, No. 1:10-cv-121, 2010 U.S. Dist. LEXIS 80785, at *1 (E.D. Va. Aug. 5, 2010)).

## ARGUMENT

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *Silvestri v. GMC*, 271 F.3d 583, 590 (4th Cir. 2001). The Court has broad discretion to impose sanctions for spoliation that should be "designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and[,] (3) restore 'the prejudiced party to the same position he [or she] would have been in absent the wrongful destruction of evidence by the opposing party.'" *Jenkins v. Woody*, Civil Action No. 3:15cv355, 2017 U.S. Dist. LEXIS 9581, *32-33 (E.D. Va. Jan. 21, 2017) (citations omitted, brackets in original). For a court to impose a sanction under its inherent power,[4] the party seeking sanctions must show: "(1) [t]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) [t]he destruction or loss was accompanied by a culpable state of mind; and (3) [t]he evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009).

Separately, Rule 37(e) governs the Court's authority to levy sanctions against a party that destroys or fails to preserve electronically stored information. "If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party

---

[4] Defendant argues that the Court must apply a "clear and convincing evidence" standard when evaluating Plaintiff's request for sanctions under its inherent authority. Def. Mem. at 10. The Fourth Circuit is silent on the issue and the courts within the Fourth Circuit that have applied the clear and convincing standard appear to have done so because "the Court's decision would remain the same under either standard." *Jenkins v. Woody*, Civil Action No. 3:15cv355, 2017 U.S. Dist. LEXIS 9581, at *31 (E.D. Va. Jan. 21, 2017) (Lauck, J.) (citing cases for preponderance standard and cases for clear and convincing standard); *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 327 F.R.D. 96, 104 (E.D. Va. 2018) (Payne, J.) (same); *Glynn v. EDO Corp.*, No. JFM-07-01660, 2010 U.S. Dist. LEXIS 86013, at *9 (D. Md. Aug. 20, 2010) (same).

failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may order measures to cure the prejudice to another party.  Fed. R. Civ. P. 37(e).  If "the party acted with the intent to deprive another party of the information's use in the litigation [the court] may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment."  *Id.*  In order for a party to show that it acted in good faith, meaning it did not intend to deprive another party of information in litigation, "a party needs to act affirmatively to prevent the system from destroying or altering information, even if such destruction would occur in the regular course of business."  *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372, 378 (D. Conn. 2007).  Thus, a movant must satisfy four threshold requirements before a court decides if any spoliation sanction is appropriate under Rule 37: (1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery.

In objecting to the Magistrate Judge's Order levying sanctions against the School Board for spoliation, the School Board claims two purported errors: (1) "the Magistrate Judge was wrong to conclude that the School Board's preservation obligation began in March 2017," claiming that litigation "was not reasonably foreseeable until Doe sent the pre-suit demand letter" in April 2018 and rejecting that its own policies and Virginia law implied a document preservation requirement; and (2) "the Magistrate Judge was wrong to find, on an inconclusive record, that certain of the documents were lost or destroyed."  Def. Mem. at 12.  On the record before the Court, both arguments are unavailing and should be rejected.

## I.     The School Board Had a Duty to Preserve Documents Starting in March 2017 and at the Latest, April 2018.

The School Board had a duty to preserve documents once it was confronted with a report of a potential sexual assault.  The School Board's understanding and knowledge of its duty to preserve is reflected in its comments to Doe and her family ("the school had no liability in this situation") and its internal policy directives.  The School Board had notice of a potential legal claim from when it first learned of Smith's assault of Doe, at the earliest, and knew of her actual legal claim within 13 months of March 2017, at the latest.  Several texts exchanged among school personnel show that Defendant should have reasonably anticipated litigation: the first report from Band Director VanValkenburg to Assistant Principal Michelle Taylor that a student that Smith "put himself on" Doe and Doe "was not into it," Dkt #158-23; VanValkenburg's text to Taylor, "we have an urgent [student name] situation or worse," referring to a female student who reported sexual assault by a male student a few years prior, Dkt. #158-24 at JV 138:14-145:6.  Furthermore, it affirmatively raised the possibility of Doe suing the school in its first meeting with her, telling her and her parents that "the school has no liability in this situation."  Likewise, school officials should reasonably have known that the evidence may be relevant to any related litigation.  The documents should have been properly preserved from the moment the School Board began looking into a disciplinary issue, whether or not it understood the issue to be a "sexual encounter" or a sexual assault.  *Jenkins v. Woody*, Civil Action No. 3:15cv355, 2017 U.S. Dist. LEXIS 9581, at *38 (E.D. Va. Jan. 21, 2017) (finding duty to preserve material reasonably expected to be relevant to any related action).

To rebut the Magistrate Judge's detailed review of the record, the School Board repeats its argument that finding a duty to preserve information upon learning of sexual assault "would be unworkable," Def. Mem. at 14, entirely ignoring its own training materials which direct FCPS

employees to preserve documents from the beginning of an allegation for the exact reason of possible legal actions or inquiries. FCPS training directs administrators to utilize BHMS "[g]iven the state requirement[s], documentation in BHMS will provide principals and schools with proof of compliance." Dkt. #158-19 at FCSB-DOE-001530; see Dkt. #158 at 12. FCPS employees are encouraged to upload all evidence into the BHMS "so if and when something is challenged," school administrators would not have to go looking for this information. Dkt. #158-22 at 11. FCPS policy and training indicates as such, directing administrators to "[r]ecord the details, capture what you told the parents, what you spoke with witnesses about. If you took notes, don't hold them back or 'save them' for if [you are] questioned, upload them into the system." Dkt #158-22 at FCSB-DOE-000785. The School Board's policies contemplate proper preservation upon receipt of a report and Defendant's suggestion that following its own policies is "unworkable" is futile.

The Magistrate Judge's reliance on *Broccoli v. Exhostar Communications Corporation* was similarly proper and Defendant's attempt to distinguish empty. *See Broccoli*, 229 F.R.D. 506 (D. Md. 2005); Order at 8-9; Def. Mem. at 14-15. In *Broccoli*, the court found that the employer was on notice of potential litigation when two supervisors were informed "both orally and via email . . . of sexually harassing behavior." *Id.* at 510-11. There, too, the employer denied that the employee made reports of sexual harassment, but the court found that the "denials ring particularly hallow" given other evidence. *Id.*; *see also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (finding duty to preserve when company "recognized the possibility that she might sue," evidenced by comment that litigation "was something that was in the back of my head"). Here, the School Board was on notice of a sexual assault as early as March 9, 2017, when V.S. reported that Smith "put himself on" Doe and Doe "was not into it," and at the latest, when

14

the School Board admits it should have treated it like a sexual assault when Doe's mother used the words "sexual assault" in a meeting with school officials (and multiple examples of triggering events in between).  This conclusion is further supported by the School Board's comments on March 13 and March 16 discouraging Doe and her parents from taking legal action against Smith or the School Board, indicating that it had litigation on the mind.  *See* Dkt. #160 at 23.  The Magistrate Judge's finding regarding the School Board's duty to preserve is deeply rooted in undisputed facts and the School Board's own admissions.  It should be upheld.

Even if the School Board did not expect litigation until April 2018 when Doe sent her pre-litigation demand letter, it still should have maintained the spoliated documents for another two years per its own policies and state law.  How the School Board continues to assert that it has no legal obligation to preserve material related to sexual harassment is beyond the pale when its own records retention policies state "Fairfax County Public Schools (FCPS) maintains student records in compliance with laws of both the Commonwealth of Virginia and the federal government," and sets a period of three years for maintenance of material related to harassment or bullying.  Dkt. #158-1 at 1, 51.  There is no question that allegations of harassment should be maintained for three years and that items loaded into BHMS are kept for five years.  Dkt. #158-20 at 96:19-99:13.

Further, "the School Board acknowledged that Oakton administrators should have entered the March 8, 2017, incident between Doe and Smith into the BHMS database after March 16, 2017, the day Doe's mother met with Hogan and called the encounter a sexual assault."  Def. Mem. at 16 n.5 ("on reflection once Jane Doe's mother classified it as a sexual assault on her meeting with Ms. Hogan on Thursday, March 16th, 2017 it should have been entered into BHMS").  Defendant's only rebuttal to this clear evidence is to repeat its contention that administrators were

not required to upload student statements into BHMS.[5]  This is belied, again, by its own documents and testimony.  Administrators were instructed "that any investigative records such as student interviews or those things should be uploaded into the [BHMS]," including administrators' notes.  Dkt. #158-20 at 99:2-13 Dkt. #158-22 at 12.  By its own admission the documents should have been uploaded in BHMS and then would have been preserved through March 2022.  The Magistrate Judge's finding that Defendant was on notice of a potential lawsuit and had a duty to preserve via state law and its own policies is well-founded and should be upheld.

## II.     By Clear and Convincing or a Preponderance of the Evidence, Documents Existed and Were Not Preserved.

The School Board dedicates a section of its brief to arguing that the "Magistrate Judge was wrong to find that Doe's statement was destroyed," because Doe produced it in discovery.  Def. Mem. at 18-22.  There is no question that Defendant did not maintain a copy of Jane Doe's statement, along with failing to maintain a copy of Smith's statement and the other student witnesses.  Defendant is not absolved of its spoliation simply because Plaintiff met her discovery obligations.

Otherwise, Defendant's objections are just a repeat of the misrepresentations it presented to the Magistrate Judge in its initial opposition to Plaintiff's Motion for Sanctions.  The Court correctly determined that Defendant failed to preserve documents that existed.  Plaintiff need not present the Court with admissions from Baranyk and Banbury that they created the documents, or testimony from C.C. for the Court to find that the documents existed, particularly where here, no

---

[5]     Defendant repeats, again, that *Gebser* prohibits the Court from relying on FCPS policies in any way.  Def. Mem. at 17.  *Gebser* limits a plaintiff's ability to assert a cause of action for deliberate indifference based solely on a funding recipient's failure to follow its own policies.  It is not a holding related to the rules of evidence and it does not prohibit the Court from looking at BHMS to determine what the School Board thought was a reasonable way to comply with Title IX and state law.

witness denies that the documents existed.  For example, the School Board merely guesses that Banbury "may have been referring to the email chain" when he said "this answers my question from the text."  Def. Mem. at 21.  Banbury actually testified that he had no recollection of the email or text message at all.  *See* Dkt. #163-5 at 207:1-15.  A lack of memory is hardy a rejection of written, contemporaneous evidence.

Similarly, Kelly testified that Baraynk took notes during her meeting with her, and Hogan testified that Baranyk always took notes, Dkt. #158 at 13, but the School Board rejects the Magistrate Judge's finding that Baranyk also took notes during his meeting with A.K. because "Baranyk himself did not recall meeting with A.K. at all, let alone whether he took notes."[6]  Def. Mem. at 20.  Again, Baranyk's inability to remember the meetings at all does not rebut other witnesses' testimony that he always took notes and a witness's testimony that Baranyk took notes in their meeting, which immediately preceded his meeting with A.K.  *See, e.g., Hatfield v. Occidental Chem. Corp.*, 1988 U.S. App. LEXIS 20520, *13 (4th Cir. 1988) (party "cannot create a genuine factual dispute simply by claiming that he does not recall a particular fact upon which the moving party has presented affirmative evidence"); *Tann v. Ludwikoski*, Civil Action No.: ELH-10-00612, 2012 U.S. Dist. LEXIS 5740, *31 (D. Md. 2012) ("Tann does not dispute these assertions. Rather, he testified that he could not recall whether he accepted Ludwikoski's offer to compare his response to Crouse's.").  From Defendant's perspective, a failure of memory would allow destruction of all types of highly relevant evidence with no avenue for the Court to sanction.

---

[6]    Defendant appears to concede that Baranyk created notes from his meeting with Laura Kelly and that they were not preserved.  *See* Def. Mem. at 18-22.  It seems to concede that Smith's statement was created and destroyed, too.  *Id.*

The School Board contends C.C.'s statement did not exist because Hogan cannot remember which student witnesses recalled which facts, Def. Mem. at 19, but when specifically asked about the file that was lost, Hogan testified that there were two statements, C.C. and B.M. *See* Dkt. 158-8 at 72:12-73:8. Without contrary evidence from Defendant, it is reasonable for the Court to infer these documents existed and were destroyed along with the other documents that should have been preserved.[7]

Lastly, the School Board comes up with purported excuses for why these critical documents are missing in this case by stating that Oakton's "administrative team had also turned over almost entirely" "in the thirteen months" between the March 2017 incident and Doe's pre-litigation demand letter in April 2018. *See* Def. Mem. at 5-6. The administrators who were involved in this case, Hogan and Taylor and Baranyk, were all employed by the School Board at Oakton High School in April and May 2018. Ex. 1. Taylor and Baranyk left Oakton *after* Doe filed her complaint in Court, and Hogan still works at Oakton. Defendant does not explain how other employee turnover prior to Doe's April 2018 pre-suit letter somehow affected the relevant documents when there is no record evidence to suggest that these random, unnamed administrators had any connection to this case. Nevertheless, the documents are not available to the parties for use at trial, whether destroyed or lost. "That distinction bears no relevance to this situation because the law views both destruction of evidence and failure to preserve evidence as spoliation." *Jenkins v. Woody*, Civil Action No. 3:15cv355, 2017 U.S. Dist. LEXIS 9581, at *6 n.29 (E.D. Va. Jan. 21,

---

[7]     Defendant repeats the incorrect statement that anything C.C. said contemporaneously would not be relevant because "so irrelevant was C.C. that neither Doe nor the School Board identified him as a person with knowledge, and neither party sought any discovery from him." Def. Mem. at 20. First, Plaintiff did not know which students the school spoke with as part of its investigation, so she could not have named him as a person with knowledge in discovery. Defendant, of course, did know who it spoke with and should have listed C.C. from the beginning, as well as B.M. (neither listed by Defendant as people with knowledge in discovery).

2017) ("The parties express disagreement about whether Sheriff Woody *destroyed* or simply *failed to preserve* the Video Data, regardless of whether he had any duty to preserve it," an irrelevant distinction, with citation to *Silvestri*) (emphasis in original); *see also Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 515 n.23 (D. Md. 2010).

The Magistrate Judge correctly found that the School Board's excuses did not undo its "culpable, negligent conduct," which "border[ed] on grossly negligent conduct." Order at 14-15.

### III.    The Spoliated Documents are Plainly Relevant.

The Magistrate Judge was correct to state that the spoliated documents are "inarguably relevant" to this case. *See* Order at 14; Def. Mem. 24-28. The School Board's contention to the contrary is as shocking today as it was then. The absence of these critical documents and how it prejudices Doe is plain. Take, for example, the School Board's version of the facts as captured in its Statement of Undisputed Facts;[8] the known circumstances from its perspective, and many of those facts—or their absence—would have been reflected in some form in the spoliated documents. For example, the School Board's SUF #14-23, 78-83 are facts that may have been undercut by Smith's written statement; SUF #26, 29, 38, 43-46 are facts that may have been undercut by notes Baranyk took of his meetings with A.K. and his teacher, Laura Kelly; SUF #52-58, 61, 64 are facts that may have been undermined by Taylor and Banbury's text message correspondence; and SUF #93-97 are facts that may have been contested by facts set forth in C.C. and B.M.'s statements. Dkt. #148 at 2-20. In this case, a jury will answer the questions of the

---

[8]    In each brief Defendant has filed since summary judgment, it was continued to repeat its notion that its Statement of Undisputed Facts in its Memorandum in Support of Summary Judgment is undisputed by Plaintiff. *See, e.g.* Def. Mem. at 2 n.1. The Court denied summary judgment and found that there are material facts in dispute, Dkt. #167, but nevertheless, Plaintiff's opposition to Defendant's motion captures a plethora of facts disputing Defendant's version of events. *See* Dkt. #160 at 1-15.

School Board's knowledge and whether it exhibited deliberate indifference to those facts. Where all seven of the destroyed documents would have undermined (or supported) facts regarding what the School Board knew of Doe's sexual assault in March 2017 and the adequacy of its response, there is no question these documents were material. The absence of this key evidence is evidence of prejudice. The School Board's contention that the Magistrate Judge needed to spell out how each individual document prejudiced Plaintiff after the court articulated with specificity how each document was material, Def. Mem. at 24-25, is unsupported by the case law.

Furthermore, the record supports the Magistrate Judge's conclusion that the spoliation of material documents prejudices Plaintiff. The School Board presumably will argue at trial that its "[s]taff and administrators at Oakton received some information about the incident" between Doe and Smith, and responded "thoughtfully and promptly," relying on testimony of school personnel more than 30 months' after the events and after suit has been filed to try to establish that its response was not "clearly unreasonable in light of the known circumstances." *See* Dkt. #148 at 1, 28-29; *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). A central issue in this case is the substance of the information the School Board received to put it on actual notice of a sexual assault and whether a jury may find that its response matched the severity of the situation. The prejudice to Plaintiff Doe resulting from the School Board's failure to preserve the written student statements and notes created by school personnel—the best contemporaneous evidence of the "known circumstances" of its investigation in March 2017—is clear and grave.

Contemporaneous documentation is invaluable to a jury weighing the credibility of witnesses before it. Kelly testified that she told Baranyk that a student was "forced to" engage in sexual activity on the band trip; Baranyk testified that he did not remember speaking with Kelly. Baranyk's contemporaneous notes are lost because of the School Board's failure to preserve them

and are relevant to this action and the School Board's dispositive motion.  A.K. testified that he reported a sexual assault to a teacher and three security personnel, which included Baranyk, and explicitly told them of a "sexual assault" and it was not consensual; the School Board denied A.K.'s report contained such substance.  See Dkt. #25 at ¶ 37 ("denies that Student B 'reported' to Ms. Kelly what had happened or who was involved").  Any notes of that meeting are lost because of the School Board's failure to preserve them and are directly relevant to this action.  B.M. testified that she understood Doe to be reporting a sexual assault and she believed no one who spoke with Doe would have thought she was just telling a story of a "sexual encounter;" B.M.'s formal statement is lost because the School Board failed to preserve it.  Finally, the correspondence between Assistant Principal Taylor and Principal Banbury, as well as between Taylor and school security personnel, reflected a shocking level of insensitivity and mockery upon learning that a student felt forced to engage in sexual activity during the band trip.  The spoliation of text messages between Taylor and Banbury regarding Doe and Smith are similarly relevant to Doe's claims.  *See Zbylski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1171 (D. Colo. 2015) (issuing sanctions in Title IX case where "Plaintiff has been deprived of at least contemporaneous notes made by Defendant Dierberger that reflected her knowledge of the allegations of misconduct").  Given the extraordinary relevance of the documents and the prejudice to Plaintiff from their knowing spoliation by Defendant, sanctions were warranted here.

The D.C. Circuit's opinion in *Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011), is instructive, despite Defendant's thin assertion to the contrary.  Def. Mem. at 25 n.9.  In *Talavera*, the D.C. Circuit found that destroyed interview notes were relevant to a Title VII claim because the agency had defended its non-selection of the plaintiff based on her purportedly poor performance during an interview.  *Id.* at 312.  Just like in *Talavera*, the School Board relies on its

investigation, including its "interviews and credibility assessments of Doe and Smith," as evidence that its response was not clearly unreasonable in light of the known circumstances.  Dkt. #148 at 1.  The School Board spoliated Smith and Doe's statements, as well as the statements or notes form other students who were interviewed as part of its investigation and "credibility assessment." These documents speak directly to the School Board's justification for its response and their absence is prejudicial to Doe.

### IV.   The Magistrate Judge's Sanctions Were Appropriately Tailored to Defendant's Conduct.

Given the multiple bases—law, regulation, policy, foreseeable litigation—for the School Board's obligation to maintain the destroyed or lost records, the Court may infer a "culpable state of mind" or an intent to deprive under Rule 37(e).  *See, e.g.*, *Ala. Aircraft Indus. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017) (finding circumstantial evidence of an "intent to deprive" when the party's spoliation is "unexplained, blatantly irresponsible behavior"); *Moody v. CSX Transp.*, Inc., 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017) (finding an intent to deprive when "defendants allowed the original data on the event recorder to be overwritten, and destroyed or recycled Lewandowski's laptop without ever confirming that the data had been preserved in another repository"); *Paisley Park Enters. v. Boxill*, No. 17-cv-1212 (WMW/TNL), 2019 U.S. Dist. LEXIS 34518, at *22 (D. Minn. Mar. 4, 2019) ("There need not be a 'smoking gun' to prove intent.") (internal citation omitted).  "[A] party's conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2).  Whether the spoliator affirmatively destroys the data, or passively allows it to be lost, is irrelevant; it is the spoliator's state of mind that logically supports the adverse inference." *Ungar v. City of N.Y.*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018) (citing *Moody*, 271 F.Supp.3d at 431).

Defendant is cloaking the bad faith standard in a negligence standard to assert that the Magistrate Judge's ruling was contrary to law. Def. Mem. at 24-25; *see also* Order at 13-15 (outlining with specificity the School Board's excuses for the spoliated documents and finding that the spoliation was done with culpability). Defendant's reliance on *Vodusek v. Bayliner Marine Corporation* to rebut the Magistrate Judge's issuance of an adverse inference is curious given the Fourth Circuit's holding in that case that "[w]e reject the argument that bad faith is an essential element of the spoliation rule," *Vodusek*, 71 F.3d 148, 156 (4th Cir. 1995), and where the case further serves to illustrate how the Magistrate Judge's assessment of the culpability of Defendant's actions was correct.[9] *Id.*; *see also id.* ("But when a proponent's intentional conduct contributes to the loss or destruction of evidence, the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct.") (citing two circuit court cases where sanctions were issued on negligent or borderline gross negligent conduct). In *Vodusek*, the plaintiff and her actors were investigating an issue with a boat, and in its investigation, tarnished the boat so that defendant and its expert could not further examine it. *Id.* at 155. When the district court instructed the jury on the spoliation of evidence (the boat), the plaintiff objected, arguing that there was no evidence that she, or her agents, acted in bad faith in examining the boat; yes, the boat was unavailable, but she did not intend for it to be unavailable. *Id.* In rejecting her argument, the Fourth Circuit explained that, while the plaintiff may "be correct in concluding that she and her [agent] did not act in bad faith in destroying portions of the boat, she does not dispute that those portions were permanently destroyed as part of [her agent's] deliberative investigative efforts." *Id.* at 156. This is the line

---

[9]    Its citation to *Goodman v. Praxiar Services* suffers from the same infirmity, particularly when the Magistrate Judge explored *Goodman* in detail in the Order. *See* Order at 8, 13.

between bad faith and culpability.  The Magistrate Judge's decision carefully examines and toes to the line, finding that Defendant did not act in bad faith, but that its actions caused the documents here to be unavailable, which results in a "culpable state of mind."  *See* Order at 15.

"Under existing case law, the nuanced, fact-specific differences among these states of mind become significant in determining what sanctions are appropriate." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 529 (D. Md. 2010) (citing *Sampson*, 251 F.R.D. at 179 ("Although, some courts require a showing of bad faith before imposing sanctions, the Fourth Circuit requires only a showing of fault, with the degree of fault impacting the severity of sanctions.")).  Given the multiple reasons the documents should have been preserved and the import of the spoliated documents, an adverse inference instructing the jury that it "may" – not "must" – infer spoliated documents are adverse to the spoliating party is reasonable here.  *See Jenkins*, 2017 U.S. Dist. LEXIS 9581, at *39 (granting motion for sanctions where defendant failed to follow its normal procedure for storing and preserving data, and as a result, the information was not available in discovery); *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001) ("even if the documents were destroyed days after the search ended and before anyone had wind of Byrnie's 'concerns,' Cromwell was still required by federal regulations implementing Title VII and the Americans with Disabilities Act to retain all records pertaining to employment decisions for a period of two years"); *EEOC v. LA Weight Loss,* 509 F. Supp. 2d 527, 539 (D. Md. 2007) (where, as here, the employer was required by law to retain the employee's records, bad faith that might otherwise be required, need not be shown to permit an adverse inference . . . The only other requirement is that the party seeking the inference show that the destroyed records were relevant to the party's claim or defense").

**V.      Defendant's Anemic Suggestion that Doe Should Be Sanctioned is Unavailing.**

In its objections to the Magistrate Judge's Order, for the first time, the School Board request

that the Court "equally subject [Doe] to sanctions for the relevant documents that she lost and

destroyed after" March 2017, "if the Court affirms the Magistrate Judge's conclusion that litigation

was foreseeable as of March 9, 2017."  Def. Mem. at 17.  This completely misapprehends the

Court's inquiry; it is the school's understanding of "reasonably foreseeable litigation" that is

relevant to the Court's assessment of Plaintiff's sanctions motion, not whether Doe or her parents

were contemplating litigation.  *See Silvestri v. GMC*, 271 F.3d 583, 591 (4th Cir. 2001); *Jenkins*

*v. Woody*, Civil Action No. 3:15cv355, 2017 U.S. Dist. LEXIS 9581, at *14, 19-20 (E.D. Va. Jan.

21, 2017).  While Doe and her parents were distressed and focused on Doe's wellbeing, potential

litigation was at the forefront of the School Board's mind from the very beginning of its

"investigation," as reflected by Baranyk's own comments to Doe.  The School Board's casual

suggestion that Doe and her father spoliated is unsupported by their cited record evidence and is

belied by the more than 4,000 pages of documents produced by Doe in discovery, including

thousands of text messages (over 550 pages).  *See, e.g.*, Dkt. #163-11 ("Q. Okay. Before the case

was filed, did anybody instruct you not to delete any e-mails about her education at Oakton? . . .

A. I can't remember the timing, but at one point I was told not to delete e-mails to teachers.").  The

only specific documents the School Board suggests Doe spoliated are messages sent via SnapChat

*See* Def. Mem. at 18 n.7 (characterizing the documents as text messages, with a footnote clarifying

they were sent via SnapChat).  It is frivolous to suggest that Doe spoliated because she failed to

save messages in SnapChat, an application designed to automatically delete material once it is

opened and did not always allow users to screenshot or save material (which now can be done, but

still cannot be done without notifying the sending party that the receiver attempted to permanently capture the information).

**CONCLUSION**

The Magistrate Judge's Order is far from "clearly erroneous" or "contrary to law." Defendant's Rule 72(a) objections fail to undermine the Magistrate Judge's well-reasoned, detailed, and thorough Order granting Plaintiff's Motion for Sanctions.  The Order should be upheld and Defendant's objections overruled.

Date: July 17, 2019                              Respectfully submitted,

ATES LAW FIRM, P.C.

*/s/ John R. Ates*
John R. Ates (VSB #71697)
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
703-647-7501 (tel)
703-229-6430 (fax)
j.ates@ateslaw.com

PUBLIC JUSTICE, P.C.

*/s/ Adele P. Kimmel*
Adele P. Kimmel (admitted *pro hac vice*)
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600 (tel)
(202) 232-7203 (fax)
akimmel@publicjustice.net

CORREIA & PUTH, PLLC

*/s/ Linda M. Correia*
Linda M. Correia (admitted *pro hac vice*)
Lauren A. Khouri (admitted *pro hac vice*)
1400 16th Street NW, Suite 450
Washington, D.C. 20036
(202) 602-6500 (tel)
(202) 602-6501 (fax)
lcorreia@correiaputh.com

lkhouri@correiaputh.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2019, I filed the foregoing using the CM/ECF system, which will send electronic notice of this filing to Defendant's counsel of record:

Sona Rewari
Andrea Calem
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
srewari@huntonak.com
ACalem@huntonak.com
*Counsel for Defendant*

/s/ John R. Ates
John R. Ates (VSB #71697)