# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-614 (LOG/MSN) |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| Defendant. | ) | |

# DEFENDANT'S BRIEF IN SUPPORT OF
# <u>MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

Stuart A. Raphael (VSB No. 30380)
Sona Rewari (VSB No. 47327)
Andrea R. Calem (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (703) 918-4018
srewari@HuntonAK.com
sraphael@HuntonAK.com
acalem@HuntonAK.com

*Counsel for Defendant*
*Fairfax County School Board*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................................................................. i

STANDARD OF REVIEW .......................................................................................................... 1

ARGUMENT: PLAINTIFF HAS FAILED TO ESTABLISH  ESSENTIAL ELEMENTS OF
HER TITLE IX CLAIM ............................................................................................................... 1

I.      Plaintiff failed to prove that authorized administrators acted with deliberate
        indifference. ...................................................................................................................... 4

        A.      Taylor. ................................................................................................................... 5

        B.      Hogan. ................................................................................................................. 10

        C.      Banbury. .............................................................................................................. 13

II.     Plaintiff failed to prove that she suffered sexual harassment so severe that it had the
        systemic effect of barring her access to the educational opportunities provided by
        FCPS. ............................................................................................................................... 15

III.    The Court should rule that no claim for liability may be based on conduct that occurred
        after Jack Smith graduated in June 2017. ....................................................................... 17

CONCLUSION ........................................................................................................................... 17

CERTIFICATE OF SERVICE ................................................................................................... 18

The Court should enter judgment as a matter of law for the School Board because Plaintiff Jane Doe has failed to adduce evidence sufficient to establish at least two independent elements of her Title IX claim.  The failure to establish even one element is fatal to her case.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 50 empowers the Court to enter judgment as a matter of law for the defendant, following the close of a plaintiff's case-in-chief, if "a reasonable jury would not have a legally sufficient evidentiary basis to find for" the plaintiff.  Fed. R. Civ. P. 50(a)(1).  "Judgment as a matter of law 'is properly granted if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof.'"  *Russell v. Absolute Collection Servs., Inc*., 763 F.3d 385, 391 (4th Cir. 2014) (quoting *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 332 (4th Cir. 2004)).  In making that determination, a court must "view[] the evidence and all inferences reasonably drawn therefrom in the light most favorable to" the plaintiff.  *Id.*  The ruling is subject to de novo appellate review.  *Id.*

## ARGUMENT:
## PLAINTIFF HAS FAILED TO ESTABLISH
## ESSENTIAL ELEMENTS OF HER TITLE IX CLAIM

Title IX of the Education Amendments of 1972 provides that no person shall "on the basis of sex" be "excluded from . . .  denied the benefits of . . . or . . . subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Congress expressly authorized an administrative enforcement mechanism in the statute.  *Id*. § 1682.  But the Supreme Court has also recognized an implied private right of action, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979), that allows plaintiffs to recover money damages, *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 76 (1992).  Because Title IX draws its authority from the Spending Clause, educational institutions can be liable only for their

own intentional misconduct; their liability may not be premised on vicarious liability or constructive knowledge. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998).

The Supreme Court held in *Davis* that a funding recipient may be liable under Title IX to a victim of student-on-student sexual harassment if the funding recipient fails to take corrective action to protect the victim in response to known acts of such harassment. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). *Davis* made clear, however, that a funding recipient is liable "only for its own misconduct," not for the actions of the student harasser. *Id.* at 640.

*Davis* establishes four elements that a plaintiff must satisfy to recover on such a claim. First, the sexual harassment must be "sufficiently severe" to "rise to the level of discrimination actionable under the statute." *Id.* at 650. In determining severity, courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Id.* at 651. "Damages are not available for simple acts of teasing and name-calling among school children, . . . even where these comments target differences in gender." *Id.* at 652.

That ties into the second element: the sexual harassment must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633, 650. Proving that element is difficult in cases involving a single act of alleged student-on-student harassment—like this one—because "the behavior must be serious enough to have the *systemic effect* of denying the victim equal access to an education." *Id.* at 652 (emphasis added). The Court said that it imposed the systemic-effect requirement to forestall a flood of litigation that might otherwise arise, and the Court suggested that successful single-instance suits would be rare:

> Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such [a systemic]

2

> effect, we think it unlikely that Congress would have thought such
> behavior sufficient to rise to this level in light of the inevitability of
> student misconduct and the amount of litigation that would be
> invited by entertaining claims of official indifference to a single
> instance of one-on-one peer harassment.

*Id*. at 652–53.

Third, Plaintiff must prove that a school official with authority to take corrective action

on behalf of the School Board had "actual knowledge" of the sexual assault or harassment.

*Davis*, 526 U.S. at 650; *Gebser*, 524 U.S. at 290.  In this case, Principal Banbury, Assistant

Principal Hogan, and Assistant Principal Taylor are the relevant actors for the "actual

knowledge" inquiry.  *See* Tr. 724:21–25 (testimony by Dr. Banbury that he gave only assistant

principals authority to take corrective action); Tr. 811:15–17 (testimony by Dr. VanValkenburg

that he would have needed permission from an administrator to send a student home from the

band trip).[1]

Fourth, Plaintiff must prove that the authorized school official responded with "deliberate

indifference" to such "known acts of harassment."  *Davis*, 526 U.S. at 633; *Gebser*, 524 U.S. at

277.  "*Davis* sets the bar high for deliberate indifference."  *S.B. v. Bd. of Educ. of Harford Cty.,*

---

[1] As the School Board showed in its bench brief, ECF No. 275, "actual knowledge" requires more than mere inquiry notice or "constructive notice."  *Gebser*, 524 U.S. at 285, 289; *Baynard v. Malone*, 268 F.3d 228, 237–238 (4th Cir. 2001).  "Actual knowledge" does not include things that the authorized school official did not actually know about, even if the school official might have discovered those things through a more thorough investigation.  *E.g.*, *Doe v. Bd. of Educ. of Prince George's Cty.*, 605 F. App'x 159, 168 (4th Cir. 2015) (rejecting efforts to "speculate what the Board might have known had school employees more thoroughly investigated J.D.'s allegations").  A school board is not liable "for failing to discover 'the full extent of the pattern of sexual harassment.'"  *Id.* (citation omitted).  It is not enough to know of a "substantial risk" of ongoing harassment, *Baynard*, 268 F.3d at 237–38; "actual knowledge" means actual knowledge.  *Id.*  The Fourth Circuit in *Baynard* specifically rejected the criticism that this standard is "too strict," concluding that *"Gebser* is quite clear . . . that Title IX liability may be imposed only upon a showing that school district officials possessed actual knowledge of the discriminatory conduct in question."  *Id.* at 238.

819 F.3d 69, 76 (4th Cir. 2016).  It is a "very high standard." *Baynard*, 268 F.3d at 236.

Deliberate indifference means that the official's "response to the harassment or lack thereof is

clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.  Actions that

in hindsight are 'unfortunate' or even 'imprudent' will not suffice." *Baynard*, 268 F.3d at 236.

A "showing of mere negligence will not meet it." *Id*.  Indeed, deliberate indifference requires

"more than mere 'recklessness' on the part of the appropriate person." *Vance v. Spencer Cty.*

*Pub. Sch. Dist.*, 231 F.3d 253, 263 (6th Cir. 2000).

"In order for an act to be 'deliberate,' the particular appropriate person must have been

shown to have been *aware that adverse consequences from his or her action were certain or*

*substantially certain to cause the harm*." *Id*. (emphasis added).  As the Supreme Court put it in

*Davis*, "the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment

or 'make them liable or vulnerable' to it."  526 U.S. at 645 (citation omitted).  In other words,

"the response must be so deficient as to *itself* constitute harassment."  *IL v. Houston Indep. Sch.*

*Dist.*, No. 18-20113, 2019 WL 2591696, at \*4 (5th Cir. June 24, 2019).

As shown below, Plaintiff's case-in-chief evidence fails to meet at least two of the

required elements: she has failed to demonstrate that Dr. Banbury, Ms. Hogan, or Ms. Taylor

acted with deliberate indifference after the facts of the bus encounter came to their attention; and

neither the alleged harassment by Jack Smith nor the School Board's response to it had the

necessary "systemic effect" of denying her access to educational opportunities or benefits.

I.      **Plaintiff failed to prove that authorized administrators acted with deliberate indifference.**

Plaintiff adduced no evidence that Taylor, Hogan, or Banbury acted with deliberate

indifference.

4

### A.    Taylor.

Plaintiff has cited no authority holding that the failure to commence an investigation immediately, let alone immediately on a weekend while away from school, constitutes deliberate indifference under Title IX.  Indeed, a college's *two-week* delay in commencing a rape investigation has been held as a matter of law not to constitute deliberate indifference.  *Doe v. Emerson Coll.*, 271 F. Supp. 3d 337, 354–55 (D. Mass. 2017).  The evidence in this case falls far short of the demanding standard for establishing deliberate indifference.

General Summary of Evidence

As shown below, the early details about the bus incident that came to Taylor's attention were at best ambiguous about what had happened.  Those details were consistent with a consensual sexual encounter between Jack and Jane and no evidence emerged, either that weekend or later, that Jack posed any danger to Jane.  Taylor and Dr. Banbury, in close consultation, concluded that it was best to wait to commence the investigation until the students were back at school on Monday, when all of the necessary resources would be in place.  That decision was not "clearly unreasonable" under *Davis.*  Moreover, when Dr. VanValkenburg's Sunday-night text to Taylor suggested that what happened on the bus might have been more serious than what they initially thought, Taylor responded immediately, briefing Hogan that night and making sure that everything was in place the next day at school to conduct the investigation —including a counselor for Jane.

Specific Evidence

The first indication to Taylor that anything had happened on the Wednesday-night bus trip was the text by Dr. VanValkenburg ("Dr. V") to Taylor at 9:56 p.m. on Thursday night.  PX 3.  Dr. V reported that Victoria Staub "just told me that there was some 'funny business' on the bus" and that Jack Smith "'put himself on' [Jane] or something like that.  Jane Doe was not into

it. Jane Doe told Victoria not to tell anyone, as she's embarrassed. Please advise." *Id.* Taylor testified that the content and context of that text did not suggest a sexual assault had occurred. Indeed, she had previously dealt with a similar report in which a male student had sat on a female student's lap on a bus trip. Tr. 581:9–21. Moreover, Taylor knew Dr. V to be "very cautious" and "would often ask me for advice"; she read the text as "how he should follow up with Victoria." Tr. 629:21–630:1.

Taylor tried to call Dr. V that night but couldn't reach him. Tr. 626:11–13. The students had to be up very early the next morning, at 5 a.m. PX 10 at 13209. She texted Dr. V to ask "Who told you that," to which he replied, at 10:25 pm, "Victoria Staub." PX 3.

Taylor was up early on Friday morning and had breakfast with the students (6:15–7:00 a.m.), traveled with them on the bus to Butler University (at 7:30 a.m.), and then guest-conducted the orchestral performance (at 9 a.m.). Tr. 626:14–627:4; PX 10 at 13209–10 (itinerary). She spoke with Dr. V "first thing" that morning. Tr. 630:2–8. He did not tell her that Victoria wanted to speak with her. Tr. 630:13–15.

Taylor made it a point that morning to observe Jane and Victoria. During the warm-up— which was in close quarters—Taylor observed that "all the students were laughing," and that Jane and Victoria in particular "were also smiling and engaged in kind of the repartee that was going on at that time." Tr. 627:19–628:13. And when Taylor guest-conducted the performance at 9 a.m., she observed Jane eye-to-eye, again in close quarters; she detected no sign that Jane was struggling in any way. Tr. 631:7–632:18. And Taylor would have noticed a struggling student in that situation given the intense eye contact between musician and conductor. Tr. 632:15–633:6.

Taylor's actions Thursday evening and Friday morning negate any claim of deliberate indifference.  She made it a point to check on Jane to make sure that she was not struggling.  It was the right call not to immediately approach Jane on Thursday evening or Wednesday morning to ask her about the sexual encounter.  That would have risked an emotionally volatile confrontation that could reasonably be predicted to derail Jane's ability to participate at all in Friday morning's performance (the highlight of the festival).

After lunchtime that Friday, when Taylor was with the students attending a concert, she received a phone call from Walter Baranyk.  Because she could not speak by phone during the concert, she texted him at 2 p.m.: "Hey.  I'm in a concert.  Is it an emergency?  I can call in a few, if you need me."  PX 6.  When Baranyk didn't immediately respond, Taylor followed up a minute later by texting Baranyk's assistant security specialist, Kathleen Sefchick, and the School Resource Officer ("SRO"), Darrell Estess: "Wally just called me.  I'm in a PM concert . . . .  Is it an emergency?"  PX 4.  Sefchick responded "No emergency."  *Id.*  Estess almost simultaneously texted "[n]o" emergency, saying that she should just listen to Baranyk's voicemail.  PX 4; Tr. 638:3–6.  Taylor responded "What's up . . . .  Can't listen right now . . . ."  PX 4.  Estess replied "Possibly sex act on one of your buses."  PX 4 at 2.  Sefchick similarly responded "Sexual act on the bus, no names yet."  *Id.*; *see also* Tr. 637:3–638:22.

Taylor recognized the possible connection between that report and Dr. V's, Tr. 582:21–583:5, but here again, Sefchick and Estess made clear that there was "no" emergency.  PX 4.  And their description was of a singular "sex act" on the bus, not a sexual assault.  *Id.* at 2.

Taylor then reached out to Victoria when she saw her in the hotel sometime after 2:45 p.m., to let her know she wanted to speak with her later that day when they could do so without students streaming by.  Tr. 627:23–629:7.  Taylor attended the 5 p.m. dinner at an Italian

restaurant, where she took a photograph in which Jane appears happy and smiling.  Tr. 639:21–640:17, 646:12–647:3; DX 57 (Photo at 1).  During the 6-9 p.m. visit to the Circle Center Mall, PX 10 at 13210, Taylor took Victoria aside to speak with her.  Victoria's and Taylor's accounts of that conversation differed.

Victoria said that she told Taylor that Jack had asked Jane to retrieve a blanket because he was cold, that Jane put the blanket over them, that Jack "put his hands down her pants and up her shirt, and she had removed his hands from her body, and then he kept putting them back on her, and he forced her to put her hands on him and pleasure him until he ejaculated into the blanket, and he penetrated her with his fingers."  Tr. 96:15–97:1.  Taylor testified that Victoria told her that Jane had been interested in Jack; that she had gotten the blanket to put over themselves on the bus; that Jane had rubbed Jack's penis until he ejaculated; and that Victoria's "primary concern" was that Jack had "hooked up" with Jane despite that he had a girlfriend.  Tr. 649:23–650:21, 651:1–9.  Taylor did not understand Victoria to say that Jack had forced anything on Jane, nor that Jack had put her hand on his penis.  Tr. 650:19–25.  She said Victoria did not tell her that Jack had touched Jane's private areas, and said she would remember if Victoria had reported that Jack digitally penetrated Jane. Tr. 651:10–12.

In any case, Taylor did not observe any sign of distress on Jane's part that day.  Tr. 640:18–20.  After meeting with Victoria, Taylor called Banbury to fill him in.  Taylor told Banbury that she had observed no signs of anything out of the ordinary with Jane and that she understood the encounter to have been consensual; they agreed that Taylor would continue to monitor Jane that weekend for any signs of difficulty or withdrawal.  Tr. 657:21–658:12 (Taylor); 726:19–728:12 (Banbury).

Taylor had other calls with Banbury that weekend, telling him again that she had seen Jane and that she seemed to be doing fine; Jane had not missed any activities and did not appear withdrawn or depressed. Tr. 632:1–18 (Taylor); Tr. 730:6–20 (Banbury). Again, Taylor and Banbury discussed commencing the investigation Monday morning, when students returned to Virginia and were back at school. Tr. 595:24–597:6 (Taylor); Tr. 731:10–732:9 (Banbury).

When Taylor received the Sunday night text from VanValkenburg suggesting that something more serious might have happened on the bus than previously thought, DX 84, again she did not stand by idly. She emailed Hogan and Banbury to highlight the need to speak with Plaintiff the next morning at school. PX 13, PX 15/DX 78, DX 80. Showing that she cared about Plaintiff's wellbeing, Taylor also advised that "Jane will need her counselor." *Id.* And she and Hogan then communicated that night to make sure that Hogan would be prepared to speak to Jane the next day. Tr. 663:3–7.

As noted above, we are aware of no case in which a court found that a delay this short in commencing an investigation showed deliberate indifference by school officials. Such a holding would be unprecedented. Indeed, delays of far longer have been held *not* to constitute deliberate indifference as a matter of law. *E.g.*, *Emerson Coll.*, 271 F. Supp. 3d at 354–55 (two-week delay); *Roskin-Frazee v. Columbia Univ.*, No. 17-CIV-2032, 2018 WL 6523721, at *9 (S.D.N.Y. Nov. 26, 2018) (one-month delay between university's actual knowledge of plaintiff's rape and its outreach to plaintiff to open an investigation was not clearly unreasonable); *see also Wyler v. Conn. State Univ. Sys.*, 100 F. Supp. 3d 182, 194 (D. Conn. 2015) (no deliberate indifference despite plaintiff's testimony that officials had told her to "let it go" and failed to return her phone calls, before the university opened a full investigation three weeks later).

**B.      Hogan.**

Nor can Assistant Principal Hogan be said to have acted with deliberate indifference. She responded by text within 8 minutes on Sunday night to Taylor's email asking her to lead the investigation the next morning.  PX 13; PX 11.  Hogan then called her "right away."  Tr. 951:15–24.  She and Hogan discussed the best approach to take the next morning when Jane returned to school, agreeing that Hogan was well-suited for the sensitive topic because of her prior experience as a counselor.  Tr. 951:25–952:10.

On Monday, Hogan interviewed both Jack and Jane.  Far from being indifferent to Jane's position, Hogan took Jane at her word that she felt she had been in a situation that she didn't know how to get out of.  Even so, Jane acknowledged that she manually stimulated Jack for 15-20 minutes to ejaculation, leading Hogan to conclude that Jane had not communicated to Jack that the encounter was unwelcome.  Tr. 933:13–934:11.  Hogan described Jack as having been stunned at the suggestion that he used force; he described a consensual sexual encounter that Jane initiated.  *See* Tr. 983:24–984:2, 997:8–14.[2]  Hogan determined (correctly) that Jack and Jane were the only eyewitnesses to what happened on the bus under the blanket.  Tr. 998:4–11.  She concluded that there was insufficient evidence to support an assault charge against Jack, certainly under a 51%, preponderance-of-the-evidence standard.  Tr. 933:22–24, 994:15–16, 996:6–12.

Hogan also took into account that to discipline Jack for sexual assault would entail a 10-day suspension and referral to the Division Superintendent.  DX 16 at 14928, 14957.  She

---

[2] Jack confirmed at trial that he believed that Jane was a willing participant and that he used no force during the encounter.  Tr. 1066:14–1067:5.

10

explained that such a finding means "an automatic referral to our superintendent.  And [she] did

not have evidence to put that [sexual assault] title on him." Tr. 915:15–16.

The deliberate-indifference standard is particularly hard for plaintiff to satisfy where, as

here, the only two students to the event tell conflicting stories about whether an act of sexual

harassment occurred.  In *Doe v. Dardanelle School District*, 928 F.3d 722 (8th Cir. 2019), for

instance, the accused boy denied that he inappropriately touched the plaintiff girl in class and

there were no witnesses.  The Eighth Circuit held that, in light of that factual disagreement, the

principal's decision to keep an eye on the boy but not to discipline him was not clearly

unreasonable: "In light of the fact that R.C. denied the second incident and nobody else in the

home economics class witnessed it, Dardanelle's response was not 'clearly unreasonable in light

of the known circumstances.'" *Id*. at 727.  The same is true here.

Moreover, although Jane had confided to Aveesh the previous Friday that "I could

technically get in trouble cause I didn't explicitly say no," DX 59 at 2, Hogan showed

compassion by recommending no discipline.  Hogan felt that Jane needed help improving her

choices and finding her voice; she needed counseling to help her advocate for herself.  Tr. 975:2–

19.  Hogan followed through with that advice, sharing it with Jane's parents that Thursday,

March 16, noting her concern that Jane needed to develop those life skills as she was getting

ready to go off to college.  Tr. 1011:16–1013:7.

Then on Friday, March 17, the school sent a directive to all of Jane's teachers, on which

Hogan was copied, to show the administration's support, encouraging the teachers to provide

liberal academic accommodations to Jane.  PX 27, DX 13, DX 19.  Jane's parents, who were

copied on that email, followed up with a reply-all email requesting to know of any issues

involving their daughter and signaling that they might well ask for help "with the scheduling or rescheduling of her assignments/tests."  DX 19.

On Tuesday morning, March 21, Hogan again reached out by email to Jane's parents, asking if it would "be ok for Erica Evert, our school psychologist," to check in on Jane.  DX 47. But Jane's mother closed the door on further assistance.  She told Hogan that the family "didn't want any emotional support from Oakton High School, and they were going to take care of it on their own."  Tr. 1017:13–15.  As the parents requested, Hogan directed Jane's counselors to stop checking in on her.  DX 94; Tr. 1018:22–1019:11.

Far from reacting with deliberate indifference, Hogan was distressed that she was unable to do anything more to help Jane once the parents refused further assistance.  Tr. 1025:3–5 (Hogan); Tr. 1254:5–6 (father testified "we decided to take it on ourselves as far as counselors, psychiatrists, and whatever").  Even so, Hogan checked on Jane's grades to make sure that teachers were accommodating her needs and that Jane was not suffering academically. Tr. 1023:18–1024:4.

Based on these facts, taken in the light most favorable to Plaintiff, no reasonable jury could find that Hogan acted with deliberate indifference.  *See, e.g.*, *Porto v. Town of Tewksbury*, 488 F.3d 67, 76 (1st Cir. 2007) (setting aside jury verdict for lack of evidence of deliberate indifference in student-on-student harassment case, noting that the school administrator "acted reasonably in responding to RC's inappropriate touching by separating RC and SC and sending them to the guidance counselor").  Here again, Plaintiff can cite no case where similar conduct was found by the trier of fact to violate Title IX.  Hogan's actions were not those of an uncaring school administrator.

### C.     Banbury.

Since neither Hogan nor Taylor acted with deliberate indifference, Principal Banbury didn't either.  He relied on Taylor's reports during the band trip and relied on Hogan's conclusion following her investigation that the encounter did not involve any assault by Smith.

It is undisputed that throughout the weekend Banbury thought, based on Taylor's reports, that the encounter was consensual.  Tr. 727:14–21; 728:10–12; 729:18–24.  He had follow-up calls with Taylor during the weekend in which she confirmed that Jane had remained fully involved in activities and seemed happy; she attended everything and did not appear sad or depressed.  Tr. 730:6–20.  In light of those reports, it was Banbury's professional judgment to wait until Monday to conduct the investigation.  Tr. 729:6–17 (monitoring Jane to see if she was withdrawing); 731:15–732:2 (Taylor was alone; better to wait until resources were in place).

Banbury didn't see until after 4 a.m. on Monday, March 13, Taylor's Sunday-night email that there might be a more serious issue than initially thought; even so, he had his administrative meeting later that morning at which the plan was finalized for Hogan to conduct the investigation that very day, with Calvello to provide emotional support for Jane if needed.  Tr. 739:15–740:4 (Banbury), 1002:4–13 (Hogan).

The "inches" email that Banbury shared privately with Taylor the Sunday afternoon of the band trip, PX 9—before Taylor learned of the more serious report that evening from Kristen Jorgenson to Dr. V—likewise fails to establish deliberate indifference.  Banbury acknowledged that his email was "inappropriate" and "unprofessional"; he "own[ed]" that he should not have sent it; but he testified without contradiction that he believed that the encounter was consensual and that no sexual assault had occurred.  Tr. 707:5–8, 729:18–24, 734:4–20.  Although his private joke to Taylor was in poor taste, it fails to prove deliberate indifference.  What counts are the school's actions, not the stray comments of administrators: "rude or critical comments . . . do

13

not undercut the reasonableness of Defendants' concrete actions taken in response to Plaintiffs' complaints." *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 849 (6th Cir. 2016).

Finally, Plaintiff's complaint that Oakton's administrators didn't punish Smith fails as a matter of law to prove deliberate indifference.  Having concluded that Smith was innocent of any assault allegation, the school could not suspend him or eject him from band class.  Indeed, it wasn't feasible to move either Jack or Jane to a different class.  There was only one Orchestra 1 class, which students had to audition for; moving either student would be a step down for them. Tr. 832:21–833:21.

*Davis* also rejected the claim that "victims of peer harassment now have a Title IX right to make particular remedial demands." *Davis*, 526 U.S. at 648.  The School Board's obligation is to "merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id*. at 649.  And school administrators are entitled to substantial deference when they calibrate a disciplinary response to student-on-student bullying or harassment.  *Id*. at 648.  A "school's actions do not become 'clearly unreasonable' simply because a victim or his parents advocated for stronger remedial measures . . . ." *S.B.*, 819 F.3d at 77 (citations omitted); *see also IL*, 2019 WL 2591696, at *3 ("The law does not require schools to expel or suspend any student accused of sexual harassment in order to avoid liability."); *id*. at *4 ("Nor was the school required to provide I.L. with her chosen remedy . . . .").  "After all, in situations involving charges of peer-on-peer harassment, a public school has obligations not only to the accuser but also to the accused." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009); *see also Butters v. James Madison Univ.*, 208 F. Supp. 3d 745, 759 (W.D. Va. 2016) ("JMU had to consider not only Butters's concerns, but also any rights of the accused.  A number of the cases cited by the parties acknowledge this balancing act.").

14

* * *

The thrust of Plaintiff's deliberate-indifference claim is that Taylor and Hogan should have done a faster and more thorough investigation and should have uncovered more information about what happened. But it is undisputed that Jack and Jane were the only witnesses to the sexual encounter on the bus, and Hogan interviewed both of them on the first school day following their return from Indianapolis. "Title IX does not require flawless investigations or perfect solutions." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011). What school administrators did here does not come close to being "clearly unreasonable."

## II.  Plaintiff failed to prove that she suffered sexual harassment so severe that it had the systemic effect of barring her access to the educational opportunities provided by FCPS.

Although a sexual assault or battery can unquestionably qualify as a severe form of sexual harassment, more is needed to meet *Davis*'s standard for Title IX liability. The harassment must be "so severe, pervasive, and objectively offensive *that it effectively bars the victim's access to an educational opportunity or benefit*." *Id*. at 633 (emphasis added), 650. It must have "the *systemic effect* of denying the victim equal access to an education." *Id*. at 652 (emphasis added).

Plaintiff's evidence falls far short of that demanding standard.

For starters, Oakton accommodated Jane by acceding to her parents' May 21 request (PX 34) for Jane to be excused from band to sit elsewhere. Tr. 833:22–24 (Dr. V—not his idea for Jane to sit in practice room), 834:14–23 (Dr. V); 1223:14–22 (father). When Jane's father requested an alternative solution to Jane's discomfort about being in the same class with Jack, Dr. V proposed rearranging the seating to move them further apart. Tr. 835:25–836:22. As a result of that accommodation, completed May 30, Jane sat in the practice room for only three

days of band class.  Tr. 837:14–838:18.  And it was undisputed that her parents did not request any further accommodation from Dr. V thereafter.  Tr. 839:4–8 (Dr. V); 1223:23–25 (father).

Moreover, at the parents' request on Wednesday, March 15 (PX 22), the school directed *all* of Jane's teachers to provide whatever accommodations she needed (PX 27).  They complied, and Jane's father testified that there was no "different accommodation" that the family wanted that was not provided.  Tr. 1211–15.

Jane attended all but one of the band events the rest of that school year.  Plaintiff hinted that she didn't go on the jazz band trip because Jack would be there.  *See* Tr. 794:7–795:8; PX 39.  But the trip never happened because there was insufficient interest.  Tr. 854:15–20.  The only scheduled band event that Jane did not attend was the band's performance at Jack's graduation in June, for which her father excused her (PX 47; Tr. 795:21–796:16), but Jane claims no disappointment or harm from being granted that accommodation.

In the end, Jane got top grades her junior year, DX 8, and earned early admission to William & Mary, her top-choice school.  Even Plaintiff's own expert testified that Jane's grades did not slip and that she did not suffer academically.  Tr. 1283:9–13.

Such evidence entitles a school defendant to judgment as a matter of law on the severe-harassment element.  For instance, the Eighth Circuit recently affirmed a summary-judgment ruling for a school district where, even though the court assumed that the school board was deliberately indifferent to known harassment, the plaintiff could not meet the denial-of-educational-access test because her "grade point average increased in both her junior and senior years, and she graduated on time."  *Dardanelle*, 928 F.3d at 727.

Plaintiff's evidence here is likewise deficient.

**III.    The Court should rule that no claim for liability may be based on conduct that occurred after Jack Smith graduated in June 2017.**

Finally, even if the Court decides to reserve ruling in full on this motion, it should at least rule that no liability may be imposed on the School Board for any conduct by Oakton High School officials *after* the 2016-2017 school year, which ended in June 2017, when Jack Smith graduated.  Plaintiff had no contact with Jack Smith after the March 2017 band trip, and he graduated from Oakton in June 2017.  So there is no basis on which a reasonable jury could find that, for the 2017–2018 school year, the School Board's alleged deliberate indifference, "at a minimum, 'cause[d] [Plaintiff] to undergo' harassment or 'make [her] liable or vulnerable' to it." *Davis*, 526 U.S. at 645 (citation omitted).

## CONCLUSION

The Court should grant the School Board's motion, enter judgment in its favor, and dismiss this case with prejudice.

Respectfully submitted,

FAIRFAX COUNTY SCHOOL BOARD

By:____/s/_____
Stuart A. Raphael (VSB No. 30380)
Sona Rewari (VSB No. 47327)
Andrea R. Calem (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (703) 918-4018
srewari@HuntonAK.com
sraphael@HuntonAK.com
acalem@HuntonAK.com

*Counsel for Defendant*
*Fairfax County School Board*

17

**CERTIFICATE OF SERVICE**

I certify that on August 5, 2019, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

_____/s/_____
Stuart A. Raphael (VSB No. 30380)
