```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division




-----------------------------:
                             :
JANE DOE,                    :
              Plaintiff,     :
                             :
     -vs-                    :        Case No. 1:18-cv-614
                             :
                             :
FAIRFAX COUNTY SCHOOL BOARD, :
              Defendant.     :
                             :
-----------------------------:

                             V O L U M E   7 p.m.



                     JURY TRIAL PROCEEDINGS


                       August 6, 2019


             Before:  Liam O'Grady, USDC Judge


                       And a Jury
```

APPEARANCES:


John R. Ates, Linda M. Correia, and Lauren A. Khouri,
Counsel for the Plaintiff

Sona Rewari, Stuart A. Raphael, and Andrea R. Calem,
Counsel for the Defendant

1826

INDEX

WITNESS                         EXAMINATION        PAGE


LIZA H. GOLD

                                DIRECT             1848
                                CROSS              1893
                                REDIRECT           1916




JANE DOE - Deposition Excerpt



MEREDITH KERLEY

                                DIRECT             1928
                                CROSS              1943
                                REDIRECT           1965


JOHN BANBURY - Video Deposition Excerpt

1827

1        NOTE:  The afternoon portion of the trial proceedings

2   on August 6, 2019, begins in the absence of the jury as

3   follows:

4   JURY OUT

5        THE COURT:  All right, you wanted to address 801, Mr.

6   Ates?

7        MR. ATES:  We do, Your Honor.  And what we are asking

8   the Court for is an instruction to the jury that the statements

9   made to the five friends prior to Ms. Doe being told she could

10  be punished for being the victim of a sexual assault, those

11  statements should come in for the truth of the matter asserted.

12  Or, alternatively, that those statements may be considered by

13  the jury in determining credibility.

14       And we've argued this a couple different times, Your

15  Honor.  I think the law in the Fourth Circuit is clear,

16  certainly in the context of a criminal case, that a witness

17  must be facing imminent -- I don't want to call it harm, but

18  imminent sanction for -- before the motive to fabricate arises.

19       And we gave you an unpublished case where somebody

20  goes and talks to their attorney, knowing they may be in

21  trouble, and the Court allows that in.  As well as another

22  unpublished case as well.

23       If may briefly their Eighth Circuit and Third Circuit

24  cases.  Those are criminal cases.  We think that's different

25  than here.  But in those criminal cases there was an assault

1828

1    victim that the Government was trying to prove a criminal

2    charge, and the defendant said they couldn't testify about what

3    they may have told others.

4         We believe in the civil context, Your Honor, that

5    leads to an improper rule of any sexual assault victim can

6    never tell someone what happened and, in essence, have that

7    state admitted for the veracity of it.

8         There are different concerns that play in a criminal

9    trial where the defendant doesn't have to testify and the

10   burdens are a little bit different.

11        Here, all of the witnesses who were a party, in

12   essence, to the statements testified and were subject to

13   cross-examination, Your Honor.

14        Anything -- if you have any questions, Your Honor, I

15   think --

16        THE COURT:  I don't.  I think we have briefed it

17   quite a bit.  Thank you, Mr. Ates.

18        MR. RAPHAEL:  Thank you, Your Honor.

19        In the brief that we filed we had an attachment that

20   had a time line.  I don't know if you had a chance to see that.

21   And then each of the entries on the time line were footnoted to

22   where you can find the material in the record.

23        Let me start at the beginning with what 801(d)(1)

24   requires.  And the Tome case is very helpful about this.  Tome

25   says that the common law rule was that if you are going to use

1829

1   prior consistent statements to rehabilitate a witness, you have

2   to show that the prior consistent statement was made before the

3   issue arose that was the basis for the impeachment.

4          And Tome explains that 801(d)(1)(B) comes along and

5   it codifies one aspect of that rule which relates to motive to

6   fabricate.  And the Court holds that -- and this is a gloss on

7   the rule, because it's not in the rule itself.  The Court holds

8   in Tome that in order to use 801(d)(1)(B) to get a prior

9   consistent statement in, you have to show that it was made

10  before the duty to -- the motive to fabricate arose.  I think

11  everybody is in agreement about that rule.

12         I have to tell you, when I was -- when I read the

13  2014 amendment, which is 801(d)(1)(B)(ii), I was a little

14  confused about what that meant.  And then I had sort of an

15  epiphany about what it means after I read a Law Review article

16  on it.

17         The thing that was throwing me was 801(d)(1)(B)(ii)

18  where it says:  To rehabilitate the declarant's credibility as

19  a witness when attacked on another ground.  And I as scratching

20  my head thinking, what the heck is "another ground."

21         And then I realized, well, another ground -- it's

22  another ground than recent fabrication.

23         And so, you tie this back to Tome, which says, you

24  know, under the common law there were other bases to try to

25  impeach a witness like "you forgot about it," or something like

1830

1    that.

2           And what the notes to the 2014 amendment explain is

3    that the drafters were expanding the rule in 801(d)(1)(B) to

4    include things in addition to recent fabrication.  And that's

5    what that "on another ground" means.  It's on another ground

6    than recent fabrication.

7           But the notes make it crystal clear that the drafters

8    and the Supreme Court, which promulgated the rule, intended to

9    retain the temporal requirement that the prior consistent

10   statement had been made -- must have been made before the issue

11   arose on which the witness is -- the witness is to be

12   impeached.

13          Now, in some sense I think this is sort of a red

14   herring because I don't believe that Ms. Rewari impeached Jane

15   Doe on any ground other than recent fabrication.  She wasn't

16   arguing, you know, she forgot or anything like that.

17          So I think we are not in the 801(d)(1)(B)(ii) box,

18   we're in the 801 -- and, I'm sorry, Mr. Linnell -- we're in the

19   801(d)(1)(B)(i) box.  So we're only dealing with recent

20   fabrication.  And for that, you have to show that the motive

21   arose -- that the statement was made before the motive arose.

22          Now, there are two -- there are two motives that have

23   been discussed.  One is Jane's fear of being disciplined for

24   having engaged in a consensual sexual encounter on a school

25   trip.

1     In footnote -- and then the second motive was she

2  learns that Jack has a girlfriend and she wants to punish him

3  because she is not happy to find that out.

4     We cited in footnote 1 to our chart, which is on ECF

5  301-1, the evidence that we have had so far that showed that

6  she was aware from the outset that she could be punished for

7  engaging in a consensual sexual activity.  But I think that she

8  iced it for this issue because she testified yesterday that she

9  was aware that the SR&R prohibits consensual sexual activity.

10     And moreover, the testimony has been consistent that

11  the students are trained on the SR&R every year.  They got the

12  -- she got that training every year.

13     So she knew from the outset that being caught in a

14  consensual sexual encounter was -- would be subject to

15  discipline.  And that's why, if you go back to our chart now,

16  she knew that before the bus incident even happened.  That's --

17  she knew that even no PDA was allowed.  And according to one

18  interpretation of the evidence, that's why they had the blanket

19  over them and they weren't kissing, everything happened under

20  the blanket.

21     But -- so all of these prior consistent statements

22  occurred after the motive to fabricate arose.

23     The girlfriend issue I think is a red hearing because

24  it is simply an additional motive.

25     The Eighth Circuit case that Mr. Ates says is

1832

1  distinguishable, I don't think it is because the fact, first of

2  all, that it was a criminal case doesn't matter.  The rules of

3  evidence are the same.  And the Court of Appeals said in that

4  case that the motive to fabricate arose right after the person

5  was leaving the bedroom, right at the outset.  And that's

6  really the same that we have here.

7          The other thing I would just finish with is this

8  would be a huge loophole, what they're trying to do, to say if

9  you're attacking a witness' credibility, then all of the prior

10 consistent statements come in.  And I think our brief set out

11 well the -- what commentators and courts worry about, that

12 you're just going to let all this stuff in and it's improper to

13 let the jury consider it for the truth of the matter asserted.

14         I also think that an instruction calling attention to

15 it would be particularly prejudicial.

16         So we think the solution is to keep the instruction

17 you have in place.  I do think a couple times when you gave

18 it -- and we really appreciate your giving the limiting

19 instruction when you did.  A number of times you didn't

20 specifically say, you cannot consider it for the truth of what

21 happened on the bus.  And I think that that last phrase is

22 really important because, you know, juries don't know what

23 hearsay is.  They need to know that they can't consider the

24 prior consistent statement for the truth of what happened on

25 the bus.

1833

1      Thank you.

2      MR. ATES:  If I may briefly, Your Honor.

3      Clearly the night of the assault she calls her

4  friend, and she is telling him it wasn't consensual and she is

5  wondering how to report it to someone.  And there is no motive

6  there to lie to her close friend.  And you have seen the

7  testimony of her and the testimony on both -- on both accounts.

8      And at that point in time there is no knowledge of a

9  girlfriend.  There is no knowledge of her being subject to

10 discipline.  There is no knowledge of any administrator knowing

11 about this, or any parent, or anyone other than Aveesh Kachroo.

12     And so, you get to the next morning and there is

13 still no such knowledge and no motive.

14     At best from their side, the girlfriend comes up.

15 But by this point there is a conversation with Aveesh Kachroo

16 and a conversation with Karoline Davis.  Those should come in

17 for the truth of the matter asserted.

18     The girlfriend thing, I think the testimony has been

19 very consistent.  Jane is concerned about her.  She and

20 Karoline are discussing, if we were in this other person's

21 shoes, we would want to know.  This goes to Jack Smith's

22 character.  And we -- they have a discussion, and ultimately

23 they both tell her.

24     It's not -- there is no evidence about jealousy at

25 all in this case.  They were able to cross-examine all of the

1834

1    witnesses who heard about it.  None said anything about the

2    girlfriend being some type of improper motive.

3         I think on balance, the testimony clearly is this was

4    a young woman, that something severe happened to her.  She was

5    trying to process it.  She was trying to figure out what to do.

6    She was seeking help from her very best friends within band.

7    And that's what occurred.

8         So at most it's when the school officials tell her

9    she can be disciplined and she begins to dissolve at that

10   moment, Your Honor.

11        THE COURT:  Okay.  Well, obviously under Rule 104 I

12   am to look at this issue and decide what the jury can, what the

13   jury can consider in terms of a prior consistent statement

14   coming in as the truth or not.

15        And, you know, the -- and, of course, that requires

16   me to look at the pre-motive requirement.  And I think Tome is

17   the governing law, and it requires me to look at whether there

18   were recent fabrications or improper influence or motive.

19        I don't think that there is a credible argument that

20   there was fear of discipline at the time she made the call to

21   Aveesh or to Karoline Davis.

22        The testimony has been that this act occurred on the

23   bus without anybody seeing it, without anybody knowing about

24   it, without anybody observing it, with -- and if you follow the

25   logic of, I better fabricate a story because I'm going to be

1835

1   disciplined, you have to believe that Jane Doe thought somehow

2   that somebody was going to find out.  Which is completely

3   inconsistent with the facts of the case.  And then she would go

4   around and report it to all of her girlfriends and expose

5   herself to discipline when all she had to do to -- if that was

6   in her mindset, is not say anything.

7        And so, the facts are completely inconsistent with --

8   you know, and I know that they are all educated, but at the

9   time this occurred the idea that she had a fear of discipline

10  immediately afterwards is not supported by the facts.

11       The girlfriend motive, I have got to look at that

12  more closely because of the prior friendship, the prior

13  association.  The fact that they had -- you know, they didn't

14  have a date at Homecoming, but they had at least had gone to

15  Homecoming, that Jane Doe had agreed to sit with Jack Smith

16  after dinner, and that she clearly was not afraid of him at

17  that stage and was friendly with him.

18       So I think that there is enough of a -- of a motive

19  there that, being very cautious, I think that we ought to cut

20  off the prior consistent statement testimony offered for the

21  truth with Aveesh Kachroo and Karoline Davis.  Because it's

22  also clear from the testimony that Jane Doe had already

23  described to Karoline Davis what had happened before they began

24  discussing the girlfriend.

25       So your exception is noted.  I am going to allow the

1836

1   first two statements to be used for the truth.

2          How to fashion an instruction to that effect, I will

3   put something very simple together and we will go and present

4   that to the jury.

5          MR. ATES:  Your Honor, may you under 106 also advise

6   for completeness that they can look at the other statements in

7   determining credibility?

8          THE COURT:  Don't you think Tome prohibits that?

9          MR. ATES:  There is that Fourth Circuit case

10  pre-Tome, Your Honor.

11         THE COURT:  Yeah.

12         MR. ATES:  I need to make the argument.  I would be

13  satisfied, Your Honor, if you instruct on the first two, but I

14  would like to note that was preserved.

15         THE COURT:  Okay.  Yeah, I am not going to instruct

16  on the credibility issue.

17         Yes.

18         MR. RAPHAEL:  Thank you, Your Honor.  If I could, I

19  am not going to try to reargue this --

20         THE COURT:  Yeah, don't.

21         MR. RAPHAEL:  I am not.  I am just going to point out

22  that the next -- our case isn't done yet.  The next witness,

23  Dr. Gold, had a conversation with this witness that I think

24  bears on this specific issue.

25         So I would ask the Court to just wait until you hear

1837

1    from Dr. Gold.  And I would ask permission to revisit it after

2    her testimony.

3            THE COURT:  Okay.

4            MR. RAPHAEL:  Thank you.

5            THE COURT:  All right.  Are we ready for our jury?

6    Yes.

7            MS. CALEM:  Your Honor, we have one preliminary

8    matter before Dr. Gold.

9            THE COURT:  Please.

10           MS. CORREIA:  Your Honor, before they bring Dr. Gold,

11   we had two points that we wanted to raise.

12           THE COURT:  Okay.  Let's hear from Mr. Raphael, and I

13   will give you an opportunity to be heard.

14           MR. RAPHAEL:  So I guess we have got three

15   preliminaries.  They should be short.

16           One is -- let me take the first one first.

17   Plaintiff's Exhibit 60, these are the Harlow notes that they

18   have -- you said that they could take a look at redacting them.

19           THE COURT:  Right.

20           MR. RAPHAEL:  They provided -- plaintiffs provided a

21   redacted copy to us this morning, which I had a chance to look

22   at over the lunch break.

23           We still think that these should be excluded.  I

24   think the Court should ask the plaintiffs to proffer what it is

25   they think they need from these notes.  They are quite lengthy.

1838

1    I think they are cumulative of anything that has already come

2    in under Rule 403.  There are at least -- there are over 100

3    references to the plaintiff's name that haven't been redacted

4    yet.

5              And then there are three additional statements that

6    are double hearsay that would have to come out at pages 1529,

7    1530, and 1532.

8              But I think the overarching issue is why are we

9    giving the jury 100 pages of these notes when they had every

10   ability to ask Ms. Harlow what was the basis for her treatment.

11   I just think it is cumulative.

12             THE COURT:  They did ask her.  And she explained what

13   she had discussed with Jane Doe and what she did in response to

14   that.

15             MR. RAPHAEL:  That's exactly right.  So 100 pages of

16   notes are not necessary.

17             THE COURT:  Okay.  Obviously, I can't rule on

18   something I haven't seen yet.  So I will need a -- I'll get a

19   copy of 60 and look at it.

20             MR. RAPHAEL:  All right.

21             THE COURT:  All right.  What else?

22             MR. RAPHAEL:  The next one is, in the event that we

23   go right from the close of our case to rebuttal, their rebuttal

24   case, Mr. Ates has identified for me a short clip that he wants

25   to read from Dr. Banbury's deposition.

1839

1           THE COURT:  Yes.

2           MR. RAPHAEL:  And we have asked for five lines before

3    that to be included.  I've provided a -- I have a copy for the

4    Court.  I provided a thumb drive with the video that has both

5    clips.  I just want to make sure that there is no disagreement

6    on that so we don't derail when the jury is in the box.

7           THE COURT:  Agreed.

8           MS. CORREIA:  We have the clip, Your Honor.  We have

9    no problem with it.

10          THE COURT:  I am sorry?

11          MS. CORREIA:  We have the clip ready and we do not

12   have a problem with it.

13          THE COURT:  No, you've -- okay.  So it will be played

14   in -- you're not going to try and play your part first and your

15   part second?  You will just play it as he answers the

16   questions.

17          MR. RAPHAEL:  I think that makes sense.  And I think

18   they have it, but Mr. Sapp also has it and can play it on his

19   speakers, whichever the Court prefers.

20          I think there is one more matter with Dr. Gold.

21          THE COURT:  Okay.  Well, Mr. Ates, you are prepared

22   to put it on on your system, and it is your witness.  So --

23          MR. ATES:  I can't vouch that our system is as good

24   as theirs, Your Honor, but we will try to have it played.

25          I'm sorry if I was a little flip, Your Honor.

1840

1          THE COURT:  No, use either system.  And I am sure

2    that won't be a problem.

3          MR. ATES:  Thank you.

4          THE COURT:  Okay.  The third issue.

5          MS. CALEM:  Your Honor, with respect to Dr. Gold,

6    before she testifies, we want to be sure that her testimony

7    will comport with the parameters the Court established as to

8    the prior relationship between Smith and Doe.

9          Obviously, per the Court's ruling, she will not be

10   testifying about the improper Snapchat exchanges.  However, as

11   a result of her clinical examination of Ms. Doe, she did

12   inquire into and learn about their prior, for lack of a better

13   word, although the plaintiff does not like this, relationship.

14         What she learned is set forth in her report.  That

15   they had known each other for many years because they went to

16   the same local pool.  They knew -- she told Dr. Gold she had

17   sort of grown up around him, but really didn't get to know him

18   until high school.  They were not close.  She said she was

19   interested in him romantically at the beginning of freshman

20   year, but nothing happened.

21         And she acknowledged that in the months leading up to

22   the incident on the bus she had in her junior year been

23   interested in him again.  And mentioned the Homecoming.

24         And that is the extent of what Dr. Gold would be

25   testifying to.

1841

1        THE COURT:  Okay.  Mr. Ates, any objection to that?

2        MR. ATES:  Your Honor, Ms. Correia is going to handle

3   that if that is acceptable to the Court, please.

4        THE COURT:  Certainly.

5        MS. CORREIA:  Thank you, Your Honor.  This is exactly

6   what we wanted to raise because all of that has been excluded

7   from the case.  So it would be improper for Dr. Gold to come in

8   here and discuss that.

9        THE COURT:  So what the County knew -- what's the

10  testimony been so far about how long they knew each other?

11       MS. CORREIA:  They were just friends, and just what

12  was --

13       THE COURT:  Yeah, but there was a temporal period put

14  on that, and I can't remember what it was.

15       MS. CORREIA:  The Court's temporal period was six

16  months.

17       THE COURT:  That's the one I had suggested, but I

18  think we went back, that they had been in band together.  So

19  that takes us a couple years back.

20       What else was testified to previously?  I think at

21  this stage Dr. Gold can testify to what was previously in the

22  record.  All right.

23       MS. CORREIA:  Your Honor, all of that -- that's not

24  evidence that the jury has heard, Your Honor.

25       THE COURT:  No, that's what I mean by in the record.

1842

```
 1   Evidence adduced during the trial.
 2              MS. CORREIA:  The trial.
 3              THE COURT:  And so, let's get straight what that is.
 4   What is your recollection as to how long -- what the testimony
 5   has been about the relationship?  We have got the Homecoming.
 6   We have got they were in band together.  And what else do we
 7   have?
 8              MS. CALEM:  Your Honor, there is testimony in the
 9   record that they had known each other for three years.  That
10   was given to Ms. Hogan.  This all came in for notice purposes.
11              We are now on the issue of damages.  And Dr. Gold is
12   assessing her damages, her emotional harm in light of the
13   nature and extent of their prior interactions, among other
14   things.
15              THE COURT:  I understand that.  My question -- did
16   you answer my question?
17              MS. CALEM:  Yes, I did.  Three years.
18              THE COURT:  Three years.  Homecoming.  Band.  You
19   want to also get in the fact that they were at a pool together,
20   a summer swim club or something?
21              MS. CALEM:  Yeah.  I think her main point that she
22   wants to get across is that she heard in her clinical interview
23   Ms. Doe told Dr. Gold that she liked him intermittently
24   throughout high school.  That's it.  Liked in a teenage way,
25   nothing more.
```

1843

1         THE COURT:  And that testimony has come in, at least

2    referenced to the junior year, as well.  That's already before

3    the jury.

4         MS. CALEM:  It has.

5         THE COURT:  And we never actually resolved whether

6    there was a problem with that.

7         MS. CORREIA:  Your Honor, I am not sure what

8    Ms. Calem meant by "liked in a teenage way."  That's not in the

9    record.

10         The problem is that the damages that are sought here

11    flow from the response of the school and not from anything

12    having to do with whatever their interactions were.

13         THE COURT:  Well, yeah, I agree.  I am going to allow

14    her to testify about the relationship to the extent it's

15    already in evidence in the trial.  So you lead her.  And that

16    would not include that they were -- she had a romantic interest

17    when she was a freshman.  That's just irrelevant.

18         But you can ask about the junior --

19         MS. CALEM:  But junior year would be all right?

20         THE COURT:  Yeah.  Or earlier -- what was it, earlier

21    than junior year, I think?

22         MS. CALEM:  Yeah.  Ms. Taylor's testimony, I believe,

23    was that she was told by Victoria Staub that the prior year, at

24    least, there was some sort of romantic interest.  And that

25    would be Ms. Doe's sophomore year.

1844

1          THE COURT:  Right.  Okay.  You can ask her that

2     question.  Okay.

3          MS. CALEM:  Thank you, Your Honor.

4          THE COURT:  All right.

5          MS. CORREIA:  Your Honor, one last thing --

6          THE COURT:  Yes.

7          MS. CORREIA:  -- related to that is that Dr. Gold

8     sets up a claim by Jane Doe in her report that is not her

9     claim.  So we think it's unfair and improper for her to testify

10    to a claim that Jane Doe hasn't made.

11         Specifically, she makes several references to Jane

12    Doe's claims of severe or extreme emotional distress.  And that

13    is just not a claim that is present in the case.

14         So we think it's unfair for her to mischaracterize

15    the claim in that way and then shoot it down to say, she didn't

16    think she suffered severe or extreme emotional distress.

17         MS. CALEM:  Your Honor, I believe we sort of took

18    care of this in the initial briefing and the Daubert briefing.

19    This goes to the weight of her testimony.

20         The allegations in the complaint are very clear that

21    there is ongoing severe emotional distress that will impair her

22    ability to get a job in the future, will impair her ability to

23    function well going forward.

24         And Dr. Gold is opining on whether or not this -- you

25    know, what is the nature of her emotional distress that she

1845

1  could observe based on her forensic examination and how severe

2  it was.

3          MS. CORREIA:  If I may, Your Honor.

4          THE COURT:  Yes.

5          MS. CORREIA:  The first amended complaint mentions

6  emotional distress three times, paragraphs 55, 82, and 112.

7  And it does not use the word "severe" or "extreme."

8          MS. CALEM:  Your Honor, this was addressed also in

9  the argument, the motions and the argument around the Rule 35

10  exam, whether she had placed her mental condition in

11  controversy sufficiently for the exam.

12          THE COURT:  Yeah, but what Ms. Correia is saying is

13  that emotional distress is different than severe emotional or

14  extreme distress, and that they have not alleged that.

15          So having Dr. Gold testify to it, and then say it

16  doesn't exist, is putting up a straw argument and then shooting

17  it down.

18          So I am not going to allow that testimony.  It's just

19  not -- I haven't heard any testimony --

20          MS. CALEM:  Although --

21          THE COURT:  I don't know what the other rebuttal

22  expert is going to say, the counselor, but certainly Harlow

23  didn't testify to that.  So let's be limited in that.

24          All right.

25          MS. CALEM:  Yeah.  Your Honor, we had testimony from

1846

1     Ms. Doe's mother that she was destroyed.  You know, she was

2     severely -- she was damaged, she couldn't function, she was

3     destroyed.

4               And I think the implication of allegations that she

5     is impaired in earning a living in the future are that she was,

6     you know, severely emotional distressed.

7               THE COURT:  Is that alleged --

8               MS. CALEM:  That's alleged in the complaint.

9               THE COURT:  Is that alleged in the complaint?

10              MS. CORREIA:  There is no testimony on that, Your

11    Honor.

12              THE COURT:  Well, is it alleged in the complaint?

13              MS. CALEM:  Yes, there is loss of future earning

14    capacity and asking for compensation for future psychological

15    care.

16              THE COURT:  Okay.  I am going to -- I am going to

17    allow it.  I think you are right.

18              MS. CORREIA:  We can --

19              THE COURT:  The facts as testified and some of the

20    e-mails do go beyond just emotional distress and talk about

21    it's very extreme, serious, inability to function.

22              So -- and, you know, in your argument, at the end of

23    the -- closing argument, you can talk about what relief you

24    want and what you're asking for and why you're asking it.  But

25    I think that the school has -- should have an opportunity to

1847

1    foreclose an argument that they think might be made.

2            MS. CORREIA:  Your Honor, I wouldn't make an argument

3    that wasn't supported by the record.  Since we don't have trial

4    testimony on that, I wouldn't make that argument.  And I would

5    certainly amend the complaint, if that's necessary, to take

6    that out.

7            THE COURT:  Well, no, but it's already in --

8    Ms. Dahlman did testify about how -- and the e-mails also talk

9    about some very extreme mental health issues from that.

10           So I think they are entitled to explore it.  If it's

11   not an issue in closing argument, it's not an issue in closing

12   argument.  But I think they have a right to make sure it

13   doesn't find its way into the jury's minds.

14           So I will allow it.  I apologize for that.  Thank you

15   for --

16           MS. CALEM:  Thank you, Your Honor.

17           THE COURT:  -- identifying that additional testimony.

18           Okay.  Are we ready for our jury?

19           All right.  Joe, let's get our jury, please.

20           NOTE:  At this point the jury returns to the

21   courtroom; whereupon the case continues as follows:

22   JURY IN

23           THE COURT:  All right, good afternoon.  Have a seat,

24   please.

25           Sorry for the delay.  We've been working, though.

1848

1    Okay.

2            All right, next witness.

3            MS. CALEM:  Your Honor, we would call Dr. Liza Gold.

4            THE COURT:  Okay.  Do we have somebody who is getting

5    her?

6            MS. CALEM:  She is going to get her.  She is on

7    crutches, so it's a little slow going.

8            THE COURT:  All right.

9            NOTE:  The witness is sworn.

10           THE COURT:  Good afternoon, Dr. Gold.

11           THE WITNESS:  Hello.

12           THE COURT:  All right.  Please proceed.

13           MS. CALEM:  Thank you, Your Honor.

14           LIZA H. GOLD, called by counsel for the defendant,

15   first being duly sworn, testifies and states:

16       DIRECT EXAMINATION

17   BY MS. CALEM:

18   Q.   Good afternoon, Dr. Gold.  Can you please give the jury

19   your full name.

20   A.   Liza Hannah Gold.

21   Q.   What kind of doctor are you?

22   A.   I am a psychiatrist.

23   Q.   And a psychiatrist is a medical doctor?

24   A.   Yes.  M.D. degree.

25   Q.   And a psychologist does not have an M.D. degree; is that

L.H. Gold - Direct

1849

1    accurate?

2    A.   That's correct.  Ph.D. or Psy.D. usually.

3    Q.   Where you are you licensed to practice medicine?

4    A.   Virginia, Maryland, the District of Columbia, New York,

5    and New Jersey.

6    Q.   How many years have you practiced medicine as a

7    psychiatrist?

8    A.   Almost 30 years.

9    Q.   Where is your office?

10   A.   In Arlington.

11   Q.   Are you here today to talk about Ms. Doe's claims of

12   emotional distress?

13   A.   Yes.

14   Q.   Are you here today to give any opinion as to whether or

15   not the interaction between Ms. Doe and Mr. Smith was

16   consensual?

17   A.   No.

18   Q.   Did anyone ask you to give such an opinion in this case?

19   A.   No.

20   Q.   And in reaching your opinions in this case, did you take

21   into account that either version of the facts could be correct?

22   A.   Yes.

23   Q.   All right.  Thank you.  First, I would like to talk to the

24   jury about your background.  Can you please turn in the exhibit

25   books to what has been marked as Defendant's Exhibit 150.

L.H. Gold - Direct

1850

1    A.   Don't have a book.

2    Q.   You will get one.

3    A.   Okay, sorry.

4              COURT SECURITY OFFICER:  115, Counsel?

5              MS. CALEM:  1-5-0.  I believe it's our second-to-last

6    exhibit at this point.

7              COURT SECURITY OFFICER:  150.

8    A.   Okay.  I'm there.

9    BY MS. CALEM: (Continuing)

10   Q.   All right.  Do you recognize Exhibit 150?

11   A.   Yes.

12   Q.   Can you tell us what it is.

13   A.   That is my CV or resumé from October of last year.

14             MS. CALEM:  Your Honor, we move to admit Exhibit 150

15   into evidence.

16             THE COURT:  Any objection?

17             MS. CORREIA:  No objection.

18             THE COURT:  Received.

19   BY MS. CALEM: (Continuing)

20   Q.   So your CV is quite long, it's more than 20 pages, and we

21   are certainly not going to go over every page of it, but I

22   would like to talk about a few different parts of it.

23             First of all, let's talk about your formal education.

24   Where did you go to college?

25   A.   I went to Harvard/Radcliffe College, graduated in 19 -- I

1851

1    was class of 1980.  I graduated in 1981.

2    Q.   And after college did you do any graduate work?

3    A.   I did.  I got a Master's degree at the University of

4    Cambridge in England.  And then I went to medical school at New

5    York University School of Medicine.

6    Q.   And when did you graduate from NYU School of Medicine?

7    A.   1986.

8    Q.   Did you then do a residency?

9    A.   Yes.  I did a residency in psychiatry as Boston

10   University.  First I did an internship for one year, and then a

11   three-year psychiatric residency, from which I graduated in

12   1990.

13   Q.   And during -- can you just explain to us what exactly a

14   residency is.

15   A.   Yeah.  A residency is a specialty postgraduate clinical

16   training -- clinical and academic training, but with the

17   emphasis on the clinical.

18        So after, you know, a dozen years of higher

19   education, you have to start doing some practical learning.

20   And that's what a resident -- internship and residency is for.

21   Q.   During your residency, did you achieve any positions of

22   distinction?

23   A.   Yes.  My last year I was a chief resident.  I also was

24   selected as a fellow for the Group for the Advancement of

25   Psychiatry, which is sort of an honor, I guess.  So, yes.

L.H. Gold - Direct

1852

1    Q.    The first page of your CV lists your medical board

2    certifications and memberships.  What does it mean to be board

3    certified?

4    A.    Board certified means that the specialty at question, you

5    have passed the tests, verbal, oral, and/or both that

6    demonstrates that you're practicing at the highest degree of

7    best practices as -- as judged by that particular -- by experts

8    in that particular specialty.

9    Q.    In what areas of medical practice are you board certified?

10   A.    General clinical psychiatry and forensic psychiatry.

11   And -- I'm sorry.

12   Q.    Go ahead.

13   A.    Oh, and in fact, I'm actually on the board for forensic --

14   the forensic psychiatry committee that writes the questions for

15   the tests for forensic psychiatry.

16   Q.    Can you just explain to us what forensic psychiatry is.

17   A.    Yeah.  So forensic psychiatry, broadly speaking, is the

18   application of the principles and practice of forensic

19   psychiatry -- of psychiatry for non-clinical or non-treatment

20   purposes.

21         So it can be analysis, legal consultation, working in

22   an insurance company, for example.  All kinds of things.

23   Q.    So non-treatment?

24   A.    Non-treatment.

25   Q.    Are you here today as a forensic psychiatrist?

L.H. Gold - Direct

1853

1    A.    Yes, I am.

2    Q.    There's also a section on your CV on page 1 called

3    Academic Appointments.   Do you teach at any universities?

4    A.    Yes.   I'm a clinical professor of psychiatry at Georgetown

5    University School of Medicine.   And I'm in the process right

6    now of designing a teaching module for the residents in

7    forensic psychiatry.

8    Q.    Are you a member of any professional organizations in the

9    field of psychiatry?

10   A.    Yes.   I'm a member of the American Psychiatric

11   Association, the Washington Psychiatric Society, and I'm

12   incoming president elect of the American Academy of Psychiatry

13   and the Law.

14   Q.    And what is the primary focus of the American Academy of

15   Psychiatry and the Law?

16   A.    It's the professional organization for forensic

17   psychiatrists, primarily in the United States, but we also have

18   international members.   And the purpose of that organization is

19   education.

20   Q.    Does the American Psychiatric Association have a

21   publishing arm?

22   A.    Yes, it does.

23   Q.    And has that organization published any books that you

24   have written or edited?

25   A.    Yes.

L.H. Gold - Direct

1854

1  Q.   What books are those?

2  A.   Well, there's one coming out in the spring, which is the

3  third edition of the *Textbook of Suicide Risk Assessment and*

4  *Management*.

5        A couple years ago I was the editor of the third

6  edition -- well, I've been the editor of all the editions of

7  the *Textbook of Forensic Psychiatry*, which is one of only two

8  textbooks on that, general textbooks on that subject.  A

9  textbook on *Gun Violence and Mental Illness*.  Textbook on

10 *Sexual Harassment, Evaluations in Litigation*.

11 Q.   Are these textbooks used in residency programs?

12 A.   I hope so.

13 Q.   Have you -- have you also published articles in the field

14 of forensic psychiatry?

15 A.   Yes.

16 Q.   And these are all listed in your CV?

17 A.   Yes.

18 Q.   All right.  We do not need to run through all of them.

19       On page 3 of your CV there's one publication that I

20 would like to call attention to it, and it's entitled *Sexual*

21 *Harassment of Women:  Climate, Culture, and Consequences in*

22 *Academic Sciences, Engineering, and Medicine*, which was

23 published in June 2018.

24       Very briefly, can you tell us about your work on this

25 publication.

L.H. Gold - Direct

1855

1    A.    Yes.   I was part of a committee selected by the National

2    Academy of Sciences, Engineering, and Medicine to work on a

3    research study, and then be part of the publication process for

4    the results of that research and our recommendations on how to

5    address our findings regarding sexual harassment in academia,

6    primarily science, STEM subject, science, technology,

7    engineering, and medicine.

8    Q.    Thank you.   Page 6 of you CV has a section entitled

9    Journal Affiliations.   Do you edit certain journals, medical

10   journals?

11   A.    I have been the associate editor or on the editorial

12   review board of various journals and publishing.   I'm on the

13   editorial board for the American Psychiatric Publishing,

14   Incorporated, the publishing arm of the American Psychiatric

15   Association.

16          But also I've been on -- I've been an associate

17   editor or on the editorial board of a variety of other

18   journals.

19   Q.    And do you also function as a peer reviewer for medical

20   articles?

21   A.    Primarily psychiatric.   Occasionally more medical than

22   psychiatric, but, yes.

23   Q.    Briefly in one or two sentences, if you could explain what

24   peer review is.

25   A.    Peer review is an essential part of the scientific process

L.H. Gold - Direct

1856

1  where typically if someone writes an article or conducts

2  research and wants to have it published, it is sent to

3  recognized experts in that field for them to read over and

4  comment on and address whether it meets specific kinds of

5  scientific standards.

6         If it's a research article, there might be

7  statistical standards.  For other subjects, there might be

8  other kinds of standards.  There's a variety of standards for

9  any individual article.

10 Q.   Do you do any work with the District of Columbia Mental

11 Health Commission?

12 A.   Yes, I'm a member of the commission.

13 Q.   What's the function of the commission?

14 A.   The District of Columbia Mental Health Commission, which I

15 believe is part of the Superior Court of the District of

16 Columbia, I get them confused, I'm sorry, handles involuntary

17 commitment petitions in the District of Columbia on -- whether

18 they're inpatient or outpatient.

19        So we conduct the hearings to see whether someone

20 should or shouldn't be involuntarily committed.

21 Q.   Thank you.  Now --

22 A.   Or whether we recommend that they be involuntarily

23 committed.  The Court decides whether they should.

24 Q.   Understood.  Aside from your teaching and writing, have

25 you also had a private practice in which you treat patients?

L.H. Gold - Direct

1857

1    A.    Yes.

2    Q.    Do you still see private patients at this time?

3    A.    Not at this moment.

4    Q.    For what period of time did you see private patients?

5    A.    From 1992 until about April of this year.

6    Q.    And you also have a private forensic practice, correct?

7    A.    That is correct.

8    Q.    And in your clinical practice with patients, as well as

9    your forensic practice, would you say that you have an area of

10   specialty?

11   A.    Yes.

12   Q.    What would that be?

13   A.    Post-traumatic stress disorder, personal injury, diagnoses

14   associated with those.  That would be both clinical and

15   forensic.  But clinically mood disorders, anxiety disorders,

16   and post-traumatic disorders, also personality disorders.

17   Q.    When you say "post-traumatic disorders," do you include

18   trauma as a result of sexual abuse?

19   A.    Yes.  Well, yes, because in women that is actually the

20   most common kind of post-traumatic -- is the most common reason

21   for post-traumatic disorders.

22   Q.    Over the last 30 years or so of your practice, can you

23   estimate the number of women you have evaluated, whether as a

24   treating doctor or as a part of your forensic work, who have

25   experienced sexual assaults?

L.H. Gold - Direct

1858

1   A.   Well, "sexual assault" is a very broad term.   But

2   including everything under the umbrella of what could be

3   considered a sexual assault, it's probably between 6 and 800

4   women.

5   Q.   Have you evaluated adolescents who claim to have

6   experienced sexual assault?

7   A.   Yes.

8   Q.   And can you explain for us briefly in your area of

9   specialty what the difference is between your forensic work and

10  your clinical work, your treatment work.

11  A.   Yes, forensic work is I evaluate people, usually people

12  involved in litigation, whether criminal or civil, and I don't

13  provide treatment.

14        In my clinical practice, I provide treatment.  Or I

15  provided treatment.

16  Q.   In your treatment practice, have you evaluated and treated

17  adolescents who have experienced severe trauma as a result of

18  claimed sexual assault?

19  A.   Yes.

20  Q.   Are you familiar with the research and literature on the

21  fight-flight-freeze response to a traumatic event?

22  A.   Yes, it's the basis of most post-traumatic theory, stress

23  theory.

24  Q.   Are you familiar with the concept of secondary

25  victimization in the context of a sexual assault?

1  A.   Yes.  In the context of sexual assault and other types

2  of -- other types of events, yes.

3  Q.   Based on your training and experience, are you

4  knowledgeable about the ways in which adolescents process

5  adverse events in their lives?

6  A.   Yes, if by that you're asking am I aware of some of the

7  developmental issues that can affect how they process adverse

8  events or traumatic events.

9  Q.   When you're working as a forensic evaluator, are you able

10 to go outside the therapeutic relationship to gather

11 information?

12 A.   You're ethically required to.

13 Q.   What type of information do you typically look for when

14 you're doing a forensic consult?

15 A.   I ask to review legal records, medical records,

16 psychiatric records, counseling records, school records, social

17 media.  Pretty much -- sometime tax records.  Sometimes

18 military records.  As many contemporaneously-generated records

19 as I can.  Any other reports by other experts.

20 Q.   And what is the purpose for looking at all of those

21 records?

22 A.   To try to come to an opinion based on as many facts as I

23 can gather about someone's emotional or mental state at

24 whichever time I am asked to evaluate.

25 Q.   And you would not undergo the same exercise, would you, in

L.H. Gold - Direct

1860

1   your capacity as a treating doctor?

2   A.   It would be unethical to do that for the most part.

3   Q.   And why is that?

4   A.   Confidentiality is the cornerstone of the therapeutic

5   relationship.  And a therapeutic relationship is basically

6   between the treatment provider and the client or the patient.

7   And the therapeutic relationships are based on that rapport.

8   And that rapport is developed as a result of, hopefully, trust

9   on both sides.

10          And so, treatment providers almost, almost

11   exclusively rely on self-report, except in unusual

12   circumstances.

13   Q.   Let's move on to the work that you did in this case.  Did

14   review records as part of your work in this case?

15   A.   Yes, I did.

16   Q.   About how many hours did you spend reviewing these

17   records?

18   A.   Oh, 35 to 40, I think.

19   Q.   So let's look at some of the specific records and

20   materials you may have reviewed.  Did you review the legal

21   documents in this case?

22   A.   Well, I don't know if I reviewed all of them, but I

23   reviewed many legal documents in this case.

24   Q.   You reviewed the complaint and the answer, did you not?

25   A.   Yes.

L.H. Gold - Direct

1861

1 Q.   And you reviewed interrogatory answers?

2 A.   Yes.

3 Q.   And you reviewed a number of deposition transcripts?

4 A.   Many, yes.

5 Q.   Including the deposition of the plaintiff, Ms. Doe?

6 A.   Yes.

7 Q.   Did you review the deposition testimony of her parents?

8 A.   Yes.

9        MS. CORREIA:  Objection, Your Honor.

10       THE COURT:  Overruled.

11       MS. CORREIA:  May we approach?

12       THE COURT:  Yes.

13       NOTE:  A sidebar discussion is had between the Court

14 and counsel out of the hearing of the jury as follows:

15 AT SIDEBAR

16       MS. CORREIA:  I understood the testimony --

17       THE COURT:  Okay, hold on.  What's the objection?

18       MS. CORREIA:  I understood the testimony is supposed

19 to be based on the trial record and not the deposition record.

20       THE COURT:  No.  No, I wasn't trying to make that

21 statement.  I think she can -- what are you afraid of coming

22 out in --

23       MS. CORREIA:  I am not afraid of anything coming out.

24 I am afraid that the jury should be making a decision based on

25 the trial record.  And the expert's opinion should be based on

L.H. Gold - Direct

1862

1  the trial record evidence, and not things that the jury hasn't

2  heard.

3           MS. CALEM:  Your Honor, I am trying to lay a

4  foundation to qualify her and to offer her as an expert.  And

5  in order to do that, I want her to say what she did in her

6  forensic capacity.

7           THE COURT:  Yeah, I'm going to allow it.  Your

8  exception is noted.

9           MS. CALEM:  And plus, there is a rule on witnesses.

10  We did not tell her what other witnesses said.

11           THE COURT:  Right.  No, this will be permitted.

12           NOTE:  The sidebar discussion is concluded; whereupon

13  the case continues before the jury as follows:

14  BEFORE THE JURY

15           THE COURT:  Please proceed.

16  BY MS. CALEM: (Continuing)

17  Q.   Let's see.  When we left off, Dr. Gold, I believe I was

18  asking you about the deposition testimony that you reviewed.

19  And I don't need you to reiterate all the deposition testimony.

20  I just want to know whether you reviewed the depositions of the

21  plaintiff's parents?

22           You did that, did you not?

23  A.   Yes.

24  Q.   And did you interview -- read the deposition testimonies

25  of the people involved in the investigation in this case?

1863

1   Mr. Baranyk --

2   A.   Yes.

3   Q.   -- Calvello.  Ms. Hogan?

4   A.   Yes, yes.

5   Q.   Did you review any written statements given by Ms. Doe's

6   high school friends?

7   A.   Yes.

8   Q.   Did you review Ms. Doe's academic records?

9   A.   Yes.

10  Q.   And why were those important?

11  A.   In young adults -- teenagers, young adults, college-age

12  students, when they are experiencing emotional distress,

13  particularly severe emotional distress, one of the places that

14  you see that reflected is in academic functioning often.

15          And so, that can provide corroborating evidence or

16  information regarding how -- regarding their reports,

17  subjective reports of distress.

18  Q.   Did you review Ms. Doe's medical records, including the

19  records of her treating therapists?

20  A.   Yes.

21  Q.   Did you review communications between Ms. Doe and her

22  friends from around the time of the bus incident in March 2017

23  and in the year following?

24  A.   I reviewed quiet a few social media texts.  I don't know

25  if they are all of them, but I reviewed quite a number of them.

L.H. Gold - Direct

1864

1    Q.   And what is the importance of those types of

2    communications?

3    A.   Well, those are particularly valuable because they are, A,

4    contemporaneous; and, B, tend to be unfiltered.  Which is why

5    all of us get in trouble with them.  So they often get fired

6    off in the heat of a moment and can give you insight into how

7    that person is feeling at that moment.

8    Q.   And do forensic psychiatrists typically rely on all of

9    these types of documents in conducting their evaluations?

10   A.   These and, depending on the case, more, yes.

11            MS. CALEM:  Your Honor, at this point I would like to

12   move to offer Dr. Gold as our expert witness.

13            THE COURT:  For purposes of testimony about --

14            MS. CALEM:  For purposes of testimony regarding the

15   plaintiff's emotional distress.

16            THE COURT:  All right.  Any objection?

17            MS. CORREIA:  I didn't hear a specificity about the

18   expertise for purposes of this case.

19            THE COURT:  No, that's -- those are based on the

20   questions she has been asking for the last ten minutes.

21            I am going to permit her to testify about the

22   emotional distress of Jane Doe.

23            Go ahead.

24   BY MS. CALEM: (Continuing)

25   Q.   Dr. Gold, as part of your forensic evaluation, did you

L.H. Gold - Direct

1865

1   meet with Ms. Doe?

2   A.   Yes, I did.

3   Q.   Is this a standard part of your forensic evaluation?

4   A.   When possible, yes.

5   Q.   And why is this something important to do?

6   A.   It's a standard part of psychiatric evaluation, whether

7   it's clinical or forensic.  It allows you not only to hear the

8   person's subjective experience, which is extremely important,

9   it also allows you to flesh out information that you've

10  reviewed in the documents and make your own objective

11  observations of that person's emotional state, again at that

12  moment in time.

13  Q.   How long did you meet with Ms. Doe for?

14  A.   Two hours.

15  Q.   Is this a standard amount of time for an evaluation of

16  this sort?

17  A.   Not, not typically for me.  Although evaluating

18  adolescents usually is on the shorter side, between two and

19  four hours.  Hers was two hours, which is a little on the

20  shorter side.

21  Q.   Can you explain why you believe it was a little on the

22  shorter side?

23  A.   There were certain areas that Ms. Doe was not particularly

24  responsive about, certain questions that she was not

25  particularly responsive about.

L.H. Gold - Direct

1866

1       And so, it curtailed the length of time because there
2   were just subjects that weren't discussed, or weren't discussed
3   very much.
4   Q.   Nonetheless, based on all of the work that you did, were
5   you confident that you had all of the information you needed to
6   arrive at your opinions about Ms. Doe's emotional distress
7   within a reasonable degree of medical and psychiatric
8   certainty?
9   A.   Yes.
10  Q.   So let's go to the issue of Ms. Doe's emotional distress.
11      Is it your opinion that Ms. Doe has experienced
12  severe, long-lasting emotional distress as a result of the
13  actions of the School Board?
14      MS. CORREIA:  Objection.
15      THE COURT:  Overruled.
16  A.   My opinion is that she has not.
17  BY MS. CALEM: (Continuing)
18  Q.   And is it your opinion that Ms. Doe has experienced
19  emotional distress that rises to the level of a psychiatric
20  disorder as a result of the actions of the School Board?
21  A.   My opinion is that she has not.
22  Q.   And are those opinions held within a reasonable degree of
23  medical and psychiatric certainty?
24  A.   Yes, they are.
25  Q.   So let's start with the fact of emotional distress.  Would

L.H. Gold - Direct

1867

1  you agree that Ms. Doe did experience some emotional distress

2  as a result of the incident that occurred on the bus?

3  A.  Yes.

4  Q.  So let's look at that incident itself.  First of all, in

5  speaking to Ms. Doe, did you have an understanding of her --

6  the history of her interactions with Mr. Smith within the

7  last -- the year or two prior to the incident?

8  A.  Yes, I believe I did.

9  Q.  What was your understanding?

10  A.  They had known each other.  They were peers.  They were

11  friends.  They had -- they belonged to the same swim club.

12  They were in band together.  And Ms. Doe reported that at least

13  at one point she had had some romantic interest in him.

14  Q.  Was that romantic interest, did she say --

15        MS. CORREIA:  Objection.

16        THE COURT:  I will strike that answer.  Ask your next

17  question.

18  BY MS. CALEM: (Continuing)

19  Q.  In the -- strike that.

20        What did Ms. Doe tell you about the history of her

21  interactions with Mr. Smith?

22  A.  There had been an element of romantic interest --

23        MS. CORREIA:  Objection, Your Honor.

24        MS. CALEM:  Your Honor --

25        THE COURT:  Approach the bench, please.

L.H. Gold - Direct

1868

1             NOTE:  A sidebar discussion is had between the Court

2   and counsel out of the hearing of the jury as follows:

3   AT SIDEBAR

4             MS. CALEM:  I'm sorry, Your Honor.  I'm not trying to

5   go beyond the Court's ruling.  I thought I was complying with

6   what we discussed.

7             THE COURT:  What's your objection?

8             MS. CORREIA:  The objection is it was an opened-ended

9   question about their history --

10            THE COURT:  Yeah.  The question suggests that they

11  had a mutual romantic interest.  And that's not the testimony

12  that we've heard.

13            The testimony has been that Jane Doe admitted she had

14  an interest.  I'm not sure -- is "romantic" the right word?

15            MS. CORREIA:  Maybe adults have used that word.  The

16  lawyers, I should say.

17            THE COURT:  That she was interested in him at one

18  period, but it wasn't a romantic interest.

19            MS. CALEM:  Can I ask the question, did she indicate

20  she had an interest in him at any point?

21            THE COURT:  I think that that --

22            MS. KHOURI:  I think it has to be time limited, not

23  open it up as if it could be at any point in time.

24            MS. CALEM:  I limited it to the year, as we discussed

25  in our earlier conference, before this exam.  I did limit it to

L.H. Gold - Direct

1869

1  the year or so before the incident.

2          MS. CORREIA:  I think the question was what did Doe

3  tell you about the history of her interactions with Smith.

4  That was too broad.

5          THE COURT:  So what I want you to do is lead her so

6  she can give a yes or no answer and just say:  Did she tell you

7  that she had had an interest in him in a year or so before this

8  incident.

9          MS. CALEM:  All right.

10         THE COURT:  Okay?

11         MS. CALEM:  Can I ask about freshman year, or is

12  that --

13         MS. CORREIA:  No.

14         MS. CALEM:  I thought we had talked about that.

15         MS. CORREIA:  Sorry, Your Honor.  Stay in my lane.

16         MS. CALEM:  To quote you, Linda, you are not judge

17  and jury.

18         THE COURT:  Yeah, let's leave it right where that is,

19  just ask that one question.  Thank you.

20         NOTE:  The sidebar discussion is concluded; whereupon

21  the case continues before the jury as follows:

22  BEFORE THE JURY

23  BY MS. CALEM: (Continuing)

24  Q.   Dr. Gold, did Ms. Doe tell you that she was at any time

25  interested in Mr. Smith in the year leading up to the bus

L.H. Gold - Direct

1870

1    incident?

2    A.   In a non-platonic way, yes.  And not necessarily

3    consistently --

4            THE COURT:  I'm sorry.  Just listen to the question

5    and answer the next question.

6            THE WITNESS:  I'm sorry.

7            THE COURT:  Thank you.

8            THE WITNESS:  Sorry, Your Honor.

9    BY MS. CALEM: (Continuing)

10   Q.   So what are -- let's go to your opinions about Ms. Doe's

11   emotional distress during the band trip.  I want to focus on

12   that period of time.

13           What is your opinion about the emotional distress --

14   her emotional distress at that time?

15   A.   I think Ms. Doe was emotionally distressed in a --

16   primarily as a -- well, Ms. Doe was emotionally distressed.

17   Q.   And what -- based on the facts you have reviewed and your

18   conversation with her, what do you believe the reason for that

19   distress was?

20   A.   The primary reason appears to have been that she became

21   very upset upon discovering that Mr. Smith had a girlfriend.

22   Q.   Do you know how she learned this information?

23   A.   I believe in the course of confiding in a friend that she

24   was not sure if she was entirely comfortable with what had

25   happened on the bus, that she was not sure that it was entirely

L.H. Gold - Direct

1871

1   okay or consensual or -- again, it's very hard to characterize,

2   but this friend advised her that he had a girlfriend.

3   Q.   And what is the basis of your belief that Ms. Doe became

4   upset by that information?

5   A.   That's when her texts blew up.  And the focus of the texts

6   and the other information -- contemporaneous information I saw

7   over the next few days centered on her distress, anger, upset

8   that Jack Smith was cheating.

9   Q.   Can I ask you, please -- and you will get the book -- can

10  you turn to Plaintiff's Exhibit 82.

11  A.   Can I add something?

12  Q.   No, wait until I ask.

13           MS. CALEM:  Your Honor, I believe this has been

14  admitted into evidence.  May I publish the first page to the

15  jury?

16           THE COURT:  Yes.

17  BY MS. CALEM:  (Continuing)

18  Q.   Dr. Gold, have you seen this exchange of text messages?

19  A.   Yes.

20  Q.   And is this information that you considered in arriving at

21  your opinion about Ms. Doe's emotional distress?

22  A.   Yes.  Her emotional distress at this point in time.

23  Q.   Okay.  And tell us, what is it about this exchange of text

24  messages that indicates to you emotional distress relating to

25  Mr. Smith having a girlfriend?

L.H. Gold - Direct

1872

1      MS. CORREIA:  Objection.  Your Honor, may we

2  approach?

3      THE COURT:  Yes.

4      NOTE:  A sidebar discussion is had between the Court

5  and counsel out of the hearing of the jury as follows:

6  AT SIDEBAR

7      MS. CORREIA:  Sorry, Your Honor.  The Court's order

8  is that the expert will not be allowed to testify directly

9  about the credibility of other witnesses or the credibility of

10  the facts of the case.  And that's what she is doing,

11  interpreting the evidence.

12      MS. CALEM:  No.  This is not credibility.  This is --

13  she is simply saying, based on the evidence that she reviewed,

14  her impression is that this was a source of emotional distress.

15  This was in her report.  You challenged this in the Daubert

16  motion.  And she was admitted.  And you knew that this was her

17  opinion.

18      MS. CORREIA:  It's the role of the jury to decide

19  whether she suffered emotional distress in this case and the

20  degree of it.

21      THE COURT:  She is allowed to point out facts that

22  support her position that she believes the emotional distress

23  is a result of the finding out about the girlfriend.

24      Now, whether it's believable or not, but there is

25  evidence to that fact.  So that ruling does not exclude the

L.H. Gold - Direct

1873

1  ability to highlight different pieces of information that she

2  looked at.  So I don't think it violates that part of the order

3  that I entered previously.

4          MS. CORREIA:  Thank you, Your Honor.

5          THE COURT:  Okay.

6          NOTE:  The sidebar discussion is concluded; whereupon

7  the case continues before the jury as follows:

8  BEFORE THE JURY

9  BY MS. CALEM: (Continuing)

10 Q.   Do you remember the question, Dr. Gold?

11 A.   Could you repeat it, just to --

12 Q.   Let's see if I remember it.  We're looking at Plaintiff's

13 Exhibit 82, and there is a text exchange here between Ms. Doe

14 and her friend Aveesh.  And you said that this is one of the

15 documents, pieces of information, that you reviewed in arriving

16 at your opinion about her emotional distress on the band trip.

17          My question to you is, what is it about this exchange

18 that supports your opinion that the girlfriend was a source of

19 emotional distress while on the band trip?

20 A.   I would reframe it.  Not necessarily the girlfriend, it's

21 the fact that there had been this contact between them and

22 afterward she discovered that he had a girlfriend.

23          So the first thing is, in all caps, HATE HIM.  And

24 that's -- I'm sorry, that's 7:22.

25          And then her friend responded:  What happened?

1     And at 7:24 there is a narrative text -- you don't

2     want me to read it, do you?

3     Q.   You don't need to read it.

4     A.   Okay.  So what it indicates is that in response to finding

5     out about this girlfriend, Ms. Doe confronted Mr. Smith about

6     having a girlfriend and insisting that he tell the girlfriend

7     what had happened between her -- between Ms. Doe and Mr. Smith

8     on the bus.

9     And she reports that Mr. Smith texted her back, told

10    her that he had told his girlfriend, but that Ms. Doe had

11    observed them -- and I believe this was again -- she was not at

12    the same school, but she was on the same band trip with another

13    school, that's why she was there.  And she didn't -- she saw

14    them walking by and holding hands and she became very angry.

15    And she says:  There is no way he told her the whole

16    story and he said he would, they were holding hands.

17    And that, to her, indicated, quote:  There is no way

18    she would forgive him.

19    So she believed he hadn't, either hadn't told her or

20    hadn't told her the whole thing or, I don't know, but not to

21    her satisfaction.

22    Q.   You can take that down.

23    What is -- you referenced the use of the word

24    "cheating" before.  What is the significance of that word?

25    A.   Well, "cheating" is a word that comes up in the context of

L.H. Gold - Direct

1875

1    non-platonic interest in people.  It's not a word that I have,

2    in my experience, heard used in the context of a sexual

3    assault.  Women who are assaulted aren't usually, in my

4    experience, worried whether the perpetrator is married,

5    engaged, any -- about their personal life.  It's not relevant

6    to the fact that they were just assaulted.  That's what's

7    relevant to them.

8            So the fact that the subject of hate him, and he

9    didn't tell his girlfriend, and he said he was going to tell

10   his girlfriend, to me that's the telling emotional content

11   here.

12   Q.   How, if at all, did you factor in Ms. Doe's reports to her

13   friends about this incident?

14   A.   Well, whatever -- again, I don't know what happened on the

15   bus.  And I think that Ms. Doe was processing that, and she

16   wasn't entirely sure exactly what happened on the bus.

17           But in trying to work that through and talking to her

18   friends about it, she was given this information.  What that

19   tells me is that as she was trying to work it through, at least

20   part of the totality of the circumstances was that -- and,

21   again, I don't know what happened, but at least prior to the

22   event or events that made her question what was going on, it

23   included her having something more than a non-platonic interest

24   in him.

25   Q.   Did you factor in the observations of Ms. Doe's friends

1876

1   during the trip that she reported feeling unwell?

2   A.   Yes.

3   Q.   And what did you make of those observations?

4   A.   She was upset.  She was very upset.

5   Q.   Would you agree that adolescents tend to report traumatic

6   events relating to peer relationships to their friends rather

7   than to adults?

8   A.   Yes.

9   Q.   Is there anything else about -- any other factor relating

10  to the bus trip itself that you considered in arriving at your

11  opinion regarding Ms. Doe's emotional distress at that point in

12  time?

13  A.   You know, up to whatever happened after the blanket had

14  been taken out, the interaction between the two of them was a

15  consensual interaction at least --

16          MS. CORREIA:  Objection.

17          THE COURT:  Sustained.  Strike that last answer.

18          MS. CALEM:  Okay.  I apologize, Your Honor, this

19  is --

20          THE COURT:  You just started off by saying she wasn't

21  going to offer any opinion --

22          MS. CALEM:  No, she is -- no.  She is not intended to

23  offer any opinion on consent.

24          THE COURT:  Well, it sounded like that may have been

25  what she was saying.  So you are to disregard that opinion.

L.H. Gold - Direct

1877

1  BY MS. CALEM: (Continuing)

2  Q.   Okay.  Did you understand that Ms. Doe had agreed to sit

3  next to Mr. Smith on the bus?

4  A.   I understood that he had specifically asked her if he

5  could sit next to her.  That she agreed.  And that this

6  actually necessitated some rearrangement of seating.

7  Q.   Let's move to after the band trip.

8        Was there another point after the band trip during

9  which you, in your opinion, observed Ms. Doe experiencing acute

10  emotional distress?

11  A.   Yes.

12  Q.   And when was that?

13  A.   That was following being asked to report to the school

14  officials what happened.

15  Q.   What information did you have to support your belief about

16  that?

17  A.   A couple of significant things.  The first one was, again,

18  a text that was immediately sent to a friend about concern

19  about that she was going to be disciplined, either expelled or

20  suspended, I think.

21        But even -- again, the most significant piece of

22  evidence for me was her father's report of her calling him

23  afterwards, and she was so distraught that she could barely

24  talk.  And that he -- what he gathered from what she was saying

25  to him was that she might get expelled from school and that

1878

1  was -- or suspended, and that was overwhelming at that moment

2  in time.

3  Q.   Do you have an understanding as to how long that acute

4  emotional distress lasted?

5  A.   Well, Ms. Doe was advised about 48 hours later that there

6  was not going to be any discipline against her.  So that would

7  have resolved the acute distress issue in regard to discipline.

8           She might still have had some distress over the fact

9  that it happened because it was unpleasant, but there was no

10  longer fear that there would be a severe consequence.

11  Q.   Now let's look at the remainder of that school year.

12           Based on your forensic evaluation, what are your

13  opinions about Ms. Doe's level of emotional distress for the

14  remainder of the school year based on the information that you

15  reviewed?

16  A.   By -- certainly by the end of the school year Ms. Doe's

17  distress had for the most part resolved.  There were still some

18  issues in the following weeks about contact with Jack Smith in

19  band class.  Those were resolved by the end of the month.

20           And at that point there is no evidence of ongoing

21  acute or severe emotional distress other than subjective

22  reports.

23  Q.   What type of evidence are you looking for as a forensic

24  psychiatrist to show the existence of ongoing emotional

25  distress?

L.H. Gold - Direct

1879

1   A.   Well, there is two, given Ms. Doe's age, primarily two.

2   One is a change in social functioning.  And the other is a

3   change in academic function.

4   Q.   And what did you learn about her academic functioning for

5   the rest of her junior year?

6   A.   Ms. Doe had been a higher than 4.0 grade point average

7   student.  And she continued to be a higher than a 4.0 grade

8   point average student.

9        You know, with very bright people, including very

10  bright teens, you know, sometimes they might -- people might

11  say, oh, they went from an A to a B, so that's okay.  But what

12  I look at is whether there is any significant change.  An A

13  student who becomes a B student, to me that's a significant

14  indicator of some impairment for some reason.

15       Her grades stayed between 4.0 and 4.2, I believe

16  between 4.1 and 4.2.  She was taking two or possibly three AP

17  classes.  This was a very high powered, you know, committed

18  high school student.  And her -- she did well.

19  Q.   Did you consider Ms. Doe's extracurricular activities in

20  arriving at your opinions about her emotional distress for the

21  remainder of that school year?

22  A.   Yes.  To the extent that I could identify them.  And the

23  only one of which I was really appeared -- because when you're

24  taking two or three AP classes and getting a 4.2 or 4.1 grade

25  point average, you probably don't have a huge amount of time

L.H. Gold - Direct

1880

1   for extracurricular activities.  But the one that Ms. Doe had

2   been committed to was band.  And she continued to participate

3   in band.  And there does not appear to have been any change in

4   her functioning or level of participation.

5          Even on the band trip, she participated in all the

6   activities, as far as I could tell, despite the fact that she

7   was upset.

8   Q.   Did Ms. Doe tell you that she felt uncomfortable in band

9   after this incident because of Mr. Smith's presence?

10  A.   Yes.

11  Q.   And how did that factor into your analysis?

12  A.   Well, she had clearly been upset with him, you know, on

13  the band trip.  So -- and on top of that, there had been this

14  adverse experience.  Ms. Doe did not directly report this to

15  the school.  Somehow it got reported to the school through the

16  grapevine of people that had been informed.

17         And so, I don't know that she was necessarily

18  expecting there to be -- to be put on the spot about what

19  happened and have her parents involved and potentially be

20  looking at disciplinary action.

21         So I'm sure that she was not -- she was uncomfortable

22  looking at Jack Smith at that point.

23  Q.   Did you factor in Ms. Doe's college application process to

24  your thinking about her functioning after the band trip?

25  A.   I'm not sure I understand the question.

1881

1   Q.   Were you aware that she was accepted at William & Mary?

2   A.   Yeah.  I don't think that was until later in the year.  I

3   mean, I don't think that was until her senior year, right?

4   Q.   Okay.

5   A.   But she -- but in terms of college functioning, she --

6   over the summer, which is, again, after the school year, she

7   was very involved in college application process.  She went on

8   12 -- I think she went to see 12 colleges in 10 days.  She

9   participated in band camp.  I believe she ran for a leadership

10  role or wanted a leadership role in band.  I don't think she

11  got it, but I believe she tried to.

12          These are -- these are indications that her

13  functioning -- there is no evidence of impaired functioning

14  that I could find.

15  Q.   What about the fact that Ms. Doe began seeing a therapist

16  in June of 2017, how did that factor into your conclusion that

17  there was no impaired functioning?

18  A.   Well, one doesn't have to have impaired functioning to go

19  see a therapist.  And to the -- I am not sure entirely that

20  Ms. Doe had at that point been able to process all these

21  events.  And she -- there is nothing, nothing surprising about

22  her going to see a therapist.

23          The part that leads me to believe that it's not a

24  result of acute emotional distress was the fact that these

25  incidents happened in March and she didn't see the therapist

L.H. Gold - Direct

1882

1    until -- until sometime in June.  So it was a good two to

2    three months -- I'm not remembering the exact dates, but two to

3    three months after the events in question.

4           Meanwhile, she had completed her classes, engaged in

5    her activities, et cetera, and done well.

6           So, again, social functioning, academic functioning,

7    were okay, not impaired.  No evidence of impairment.

8    Q.   Did you form any assessment as to Ms. Doe's ability to

9    self-advocate in academics and in her social life?

10   A.   Ms. Doe has the capacity to self-advocate.

11   Q.   And what is the basis for that statement?

12   A.   She confronted Jack Smith.  She confronted Jack Smith's

13   girlfriend, a young woman that she did not know about

14   Jack Smith's activity, encounter, the incident on the bus -- I

15   am not sure what words to use for that.

16          She became very angry at the end of the school year

17   when Jack Smith was given a band award, and she immediately

18   confronted the band teacher, who obviously is not a peer, about

19   the inappropriateness of giving Jack Smith an award given her

20   complaints about him.

21          She -- so those are three instances of self-advocacy

22   that occurred within -- both immediately and within the short

23   term range after the events on the bus.

24   Q.   Have you read the report of one of Ms. Doe's therapists in

25   which she opines that the incident on the bus and the incidents

1883

1    following and the events following have impaired Ms. Doe's

2    ability to -- in her relationships with boyfriends?

3              MS. CORREIA:  Objection.

4              THE COURT:  Approach the bench.

5              NOTE:  A sidebar discussion is had between the Court

6    and counsel out of the hearing of the jury as follows:

7    AT SIDEBAR

8              MS. CORREIA:  She is asking about a therapist's

9    report.  There isn't a therapist's report.

10             THE COURT:  A couple of letters, is that what you're

11   referring to?

12             MS. CORREIA:  There was a clinical file.

13             MS. CALEM:  Is your objection to the terminology of

14   "report" rather than "clinical file"?  There is an expert

15   disclosure which she read in which you said that Ms. Kerley

16   would be opining that her relationships with her boyfriends

17   were affected.  And the plaintiff herself testified to that

18   yesterday.

19             MS. CORREIA:  That's in rebuttal.  It hasn't come

20   yet.

21             MS. CALEM:  But she read all that information and she

22   read the Kerley file.

23             MS. CORREIA:  So that the disclosure that you are

24   referring to, you are talking about the report?

25             MS. CALEM:  I don't --

1884

1        MS. CORREIA:  You just asked about a therapist's

2    report.  And I am objecting that there isn't a therapist's

3    report.

4        THE COURT:  Okay.

5        MS. CALEM:  Therapist's files.

6        THE COURT:  So the import is whether she should be

7    allowed as to testify whether she believes that the events that

8    occurred would affect her ability to have relationships in the

9    future.  Is that what you're asking?

10        MS. CALEM:  I don't want to go broad brush with this.

11   She just talked about one boyfriend, and that's all I want to

12   ask about.  And there were some text messages admitted into

13   evidence yesterday that go to that issue.  That's all I want to

14   ask her about.

15        THE COURT:  All right.  You may ask it.  Clean up the

16   reference to the file versus a report.

17        MS. CALEM:  Yes, Your Honor.

18        MS. CORREIA:  Thank you, Your Honor.

19        THE COURT:  Okay.  Thank you.

20        NOTE:  The sidebar discussion is concluded; whereupon

21   the case continues before the jury as follows:

22   BEFORE THE JURY

23   BY MS. CALEM: (Continuing)

24   Q.   Dr. Gold, I misspoke when I said "report."

25        Did you review any materials from either of Ms. Doe's

L.H. Gold - Direct

1885

1    treating therapists which refer to difficulty she had with a

2    high school boyfriend and the connection between that and the

3    incident on the bus?

4    A.    Yes.

5    Q.    What was your understanding of what the treating therapist

6    said about that?

7    A.    That Ms. Doe's relationship in her senior year with

8    another young man in school, that she had difficulty with that

9    due to issues of trust.  And that's really the primary one that

10   I can recall.

11   Q.    Did you, yourself, ask Ms. Doe about this in your clinical

12   interview?

13   A.    Yes, I did.

14   Q.    And what was her response?

15   A.    Her response was that the events with Jack Smith had not

16   affected that relationship.

17   Q.    Did you review any text message exchanges between Ms. Doe

18   and a friend that relate to this high school boyfriend?

19   A.    Yes.

20   Q.    Did the information in -- did those text messages furnish

21   you with any information that is relevant to your opinions in

22   this case?

23   A.    Yes.

24   Q.    What was that?

25   A.    Those text messages took place in March and April.  So --

1886

1    of 2018.  So one year later.  And Ms. Doe was complaining that

2    the boyfriend had been -- I don't know if "ignoring" is the

3    right word, but I think blowing her off is kind of how I would

4    think about it.  That she had ask him, in one text she said ten

5    times to hang out or do something.  And he wasn't doing it, not

6    putting an effort.  And, you know, she wasn't sure what was

7    going on, whether they were still going out or they weren't

8    going out, and maybe they were breaking up or not breaking up.

9    That she still loved him, but he wasn't a good boyfriend.  That

10   information.

11         And subsequently, I guess, as this relationship

12   deteriorated or followed its natural course to its end, one of

13   her friends reported to her that he had had a conversation with

14   this boyfriend who said that they had broken up, at least for

15   one reason, was that he was becoming emotionally closer to

16   other people rather than her.

17         And Ms. Doe again had the reaction that mirrored the

18   reaction of one year previously when she found out that Jack

19   Smith had a girlfriend.

20   Q.   And what reaction was that?

21   A.   Well, the first -- one of the first things she said was, I

22   hate him.  And he cheated on me.  And her friend tried to

23   assure her that he didn't think that he had really cheated on

24   her.  And Ms. Doe insisted that he was a horrible human being

25   and that he had lied to her.  And said that she felt, I

L.H. Gold - Direct

1887

1    believe -- first of all, she was clearly heart broken, okay,

2    which -- you know, I mean, you feel for people.

3           But that she also was angry and felt humiliated,

4    especially -- that was the later -- that was later in April

5    because apparently he started dating or going out with someone

6    else.  And again, she reported how it was breaking her heart

7    every time she saw them together and made her feel humiliated

8    and angry.

9    Q.   So if you could please turn in the Defendant's Exhibit

10   book to 152.

11          And I do not intend to publish this to the jury, Your

12   Honor.  Yeah, it is in evidence.

13          Dr. Gold, if you could take a look at Defendant's

14   Exhibit 152.

15   A.   Okay.

16   Q.   And scan that and let me know if this is the text exchange

17   you are talking about in discussing this relationship.

18          MS. CORREIA:  Objection, Your Honor.

19          THE COURT:  Do you have 152 in evidence?

20          THE CLERK:  Yes, I do.

21          THE COURT:  Okay.  What's your objection?  I'm sorry.

22          MS. CORREIA:  Foundation.

23          THE COURT:  Overruled.  I'll allow it.  Let's not --

24   she has already testified about what she drew from the

25   document.

L.H. Gold - Direct

1888

1        MS. CALEM:  I'm just having her confirm that this is

2   what she looked at, that's all.

3        THE WITNESS:  Yes, this is the document.

4        THE COURT:  Okay.

5        THE WITNESS:  Or one of them.

6   BY MS. CALEM: (Continuing)

7   Q.   Thank you.  You may put that aside.

8   A.   There were others, but this is one.

9   Q.   All right.  With regard to the diagnosis of adjustment

10  disorder with which Ms. Doe's treating therapists -- that

11  Ms. Doe's treating therapist gave her, can you comment on your

12  views as to the appropriateness of that diagnosis?

13  A.   I found no evidence that Ms. Doe's emotional upset

14  distress rose to the level that met the criteria in the

15  Diagnostic and Statistical Manual, which is the -- lists all

16  the criteria and categories for psychiatric disorders, that she

17  met the criteria for any psychiatric disorder, including an

18  adjustment disorder.

19        Regardless of the causation, what the DSM requires

20  for that diagnosis is emotional symptoms outside those which

21  would be expected or beyond those which would be expected for

22  that -- for the event that has ostensibly caused them, and/or a

23  significant impairment in functioning.  Specifically, again, in

24  adolescents or teens, change in social relationships or

25  academic functioning.

L.H. Gold - Direct

1889

1    Q.   So we have already talked about your conclusions with

2    regard to Ms. Doe's academic functioning.  In the therapeutic

3    records that you reviewed there was discussion of, according to

4    the therapists, certain social impairments, loss of friends,

5    changes in some relationships.

6           How does that factor into your thinking about whether

7    or not there was social impairment sufficient to meet the

8    diagnosis of adjustment disorder?

9    A.   You know, to the extent that that is part of the

10   developmental trajectory of teenagers, it's not unusual.  In

11   the context of an adverse event that's being seen as a black

12   and white issue, you're either with me or you're against me,

13   you either believe me or you don't believe me, that's the kind

14   of thing that's going to create some turbulence in social

15   relationships.

16          And I think that what you saw -- what happened was

17   the kind of turbulence you're going to see after the kind of

18   adverse events that took place, but they didn't rise at that

19   time in the three months following the events to meet the

20   criteria of a psychiatric diagnosis.

21          That's not to say that Ms. Doe was not upset and

22   didn't have periods when she felt very, very badly or very

23   angry or whatever.  But she -- she didn't miss school.  She

24   didn't miss band.  She maintained a number of her friendships.

25   She -- you know, she did what she had to do in terms of both

L.H. Gold - Direct

1890

1   functioning and she didn't become isolated, she didn't stay in

2   bed all day, et cetera.

3           There's a number of things that you see in terms of

4   social or academic functioning in people with severe

5   symptomatology that just were not in evidence here.

6   Q.   What about the fact that Ms. Doe resumed seeing a

7   therapist in the spring of 2018, I believe, and basically with

8   one gap has continued on and off to this day, does that suggest

9   to you that there is an appropriate diagnosis of adjustment

10  disorder with anxiety?

11  A.   If there is, it's not related to these events.  Because,

12  again, by definition, an adjustment disorder typically

13  resolves -- its onset is within three months of an identifiable

14  stressor, and it typically resolves within six months of the

15  consequences of that stressor.

16          It becomes a little more complicated when people

17  engage in litigation because then you can't ever -- you can't

18  entirely let go of it, the litigation keeps it alive and adds

19  additional stress.

20          But that doesn't necessarily mean that it's a

21  continuation of a previous adjustment disorder.

22  Q.   Does litigation in and of itself create a type of stress?

23          MS. CORREIA:  Objection.

24          THE COURT:  Sustained.

25  BY MS. CALEM: (Continuing)

L.H. Gold - Direct

1891

1   Q.   Were you able to determine based upon your forensic

2   evaluation what effect the litigation had on Ms. Doe's

3   emotional distress?

4           MS. CORREIA:  Objection.

5           THE COURT:  Sustained.  If she asked Jane Doe whether

6   she was stressed from the litigation, I think you can ask her

7   that.  But otherwise, let's move on.

8   BY MS. CALEM: (Continuing)

9   Q.   Did you discuss with Ms. Doe whether or not she was upset

10  about the litigation?

11  A.   I did not specifically ask that question.

12  Q.   All right.  Were you able to determine if there were other

13  sources of emotional distress in Ms. Doe's life unrelated to

14  this incident and the school's response?

15  A.   There were to the extent that, again, these were to some

16  degree normal developmental sources of stress that are common

17  to people who are about to -- who are very driven, who are very

18  responsible, who have high goals for themselves.  And that can

19  create quite a bit of anxiety.

20          The idea of leaving home and going to college can

21  create quite a bit of anxiety.  Applying to college can be a

22  very stressful process.

23          And all of these are reflected in the therapist's

24  notes from both the summer of 2017 and then again in 2018.

25          MS. CALEM:  Thank you.  One moment, Your Honor, if I

L.H. Gold - Direct

1892

1    may have the Court's indulgence.

2              THE COURT:  Yes.

3              MS. CALEM:  I would just like to -- it has been

4    brought to my attention that Plaintiff's Exhibit 82, there's a

5    slight discrepancy as between Defendant's Exhibit 59, and that.

6    Both are admitted into evidence.

7    BY MS. CALEM:  (Continued)

8    Q.   Could you please look at Defendant's Exhibit 59.

9              Can you bring up Defendant's Exhibit 59, please, Mr.

10   Sapp?

11             And I really --

12   A.   I'm looking at 82.  Did you want me to see 82 or 59?

13   Q.   Defendant's 59.

14   A.   Oh, I am sorry.

15   Q.   Side by side.

16             MS. CORREIA:  Your Honor, can we approach?

17             THE COURT:  They're the same content, one runs longer

18   than the other one?

19             MS. CALEM:  No, there's word missing from 82.

20             THE COURT:  Okay.  So what is the purpose of asking

21   her to compare them?

22             MS. CALEM:  I wanted -- I want to make sure she saw

23   the complete version, that's all.

24             THE COURT:  Okay.  That she have saw 59?

25             MS. CALEM:  Yes.

1893

1          THE COURT:  Okay.  I'll permit that.  You don't have

2    to put them up side by side.  Thank you.

3    BY MS. CALEM: (Continuing)

4    Q.   So in Defendant's Exhibit 59, the words --

5          THE COURT:  Do you want to point out the word that

6    isn't in the other?

7          MS. CALEM:  Yeah.  If you would put up 59.

8          THE COURT:  All right.  I understand.  Yes, you can

9    put them up.  Sorry.

10          MS. CALEM:  Thank you.

11    BY MS. CALEM:  (Continued)

12    Q.   One says:  HATE HIM.  And one says:  I Hate Him.

13          In capital letters?

14    A.   Yes.

15    Q.   Okay.  Did you see Defendant's Exhibit 59?

16    A.   I saw the one that says:  I hate him.

17    Q.   All right.  And that is the one upon which you relied in

18    forming your opinion?

19    A.   Yes.

20          MS. CALEM:  Nothing further.

21          THE COURT:  Okay.

22          MS. CALEM:  Thank you, Your Honor.

23          THE COURT:  All right.  Cross-examination.

24       CROSS-EXAMINATION

25    BY MS. CORREIA:

L.H. Gold - Cross

1894

1   Q.   Hello, Dr. Gold.

2   A.   Good afternoon.

3   Q.   The materials that you reviewed before rendering your

4   report with your opinions in this case were all provided to you

5   by the School Board's attorneys, right?

6   A.   Yes.

7   Q.   And did you review the sworn declarations provided by

8   other students who were in the band?

9   A.   I you reviewed five sworn declarations.

10  Q.   And you disregarded those, right?

11  A.   It's not that I disregarded them.  I looked at them and

12  weighed their content and what they added to my opinion.

13  Q.   And in your view, they contradicted your view that

14  Jane Doe did not suffer emotional distress because of the

15  school's response to her, right?

16  A.   The statements -- some of -- I don't recall -- I would

17  have to look specifically at each one of them, but I don't

18  recall specifically.  They were more -- they certainly had

19  information in them about these students' experiences in

20  reporting to the School Board.  But I don't recall specific

21  content about Ms. Doe's distress relating to the School

22  Board -- or the investigation, I'm sorry.

23  Q.   This is --

24  A.   I'm happy to review those specifically and let you know if

25  I'm misremembering.

L.H. Gold - Cross

1895

1    Q.    Sure.  This isn't the first time you've testified in

2    court, right?

3    A.    No, it is not.

4    Q.    And you've testified before?

5    A.    Yes.

6    Q.    Would you tell the jury how many times.

7    A.    Oh, my goodness.  I probably testify in trials two time

8    times a year, maybe.  So over 25 years -- 50 seems like a lot,

9    but maybe it's as much as that.  Depositions way more than

10   trial testimony.  But trials, one or two a year.

11   Q.    Okay.  And every time you testified, you were paid to do

12   so, right?

13   A.    I'm paid for my time by -- whether I testify or not.  And

14   I don't testify in many cases I'm retained in.

15   Q.    You get paid whether you testify or not?

16   A.    I get paid for the time I spend rendering services,

17   whether those services include testimony or they do not include

18   testimony.

19   Q.    The defendant is paying you $6,000 to testify in court

20   today, right?

21   A.    No, not exactly correct.

22   Q.    You're not paid $6,000 for one day of testimony?

23   A.    I am, but I'm not charging them for a whole day today.

24   Q.    Did you charge them for a whole day yesterday when you

25   were waiting to testify?

L.H. Gold - Cross

1896

1    A.    No.

2    Q.    Have you sent a recent invoice to the defendant's counsel

3    in this case?

4    A.    Yes.

5    Q.    And isn't it true that you estimated that you would be

6    charging them $6,000 to testify yesterday when you were

7    supposed to testify?

8    A.    I did, but I anticipated testifying last Wednesday, and

9    events have overtaken my estimate.  That's why it's an

10   estimate.

11              MS. CORREIA:  May I hand this up, Your Honor?

12              MS. CALEM:  Your Honor, we object.

13              THE COURT:  On the bill?  I don't know what this is.

14   So it's hard for me to -- why don't we approach the bench,

15   please.

16              MS. CALEM:  Your Honor, this is a letter.

17              THE COURT:  Okay.  Come to the bench, please.

18              NOTE:  A sidebar discussion is had between the Court

19   and counsel out of the hearing of the jury as follows:

20   AT SIDEBAR

21              MS. CORREIA:  This is the invoice that we just got

22   yesterday.

23              THE COURT:  Okay.  Well, what's the rest of it?  Are

24   you trying to admit this, or do you just want her to say --

25              MS. CORREIA:  I want to refresh her, and then I'll be

L.H. Gold - Cross

1897

1 offering it, yes.  That's her invoice.

2          MS. CALEM:  Your Honor, this is not -- I mean, she

3 hasn't testified inconsistently.  There's nothing to impeach

4 her on here.  She can certainly refresh her recollection with

5 it on the fees.

6          MS. CORREIA:  She said she's not billing $6,000 a

7 day, and it says right there that she is.

8          MS. CALEM:  She said the events have overtaken the

9 bill.

10          THE COURT:  You may use the document to refresh her

11 recollection.  I don't see any reason to admit the document

12 itself, unless she denies it.  If she does, then the document

13 goes in.  Okay.  Thank you.

14          NOTE:  The sidebar discussion is concluded; whereupon

15 the case continues before the jury as follows:

16 BEFORE THE JURY

17          THE COURT:  Do you want to take a break?  I'm sorry.

18 Let's take 15 minutes, and we'll come back and continue with

19 the testimony.  I've run over and I didn't realize it.  I

20 apologize.

21          NOTE:  At this point the jury leaves the courtroom;

22 whereupon the case continues as follows:

23 JURY OUT

24          THE COURT:  All right, let's take 15 minutes.

25          MR. ATES:  Thank you, Your Honor.

L.H. Gold - Cross

1898

1        THE COURT:  All right.  We're in recess.

2        NOTE:  At this point a recess is taken; at the

3   conclusion of which the case continues in the absence of the

4   jury as follows:

5   JURY OUT

6        THE COURT:  Any preliminary matters?

7        All right.  Joe, let's get our jury, please.

8        NOTE:  At this point, the jury returns to the

9   courtroom; whereupon, the case continues as follows:

10  JURY IN

11       THE COURT:  All right.  Please have a seat.

12       Please continue, Ms. Correia.

13       MS. CORREIA:  Thank you, Your Honor.

14  BY MS. CORREIA:

15  Q.   Dr. Gold, is it true that you have billed the defendant

16  more than $50,000 for this case so far?

17  A.   I think it's, it's about 50.  It might be a little bit

18  more, but it's about 50.

19  Q.   And the School Board's paying you $600 an hour, right?

20  A.   $600 an hour is my fee, regardless of who retains me.

21  Q.   And -- but it was the defense who retained you in this

22  case, right?

23  A.   In this matter, I was retained by the defense.

24  Q.   And you knew that you'd be rendering a report in this

25  case, right?

1  A.   Not necessarily.

2  Q.   When you addressed your report in this case, you sent it

3  to the defense attorneys, right?

4  A.   I'd have to look and see if I addressed it specifically to

5  them or not.  Sometimes I address it to the attorneys, and

6  sometimes I don't.

7  Q.   You didn't send it to Jane Doe's counsel, did you?

8  A.   No, but when you say address, I -- I'm sorry, I sent it --

9  I definitely sent it to them.  I don't know if it was addressed

10  specifically to them.

11  Q.   You sent it to them, and part of preparing it was talking

12  to them about your review of the information, right?

13  A.   Before I prepare a report, I talk to the attorneys about

14  my findings and what they're based on.  If the -- if they feel

15  that my opinions are helpful to their case, they typically ask

16  me to write a report.  If my opinions are not helpful, they may

17  ask me not to write a report.

18  Q.   And in this case, they did ask you to write a report,

19  right?

20  A.   Yes.

21  Q.   Because they wouldn't have asked you to write a report if

22  they thought you weren't helping them, right?

23  A.   My intent was not to help the attorneys.  It was to

24  develop opinions.  If they wanted a report of those opinions,

25  that's part of what I'm prepared to do.

L.H. Gold - Cross

1900

1    Q.   Now, you talked a little bit about the information that

2    you reviewed in coming to your opinion.  You first met Jane Doe

3    on March 4, 2019, right?

4    A.   I believe that's correct.  I'd have to look at my report

5    to refresh my memory about the date, but it was March.

6    Q.   It's not pretty, but I'm happy to hand you my copy if you

7    want to refresh yourself on the date.

8    A.   That's fine.  Either way.  I mean, I'm -- the day I

9    evaluated her was the first day I met her.

10   Q.   Do we have the date right?

11   A.   Yes.

12   Q.   Okay.  I'll take that back.  Thank you.

13           And, Dr. Gold, March 4, 2019, was two years after

14   Jack Smith sexually assaulted Jane Doe, right?

15   A.   It was two years after the incident on the bus.  I don't

16   know how to characterize it, so I can't say it was two years

17   after the assault.

18   Q.   It was two years after the school closed its investigation

19   of the assault, right?

20   A.   Same -- I don't know exactly when the school closed its

21   investigation.  I know that their findings that no one was

22   going to be disciplined were delivered to Ms. Doe on the

23   Wednesday.  And the Monday was when they had first spoken to

24   her.

25           I don't -- again, I don't know -- I'm hesitant to

L.H. Gold - Cross

1901

1    agree to the use of the word "assault" because I don't know

2    that that's -- I don't know that it didn't happen; I don't know

3    that it did happen.

4    Q.   You didn't review any information that the school took any

5    action related to an investigation other than that Monday when

6    they interviewed Jane Doe and Jack Smith, right?

7             MS. CALEM:  Objection.

8             THE COURT:  Yeah, sustained.

9    BY MS. CORREIA:

10   Q.   Did you interview [sic] any information that showed that

11   the investigation went beyond that Monday?

12            MS. CALEM:  Objection, Your Honor.

13            THE COURT:  A little different question.  I'll allow

14   the question.

15            THE WITNESS:  I'm sorry, could you repeat the

16   question?  I'm sorry.

17   BY MS. CORREIA:

18   Q.   Did you, did you review any information that showed that

19   the school continued its investigation beyond that Monday?

20   A.   I did not see any information from the school that was

21   dated after the Monday.

22   Q.   Okay.  And so when you met Jane Doe on March 4, 2019, it

23   was just about two years after the school closed its

24   investigation on March 13, 2017, right?

25   A.   I don't mean to, to quibble with the question.  I'm

L.H. Gold - Cross

1902

1    just -- I don't know when they closed the investigation.  I

2    didn't see any additional information after the Monday.

3            When I met with Jane Doe, it was two years after the

4    events that are in question in the litigation, to my

5    understanding.

6    Q.    You reviewed Kathryn Harlow's clinical notes, right?

7    A.    Correct.

8    Q.    And those were the contemporaneous notes of her treatment

9    of Jane Doe?

10   A.    That's my understanding, yes.

11   Q.    And those were her notes taken during her therapeutic

12   sessions with Jane Doe, right?

13   A.    If by "during" you mean -- I don't believe they were taken

14   while they were sitting there, but shortly thereafter, so yes.

15   Q.    Do you have a reason to believe -- to disbelieve any

16   representation that Ms. Harlow took those notes during her

17   therapeutic sessions?

18   A.    No, I don't.  I'm just saying that different therapists do

19   things different ways, and some write during the session, and

20   some write immediately afterwards, but they're contemporaneous

21   regardless.

22   Q.    Okay.  So those were contemporaneous notes.  You'll agree

23   to that?

24   A.    I consider them contemporaneous.

25   Q.    Okay.  And you weren't present for those sessions two

L.H. Gold - Cross

1903

1  years ago, right?

2  A.   No.

3  Q.   And -- so you didn't observe Jane Doe while Ms. Harlow met

4  with her, right?

5  A.   No.

6  Q.   And you didn't see Jane Doe's emotion as she told

7  Ms. Harlow in 2017 about what happened to her on the bus, did

8  you?

9  A.   No, I did not.

10  Q.   And you didn't hear Jane Doe's emotion in 2017 when she

11  told Ms. Harlow that Jack Smith digitally penetrated her, did

12  you?

13  A.   No, I didn't.

14  Q.   And you didn't hear her emotion when she described how he

15  grabbed her hand and used her hand to touch his penis, did you?

16  A.   No, I did not.

17  Q.   And you didn't hear from two years ago Jane Doe describe

18  the movie playing in her head as she recounted the sexual

19  assault to Ms. Harlow, did you?

20  A.   Since I didn't -- no, but again, I -- I don't know that it

21  was an assault.  I know that's how she characterizes it.  I

22  know that that's part of the questions here.  But I didn't

23  observe her emotions at any point in recounting anything to

24  Ms. Harlow.

25  Q.   Right.  And you didn't observe her emotions when she

L.H. Gold - Cross

1904

1  recounted in 2017 that same movie playing in her head when she

2  described the nightmares that she had of school officials,

3  right?

4  A.   No.

5  Q.   And you saw in the notes that she had talked about those

6  nightmares and about those emotions, right?

7  A.   I saw that she mentioned nightmares, yes.

8  Q.   Okay.  And you didn't hear from Jane Doe's mouth in 2017

9  her trying to understand why she froze in the moment, did you?

10 A.   I'm sorry, could you repeat that one?

11 Q.   You didn't hear from Jane Doe's mouth in 2017 her trying

12 to understand why she froze in the moment?

13 A.   I didn't meet Ms. Doe until March 2019, so no.

14          THE COURT:  Now, you've --

15          MS. CORREIA:  I'm moving on.

16          THE COURT:  Let's move on.

17 BY MS. CORREIA:

18 Q.   Now, you had a chance to do a psychiatric evaluation of

19 Jane Doe on March 4, 2019, right?

20 A.   Correct.

21 Q.   And in fact, the School Board got a court order requiring

22 her to see you for that purpose, right?

23 A.   That's my understanding.

24 Q.   And you were hired to evaluate her emotional harm in this

25 case, right?

L.H. Gold - Cross

1905

1   A.   I was asked to come to opinions about whether there had

2   been emotional harm.

3   Q.   Right.  And you weren't providing any treatment, right?

4   A.   No, I was not.

5   Q.   And specifically, the purpose of your exam, as the School

6   Board put it to you, was to come to psychiatric opinions

7   regarding Ms. Doe's claim of psychiatric injury related to the

8   response of Oakton High School personnel to reports of a

9   possible sexual assault against Ms. Doe, right?

10  A.   Yes.

11  Q.   And that was what the defendant's lawyers asked you to do?

12  A.   Well, let me -- let me back up.  It was -- there was that

13  piece of it, and then there was also the piece about the School

14  Board investigation.

15  Q.   Right.  And you spent two hours with Jane Doe, right?

16  A.   I did.

17  Q.   And you weren't limited in the questions you could ask,

18  right?

19  A.   Limited how?

20  Q.   In any way.

21  A.   Well, I was -- what I could ask was not limited, no.

22  Q.   Right.  And you could have spent up to four hours with

23  Jane Doe, but you chose not to, right?

24  A.   There was no more information I felt that -- to be had at

25  the time I --

L.H. Gold - Cross

1906

1  Q.   You didn't ask to meet with Jane Doe's family members, did

2  you?

3  A.   I didn't ask to, no.

4  Q.   Because it wasn't relevant to your job, right?

5  A.   No.

6  Q.   Now --

7  A.   I'm not typically allowed -- generally at this point, I

8  don't ask to interview third parties because I'm typically not

9  given access to third parties such as parents, friends, etc.

10  They're under no obligation to come and speak with me.

11  Q.   Right.  You were given access to what the defendant's

12  lawyers gave you, right?

13  A.   No.  When you're talking about talking to other people,

14  very few people want to come in and talk -- it may come as a

15  surprise, but very few people want to come in and talk to a

16  psychiatrist under these circumstances, and Ms. Doe herself

17  only did so after a court order.  Other people are not required

18  to do that.

19        And at this point, I could go through the motions of

20  asking, please let me -- please arrange for me to see so-and-so

21  and so-and-so, but I don't anymore because the answer has

22  always been no.

23  Q.   Right.  So you agree that Jane Doe did not want to come in

24  and talk to you that day, right?

25  A.   It's clear that Ms. Doe did not want to come in and

L.H. Gold - Cross

1907

1    undergo a psychiatric evaluation.  I don't know -- I doubt it

2    was with me specifically.  It could have been.

3    Q.   Right.

4    A.   But it -- I think any psychiatrist retained by the

5    defendant would -- she, I assume, would have had the same

6    stance.

7    Q.   Right.  And despite all of that, your testimony a little

8    while ago is that she came in for two hours, having never met

9    you before, and told you that she was interested in Jack Smith

10   in a non- -- in a -- I lost the word -- in a non-platonic way?

11   That's your testimony?

12   A.   She did tell -- well, she didn't use the word

13   non-platonic.  I don't know that --

14   Q.   Oh, she didn't?

15   A.   No.  I don't know what word I'm supposed to use because

16   I keep, you know -- but, but she was interested at one point in

17   a relationship with Jack Smith.  She was romantically

18   interested in Jack Smith at one point.

19   Q.   She didn't tell you that?

20   A.   Yes, she did.

21   Q.   Now, you also didn't look at information from teachers

22   that Jane Doe had in the spring of 2017, did you?

23   A.   I did see some information from teachers.

24   Q.   And you didn't take into account one of her teachers who

25   said that she wasn't 100 percent during that time period,

L.H. Gold - Cross

1908

1    right?

2    A.   I don't know what you're referring to.  I'd be happy to

3    refresh my memory by taking a look at it.

4    Q.   Did you, did you consider the, the deposition of one of

5    her teachers by the name of Ms. London?

6    A.   I don't recall specifically.  I would have to look at my

7    report to refresh my memory to see whether I saw that document.

8    Q.   And if Ms. London said that there was definitely a visible

9    change in Jane Doe's behavior in that 2017 period after March,

10   you didn't consider that, right?

11   A.   I would have to take a look at the document and -- to

12   refresh my memory about whether I saw it or not.

13   Q.   And you didn't take into account her view that Jane Doe

14   seemed a little more anxious and a little more withdrawn during

15   that period either, did you?

16   A.   I would not be surprised if that was true.  I don't know

17   that I saw that particular deposition, but she was -- she had

18   gone through an experience that was upsetting.

19   Q.   And if you didn't see that deposition, it's only because

20   the defendant didn't share it with you, right?

21   A.   If I didn't see it, I don't know why I didn't see it, but

22   I --

23            THE COURT:  She doesn't know whether she saw it or

24   not, so let's move along.

25   BY MS. CORREIA:

1909

1   Q.   Did you take into account the deposition of Jane Doe's

2   teacher, Ms. Brady?

3   A.   Yes.

4   Q.   And Ms. Brady said that Jane Doe's walls went up after

5   what happened, right?

6   A.   I -- yes.  I believe those were the words, but I -- again,

7   I would want to -- and again, when someone goes through an

8   upsetting and adverse experience, it does have reverberations.

9   Those do not necessarily mean that someone has a psychiatric

10   disorder or -- we're all the result of our experiences.  They

11   affect us.

12          I'm sure she was affected by what she went through.

13   That doesn't take it to a psychiatric diagnostic level.

14   Q.   So your diagnosis in 2019 was, was something else, right?

15   Mental health diagnoses are listed in the *Diagnostic and*

16   *Statistical Manual of Mental Disorders*, right?

17   A.   Which -- that's two questions, I'm sorry.

18   Q.   Let me take one question.

19   A.   Please.

20   Q.   Mental health diagnoses are listed in the *Diagnostic and*

21   *Statistical Manual of Mental Disorders*, right?

22   A.   That's correct.

23   Q.   And the current edition is known as *DSM-5*, right?

24   A.   That's correct.

25   Q.   And the *DSM-5* is the diagnostic tool published by the

L.H. Gold - Cross

1910

1    American Psychiatric Association for mental health disorders,

2    right?

3    A.   It's the diagnostic classification of the American

4    Psychiatric Association.  It's pretty much accepted in the

5    United States, and now it's congruent with Europe and other

6    places, but yes.

7    Q.   Right.  And your, your opinion in this case, your

8    diagnosis in this case, having met Jane Doe, was that Jane Doe

9    experienced something called transient emotional distress,

10   right?

11   A.   That's not a diagnosis.

12   Q.   No, it isn't, is it?

13   A.   No.

14   Q.   It's not a term that you'll find in the *DSM-5*, is it?

15   A.   No.  It's a paraphrase of the differential diagnosis for

16   normative stress reaction or normative emotional distress

17   that's part of the differential for adjustment disorder.

18   Q.   Is that something that you find in the *DSM-5*?

19   A.   Yes.

20   Q.   Can you show us where?

21   A.   If you can give me a copy, I'll be happy to show it to

22   you.

23   Q.   The differential diagnosis for an adjustment disorder?

24   A.   Yes.

25   Q.   Wasn't that your own phrase?

L.H. Gold - Cross

1911

1    A.   I did paraphrase because I don't -- I felt that transient

2    emotional distress was easier to understand than the term

3    that's in the *DSM*, but it's essentially the same term.

4    Q.   But you introduced this in your deposition to us as

5    something that you came up with yourself, didn't you?

6    A.   Right.  The paraphrase is my term, but the concept is in

7    the *DSM-5*.

8    Q.   But the phrase "transient emotional distress" is not a

9    psychiatric diagnosis, is it?

10   A.   Neither is "normative stress reaction."  It's not a

11   psychiatric diagnosis.  It's just a phrase in the, in the book.

12   Q.   There's no diagnosis of normative stress reaction in this

13   case, is there?

14   A.   I'm sorry, I -- it's not a diagnosis, so you can't make

15   it.  The differential for an adjustment disorder is that you

16   shouldn't -- it's -- the reason it's there is that people are

17   cautioned not to make a diagnosis that -- of the presence of a

18   psychiatric disorder just because someone is having a reaction

19   to an upsetting experience.

20        If all of us develop psychiatric disorders every time

21   something adverse or upsetting happened to us, we'd all be

22   walking around with psychiatric disorders.  It has to reach a

23   clinically significant level.

24   Q.   Okay.  Well, you had the opportunity to look at

25   Ms. Harlow's notes and how she came to that diagnosis, right?

L.H. Gold - Cross

1912

1    A.   Ms. Harlow's notes don't really reflect how she came to

2    that diagnosis.

3    Q.   Okay.  Turn in your book to Plaintiff's Exhibit No. 60,

4    please.

5            THE COURT:  Plaintiff's 60?

6            MS. CORREIA:  Yes.

7            THE WITNESS:  Okay.  Thank you.  Got it.

8    BY MS. CORREIA:

9    Q.   Do you have page 12 -- 1512 at the bottom?

10   A.   Yes.

11   Q.   Do you see where it says at the top, "Impact of Symptoms

12   on Daily Living and Family"?

13   A.   Yes.

14   Q.   "(E.g. housing, housekeeping, job, medical, hygiene,

15   eating, sleep, money management, caring for children, etc.)"?

16            Still on the same page.

17   A.   No, no, I understand.  I'm looking for the date of the

18   document.

19            Okay.  Yes, I do.

20   Q.   Those were the bases for Ms. Harlow's observations on the

21   impact of symptoms on daily living and family, right?

22   A.   Those are not Ms. Harlow's observations.  Those are

23   Ms. Doe's self-report and Ms. Harlow's documentation of

24   Ms. Doe's self-report.

25   Q.   Right.  And you've said in your testimony that the -- that

L.H. Gold - Cross

1913

1   self-reporting in the therapeutic setting is normal.  That's

2   how --

3   A.   Yes.

4   Q.   -- therapists do their job, right?

5   A.   Yes.

6   Q.   Okay.  And when you interviewed Jane Doe in March of 2019,

7   you used your own checklist to ask her about symptoms she had

8   experienced in the six months before your interview, right?

9   A.   Among other things, but yes.

10  Q.   Okay.  And on that checklist, you asked her about things

11  like whether she had experienced depression, right?

12  A.   Depressed mood, yes.

13  Q.   And she reported that she had, right?

14  A.   Yes.

15  Q.   And she also reported that something small would get her

16  really upset.  And that was unusual, right?

17  A.   I'd have to look at the document to see what I wrote down.

18  Q.   Sorry, I don't have a clean copy at the moment.

19  A.   Okay.

20  Q.   Do you have the page from your report that is the

21  checklist?

22  A.   Yes.

23  Q.   Okay.  And does that help refresh your recollection that

24  she reported that something small would get her really upset?

25  A.   Yes.

L.H. Gold - Cross

1914

1    Q.   You didn't explore that further with her, did you?

2    A.   I don't recall.

3    Q.   And she was experiencing increased tearfulness two or

4    three times a week?

5    A.   That's what she reported.

6    Q.   And she never used to?

7    A.   That's what she reported.

8    Q.   And she also reported that she was sometimes having

9    feelings of guilt, right?

10   A.   Yes.

11   Q.   And isn't that a common emotion that's experienced by

12   people who have experienced sexual trauma?

13   A.   It's a common emotion among people generally.

14   Q.   Isn't it a common emotion experienced by people who have

15   experienced sexual trauma?

16   A.   I don't really characterize it, the emotion people

17   experience as sexual trauma.  They wonder if they've somehow

18   done something that caused it or somehow are responsible for

19   it, which I differentiate from guilt regarding I did this and I

20   feel guilty about it.

21   Q.   Self-blame, is that better?

22   A.   That's a better word, thank you.

23   Q.   And she also reported having poor concentration?

24   A.   She did.  And I asked her why, and she said:  Because of

25   this.  Meaning having to come in for the psychiatric

1915

1    evaluation.  So --

2    Q.   She was having poor concentration because she had to come

3    in for a psychiatric evaluation?

4    A.   Well, because of the psychiatric evaluation and the

5    ongoing litigation.

6    Q.   No, she didn't talk about litigation, did she?

7    A.   She -- I don't remember her using the word "litigation,"

8    but it was clear that the lawsuit was a stressor for her.

9    Q.   You didn't find that -- you didn't recall the word

10   "litigation" because she didn't say that to you.  It's not in

11   that report, is it?

12   A.   No, most people don't use the word "litigation."  They

13   talk about their lawsuits.

14   Q.   She didn't tell you in that report, and it's not in any of

15   your handwritten notes there, that she said anything about

16   litigation, did she?

17   A.   The word "litigation" was not used.

18   Q.   One last thing.  You mentioned something about whether or

19   not Jane Doe had any changes in her functioning in her

20   extracurriculars, right?

21   A.   Well, in any kind of functioning, but extracurricular

22   functioning is one kind, yes.

23   Q.   Right.  And you wanted to be very careful about how you

24   viewed the facts that were in front of you in this case, right?

25   A.   I tried to be.

L. Gold - Redirect

1916

1   Q.   You wanted to be accurate?

2   A.   I tried to be.

3   Q.   And you know band wasn't an extracurricular activity for

4   Jane Doe, was it?

5   A.   Well, if I'm mischaracterizing it, you can, you can tell

6   me.  I mean, it's not English.  Not every kid has to do band,

7   but every kid has to do English.  So I don't know how you want

8   to characterize that.

9   Q.   She got a grade on her report card for band, right?

10  A.   I don't specifically recall.

11  Q.   You didn't see that record?

12  A.   I might have seen it.  I don't specifically recall.

13           MS. CORREIA:  I have nothing further.

14           THE COURT:  All right.  Redirect?

15           MS. CALEM:  Just briefly, Your Honor.

16                    REDIRECT EXAMINATION

17  BY MS. CALEM:

18  Q.   Just a couple of questions, Dr. Gold.  First, with respect

19  to your forensic work, have you worked for both plaintiffs and

20  defendants?

21  A.   Yes.

22  Q.   And if --

23  A.   In about -- in about equal percentages.

24  Q.   Thank you.

25           With regard to the, the materials that you reviewed

1917

1  in this case, did you ask for certain materials --

2  A.   Yes.

3  Q.   -- to be sent to you?

4  A.   Yes.

5  Q.   Was there anything that you asked for that was not sent to

6  you?

7  A.   No.  And, in fact, before designating which specific

8  things I want sent to me, as a general rule, I always say, when

9  they say what do you want to see, I want to see everything.

10       So I can't know a priori what the universe of

11  everything is, but I ask for everything, and then I list things

12  that I'm pretty sure either exist or might exist.

13  Q.   And with respect to Ms. Correia's last question about the

14  discussion of litigation, can I ask you please to just look at

15  your deposition transcription for a moment?

16  A.   Yes.

17  Q.   And it's a condensed transcript, with four pages per one

18  page, but if you would look at page No. 124 of the condensed

19  pages?

20  A.   Oh, sorry.

21       Yes.

22  Q.   And if you start at line 13, could you read from lines 13

23  to 18?  And let me know when you're done.

24  A.   Okay.

25       MS. CORREIA:  Objection, Your Honor.

L. Gold - Redirect

1918

1        THE COURT:  To refreshing her recollection?

2        MS. CORREIA:  Yes.

3        THE COURT:  Overruled.

BY MS. CALEM:

5  Q.   Does this refresh your recollection as to whether or not

6  you had a discussion during your deposition as to whether -- as

7  to what Ms. Doe meant when she said "this"?

8        MS. CORREIA:  Objection.  The question is refreshing

9  a recollection about what was discussed in the deposition.

10       MS. CALEM:  Let me -- I can rephrase that.

11       THE COURT:  Let me -- yeah, rephrase it.

BY MS. CALEM:

13  Q.   Does this refresh your recollection as to whether you had

14  any conversation with Ms. Doe that pertained in some way to the

15  lawsuit?

16  A.   Yes.  Without, without the actual use of the

17  word "litigation."

18  Q.   And the conversation with respect to the lawsuit that's

19  reflected here in this deposition that you just read, how did

20  that come up?

21  A.   When I asked why she thought she was having -- when

22  someone gives me a positive response to a symptom, I ask them

23  if they know why.  Sometimes people can't concentrate because

24  they didn't sleep well the night before.  So I ask, "Why do you

25  think you're having trouble concentrating?"

L. Gold - Redirect

1919

1          And the answer to the question was, "This," which I

2   understood to mean having to come in and see me as part of the

3   litigation, which she clearly didn't want to do, and which most

4   people find extremely stressful.

5   Q.   And is that what you testified to in your deposition?

6   A.   I believe so, yes.

7               MS. CALEM:  Nothing further.

8               THE COURT:  Okay.  May Dr. Gold be excused?

9               MS. CALEM:  Yes, Your Honor.

10              THE COURT:  All right.  Thank you, Dr. Gold.  You're

11  excused.

12              THE WITNESS:  Thank you, Judge.  Thank you.

13              THE COURT:  Please don't discuss the testimony you've

14  given until our trial is over, all right?

15              THE WITNESS:  Thank you.

16              THE COURT:  Have you got what you came in with, do

17  you think?

18              THE WITNESS:  That's always a good question.

19              THE COURT:  All right.  Have a good afternoon.

20              THE WITNESS:  Thank you.  Good to see you again,

21  Judge.  Wrong way.

22                        (Witness excused.)

23              THE COURT:  Ms. Rewari, where are we?

24              MS. REWARI:  Your Honor, we don't have any further

25  witnesses.  We do have a portion of the plaintiff's deposition

1920

1   in light of the Court's ruling after the lunch break that we

2   would like to read in, but I haven't shared it with them yet,

3   so --

4           THE COURT:  Plaintiff's deposition?

5           MS. REWARI:  Yes.

6           THE COURT:  Why don't we take a short recess, okay?

7   And the -- Ms. Rewari has just indicated that they may have

8   some additional information which they want to present, and

9   then we may have a couple of rebuttal witnesses.

10          So let us talk about that and get set up, and we'll

11  get you back here as soon as we're able.  Thank you.  You're

12  excused.

13          NOTE:  At this point, the jury leaves the courtroom;

14  whereupon, the case continues as follows:

15  JURY OUT

16          THE COURT:  Okay.  I don't think I understand.  You

17  want to put in some deposition testimony of Jane Doe?

18          MS. REWARI:  Yes, to address the point about what the

19  prior conversation with Karoline on the bus was in light of the

20  Court's ruling.

21          THE COURT:  That was all testified to and you had the

22  opportunity to, to impeach her during the trial, right?

23          MS. REWARI:  But she's also on our witness list, and

24  she's a prior -- I mean, she's -- it's an admission by --

25          THE COURT:  All right.

1921

 1          MS. REWARI:  Thank you.  And the plaintiff's

 2   deposition can be used for any purpose in our case, and it is

 3   one page of her deposition that -- where she has a recollection

 4   of the conversation with Karoline.

 5          THE COURT:  Okay.  All right.  Any objection to the

 6   use of the deposition?

 7          MR. ATES:  We don't -- we haven't seen it.  We don't

 8   know -- we haven't been able to look at it for completeness.

 9   We, we know nothing of what they're trying to introduce.

10          THE COURT:  Well, I mean, deposition testimony is

11   admissible, and -- of the plaintiff is admissible, I think, and

12   I haven't seen it either.

13          MR. ATES:  Right.

14          THE COURT:  But it's not, it's not inadmissible as a,

15   as a rule of law.  So you just need the opportunity to see it,

16   and I'll give you that opportunity right now.

17          And that will close the defendant's case; is that

18   correct?

19          MS. REWARI:  Yes.

20          THE COURT:  And do you want to renew your motion?  Do

21   you need to -- I think you need to review -- renew your motion

22   for the record just to preserve it.

23          MR. RAPHAEL:  Yes, Your Honor.

24          MS. REWARI:  Yes.

25          MR. ATES:  We would have a Rule 50 on -- they have a

1922

1  mitigation defense, Your Honor, and we would want to move on

2  Rule 50 on mitigation.

3          THE COURT:  And I'll -- we'll put a hold marker on

4  both of those until we finish the testimony.

5          MR. ATES:  I understand that you want to get the jury

6  out of here, Your Honor.

7          THE COURT:  Correct.  I'd like to go home sometime,

8  and I'm sure you-all would like to go home sometime also.

9          MR. ATES:  That would be nice, Your Honor.

10          THE COURT:  But that will happen later.

11          Okay.  Then are you ready to go into your rebuttal

12  case when Fairfax County is done with this last testimony?

13          MR. ATES:  I believe the treating counselor is

14  outside, Your Honor --

15          THE COURT:  Okay.

16          MR. ATES:  -- but I need to confirm that, but my

17  understanding is she is.

18          THE COURT:  Yeah, let's take a five-minute recess or

19  ten minutes, whatever you need to get a chance to review the

20  deposition testimony, and then -- and get your witness ready.

21          MR. ATES:  Thank you, Your Honor.

22          THE COURT:  Okay.  All right.  We're in recess.

23          NOTE:  At this point, a recess is taken; at the

24  conclusion of which the case continues in the absence of the

25  jury as follows:

1923

1    JURY OUT

2          THE COURT:  Yes, sir.

3          MR. ATES:  I just want to note an objection, Your

4    Honor, that we're -- they had the opportunity to cross my

5    client, and as I understood this Court's practice, if they do

6    do that, then that's their opportunity to examine the witness.

7    I've had to put on a witness adversely, Your Honor, where I put

8    my paralegal in the box and we go through it that way, but they

9    chose to do the cross-examination of Doe, and therefore, we

10   would ask that, you know, this not be allowed at this time.

11         THE COURT:  Okay.  Well, they did -- she's on their

12   witness list, so they could call her live, I think.  I'm not

13   sure there was an agreement on -- that she would just be called

14   once.  I don't recall that, but that may have been between the

15   two of you, but I think it's a part of their defendant's case,

16   and I think they're permitted to put it in.

17         MR. ATES:  I just want to note the objection, Your

18   Honor.

19         THE COURT:  Your exception is noted.

20         MR. ATES:  Thank you.

21         THE COURT:  All right.  So are you ready then to go

22   into your rebuttal case?

23         MR. ATES:  I believe what's about to happen is they

24   will put a paralegal in the stand, Ms. Rewari will question,

25   the paralegal will answer as if she were Ms. Doe.  If -- that's

1924

1  going to be three minutes probably.

2          And then we will be prepared to either play the

3  video, Your Honor, or call the treating person in.

4          THE COURT:  Okay.

5          MR. ATES:  Thank you, Your Honor.

6          THE COURT:  All right.  Joe, let's get our jury in,

7  please.

8          MR. ATES:  Oh, one -- I'm sorry, Your Honor.

9          THE COURT:  Yes, sir.

10         MR. ATES:  One quick thing.  My understanding under

11  the Virginia treatment rule, ethics rules, is Jane Doe is under

12  treatment with the counselor or the person we're going to call,

13  and the counselor has asked that Jane Doe not be present during

14  that, and we just would like some note or explanation to the

15  jury that, that Ms. Doe is not present because there is a

16  current treatment relationship.

17         THE COURT:  Okay.

18         MR. ATES:  Is that fair enough, Your Honor?

19         THE COURT:  Yeah.

20         Any objection to that?

21         MS. REWARI:  No, Your Honor.

22         THE COURT:  Okay.  Fine.

23         MR. ATES:  Thank you, Your Honor.

24         THE COURT:  Yes, sir.

25         Okay, Joe.  Please.

J. Doe - Depo Excerpt

1925

1      NOTE:  At this point, the jury returns to the

2  courtroom; whereupon, the case continues as follows:

3  JURY IN

4      THE COURT:  All right.  Please have a seat.

5      All right.  Ms. Rewari, you want to, you want to read

6  part of the deposition of Jane Doe, and you're going to use

7  your paralegal to act as Jane Doe and take the witness stand;

8  is that correct?

9      MS. REWARI:  Yes.  Just to read the answers.

10      THE COURT:  Sure.  So you could do a Q&A.

11      MS. REWARI:  Ms. Smoot will do that.

12      THE COURT:  Please, come forward and take the witness

13  stand.

14      MS. REWARI:  And, Your Honor, I'm reading from the

15  deposition taken on March 6, 2019, page 272, line -- starting

16  at page 272, line 12.

17      THE COURT:  All right.  Thank you.

18          JANE DOE - Deposition Excerpt -

19  BY MS. REWARI:  (Reading)

20  Q.  At some point that weekend, you learned that Jack Smith

21  had a girlfriend, right?

22  A.  Yes.

23  Q.  When did you learn that?

24  A.  Thursday.

25  Q.  Thursday?

J. Doe - Depo Excerpt

1926

1  A.   Yes.

2  Q.   Okay.  Tell me about that.

3  A.   When I was having my conversation with Karoline about what

4  happened, she seemed even more surprised because she knew that

5  he had a girlfriend.

6  Q.   What did you say?

7  A.   I just thought it was kind of screwed up that he would do

8  something like that.

9  Q.   How was the girlfriend -- the fact of the girlfriend

10  relevant to what you were discussing?

11  A.   Well, because he had cheated on her basically.

12  Q.   With you?

13  A.   Yes.

14  Q.   Who was his girlfriend?

15  A.   I don't remember her name.  I just know she went to

16  Langley and she was on the trip.

17  Q.   The Langley band was on the trip?

18  A.   Yes.

19  Q.   Were they in the same hotel?

20  A.   Yes.  Actually, I don't remember.

21  Q.   And is there anything else about his girlfriend that you

22  and Karoline discussed in that first conversation?

23  A.   Not that I remember.

24          (End of deposition excerpt.)

25          MS. REWARI:  Thank you.

1927

```
 1              THE COURT:  All right.  Thank you.

 2              Does that conclude the county's defense case?

 3              MS. REWARI:  Yes.  The School Board rests, Your

 4    Honor.

 5              THE COURT:  All right.  Thank you.

 6              Then we'll hear rebuttal testimony.  Mr. Ates?

 7              MR. ATES:  Yes, Your Honor.  Pursuant to what we

 8    discussed outside of the presence of the jury, we'll go ahead

 9    and put on the next witness.

10              THE COURT:  All right.  Go ahead.

11              MS. KHOURI:  Plaintiff calls Meredith Kerley, Your

12    Honor.

13              THE COURT:  All right.  She's on her way in.

14    Jane Doe is excused for this testimony because of Virginia laws

15    regarding ongoing treatment by a counselor.  This testimony

16    should not be conducted while Jane Doe is present in the room.

17    She's excused herself so that she's not listening to what the

18    counselor is saying at this time because of the ongoing nature

19    of their relationship.  Okay?

20              MEREDITH KERLEY, PLAINTIFF'S WITNESS, SWORN

21              THE COURT:  All right.  Good afternoon.

22              THE WITNESS:  Good afternoon.

23              THE COURT:  I can already tell that you have a soft

24    voice.  I'm going to need you to get a little closer to that

25    microphone --
```

M. Kerley - Direct

1928

1    THE WITNESS:  Okay.

2    THE COURT:  -- to make sure we all can hear you.

3    THE WITNESS:  Okay.

4    THE COURT:  Thank you.

5    Go ahead.

6    MS. KHOURI:  Thank you, Your Honor.

7                    DIRECT EXAMINATION

8  BY MS. KHOURI:

9  Q.   Good afternoon.  Can you please state your name.

10 A.   I'm Meredith Kerley.

11 Q.   Okay.  Ms. Kerley, what is your profession?

12 A.   I'm a licensed clinical social worker and therapist.

13 Q.   And where do you currently work?

14 A.   At the Growth & Recovery Center.

15 Q.   What does the Growth & Recovery Center do?

16 A.   We are a group of therapists who provide psychotherapy,

17 individual, group, family, all individual practitioners.

18 Q.   Okay.  How long have you worked in your current role?

19 A.   I believe I started there in 2012, so --

20 Q.   What type of services do you specifically provide?

21 A.   I do individual counseling, individual therapy, as well as

22 group therapy.

23 Q.   Do you specialize in any certain type of therapy?

24 A.   I work with adolescents, and I do a particular type of

25 therapy that's called dialectical behavioral therapy and I do

1929

1  cognitive behavioral therapy.  I also work with adolescents and

2  adults who have experienced trauma, domestic violence, sexual

3  violence; and I specialize in eating disorders and sort of a

4  general practice.

5  Q.   How do you know the plaintiff, Jane Doe?

6  A.   Jane Doe is a current client of mine.

7  Q.   Okay.  And so you know who I'm referring to when I say

8  "Jane Doe"?

9  A.   I do.

10  Q.   Okay.  How did Jane Doe come to find you?

11  A.   Jane Doe was referred to me by her previous therapist,

12  Kathryn Harlow.

13  Q.   When did you first start seeing Jane Doe?

14  A.   I started seeing her in the -- I believe it was March of

15  2018.

16  Q.   Okay.  As someone who's worked with Doe now for a little

17  over a year, can you tell us about her?

18  A.   Sure.  She and I have a very good therapeutic

19  relationship.  We have from the beginning.  You know, if I

20  think of words to describe her, you know, the majority of them

21  are very positive.  She's very kind, very generous, very

22  compassionate, very driven, you know, really stands up for what

23  she believes in and really works hard in therapy.  I think she

24  really wants to heal and grow and, you know, has just been a

25  pleasure to work with.

M. Kerley - Direct

1930

1    Q.    How does Jane Doe express her emotions?

2    A.    She, she doesn't always connect with her emotions.

3    She's -- she does what I describe as sort of intellectualizing

4    a lot.  We've worked a lot on her being able to identify and

5    express emotions, be able to name them.

6              A common defense mechanism for people when they don't

7    want to feel emotions is to kind of be in their head and

8    intellectualize, and so part of our work has been helping her

9    to identify her emotions and name them.

10   Q.    Okay.  When you first started seeing Jane Doe, did she

11   tell you about a sexual assault?

12   A.    She did, yes.

13   Q.    Okay.  Did she also tell you about concerns regarding the

14   school's actions in response to a sexual assault?

15   A.    She did, yes.

16   Q.    Okay.  At the point in time when she first came to see

17   you, that was March of 2018, right?

18   A.    Correct.

19   Q.    Okay.  Did you understand that the -- that she claimed the

20   assault had happened a year before?

21   A.    Yes.  That was my understanding.

22   Q.    Okay.  How did you at the time where -- when Jane Doe was

23   first walking into your offices observe the effects of the

24   sexual assault and the school's response?

25   A.    You know, I observed it in a number of different ways.

M. Kerley - Direct

1931

1    When she first came to me, you know, it was a year after the

2    assault, and I believe that her symptoms were manifesting a bit

3    differently than maybe they had previously.  She was

4    experiencing a number of eating and food-related symptoms in

5    addition to some, some general anxiety and changes in mood and,

6    you know, difficulty -- she reported difficulty concentrating

7    in school and on work, which I know that some of those had been

8    going on previously, but in particular when I first started

9    seeing her, she was having a lot of trouble with food and

10   eating and sort of different manifestations of that.

11   Q.   How do trauma symptoms manifest in food and eating?

12   A.   With Jane Doe in particular, it was through sort of

13   unconscious restriction of her intake, and -- well, and a lot

14   of times that happens because it numbs people out.  If they're

15   not properly nourished, it kind of numbs them out.

16          And she also reported feeling sick, feeling like she

17   was going to throw up, throwing up quite frequently, just

18   completely losing her appetite.  She had lost a significant

19   amount of weight, and was really kind of going downhill in that

20   regard.  So --

21   Q.   Was there other stressors going on in Jane Doe's life at

22   the time when she first came to see you?

23   A.   So the stressors that I would say that were present -- so

24   she was still in her senior year at her high school, which, of

25   course, was a stressor in itself given the interactions that

M. Kerley - Direct

1932

1   she had with the school, and she also had a boyfriend, and he

2   wasn't necessarily the problem.  It was -- you know, there was

3   nothing that he was doing.  It was sort of her reaction to him

4   based on the trauma that she had experienced.  So that was a

5   stressor.

6   Q.   What was her reaction to him?

7   A.   She sort of unconsciously, I think -- well, what she

8   described to me is that she would feel sick whenever she was

9   with him.  She would feel like she was going to throw up when

10  she was with him, and she would then not eat either before or

11  after to avoid getting sick when she was with him, but I think

12  what was really going on is that, you know, she was sort of

13  unconsciously -- sort of that fear of intimacy, you know, fear

14  of future trauma, you know, experiences of betrayal, of hurt,

15  you know, getting close to somebody, I think those were coming

16  up for her, although she didn't quite make that connection in

17  the beginning.

18  Q.   How did you make that connection?

19  A.   We did -- I, with her, did a lot of psychoeducation on why

20  especially disordered eating symptoms manifest in the way that

21  they do.  Frequently, it's not about the food or the eating;

22  it's about the underlying emotions; and her emotions were

23  related to the trauma itself as well as, you know, the response

24  that she received from the school; and so the way that I

25  describe it is it's sort of like the body's way of

M. Kerley - Direct

1933

1    communicating something, that something isn't right.

2              And so behaviorally, her symptoms manifested

3    behaviorally, but they were really rooted in emotion.  So we

4    did a lot of -- I did a lot of psychoeducation around that and

5    helped her to make different connections.

6    Q.   Did you -- have you taken notes of your sessions with

7    Jane Doe?

8    A.   I write notes after our sessions.

9    Q.   All right.  Can you describe to me your note-taking

10   process?

11   A.   Yeah.  I follow sort of what's set forth by the social

12   work guidelines, and so I, you know, state the name of the

13   client, the date, how long the session was, any observations

14   that I made, what the diagnosis was, you know, a very brief

15   description of what we talked about.  If there's any change in

16   medications, I do a risk assessment, and if there's any plan

17   for the next session.

18   Q.   All right.  Can you turn in your book, which you might

19   have in front of you, to Plaintiff's Exhibit 61, please?

20             Can you tell me what Plaintiff's Exhibit 61 is?

21   A.   This is an intake assessment that I did following the

22   intake session that I did with Jane Doe.

23   Q.   Okay.  Can you flip through it and tell me if there's more

24   in there than just the intake assessment?

25   A.   There's also the treatment plan that I did after I first

1934

1    met with her -- or the first, I think, couple of sessions, and

2    my clinical notes starting back in March of 2018 and through

3    our most recent session, which was, I think, the end of July.

4            MS. KHOURI:  Okay.  Your Honor, I'll move the

5    admittance of Plaintiff's Exhibit 61, but first -- I won't

6    publish to the jury right now given the conversation we've had

7    about other records and --

8            THE COURT:  Yeah, okay.  You may reference it in

9    your, in your questions and answers.  We'll reserve on the

10   exhibit itself.

11           MS. CALEM:  We have the same objection we did before

12   with respect to the other one.

13           THE COURT:  Understood.  Thank you.

14           MS. KHOURI:  Thank you.

15   BY MS. KHOURI:

16   Q.   If you could turn to page that's marked at the bottom

17   1397?  I just want to talk about your psychotherapy treatment

18   plan with Jane Doe.

19   A.   Okay.

20   Q.   Okay.  So it says here that you've reached a diagnosis of

21   adjustment disorder with anxiety; is that right?

22   A.   That is correct.

23   Q.   How did you come to that diagnosis?

24   A.   I came to that diagnosis based on -- so an adjustment

25   disorder is the development of some behavioral and emotional

M. Kerley - Direct

1935

1    symptoms, and they're in response to certain -- a certain

2    stressor or stressors, and they, they manifest in ways that are

3    clinically significant and impact somebody socially,

4    occupationally, interpersonally, in various aspects of their

5    lives, and so Jane Doe was exhibiting, you know, many symptoms

6    and was impacted in different areas of her life related to the

7    stressors that were going on.

8    Q.   How did you define what the stressor was that, that caused

9    this adjustment disorder?

10   A.   Well, I mean, the initial stressor, of course, was the

11   assault and the response that she received from the school, and

12   then at the time that I saw her, there's a -- if you read

13   further into the diagnostic criteria, it talks about how if a,

14   if a stressor or stressors persist over time, then the

15   adjustment disorder can also persist, as opposed to having a

16   defined time limit, and so I think she was also -- the

17   stressors that was going on was she was also in her senior year

18   at the same high school that she had been at, and she was also

19   in this relationship with the boyfriend, who again was not --

20   it was not about him.  It was about her reaction to the trauma

21   that she had experienced that was manifesting through her

22   relationship with him.

23   Q.   Okay.  How do you think the school's response affected

24   Jane Doe?

25                MS. CALEM:  Objection, Your Honor.  This is outside

M. Kerley - Direct

1936

1    the scope of the rebuttal --

2              THE COURT:  Overruled.

3              MS. CALEM:  -- as identified.

4              THE COURT:  Go ahead.  You may answer.

5              THE WITNESS:  I'm sorry, can you repeat the question?

6    BY MS. KHOURI:

7    Q.   Yeah.  How do you -- through your treatment with Jane Doe,

8    how do you think the school's response affected Jane Doe's

9    emotional well-being?

10   A.   I mean, I think it's greatly impacted her.  You know, we

11   talk about how -- you know, I think just --

12             MS. CALEM:  Your Honor, may we approach?

13             THE COURT:  Yes.

14             NOTE:  A sidebar discussion is had between the Court

15   and counsel out of the hearing of the jury as follows:

16   AT SIDEBAR

17             THE COURT:  Hello again.

18             MR. ATES:  Hello.

19             MS. CALEM:  Your Honor --

20             THE COURT:  Go ahead.  I thought I understood the

21   objection, but I may not have.  Go ahead.

22             MS. CALEM:  This is case-in-chief testimony.  This

23   witness was designated as a rebuttal expert with respect to the

24   issue of the boyfriend only.

25             MS. KHOURI:  That's not -- I mean, we could look at

M. Kerley - Direct

1937

1 our 26(a) disclosure and our rebuttal disclosure.  It was a

2 whole paragraph of things that she would talk about, which

3 included Jane Doe's treatment.  The boyfriend -- I'm not even

4 actually sure if the boyfriend was listed in our disclosure,

5 but it was about her treatment of Jane Doe, because Dr. Liza

6 Gold specifically referenced Meredith Kerley's treatment plans

7 and her notes.

8        MS. CALEM:  It was rebuttal of Dr. Gold's report

9 specific to the extent Dr. Gold commented on her treatment, on

10 Ms. Kerley's treatment, including the most recent, especially

11 with her most recent production, the issue of the boyfriend.

12 This is sounding much more like case-in-chief testimony about

13 her problems generally.

14        MS. KHOURI:  Our rebuttal disclosure wasn't specific

15 to the boyfriend.  It specifically said her treatment of Jane

16 Doe because Dr. Gold has six pages referring to the treatment

17 records of Meredith Kerley.

18        MS. CALEM:  But she needs to rebut Dr. Gold's

19 testimony.  This is going beyond what Dr. Gold testified about.

20 She did not talk about the investigation.

21        THE COURT:  Dr. Gold quantified what she thought to

22 be the emotional harm that Jane Doe suffered, putting No. 1,

23 the girlfriend; putting No. 2, the fact that she thought she

24 was going to get in trouble; putting maybe No. 3, the treatment

25 that she received; or 4, that -- what the school did.

M. Kerley - Direct

1938

1    But she certainly -- her testimony included the

2    emotional, whether or not she had been -- suffered emotional

3    trauma from the way the school treated her.  That was her --

4    that was, I think, one of the initial questions of what were

5    you asked to do, right?

6         MS. CALEM:  She was asked to opine about the extent

7    of emotional distress.  She identified two periods of acute

8    emotional distress and then talked about functioning

9    afterwards.

10        THE COURT:  Okay.  That doesn't mean that plaintiffs

11   have to follow your road map in their response.  So your

12   exception is noted.  I'm going to allow the testimony.

13        MR. ATES:  Thank you, Your Honor.

14        NOTE:  The sidebar discussion is concluded;

15   whereupon, the case continues before the jury as follows:

16   BEFORE THE JURY

17        THE COURT:  Please go ahead.

18        MS. KHOURI:  Thank you.

19   BY MS. KHOURI:

20   Q.   Ms. Kerley, how did you observe the school's response

21   affect Jane Doe?

22   A.   The way that she would describe it to me is that, you

23   know, prior to the school's response, she didn't have much

24   reason to be distrustful of people in her experiences.

25   However, because of the response that she got from the school,

M. Kerley - Direct

1939

1  she -- you know, people that she felt were supposed to protect

2  her and sort of take care of her let her down, hurt her.

3          And she now kind of approaches relationships, you

4  know, both friendship-wise and otherwise, through this lens of

5  having experienced this trauma from the school, and so she is a

6  lot more distrusting of people.  She fears, you know, future

7  trauma, or sort of being betrayed or let down as a result of

8  what she experienced.

9  Q.   Is that something that you've seen continue to manifest

10  throughout your treatment with Jane Doe?

11  A.   I have, yes.

12  Q.   Even in the last month or so?

13  A.   I, I think mostly we talked about it through the last

14  semester of her -- the last semester of college.  We have

15  talked about it a little bit since she's been home from school,

16  but a lot of -- a lot of what we talked about was in relation

17  to the relationships that she had at school and with friends at

18  home too, who she's just not seeing as frequently.

19  Q.   So you continue to see Jane Doe even while she's at

20  college?

21  A.   Excuse me.  I did -- so we had our last session before

22  college in August of 2018.  I saw her again, I don't have it in

23  front of me, but I believe it was before she went back to

24  school for winter break -- or after winter break, and then we

25  would have phone sessions or virtual sessions while she was

1940

1    away at school, and then once she came home from school, we

2    resumed our mostly weekly sessions.

3    Q.    In your -- if I can point you back to your treatment plan,

4    you have underneath Treatment Goals:  Decrease post-trauma

5    symptoms, including anxiety, flashbacks of disturbing images

6    and memories, changes in mood, fear, and difficulty

7    concentrating.

8            Do you see that?

9    A.    I do.

10   Q.    Can you describe to me how you observed Jane Doe's

11   anxiety?

12   A.    Actually physically observed it?

13   Q.    Yes.

14   A.    You know, I don't, I don't know that I physically observed

15   it necessarily.  She, you know, I think, would -- she would

16   come and describe it to me as opposed to me observing it.

17   Q.    What has Jane Doe described?

18   A.    You know, she describes experiencing intrusive thoughts,

19   intrusive memories.  She -- well, and I'm -- when I did this

20   treatment plan, it was when we first started meeting, and so

21   she would experience the intrusive thoughts.  She had some fear

22   of future trauma that she would describe to me.

23           A lot of these post-trauma symptoms, like I said,

24   were manifesting through this relationship with her boyfriend

25   at the time and really impacting that.  But, you know, she

M. Kerley - Direct

1941

1    reported that in school she wasn't as focused or -- although

2    still did very well but had a little bit more difficulty

3    focusing.

4    Q.   Can I ask, what does the fact that Jane Doe still

5    continues to get out of bed every morning and go to school, how

6    does that factor into, you know, your assessment of her

7    emotional well-being?

8    A.   I think she's an incredibly resilient person.  I think

9    she's so driven that that's just what she does.  She -- you

10   know, I ask her sometimes, you know, how, how she's coping, how

11   she does it, and she just says:  Well, I just do.

12          And I think that's just part of her nature, is to --

13   you know, like I said, she's really resilient and really driven

14   and just does.

15   Q.   Does that mean that she's healed of all of her problems?

16   A.   No, absolutely not.

17   Q.   Why not?

18   A.   I, I think, like I said, it's part of Jane Doe's sort of

19   way of being too just continue forward, but I think when she is

20   in situations that trigger some of these emotions, she really

21   feels them, and a lot of those are through relationships with

22   other people, and she really, you know, she really experiences

23   them then.

24   Q.   How do you continue to see the signs of Jane Doe's anxiety

25   in your treatment in -- like, let's focus on 2019.

M. Kerley - Direct

1942

1   A.    Um-hum.  Do you want me to start with most recent?

2   Q.    Sure.

3   A.    Okay.  So in, in May of this year, she started -- or she

4   reported having panic attacks that I believe, if I recall

5   correctly, had started sometime during the spring semester of

6   college.  And, you know, through assessment, I diagnosed her

7   with panic disorder.  She was having panic attacks pretty

8   regularly, usually at home.

9   Q.    And what relationship, from your perspective, does

10  these -- your treatment in 2019 or these panic attacks have to

11  do with the -- her anxiety from before, when she was at -- in

12  high school?

13  A.    You know, I think it's a different manifestation of

14  anxiety.  It -- you know, it's something that we only recently

15  started working on, so I can't say I can make a direct, you

16  know, connection to, or not, to anything really, but I think,

17  you know, over time, we've seen her anxiety manifest in

18  different ways from when the -- you know, when the assault and

19  the response from the school first happened and then, you know,

20  through this relationship with her boyfriend, it manifested

21  differently.

22        And now, for whatever reason that I haven't

23  necessarily gotten to what's at the root of it, it's

24  manifesting differently again.  And so that's what we're --

25  we're working on managing it behaviorally, and then we get to

M. Kerley - Cross

1943

1    what's underneath of it.

2    Q.   How do you weigh Jane Doe's response to, say, what the

3    school did versus age appropriate teenage issues?  How do you

4    weigh what is affecting her?

5    A.   Yeah.  I -- you know, I think it's really important to

6    factor in that, you know, Jane Doe can have age appropriate --

7    what did you call it?  Age appropriate --

8    Q.   Stressors.

9    A.   Stressors.

10   Q.   I might have said "things," but stressors is a better

11   word.

12   A.   Yeah, age appropriate stressors because of her age and

13   stage in life, and she can have them because of the trauma that

14   she experienced.  You know, they can be separate, or they can

15   be intertwined, and so we really just have to tease it apart.

16   Q.   Do you believe that she is still affected by what happened

17   in March of 2017?

18   A.   I do.

19             MS. KHOURI:  Nothing further.  Thank you, Your Honor.

20             THE COURT:  All right.  Thank you.

21             Cross-examination?

22                        CROSS-EXAMINATION

23   BY MS. CALEM:

24   Q.   Good afternoon, Ms. Kerley.

25   A.   Good afternoon.

M. Kerley - Cross

1944

1  Q.   You've been a licensed therapist since 2008?

2  A.   I graduated in 2008 from my MSW program, and I got my

3  license, it was either 2011 or two thousand and -- I think it

4  was 2011.  It may have been 2012.

5  Q.   All right.  And you've had your own private practice since

6  about 2012?

7  A.   Correct.

8  Q.   And you have a patient load of about 19 to 25 patients at

9  a time?

10  A.   Correct.

11  Q.   And the therapeutic technique that you used called

12  dialectical behavioral therapy, which is a big mouthful so I'm

13  just going to say DBT, this technique isn't only used to treat

14  people who have experienced sexual assault, correct?

15  A.   That's correct.

16  Q.   It can be used to treat anxiety stemming from any source,

17  correct?

18  A.   Correct.

19  Q.   Eating disorders, depression, etc.?

20  A.   Yes.

21  Q.   When you first met Ms. Doe, were you -- had she commenced

22  litigation in this case?

23  A.   I don't remember.  I don't recall.

24  Q.   During the course of your treatment of her, you became

25  aware of this litigation, did you not?

M. Kerley - Cross

1945

1  A.   I did, yes.

2  Q.   And your information about Ms. Doe comes from her

3  self-reporting; is that correct?

4  A.   That's correct.

5  Q.   So you accept what she tells you as true because that's

6  your job as her therapist, correct?

7  A.   Correct.

8  Q.   You don't go to any external sources to corroborate the

9  accuracy of what she's told you, correct?

10 A.   Correct.

11 Q.   Has Ms. Doe shared with you any of the text messages she

12 has exchanged with her friends regarding her anxiety or her

13 boyfriend?

14 A.   No, she has not.

15 Q.   Did you review Ms. Harlow's medical records?

16 A.   I did not.

17 Q.   And did you speak to Ms. Harlow?

18 A.   She and I, unfortunately, never connected.  We played a

19 bunch of phone tag and then never connected.

20 Q.   And you were not present, of course, when Ms. Harlow

21 interviewed Ms. Doe and treated her, correct?

22 A.   Correct.

23 Q.   Do you have any information as to what Ms. Harlow's final

24 conclusions were at the time of discharge?

25 A.   I can't speak to that.  I don't know.

M. Kerley - Cross

1946

1    Q.    Now, Ms. Doe reported to you that she lost a lot of weight

2    in a significant period of time, correct?

3    A.    Correct.

4    Q.    And she reported throwing up a lot when she was around her

5    boyfriend, correct?

6    A.    Correct.

7    Q.    Did you independently verify when Ms. Doe started to lose

8    weight?

9    A.    She reported to me that it was, I believe if I'm recalling

10   correctly, about three or four months prior.

11   Q.    Did you examine any medical records which tracked her

12   weight?

13   A.    I did not.

14   Q.    Did you yourself weigh her at each of your sessions?

15   A.    I do not do that, no.

16   Q.    So her, her weight is based on her self-report as well?

17   A.    That's correct.

18   Q.    Are you aware of whether she had started to lose weight

19   before she began to date this high school boyfriend?

20   A.    I actually -- she had been with the boyfriend for about

21   four months was my understanding, and she reported to me that

22   the weight loss had started about three or four months prior.

23   So I think they, from my understanding and recollection, line

24   up.

25   Q.    Do you know whether -- are you aware of whether Ms. Doe

M. Kerley - Cross

1947

1  had any stomach issues or GI issues prior to dating this

2  boyfriend, such as acid reflux?

3  A.   I don't know that information.

4  Q.   Acid reflux can cause vomiting, can it not?

5  A.   I mean, I'm not an expert, so I don't know.

6  Q.   Okay.  And you're not aware of whether or not she had any

7  eating problems at the time she was consulting with Ms. Harlow,

8  correct?

9  A.   None that she told me about.

10  Q.   Is it accurate that Ms. Doe herself attributed her weight

11  loss at least in part to general anxiety?

12  A.   I'm sorry, can you repeat that?  I didn't hear part of it.

13  Q.   Is it accurate that Ms. Doe herself attributed her weight

14  loss at least in part to generalized anxiety?

15  A.   Whether or not she stated that, I don't know.  That's my

16  opinion, that there's -- that it was connected some to just

17  general anxiety, as well, I think, she -- you know, I think

18  there was a loss of appetite, just kind of general disinterest

19  in eating based on anxiety.

20  Q.   All right.  If Ms. Doe had told Dr. Gold, who is our

21  forensic expert, that she was involved in a romantic

22  relationship with this boyfriend in her senior year of high

23  school, and that her ability to be in this relationship was

24  unaffected by the alleged sexual assault, this would be

25  inconsistent with her report to you, correct?

M. Kerley - Cross

1948

1      MS. KHOURI:  Objection.

2      THE COURT:  Overruled.

3      THE WITNESS:  That is inconsistent with what we

4  talked about in our sessions.

5  BY MS. CALEM:

6  Q.   Do you know on how many occasions Ms. Doe actually vomited

7  when she was around her boyfriend?

8  A.   I don't know the number.

9  Q.   Do you know on how many occasions she restricted her food

10  intake prior to seeing him?

11  A.   I don't know the number.

12  Q.   This was Ms. Doe's first boyfriend, wasn't it?

13  A.   I actually don't know.  I don't -- I think it may have

14  been.

15  Q.   So she was learning how to negotiate her first romantic

16  relationship, correct?

17      MS. KHOURI:  Objection.

18      THE COURT:  You may characterize -- in answering, you

19  may characterize it the way you wish.

20      THE WITNESS:  And, I'm sorry, can you repeat the

21  question?

22  BY MS. CALEM:

23  Q.   Well, yes, certainly.  Was she learning how to negotiate

24  her first romantic relationship, in your view?

25  A.   I mean, I think, yes.  I think that's pretty typical of

M. Kerley - Cross

1949

1    somebody at that stage of life.

2    Q.   And you treat adolescents, a lot of adolescents, don't

3    you?

4    A.   I do, yes.

5    Q.   Okay.  And for adolescents in romantic relationships,

6    aren't there often feelings of possessiveness that arise?

7    A.   There can be.

8    Q.   And of insecurity?

9    A.   There can be.

10   Q.   And in teen relationships, these feelings can lead to

11   tension in a relationship, can they not?

12   A.   They can.

13   Q.   Did Ms. Doe report to you that she and her boyfriend

14   fought a lot?

15   A.   She did describe to me some fighting.

16   Q.   Did she describe to you feelings of possessiveness on her

17   part?

18   A.   Not that I recall.

19   Q.   Assuming that she and her boyfriend had frequent fights,

20   might that be a cause of anxiety for her?

21          MS. KHOURI:  Objection.

22          THE COURT:  She said "assuming."  So if you can

23   answer it without speculating, you can go ahead.

24          THE WITNESS:  You know, I want to go back.  And I

25   don't know that she actually used the word "fighting" with me,

M. Kerley - Cross

1950

1    but I know that there was, you know, some discord in the

2    relationship.  And, you know, it can certainly cause anxiety,

3    but it -- you know, again, I think we need to look at the

4    source of the anxiety separately.  It can -- it doesn't have to

5    just be from the discord in the relationship.

6    BY MS. CALEM:

7    Q.   If Ms. Doe reported to her peers that she was frequently

8    fighting with this boyfriend, would that provide some insight

9    to you into the dynamics of their relationship?

10   A.   I guess I don't understand the question.

11   Q.   Well, if you had seen text messages from Ms. Doe to her

12   friends in which she reported frequent fighting, that they were

13   always fighting, would that have helped you in understanding

14   her level of anxiety?

15   A.   I think, yeah.  I mean, I think anytime there's more

16   information, it's helpful.

17   Q.   Did Ms. Doe report to you that she was anxious about the

18   possibility that her high school boyfriend would break up with

19   her?

20   A.   I know that we talked about -- she and her boyfriend broke

21   up soon after she and I started meeting, and so we didn't have

22   any lengthy conversations about it, if that was going on.

23   Q.   Okay.  Is it your understanding that the boyfriend broke

24   up with Ms. Doe?

25   A.   I actually don't recall who broke up with whom.

M. Kerley - Cross

1951

1   Q.   If he broke up with her, would that be a source of anxiety

2   for her?

3   A.   I think it could be.

4   Q.   That is a traumatic event for a teenager, is it not?

5   A.   It can be.

6   Q.   If -- do you know whether Ms. Doe in the past had

7   responded to situations in which she felt anxiety by vomiting?

8   A.   Not to my knowledge.

9   Q.   You're not aware one way or the other?

10   A.   I have not heard of any that I can recall.

11   Q.   If Ms. Doe learned that this boyfriend had been

12   emotionally cheating on her with another girl, could this have

13   been a source of anxiety for her?

14          MS. KHOURI:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  It could.

17   BY MS. CALEM:

18   Q.   So with respect to the boyfriend, it's very hard to

19   separate out, isn't it, how much of her distress related to the

20   boyfriend had to do with normal teenage heartache versus the

21   school versus the sexual assault, correct?

22   A.   I mean, I think there's pieces of, of all of those things

23   in there, and that's what we worked on is to really kind of

24   piece things apart.

25   Q.   And you cannot separate out for us what percentage belongs

M. Kerley - Cross

1952

1  to which category, can you?

2  A.   I can't, no.

3  Q.   And the relationship which caused anxiety took place in

4  her senior year of high school, correct?

5  A.   That's correct.

6  Q.   And concurrently with that relationship, I think -- I

7  believe you testified she was already experiencing anxiety

8  relating to other things in her life?

9  A.   That's correct.  I want to make sure I understand the

10  context in which I said it.

11  Q.   Okay.  Well, I withdraw that.  I certainly did not mean to

12  characterize your testimony.

13          So my question is, was she experiencing anxiety

14  relating to other issues in her life?

15  A.   Yes.

16          THE COURT:  What time now?  Is it senior year you're

17  talking about?

18          MS. CALEM:  Senior year of high school.

19  MS. CALEM:

20  Q.   And with respect to Ms. Doe's level of anxiety in general,

21  you don't know her baseline level of anxiety prior to March

22  2017, do you?

23  A.   Only, only what she's reported to me, which is that she

24  had generally pretty low anxiety prior to then.

25  Q.   And Ms. Doe was a student who pushed herself hard

M. Kerley - Cross

1953

1   academically, correct?

2   A.    That's correct.

3   Q.    And she described her parents as having very high

4   expectations of her?

5   A.    That's correct.

6   Q.    And high-achieving kids with demanding parents often are

7   anxious, aren't they?

8   A.    They can --

9   Q.    It's not -- I'm sorry.

10  A.    I'm sorry.  They can be.

11  Q.    It's not an unusual phenomenon in Fairfax County, is it?

12  A.    That's correct.

13  Q.    And in your practice, you see teens with anxiety and

14  eating disorders who have not been sexually assaulted as well,

15  correct?

16  A.    Correct.

17  Q.    On April 26, 2018, Ms. Doe discussed with you emotions

18  relating to being on her own at college, did she not?

19  A.    I don't have it in front of me, but I know that's what we

20  talked about.

21  Q.    All right.  And this -- that type of anxiety is fairly

22  normal for teens of that age, correct?

23  A.    Anxiety about going off to college, being on their own at

24  college, I would say that's pretty normal.

25  Q.    And one of Ms. Doe's concerns was how she would function

M. Kerley - Cross

1954

1   independently when her parents were not around?

2   A.   That's correct.

3   Q.   And that's a pretty normal concern for that age group as

4   well, correct?

5   A.   Yes.

6   Q.   And then Ms. Doe also discussed with you issues relating

7   to what her parents wanted for her versus what she wanted for

8   herself?

9   A.   We did talk about that, yes.

10  Q.   Okay.  And is that something that many young people of

11  this age are confronting, that issue?

12  A.   A lot of, a lot of adolescents at that age struggle with

13  that.

14  Q.   And in May of this year, she discussed with you the

15  frustrations of being at home versus being at college, where

16  she had more freedom; is that right?

17  A.   I do recall that conversation, yes.

18  Q.   And one of the things that you and Ms. Doe also discussed

19  is her relationships with peers generally, not just romantic

20  relationships, correct?

21  A.   Correct.

22  Q.   And again, this is not an unusual issue for young adults

23  of this age to grapple with, is it?

24  A.   It's not, no.

25  Q.   Do you recall a discussion on June 7 of 2018 with Ms. Doe

M. Kerley - Cross

1955

1  in which she discussed social concerns and beliefs she had

2  about herself and relationships with others?

3  A.   I don't recall the exact conversation, but I do know that

4  that's a topic that we discussed.

5  Q.   Do you recall doing some role-playing with her as to

6  conversations she might have with peers?

7  A.   I do recall us doing role-playing, yes.

8  Q.   And what was that about?  Just about -- well, what was

9  that about?

10  A.   I, I can give you an example.  I don't know if it was that

11  particular day.  One example that we would do is that she was

12  going to some graduation parties and was feeling just generally

13  anxious being around people that she didn't know, you know,

14  worrying that she wouldn't have anybody to talk to, and so we

15  role-played how she could kind of get into conversations or

16  introduce herself or carry on a conversation, find topics to

17  talk about, things like that.

18  Q.   And you would kind of give her some homework, like, you

19  know, your homework is to try to talk to two people you don't

20  know over the next -- until our next session?

21  A.   I don't know if I called it homework, but it was

22  encouraging her to, to try to have these conversations.

23  Q.   And your notes refer to the fact that you and Ms. Doe

24  worked on interpersonal effectiveness skills.  What does that

25  mean?

M. Kerley - Cross

1956

1   A.   Interpersonal effectiveness skills are part of dialectical

2   behavioral therapy.  It's -- generally, it talks about how to

3   be in relationship with not only other people, but with one's

4   self, and it's a lot of how to identify what you want, be able

5   to express it, and get those needs met in healthy ways.  It's

6   about setting boundaries, being able to say no, being

7   assertive, ways to build and maintain positive relationships.

8   Q.   Okay.  Do you believe that Ms. Doe gradually made progress

9   in that area?

10  A.   I do, yes.  Yeah, I think she did great.

11  Q.   Can you look at the page numbered 1407 in your notes?

12  A.   Okay.

13  Q.   That's your notes of August 9, 2018, correct?

14  A.   Correct.

15  Q.   And your progress notes states:  Client has made

16  significant progress in healing from her trauma as well as

17  socially, and she has tools that she can use to continue to

18  grow/heal in both areas.

19          Did you write that?

20  A.   Yes.

21  Q.   And did you believe that to be true when you wrote it?

22  A.   Yes.

23  Q.   On August 16, you saw Ms. Doe again.  Can you look at the

24  next page, 1408?

25  A.   Yes.

M. Kerley - Cross

1957

1   Q.   And there your progress notes states:  Client has

2   identified and practiced tools to tolerate, regulate, and

3   manage intense emotions related to school, being social, and

4   trauma.

5          Was that accurate when you wrote it?

6   A.   Yes.

7   Q.   And it says:  Eating and weight stable.

8          Was that accurate?

9   A.   Yes.

10  Q.   So as of August 2018, Ms. Doe was no longer losing weight?

11  A.   That's what I recall.

12  Q.   All right.  When you are trying to make a differential

13  diagnosis of a patient, litigation in which a patient is

14  seeking emotional distress damages would be a consideration,

15  would it not?

16         MS. KHOURI:  Objection.

17         THE COURT:  Yeah, sustained.

18  BY MS. CALEM:

19  Q.   Did you consider the stress related to litigation as one

20  source of Ms. Doe's anxiety?

21         MS. KHOURI:  Objection.

22         THE COURT:  Overruled.

23         THE WITNESS:  I, I did consider it.  I mean, she's

24  human.  It's, you know, it's stressful, but I don't think that

25  that was -- it is a consideration, yes.

M. Kerley - Cross

1958

BY MS. CALEM:

Q.   You don't know what percentage of the whole it is, but it is a consideration, correct?

A.   Correct.  I think it would be for most people.

Q.   All right.  Are you aware of Ms. Doe being on any medication that might affect her mood?

A.   She is on an antidepressant.  I'm sorry, not an antidepressant.  She takes an SSRI for the panic disorder.

Q.   That's, that's a recent development, correct?

A.   Correct.

Q.   When you first met with her, you did not see the need to refer her for a consult for medication, correct?

A.   Not at that time.

Q.   All right.  And was she -- at some point, did she go on some acne medication that had potential ramifications for her mood?

A.   She did start Accutane the summer before she left for college.  I am not an expert on it, but my understanding is that it can cause some mood instability.

Q.   And do you know if Ms. Doe ever followed up with a medical doctor with regard to mood instability in connection with Accutane?

            MS. KHOURI:  Objection.

            THE COURT:  You may answer the question.

            THE WITNESS:  And you're speaking specifically about

M. Kerley - Cross

1959

1  therapy; is that right?

2          THE COURT:  No, she's asking whether Jane Doe

3  asked -- told you whether she was seeking any medical -- at

4  least this is what I understand the question to be -- separate

5  medical advice from a physician, I would assume, about any mood

6  disorder.

7          THE WITNESS:  She -- I mean, she had a physician who

8  she saw who prescribed the medication.

9  BY MS. CALEM:

10  Q.   And one thing her parents wanted to talk to you about was

11  the potential impact on her mood of taking -- on her mood of

12  taking Accutane; is that right?

13  A.   Correct.  Her dad in particular had reached out to me

14  wanting for us to talk about this so that she could make an

15  informed decision.

16  Q.   Are you aware of whether or not Accutane affected her

17  mood?

18  A.   I am -- I'm not aware.

19  Q.   And she started on this medication just before she left

20  for college, correct?

21  A.   That's correct.

22  Q.   And -- now, you considered and ruled out a diagnosis of

23  post-traumatic stress disorder for Ms. Doe, correct?

24  A.   That's correct.

25  Q.   And instead, you arrived at adjustment disorder with

M. Kerley - Cross

1960

1    anxiety?

2    A.    Correct.

3    Q.    And in order to meet the diagnosis of adjustment disorder,

4    the stressor must have occurred within three months of the

5    onset of the symptoms?

6    A.    Correct.

7    Q.    And the duration of these symptoms normally is six months

8    according to the diagnostic criteria, correct?

9    A.    That's correct.

10   Q.    And in this case, you're saying that Ms. Doe's symptoms

11   continued past the six-month mark?

12   A.    So I think a couple of things -- that is correct, but I

13   think there are a couple of things going on.  If you read more,

14   more into what's written about the diagnosis, there's a part

15   that talks about if a stressor or its consequences persist,

16   then the adjustment disorder can persist.

17           And so we've talked about litigation as being a

18   stressor, and, of course, that's a stressor; however, I think

19   that, you know, through this process, the, the trauma is in the

20   forefront of her mind, and so the, the consequence persists,

21   and therefore, I think the adjustment disorder is valid.

22           And the additional stressors of the boyfriend -- and

23   again, he's not the problem; it's the way in which the symptoms

24   are manifesting in relationship with him -- and also the fact

25   that she was still at school, in an environment that didn't

M. Kerley - Cross

1961

1  feel as safe to her anymore.  You know, she was still in her

2  senior year and still in an environment that didn't actually

3  feel as safe to her as it once did.  She was still in band and

4  still among these administrators who she felt let her down.

5  Q.   And you're basing this again on her self-report, correct?

6  A.   That's correct.

7  Q.   You don't know how often she actually even saw these

8  administrators, correct?

9  A.   I don't.

10  Q.   And the stressors that precipitated the adjustment

11  disorder would have been the sexual assault and the school --

12  the alleged sexual assault and the school's reaction as -- to

13  it as reported by Ms. Doe?

14  A.   That's correct.

15  Q.   And you cannot apportion out which was the more

16  significant to her, can you?

17  A.   I can't say specifically.  I know that both were

18  incredibly impactful.

19  Q.   And for some people, the assault itself might be more

20  impactful.  For others, the follow-up process might be more

21  impactful, correct?

22  A.   Right.  That's my experience is that, is that even the

23  response can be more traumatic than the actual event, and it --

24  but that's not always the case.  It depends on the person.

25  Q.   And we really can't say here from -- well, can you say

M. Kerley - Cross

1962

1   here which portion was more?

2   A.   I can't say which one.  I just know that both were

3   incredibly impactful.

4   Q.   All right.  And you concluded that Ms. Doe had some social

5   impairment as a result of the stressors.

6   A.   That's correct.

7   Q.   Is that accurate?

8   A.   Um-hum.

9   Q.   You did not conclude that her academic functioning was

10  impaired, did you?

11  A.   I did not.  She reported to me that she had more

12  difficulty focusing and concentrating, and I also think she's

13  an incredibly driven and high-achieving student and was able to

14  compensate.

15  Q.   So as far as you know, her GPA did not suffer from these

16  stressors?

17  A.   As far as I know.

18  Q.   And as far as you know, her extracurricular activities did

19  not suffer from these stressors?

20  A.   Not to my knowledge.

21  Q.   So really the area in which you saw impairment was social

22  functioning?

23  A.   Social functioning, yes, interpersonally.

24  Q.   Interpersonally.  You don't believe, do you, that she was

25  impaired in her ability to make connections to people as a

M. Kerley - Cross

1963

1    general matter?

2    A.    I, I do know that, you know, we talked about some of the

3    social anxiety that she has felt throughout the years, so I

4    think, you know, that's a separate issue, but she has

5    experienced some social anxiety.

6    Q.    When you say "throughout the years," do you mean even

7    prior to March 2017?

8    A.    That's my understanding.  That's my -- what I recall.

9    Q.    Ms. Doe retains close friends, does she not?

10   A.    She does have some close friends, yes.

11   Q.    And she is close to her parents, correct?

12   A.    Correct.

13   Q.    So she has not lost the ability to have close

14   relationships in her life, has she?

15   A.    She hasn't lost the ability.  I think she's more

16   distrusting.

17   Q.    And you can't say, can you, whether that distrust arises

18   more from the assault or the school's conduct, can you?

19   A.    I, I think it's both.

20   Q.    But you can't apportion, correct?

21   A.    I can't give you an exact proportion, no.

22   Q.    Now, with respect to this recent panic disorder, this

23   began in May 2019, correct?

24   A.    That's when she and I first discussed it, yes.

25   Q.    And you cannot explain why Ms. Doe has these new fears,

M. Kerley - Cross

1964

1    can you?

2    A.   It's something that we only recently talked about, and the

3    symptoms were pretty debilitating in the beginning, so we

4    worked a lot on symptom management and getting that part of it

5    under control, and at this point just haven't had enough time

6    to really get at what's underneath of it.

7          I think that over time, I've seen her -- I've seen

8    her anxiety manifest in different ways, and this is just

9    another manifestation, although I don't know precisely what,

10   what the connections are.

11   Q.   So you really don't have an answer as to what the cause is

12   now, correct?

13   A.   I don't.  I know there's a lot of fear for safety, for

14   personal safety.  That's something that we've talked a lot

15   about is, like, being fearful for her personal safety and for

16   the safety of others.

17   Q.   And some of this related to some, some of the mass

18   shootings that have been happening around the country?

19   A.   That's correct.

20   Q.   And you cannot attribute these panic disorder symptoms to

21   the School Board's actions with clarity, can you?

22   A.   Not at this time.

23   Q.   It is possible these new symptoms have an entirely

24   different cause, correct?

25   A.   I think it's possible either way.

M. Kerley - Redirect

1965

1    MS. CALEM:  Nothing further.

2    THE COURT:  Thank you.  Redirect?

3    MS. KHOURI:  It will be very quick.

4    THE COURT:  All right.

5              REDIRECT EXAMINATION

6    BY MS. KHOURI:

7    Q.   Ms. Kerley, do you attribute Jane Doe's adjustment

8    disorder to the fact that she is a high-achieving student?

9    A.   No.

10   Q.   What do you attribute it to?

11   A.   I, I attribute her adjustment disorder to her experiences

12   of the trauma of being sexually assaulted and the response that

13   she received from the school.

14   Q.   How does Jane Doe's increased ability to cope relate to

15   her actual emotional well-being?

16   A.   Currently, you mean?

17   Q.   Sure.

18   A.   You know, she has worked really hard to learn skills in

19   order to be able to cope effectively, and it doesn't mean that

20   the symptoms aren't there, aren't present anymore.  They are

21   still present.  They may, you know, decrease/increase at

22   different times, but she's able to -- she has more ways to cope

23   with these skills -- or, excuse me, cope with these symptoms.

24   Q.   In your experience, is it a normal reaction of a

25   17-year-old to throw up when she's around her high school

1966

1  boyfriend?

2  A.   No.

3  Q.   When you first started seeing Jane Doe, that was in March

4  of 2018, right?

5  A.   That's correct.

6  Q.   And you said the relationship ended soon after that?

7  A.   Shortly after that, yes.

8  Q.   Around, like, May 2018, was it?

9  A.   I would have to look at my notes for sure, but I know it

10  was shortly after.

11  Q.   Okay.  And you still continue to see signs of Jane Doe's

12  anxiety in your treatment today?

13  A.   I do.

14  Q.   Despite the fact that now over a year has passed since

15  this relationship?

16  A.   That's correct.

17  Q.   Okay.  Thank you very much.

18          MS. KHOURI:  Nothing further.

19          THE COURT:  All right.  May Ms. Kerley be excused?

20          MS. KHOURI:  Yes, Your Honor.

21          THE COURT:  All right.  Thank you.  You're excused.

22  Please don't discuss the testimony you've given here with

23  anyone until our trial is over, all right?

24          THE WITNESS:  Okay.  Thank you.

25          THE COURT:  All right.  Thank you.  You have a good

1967

1    evening.

2                        (Witness excused.)

3            THE COURT:  Do you want to play your video clip now?

4            MR. ATES:  We would, Your Honor.  I hate to be

5    between the jury and them going home.  It's sort of somebody

6    standing between me and lunch, and I -- we'll play it as quick

7    as we can, Your Honor.

8            THE COURT:  Sure.

9            MR. ATES:  And there is a pause in between, and it's

10   going to take maybe a 30-minute pause in between -- 30-minute,

11   Good Lord.  30-second, Your Honor.

12           THE COURT:  Okay.

13           MR. ATES:  I apologize.

14           THE COURT:  All right.  So we're going to hear a clip

15   of some deposition testimony of Mr. Baranyk?

16           MR. ATES:  Dr. John Banbury, the principal of the

17   school, Your Honor.

18           THE COURT:  Yeah.  And I think that concludes the

19   evidence in the case, and I'll be releasing you shortly after.

20           Okay.  Let's play it.

21           MR. ATES:  Thank you, Your Honor.

22      JOHN BANBURY - Video Deposition Excerpt - was played

23           MR. ATES:  Thank you.

24           THE COURT:  All right.  Does that conclude your

25   rebuttal case?

1968

1     MR. ATES:  Yes, it does, Your Honor.

2     THE COURT:  All right.  And we've completed the

3  evidence in the case, and we'll have -- I'll give you final

4  jury instructions and then we'll have closing arguments.  It

5  may be necessary for us to go over some last-minute matters in

6  the morning, so how about if we come in at 9:30?  Does that

7  work for you-all?

8                        (Jurors nodding heads.)

9     THE COURT:  Okay.  We may get started a little

10  earlier.  Hopefully, we'll be ready for the instructions and

11  arguments when you get in at 9:30.

12     So again, it's very important you not do any research

13  or investigation or talk to anybody about the case tonight.

14  And thank you again for your patience, and we'll see you

15  tomorrow morning.  You're excused.  Thank you.

16     NOTE:  At this point, the jury leaves the courtroom;

17  whereupon, the case continues as follows:

18  JURY OUT

19     THE COURT:  All right.  Mr. Raphael, you wanted to

20  renew -- you wanted to revisit my ruling on the prior

21  consistent statements, and I'll hear you now briefly, sir.

22     MR. RAPHAEL:  Thank you, Your Honor.

23     I think that the Court has with regard to the

24  801(d)(1)(B) issue taken the facts in the light most favorable

25  to the plaintiff rather than looking at them as they could be

1969

1    argued the other way.  I mean, the --

2             THE COURT:  No, I haven't at all.

3             MR. RAPHAEL:  All right.

4             THE COURT:  I've looked at them as they exist and

5    weighted them all equally.

6             MR. RAPHAEL:  I understand.  I don't -- I think that

7    the -- I don't -- I think that for purposes of this ruling,

8    it's a factual question as to when she learned of the

9    girlfriend.  The plaintiff testified to that after we filed our

10   801(d)(1)(B) papers and made a significant question out of the

11   timing issue, and I noted that during her testimony, she made

12   it -- the question was very careful:  Yeah, I told everything

13   to Karoline Davis, and only then did she say:  Oh, he has a

14   girlfriend.

15            We played -- we did the clip from her deposition

16   because it's different from how she said it in the deposition.

17            THE COURT:  Not particularly.

18            MR. RAPHAEL:  Okay.  And then the last point I'll

19   make, just to make sure it's clear, is she did -- her, her

20   Friday night text with Aveesh said she was concerned she knew

21   that she could get in trouble, and we think that that does

22   demonstrate that there was a motive to fabricate from the

23   outset, but I don't -- I'm not trying to reargue it.

24            That's what we have on that.

25            THE COURT:  Okay.

1970

1   MR. RAPHAEL:  I did have three other matters.

2   THE COURT:  Yes.  All right.  I still think that the

3   testimony of Karoline Davis at trial is -- probably also

4   supports Jane Doe, but just the evidence is absolutely clear

5   that the conversations took place, first, about the assault

6   and, second, about the girlfriend, and so -- but your exception

7   is noted.

8   MR. RAPHAEL:  Thank you, Your Honor.  And

9   anticipating that that would be your ruling, I took the liberty

10  of trying to write up what an instruction might look like, and

11  I haven't shared this yet with anybody.  I just got it -- we

12  just got it recently printed.

13  May I hand it up to the Court?

14  THE COURT:  Yes, please.

15  MR. RAPHAEL:  And it's a variation on the one we

16  submitted, which I think was CCC, and for the -- just for the

17  record, it reads -- it's an instruction on plaintiff's prior

18  consistent statements:  You heard testimony from multiple

19  witnesses about what Jane -- it could say Jane Doe -- told them

20  had happened with Jack Smith on the bus on March 8, 2017.  For

21  two of those witnesses, Aveesh Kachroo and Victoria Staub, you

22  may consider that testimony for any purpose -- oh, I'm sorry;

23  that's right.  That Victoria Staub should be Karoline Davis.  I

24  apologize.

25  For two of those witnesses, Aveesh Kachroo and

1971

1   Karoline Davis, you may consider that testimony for any purpose

2   that you find appropriate.  For the other witnesses whom Jane

3   Doe told what happened with Jack Smith on the bus, my earlier

4   limiting instruction remains the same; that is, you may not

5   consider that testimony as evidence of what actually happened

6   on the bus, but if you find that the witness's statement of

7   what Jane told that witness was reported to Principal Banbury,

8   Assistant Principal Hogan, or Assistant Principal Taylor, then

9   you may consider that testimony as evidence of what was

10  communicated to the School Board.

11          We think that that's -- in light of the ruling, we

12  think that's a fair -- that will be a fair instruction.

13          THE COURT:  Okay.  That's got a couple of issues.

14  One is that you don't say that they may consider the testimony

15  for its --

16          MR. RAPHAEL:  That's what the any purposes --

17          THE COURT:  For any purpose, including the truth of

18  the statement?

19          MR. RAPHAEL:  Yeah.  The concern we would have with

20  that is like you're saying, you know, consider it as true, and

21  I think this is a more elegant way of saying they can consider

22  it for any purpose.

23          THE COURT:  Well, we have other instructions which

24  talk about the way that they can weigh testimony of any witness

25  and give it whatever credibility they think it deserves.

1972

1     MR. RAPHAEL:  Yes.

2     THE COURT:  So I think we ought to have something in

3   there including its truthfulness.

4     The other issue that I see immediately is that in

5   some of these witnesses' notice testimony, it's hierarchical,

6   that it goes from A to B to C before it gets to the

7   administration.  How do we address that in this instruction?

8     MR. RAPHAEL:  Well, that was -- I was trying to

9   address that with the last sentence because I think you're

10  right.  I think it's only admissible for notice purposes if it,

11  if it got to the people who had to have actual knowledge.

12    THE COURT:  Right.

13    MR. RAPHAEL:  And so that's why I -- I was trying to

14  address that with the last sentence.

15    THE COURT:  Okay.  All right, Mr. Ates?  You haven't

16  a chance to look at it, but -- and I'll certainly give you time

17  to chew on it.

18    MR. ATES:  You honed in on the, on the -- well, first

19  of all, it is Karoline Davis, but on the two issues I picked up

20  on, Your Honor, and I think, I think part of the issue is "was

21  reported."  I think it needs to be the concept of ultimately

22  filtered to or ultimately was received by or something.  We'll

23  play with that language tonight, Your Honor, but it's getting

24  to the concept of did it get up.

25    And, of course, we've got Ms. Taylor telling

1973

1    Mr. Banbury under -- you know, in testimony that Jane really

2    didn't want to do it.  Mr. Banbury denies that, but the jury

3    does have the testimony from which to show not only Taylor knew

4    but that she conveyed it to Banbury.

5            THE COURT:  Okay.

6            MR. ATES:  So be that as it may.

7            THE COURT:  Okay.  You work on it tonight, and, you

8    know, send a draft out tonight to counsel and to the --

9            MR. ATES:  The, the other issue I think this raises,

10   Your Honor, is Ms. Jorgensen, the mother, she had that clear

11   e-mail going over to the Board -- to the school officials that

12   night.

13           THE COURT:  To Mr. V?

14           MR. ATES:  To Dr. V, who then reports it through.

15           And so we -- I think they made a hearsay exception at

16   that point, and yet all this 801(d) doesn't go to that

17   specifically, but it does go to notice, and what the School

18   Board -- we need something to show what the School Board knew,

19   and so we're going to be asking for something on that, Your

20   Honor.

21           THE COURT:  So I've said it's admissible for purposes

22   of -- all this was admissible for purposes of showing notice --

23           MR. ATES:  Correct.

24           THE COURT:  -- to the administration.

25           MR. ATES:  Correct.

1974

```
 1          THE COURT:  And what more do you want out of that?

 2    I'm missing the point, I guess.

 3          MR. ATES:  I'm not being clear, and I apologize.

 4          THE COURT:  No, it's not -- it's probably not you.

 5    Go ahead.

 6          MR. ATES:  What I'm trying to convey is that it can

 7    be considered as notice to the School Board, which seemed to be

 8    different than how they were instructed is the point I'm trying

 9    to make, Your Honor, upon reflection.

10          THE COURT:  Okay.  I'm not sure whether that isn't

11    just argument.

12          MR. ATES:  An issue of fact.  Fair enough.  Fair

13    enough.

14          THE COURT:  You know, the e-mail is there.  I'm not

15    even sure that there's any issue of whether it wasn't said or

16    not.  It's just you using the evidence that you have to

17    communicate with the jury, and I'm not sure an instruction is

18    necessary, but you, again, work on it and send something over.

19          MR. ATES:  Thank you, Your Honor.

20          THE COURT:  Okay.  I have a couple of -- well, why

21    don't we finish up with you, Mr. Raphael?

22          MR. RAPHAEL:  Thank you, Your Honor.  Just briefly,

23    just for the record, we do renew our JMOL at the close of all

24    of the evidence.

25          THE COURT:  All right.
```

1975

1          MR. RAPHAEL:  I would add to it at this point that

2   the damage claim for emotional distress is unduly speculative

3   based on the testimony in plaintiff's rebuttal case, where the

4   plaintiff's expert said she couldn't unpack it and say how much

5   was caused by the assault and how much was caused by anything

6   that the school system did or any -- and how much was caused by

7   all of the other stressors.

8          *Davis* is clear that the School Board is liable only

9   for its own misconduct, and if the expert can't apportion that,

10  there's no reasonable basis on which to allow for damages.  So

11  I would add that to our JMOL.

12         THE COURT:  All right.  Well, I'll deny the JMOL

13  and -- for reasons that I may or may not have said yesterday or

14  the day before, whenever, but, I mean, Ms. Kerley testified

15  that both were incredibly impactful, and I think that's

16  sufficient testimony to get past the JMOL on the damages issue.

17         MR. RAPHAEL:  Thank you, Your Honor.  The -- it would

18  be helpful -- and I realize the Court has a lot on its plate

19  and you've got other cases.  We have pending the question about

20  whether they can recover on a theory of liability for conduct

21  in the senior year --

22         THE COURT:  '17-'18.

23         MR. RAPHAEL:  -- when they only -- I mean, there are

24  really two pieces of this.

25         One is they only pleaded a single incident.  The only

1976

1  thing they pleaded was the bus incident and the response to it,

2  and there's -- we think that the evidence, even if they got

3  past the pleading problem, there's just no evidence they can

4  survive the elements of *Davis* that are required.

5          And in preparing for closing tomorrow, obviously,

6  that's going to be a piece of it.  So I don't mean to prod the

7  Court but --

8          THE COURT:  No, it's one of my items, and we talked

9  about that a fair amount today, and you've got the elements and

10  the deliberate indifference, and without Jack Smith, you don't

11  have the actor at the school any longer, and -- so on the other

12  hand, you have Dr. V, of course, and he's not an administrator,

13  and I've made that finding, and how, how does this all come

14  together?

15          And then I just listened to the cross-examination of,

16  of Ms. Kerley, and she talked about the stressors and their

17  consequences, and the consequences are what's ongoing, and that

18  that's what -- that's why the normal six-month period of --

19  that is required to recover from this disorder was still

20  ongoing.  So how does that factor in it?

21          MR. RAPHAEL:  I think -- I take the Court's point.  I

22  think there's a distinction between what the damages could be

23  for the violation and what the basis for the violation is.

24          THE COURT:  All right.

25          MR. RAPHAEL:  And I'm focusing on the second piece,

1977

1    and I think you're focusing on the first piece.

2              THE COURT:  I'm really -- I understand you.  I'm

3    wondering how the two of them intertwine, or do they

4    intertwine?

5              MR. RAPHAEL:  I think they need to be kept separate

6    for two reasons:  One, the only basis for liability pleaded is

7    the bus incident.  That's the only basis pleaded.

8              No. 2, the only basis on which you could recover on a

9    Title IX theory under *Davis* is if you meet all those elements,

10   and they haven't met any of these elements under *Davis*.

11             Now, if -- the Court's rejected my argument that you

12   should reject the damage theory because she can't unpack it,

13   and I take the Court's point on that.  I think that in light of

14   that, they can still argue that the damages were continuing,

15   but if you don't draw the line at the junior year, then we're

16   going to have to be arguing about, okay, was Dr. V's being, you

17   know, in her view curt with her her senior year, is that an

18   independent violation?  And that's really not proper and it's

19   really not fair to the School Board.

20             This is my point yesterday, that if you had a

21   Title IX violation in first grade and nothing further, how is a

22   school system supposed to avoid liability for what happens in

23   further years?  Under their theory, you would just -- every

24   year would be -- you would have to examine, and that's just not

25   right.  No, no funding recipient would be on notice that that's

1978

1    what they're signing up for if they take federal funds.

2           THE COURT:  Well, I guess the argument would be they

3    were on notice in 2016-'17, the jury could find, and then that

4    the same stressors continued, and the administration certainly

5    was aware that Dr. V continued on in that position, and is that

6    enough to get you there.

7           MR. RAPHAEL:  It's not, because remember *Davis* says

8    that the response by the school system has to be the cause of

9    the harassment or expose the plaintiff to vulnerability, and

10   she -- and it's an objective standard.

11          And so she can't just come in and say:  I felt, I

12   felt scared all year.  You've got to point to something that

13   the school system did.

14          Because remember, this is a spending law statute.

15   The school has got to know -- it's got to know that there's a

16   problem it has to respond to, and there's zero in the record

17   for her senior year to show that school administrators were on

18   notice of a problem.  Anything Dr. V did for that purposes is

19   not -- doesn't count because he wasn't an appropriate person.

20          THE COURT:  Well, it appears most of the actions that

21   he took were still during the 2017 spring.

22          MR. RAPHAEL:  Well, and they can argue that as the

23   cases come to the Court, yes.

24          THE COURT:  Okay.  Mr. Ates, your response?

25          MR. ATES:  I'd like the Court in its ongoing

1979

1  discussions to talk through the jury confusion issue that may

2  arise if they're instructed you can't find liability, because,

3  honestly, when I read it Sunday night when they shifted over to

4  me, I immediately thought they're trying to cut liability into

5  the prior school year, and I don't -- you know, it, it

6  basically is trying, I believe, to get the Court to say you

7  can't recover for that year, or at least the jury may hear it

8  or read it that way.

9          THE COURT:  Well, Mr. Raphael quickly says it's not a

10  damages issue and we're not arguing that you can't consider her

11  mental suffering.

12          MR. ATES:  That's Point 1.

13          THE COURT:  Okay.

14          MR. ATES:  Point 2 is our claim isn't only about the

15  bus event.  Our claim -- and the assault that occurred.

16          Our claim is about the school's response.

17          THE COURT:  Correct.

18          MR. ATES:  And that's what the claim is based on.

19  And it started in March, it continued on, and she is still

20  having to be in the same school with Mr. Baranyk, be in the

21  same school with the other school officials, Hogan and Taylor

22  and Dr. V, throughout that next year, and it is their failure

23  to respond appropriately that continues on, Your Honor, and

24  that's the way we view it.

25          THE COURT:  What was the evidence of that, of the --

1980

1    of continued deliberate indifference?  Jane Doe's testimony?

2    Tell me.  I may be --

3             MR. ATES:  My recollection, Your Honor, and I've not

4    read the past couple days, I'll admit, just because of the

5    press of other matters, is Jane Doe is talking about her

6    interactions with Dr. V going into the summer, going through

7    that process, and then going through into the next year, and

8    the fact that he's still over the band, she can't be around

9    him, and she mentioned she left the field one day and had to go

10   sit at the, you know, picnic table, etc.

11            So again, Your Honor, I can't point you chapter and

12   verse on that, but that's my recollection of the testimony, and

13   it's, it's ongoing.

14            THE COURT:  There was testimony of that.  And when

15   was the -- when were the tryouts for the lead in the Marching

16   Band?

17            MR. ATES:  That was June, I believe, maybe into July,

18   Your Honor.  And again, I can't do chapter and verse, but it

19   was in that time period going into the next year.

20            Plus, the testimony also was her father is having to

21   travel on these band trips and did it two or three times that

22   next year so that she felt safe, because the school's not doing

23   anything for her on those trips.  So it's her parental

24   involvement -- part of the deliberate indifference here, Your

25   Honor, is the parents had to come up with the interim

1981

1    solutions.  Her parents had to come up with what the school

2    should have been doing, and into 2017 into 2018, it's her

3    parents solving the problem.  Her dad's going on the trip.

4            There was no testimony -- and they had the

5    opportunity to put it on -- that Dr. V tried to do something to

6    alleviate her concerns about safety on those band trips and at

7    band camp, Your Honor.

8            One more point.  Part of the claim that we discussed

9    at length, Your Honor, is it has to affect an educational

10   opportunity or benefit, and that educational opportunity or

11   benefit continues to be impacted that next year for the reasons

12   I just articulated.  So it is still part of the ongoing claim.

13           THE COURT:  Thank you.

14           MR. RAPHAEL:  Just very briefly, Your Honor, I -- the

15   focus on Dr. V, I think, shows why this argument can't win.  He

16   doesn't count as an appropriate person.  So if to her

17   perception he was curt with her or her father had to go on a

18   band trip with Dr. V, where is the evidence of what was known

19   to the new principal and the assistant principals during her

20   senior year?  There's zero evidence.

21           Another way -- another way to ask it is --

22           THE COURT:  Certainly there's her reaction to Dr. V

23   giving an award to Jack Smith, which created --

24           MR. RAPHAEL:  That's junior year.

25           THE COURT:  Right.

1982

```
1              MR. RAPHAEL:  I'm talking senior year.  Nothing in

2      senior year.  There's got to be conduct by the principal or

3      assistant principal her senior year, and they haven't --

4      there's no evidence of that.

5              Everything they've said is, oh, Dr. V, you know,

6      played favorites on a solo.  He doesn't count for Title IX

7      purposes.  The Court's already ruled on that.

8              THE COURT:  Yeah, the issue is whether the conduct is

9      ongoing in the senior year, the same conduct that constituted

10     deliberate indifference.

11             MR. RAPHAEL:  And I think if you, if you force them

12     to tell you what it is the school system should have done

13     differently, it sounds like the answer would be, well, Dr. V

14     shouldn't have acted the way he did.  And he doesn't count

15     unless you tie it to an administrator who does.

16             And then the last -- you've heard the word

17     "retaliation" a couple times, that Dr. V retaliated against

18     her.  They haven't pleaded retaliation.

19             THE COURT:  Right.

20             MR. RAPHAEL:  That's not -- that should not be an

21     issue in the case.

22             THE COURT:  Okay.

23             MR. RAPHAEL:  So I think -- I think the answer -- I

24     take the Court's concern that you don't want to cut them off

25     from a proper damages argument, and I don't think they would be
```

1983

1  if the Court rules as we think it should, that they cannot

2  recover on a liability theory based on conduct by the School

3  Board in her senior year.  That is a different question from

4  what her damages are for any misconduct by the School Board her

5  junior year.

6           THE COURT:  Okay.  Thank you.

7           MR. RAPHAEL:  And then I think I told you I had three

8  issues at the outset.

9           THE COURT:  Yeah.

10          MR. RAPHAEL:  For planning purposes, does the Court

11  have any sense of when you might be able to show us the jury

12  instructions so we don't hold things up tomorrow?

13          THE COURT:  Yes.  We'll get them to you fairly soon,

14  and that's where I want to go if you're finished with your --

15          MR. RAPHAEL:  Yes, Your Honor.  Thank you very much.

16          THE COURT:  All right.  So I didn't rule on a couple

17  of instructions, and the MM is the severe harassment causing

18  systemic effect required and really talking about the

19  educational -- denial of the educational opportunity.  And

20  *Davis*, of course, used the words systemic effect, and Mr. Ates

21  pointed out that *Jennings* does not.

22          What *Jennings* does do, on page 699, is explain what

23  it believes *Davis* is saying.  And it states:  Sexual harassment

24  victim can be said to have been deprived of access to

25  educational opportunities or benefits in several circumstances,

1984

1    including when the harassment, one, results in the physical

2    exclusion of the victim from an educational program or

3    activity; two, so undermines the -- and detracts from the

4    victim's educational experience as to effectively deny her

5    equal access to an institution's resources and opportunities;

6    or three, has a concrete negative effect on the victim's

7    ability to participate in the actual -- in the educational

8    program or activity.

9           And I, I think we should substitute this for MM.

10   Otherwise, they have no definition of what is the effect on

11   the --

12           MR. ATES:  We agree with that, Your Honor.

13           THE COURT:  Okay.

14           MR. RAPHAEL:  I don't think *Jennings* was a single act

15   case, and so it doesn't pick up the systemic requirement from

16   *Davis*, and I think that for that reason, it would be

17   inappropriate to not instruct the jury that a systemic effect

18   is required.

19           THE COURT:  Well, I mean, they cite to *Davis*.

20           MR. RAPHAEL:  I understand that, but it doesn't -- it

21   certainly doesn't overrule *Davis*.  The Fourth Circuit can't do

22   that, and it wasn't a systemic effect single act case.

23           THE COURT:  Okay.

24           MR. RAPHAEL:  So I don't think that -- I think that's

25   error.

1985

 1          THE COURT:  Okay.  I'll look at it.  I'll continue to

 2    look at that.

 3          MR. RAPHAEL:  Thank you.

 4          THE COURT:  The other instruction that I considered

 5    was -- continue to consider was a variation of the instruction

 6    that the, the School Board doesn't have to accept any and all

 7    types of, of action that they should be required to take after

 8    there has been an allegation of, of the harassment, and that

 9    there is an instruction which, which I can't find, but which

10    reads -- and I -- and it's attached actually to "deliberate

11    indifference."

12          "Deliberate indifference" means that the defendant's

13    response to the alleged harassment or lack of response was

14    clearly unreasonable in light of the known experiences, and

15    then it goes on to say, but victims do not have a right to

16    particular remedial demands, and school administrators are

17    allowed a certain level of flexibility and discretion in

18    dealing with the discipline of students.

19          So your reaction to that, Mr. Ates?  Or -- go ahead,

20    Mr. Raphael.

21          MR. RAPHAEL:  Two points.  I think the Court in the

22    first sentence read "experiences" when I think it meant

23    "circumstances."  "Known circumstances" is the language that's

24    used in *Davis*.

25          And can the Court share the source of that?

1986

1        THE COURT:  A jury instruction out of Nashville,

2   Tennessee.  And I don't know the name of the case but --

3        THE LAW CLERK:  I'll get it.

4        THE COURT:  Okay.

5        MR. RAPHAEL:  I think that gets -- I think that

6   gets -- I'd like to see it, but I think that sounds, I think

7   that sounds okay.

8        THE COURT:  It's better than nothing, right?

9        MR. RAPHAEL:  It is a lot better than nothing.

10       And I didn't -- I wasn't fast enough on my feet

11  before.  Ms. Rewari correctly points out that on the previous

12  one, you could give both the *Jennings* instruction and ours,

13  because they do address different things.

14       THE COURT:  Okay.  MM is -- really doesn't even

15  highlight the fact that, you know, we're trying to define what

16  constitutes the deprivation of the educational opportunity.

17  It's a, it's a very confusing instruction to, I think, a lay

18  jury, and that's why I've been seeking something that's --

19       MR. RAPHAEL:  Well, I think -- I take your point.  I

20  think we cited *Jennings* as support in our -- one of our filings

21  on this, but we have no objection to giving the *Jennings*

22  language that you read.  I think that that is correct.

23       But *Jennings*, as I said, was not -- because it was

24  not a systemic effect case and not a single act case, that is

25  an important qualifier.  Otherwise, a plaintiff could say, Oh,

1987

1    I missed one class.  I lost an educational, you know,

2    opportunity.

3            And that clearly is not what *Davis* contemplates.

4            THE COURT:  Okay.  Thank you.

5            MR. RAPHAEL:  Thank you.

6            THE COURT:  Those are the only jury instructions that

7    I recall that we -- that I wanted to discuss, but I'm happy to

8    revisit -- not revisit, not reargue, but tell me that I said I

9    was going to do something and I haven't done it.

10           MR. ATES:  I just wanted to respond to Your

11   Honor's --

12           THE COURT:  Yes.

13           MR. ATES:  -- language from the Nashville case.

14           THE COURT:  Yes.

15           MR. ATES:  And I think that language may be

16   appropriate, Your Honor, but to my ear, what I think was being

17   left out there is a clause at the end that says:  but that does

18   not relieve the school of its Title IX obligations, or

19   something.

20           So in other words, you're telling them a parent can't

21   dictate what to do and they get some leeway, but that

22   doesn't -- whatever I just said, Your Honor.

23           THE COURT:  Excuse them from any --

24           MR. ATES:  Yeah.  That doesn't relieve them of their

25   Title IX obligations, or some words to that effect, Your Honor.

1988

1    So it's a little bit balanced.

2             I believe that's it.  I think we're down to the

3    verdict form, Your Honor, which I believe you had reserved on

4    or held, and I'm not sure if we're ready to go there but --

5             THE COURT:  Yeah, now's the time.

6             MR. ATES:  Okay.  We proposed the general verdict

7    form from O'Malley, from the Title IX section of O'Malley.  It

8    was relatively straightforward, you know:  On this claim of a

9    Title IX violation, who do you find in favor of, plaintiff or

10   defendant?  Don't go any further if you find for defendant, but

11   if you find for the plaintiff, what amount of damages?

12            Very simple.  Very straightforward.  We can show them

13   PowerPoints tomorrow how to fill in the form and we're done.

14   That's what we think needs to be given here.  These

15   instructions, you know -- they're going to be instructed, and

16   they can weigh the four prongs and figure out whether plaintiff

17   has proven by a preponderance of the evidence.

18            The one thing that may be missing from that, Your

19   Honor, is the mitigation of damages issue, which is still

20   before Your Honor, and, you know, depending on how that goes,

21   there may need to be a question on that.

22            THE COURT:  Okay.

23            MR. ATES:  I don't know if you have any questions of

24   me, Your Honor.

25            THE COURT:  No, I don't.  Thank you.

1989

1       MR. RAPHAEL:  At the outset, both parties submitted a

2  proposed special verdict form.

3       THE COURT:  Right.

4       MR. RAPHAEL:  And we said we agree that a special

5  verdict would be appropriate in this case because there are

6  multiple factual questions that are going -- that the jury

7  needs to decide, and we set them out in our -- we filed a

8  revised form to try to track changes that occurred during the

9  trial, that's ECF 303, and it lays out how the, you know, the

10  facts that the jury needs to decide.

11       The first one is was, was Jane Doe subjected to

12  sexual harassment?

13       The second one is did the -- did Banbury, Taylor, or

14  Hogan have actual knowledge that Smith sexually harassed her?

15       No. 3 is did she prove that they acted with

16  deliberate indifference in response to known harassment?

17       No. 4 is did she prove that she suffered damages?

18  And then that's where the mitigation instruction would come in,

19  whether you give it or not.

20       And then 5 is what -- and we borrowed this from their

21  form -- what sum of money if paid now in cash would fairly and

22  reasonably compensate Jane Doe for the damages, if any, you

23  have found?

24       And that is the logical way for them to analyze it.

25  Both parties at the outset were in agreement that this was an

1990

1    appropriate case for a special verdict, and we think it is.

2           THE COURT:  Okay.  I'm going to give the special

3    verdict form with the interrogatories.  I think it's

4    appropriate.  I know that they have the elements of the offense

5    in an earlier instruction, but I think that they could use the

6    extra guidance and it's appropriate in this case.

7           So ECF 303?  Is that what you just said?

8           MR. RAPHAEL:  Yes, Your Honor.

9           THE COURT:  Okay.  I'm going to give that.

10          And I'll give you an answer on the -- well, I'm going

11   to give you a copy of -- except I've already lost it -- no, I

12   found it again.  Good.

13          I'll give you a copy of this instruction regarding

14   remedial demands and let you take that home with you.  And

15   also, if you want, I'll give you the page of the *Jennings* that

16   you can have to look at, and we'll work something up on those

17   instructions ourselves and get you the rest of the instructions

18   tonight.  I think you have really -- we can do that, yeah.  We

19   can do that before you get to your cars, but not these two.

20          And then to the extent you think I've left something

21   out and/or gone back on something I said I was going to do at

22   8:00 last night, I would not -- don't wait.  You know, let us

23   know tonight.

24          I propose that we get together at nine tomorrow

25   morning and hash out any final issues to address in the

1991

1    instructions and allow for formal objections, etc., and that

2    we -- I've taken the last couple years to giving jury

3    instructions before argument.  I used to -- that's the way I

4    did it in the state system, and I came here and, of course,

5    it's done the other way, and if Judge Bryant did it the other

6    way, that was the only way to do it.

7         So -- but I will do it either way.  Do you want jury

8    instructions first and then argument?  That way you can use

9    them to the extent you want to.  Okay.

10        MR. ATES:  I think that's what we would prefer,

11   although my good friend, Susan Podolsky, would probably

12   disagree given her clerkship, but --

13        THE COURT:  He does sit at the right hand of God.

14                  (Laughter.)

15        THE COURT:  So, okay.

16        MR. ATES:  My other question --

17        THE COURT:  And he's staring at you right now --

18   well, he's staring at me.

19                  (Laughter.)

20        MR. ATES:  The other question I had, Your Honor, is

21   does Your -- and I'm not sure what we're planning on, but does

22   Your Honor allow split closing, at least for the plaintiff's

23   side, that one attorney can do the 20 minutes and one attorney

24   can do 10 or whatever?

25        THE COURT:  Absolutely, yeah.

1992

1            MR. ATES:  Okay.  Thank you, Your Honor.

2            THE COURT:  How much time do you-all want?

3            MR. ATES:  Our gut is 30, Your Honor, but we took

4    about, I don't know, 12 to 15 in the opening, and I think they

5    went about 30-32.

6            THE COURT:  Yeah.

7            MR. ATES:  So we would just ask if it is a limit,

8    let's try to stay within the limit because we're going to

9    tailor it to whatever the limit may be.

10           THE COURT:  Okay.  Ms. Rewari?

11           MS. REWARI:  Your Honor, I think 30 to 35 minutes

12   should suffice.

13           THE COURT:  Okay.  That's fine.  And I'm not going to

14   fuss over five minutes, but I am going to fuss over, you know,

15   15 or 20 minutes, and so I'll just gently remind you that when

16   you get to about 45 minutes, I'll turn you off.

17                          (Laughter.)

18           THE COURT:  Okay.  All right.  What else do we need

19   to discuss tonight?

20           MS. REWARI:  Your Honor, are the instructions given

21   in writing to the jury, too, to take back?

22           THE COURT:  They are.

23           MS. REWARI:  Okay.  Thank you.

24           THE COURT:  Yeah, I give a couple of copies to them

25   to refer to.

1993

```
 1            MS. REWARI:  And are there any restrictions on terms

 2  of using the monitors to show exhibits or demonstratives based

 3  on the exhibits?

 4            THE COURT:  No.  They have to have been admitted

 5  during the trial.  That's it.

 6            MS. REWARI:  Other than the obvious, yes.

 7            THE COURT:  Okay.

 8            MS. REWARI:  Okay.  Thank you.

 9            MR. ATES:  Your Honor, I did not last night get to

10  compare their 303 with what you agreed to give, so I just want

11  to make sure they're marrying up and there's not some language

12  problems there.  We want everything parallel.

13            THE COURT:  Okay.  I agree.

14            MR. ATES:  Okay.  Thank you.

15            THE COURT:  You check that out and let us know if

16  there's a problem.

17            MR. ATES:  Thank you, Your Honor.

18            THE COURT:  Okay.  Then we'll get you copies to take

19  away of this instruction and then send the jury instructions to

20  you, and we'll see you-all tomorrow at 9 a.m.

21            MR. ATES:  Thank you, Your Honor.

22            THE COURT:  All right, thank you-all.

23            We're in recess.

24            NOTE:  At this point the August 6, 2019 portion of

25  the case is concluded.
```

1994

CERTIFICATE OF THE REPORTERS

We certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/
————————————————
Norman B. Linnell

/s/
————————————————
Anneliese J. Thomson