**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

JANE DOE,                                  )
      Plaintiff,                        )
                      )
                      )
v.                                         )       Case No. 1:18-cv-614 (LOG/MSN)
                      )
FAIRFAX COUNTY SCHOOL BOARD,   )
      Defendant.                        )

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION FOR NEW TRIAL

       This Court should grant a new trial under Fed. R. Civ. P. 59.  The jury's finding in response to Question #3 on the verdict form that Defendant Fairfax County School Board did not have "actual knowledge of the alleged sexual harassment by Jack Smith" of Jane Doe that occurred on Wednesday, March 8, 2017, is against the clear weight of the evidence and will result in a miscarriage of justice if not corrected.

       The only evidence adduced at trial was that Defendant, specifically through Assistant Principal Taylor, Assistant Principal Hogan and Principal Banbury, *did know* of the acts constituting sexual harassment by Jack Smith.  Assistant Principal Taylor testified that she learned of a sex act on the bus and that "Doe really didn't want to do it," and she quickly "relayed" this information to Principal Banbury on Friday, March 10, 2017.  Indeed, Assistant Principal Taylor documented on Sunday, March 12, 2017, that she knew a "possible issue" was an "actual issue," which started Defendant's belated investigation into the sexual assault of Doe by Smith after Taylor informed Assistant Principal Hogan and Principal Banbury of her further knowledge regarding the incident.

       Additional facts presented at trial reinforced that Defendant actually knew of an alleged sexual assault on the bus via multiple reports from students, teachers and parents, including that: the band director (Dr. VanValkenberg) notified Assistant Principal Taylor on March 9, 2017, that

a student (Victoria Staub) told him that Jack Smith "put himself on" Jane Doe and that Doe "was not into it"; on March 10, 2017, a teacher (Ms. Kelly) reported "forced hand stuff" on the bus on the band trip and a friend of Doe's (Aveesh Kachroo) reported a "sexual assault" to head of security Wally Baranyk, who then spoke with Assistant Principal Taylor later that day, after these reports were made to him; and that a parent (Kristin Jorgensen) alerted Dr. VanValkenberg on Sunday, March 12, 2017, that Jane Doe was sexually assaulted by Jack Smith on the bus while on the band trip, and Dr. VanValkenberg then notified Assistant Principal Taylor.  Moreover, Doe herself told Assistant Principal Hogan on March 13, 2017, that the acts were not consensual, that Doe tried to block Smith from putting his hands on her, and that Smith forced Doe's hand onto his penis, Doe removed her hand, and Smith then forced Doe's hand back to his penis.  The clear weight of the evidence is that Defendant possessed actual knowledge of allegations of sexual harassment by Jack Smith.  The jury's conclusion that Defendant did not have actual knowledge of allegations that Jack Smith sexually harassed Jane Doe on March 8 is without any evidentiary basis.  The judgment should be vacated and a new trial ordered.

Given that there is no evidence that Defendant lacked knowledge of the alleged sexual assault by Jack Smith, the only way the jury could have concluded otherwise is if the jury was confused as to the meaning of "actual knowledge."  The jury clearly indicated its confusion by asking three, separate questions regarding the meaning of "actual knowledge," an issue necessary to liability in this case.  Yet, the jury was not instructed that "actual knowledge" is equivalent to "actual notice," an instruction proposed and requested by Doe that conforms with Fourth Circuit law that rejects "constructive notice" and may have aided the jury in understanding "actual knowledge," especially where, as here, the evidence establishes that Defendant knew of the allegations of sexual harassment.  The jury also was not provided a response to its third, specific

question regarding this central issue of what "actual knowledge" means, even though the jury on its own articulated two reasonable options for what it could mean within the facts of this case. A new trial is warranted in these circumstances. The Court should grant a new trial based on this second, independent ground under Rule 59.

Finally, a new trial is warranted because the jury was not instructed that it could infer that the Defendant's loss or destruction of relevant (indeed, critical) evidence would have been harmful to Defendant's case, including that such lost or destroyed evidence went to Defendant's actual knowledge.

The Court should order a new trial to correct the miscarriage of justice that occurred.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure Rule 59(a) states in pertinent part that "the court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). In the Fourth Circuit, the Court must set aside the verdict and grant a new trial if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014) (citations omitted). The Court *sua sponte* may order a new trial for any reason that would justify granting one on a party's motion. Fed. R. Civ. P. 59(d).

When considering a grant of a new trial, the Court should exercise its "own independent judgment, after a weighing of all the evidence and any other pertinent factors, in determining whether the verdict . . . would result in a miscarriage of justice." *Williams v. Nichols*, 266 F.2d 389, 392 (4th Cir. 1959). In determining whether to grant a new trial, the district court need not

view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.  *Id.*

Granting a new trial "is not a discretionary task, but a duty" and "so long as the jury verdict has been set aside, not from mere difference of opinion, but as against the clear weight of the evidence, the trial judge will be sustained."  *Swentek v. USAIR, Inc.*, 830 F.2d 552, 559 (4th Cir. 1987).  The decision to grant a new trial "is not reviewable upon appeal, save in the most exceptional circumstances."  *Aetna Cas. & Sur. Co. v. Yeatts*, 122 F.2d 350, 354 (4th Cir. 1941).

## ARGUMENT

### I.   A NEW TRIAL SHOULD BE GRANTED BECAUSE THE JURY'S VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE AND A MANIFEST INJUSTICE OCCURRED.

After eight days of trial, the Court is well-acquainted with the facts related to Doe's Title IX claim.  The Court charged the jury on the Special Verdict Form with finding whether "the School Board had actual knowledge of the alleged sexual harassment by Jack Smith that occurred on March 8," and the jury answered in the negative.  Dkt. #326.  The clear weight of the evidence adduced at trial not only warrants a new trial on the question of whether Jane Doe proved, by a preponderance of the evidence, that the School had actual knowledge of an alleged sexual assault, but also conclusively shows manifest injustice occurred in this case.

### A.   THE UNDISPUTED FACTS FROM DEFENDANT'S OWN WITNESSES ESTABLISH THE SCHOOL BOARD'S ACTUAL KNOWLEDGE OF ALLEGATIONS OF JACK SMITH'S SEXUALLY HARASSING CONDUCT THAT TRIGGER ITS TITLE IX OBLIGATIONS.

On March 9, 2019, Assistant Principal Michelle Taylor received a text message from Band Director Jamie VanValkenburg (Dr. V) stating: "Victoria Staub just told me that there was some 'funny business' on the bus[. Jack Smith] 'put himself on' [Jane Doe] or something like that. [Jane] was not into it."  Pl. Ex. 3.  Dr. V testified that Staub's report sounded sexual in nature and inappropriate, so he felt he needed to report it and did so by sending the text to Assistant Principal

Taylor.  765:19-766:18.  Assistant Principal Taylor did not speak with Staub until after dinner on Friday, a day after Staub came to Dr. V for guidance.

Before Taylor made any efforts to speak with Staub, Baranyk called Taylor and left her a voicemail message (which was not produced in discovery).  Taylor sent Baranyk a text message back, but then also sent messages to SRO Darrell Estess and Kathleen Sefchick, a member of the security team, asking what was going on.  Pl. Ex. 4, 6.  Estess and Sefchick told Taylor via that text message chain to listen to the voicemail message from Baranyk, and when Taylor said she could not listen, they told her that someone reported a sex act on one of the school busses.  Baranyk and Taylor spoke later that day (570:11-24), though neither Taylor nor Baranyk remembered any part of their telephone call (570:11-24, 616:2-18, 1738:20-1739:2), despite claiming to have intricate knowledge of other events and conversations that same day or on Monday, including Taylor recalling specifics of her conversation with Staub on Friday and Baranyk testifying that Doe cried when interviewed by him on Monday, where people physically sat and allegedly what Doe said in the interview.[1]  649:11-651:23; 1729:16-1731:22.  Indeed, when Taylor spoke with Staub later, Taylor admitted that Staub told her "Doe did not – wasn't really into it, didn't really want to do it . . . She didn't really want to do it."  592:7-22.

Immediately after this interaction, Taylor called Principal John Banbury.  593:23-594:4. Taylor confirmed that her conversation with Dr. Banbury "was based upon whatever information

---

[1]    Aveesh Kachroo and Laura Kelly each had reported, separately, to school officials back at Oakton by the time of these text messages and the conversation between Bayanyk and Taylor.  *See* Section B, below.  It is commonsense to infer Baranyk told Taylor what he learned regarding students on the band trip over whom Taylor was the responsible school official.  In fact, even Taylor inferred Baranyk told the other Assistant Principals, Jennifer Hogan and Colleen Eddy, about the reports he received on Friday.  *See* Pl. Ex. 13.  It is more than reasonable to infer that Taylor believed Hogan and Eddy knew because Baranyk also told her directly in their conversation on Friday.

I had received from Victoria Staub, and the nature of the conversation was what our next steps would be." 596:4-18; *see also* 594:13-23.  Taylor testified that she specifically alerted Dr. Banbury that Doe said "she didn't really want to do it."  594:13-15.  At the least, by Friday around 9:00 p.m., Principal Banbury had all the information Taylor possessed at that time because Taylor "relayed" all the information she had to Principal Banbury.  594:20-595:6.

On Sunday, March 12, Taylor received additional information regarding the sexual assault via a text message from Dr. V stating: "FYI Kristen Jorgensen has texted me, saying we have an urgent [student name] situation or worse, and she wants me to call her. I'm assuming her daughter told her about [Jack/Jane]."  Pl. Ex. 3.  Taylor testified that the "[student name]" referred to "an alleged sexual assault, improper touching, from a couple of years earlier that both those students were also in the band." 607:3-8. Taylor testified, "for me, it means that there was more information that was more concerning and maybe more specific than what I had originally received. . . . there's more information that we need to look into immediately" 608:18-609:22.  Taylor acknowledged that by Sunday night she had received a report of alleged sexual harassing conduct.  609:10-13 ("Q. You understood then, on Sunday at 9:10 p.m., that this was the report of alleged sexual harassing conduct, right? A. I was aware that there was more information that, that might be something like that, yes.").

That Sunday, Taylor then emailed Assistant Principals Jennifer Hogan and Colleen Eddy, copying Principal Banbury, telling them: "As you are both aware there was a potential issue on the band trip.  Apparently, there was an actual issue. I know the female student's name is [Jane Doe]. I heard from a parent this evening, so it's the third person to give some sort of information." Pl. Ex. 13.  Taylor expresses to the Assistants Principals and Principal Banbury that "[Jane] will need her counselor."  After sending the email, Taylor and Hogan spoke about the incident via

telephone, and Taylor conveyed to Hogan everything Taylor had learned from Victoria Staub, including that it was a sexual incident that Jane Doe "didn't really want to do." 619:11-620:9, Pl. Ex. 11. Hogan testified that she knew she was dealing with a reported sexual assault by that Sunday because "Jane Doe might not have wanted to be a full participant." 897:14-899:10.

It is undisputed that Doe informed Assistant Principal Hogan about allegations of a sexual assault. Doe's March 13 handwritten statement described sexual touching and her actions of resistance: "I moved my hand away but he moved my hand back onto his genitals. I was so shocked and scared that I did not know what to say or do. He then started to move his hands towards me and I tried to block him but he still put his hands up my shirt and down my pants." Pl. Ex. 16. Assistant Principal Hogan's notes capture Jane Doe telling her she "tried to block it" and Smith "took my hand and [put it] on his pants then touch his pants down [*sic*] and he touched me, went up my shirt and down my pants." Pl. Ex. 18. When Baranyk asked Doe point blank if the sexual activity was consensual, with Hogan present taking notes, Hogan testified that Doe's response was "I don't think it was consensual," which Hogan took to mean "she didn't want to be a participant at that time" and that it "means a lack of consent." 918:21-919:8.

Lastly, it is undisputed that Taylor and Hogan also received additional information from other parents and students regarding Smith's sexual assault of Doe. For example, one parent emailed Taylor on March 17, 2017, and told her that she learned of a "non-consenting sexual act between [Doe] and a student on the Indiana trip." Pl. Ex. 30. An Oakton counselor, Quesuan Wigfall, emailed Taylor twice with a message from a student with the subject line "Need to Report Peer Pressure and Sexual Harassment." Pl. Ex. 25-26. The student said, "I need to talk to you immediately when we have our next school day depending on the snow. I've heard somethings that happened between two of my band classmates on the Indianapolis band trip this past weekend.

The girl involved was peer pressured into something not fully consensual, but she was too afraid to say no after he pulled her back when she tried to move away." *Id.* After Wigfall forwarded Taylor the message twice, on March 15 then again on March 16, and did not receive a response, he forwarded it to Hogan, too, so both Assistant Principals had the message. Pl. Ex. 26.

### B. ADDITIONAL TESTIMONY FROM NON-SCHOOL BOARD WITNESSES ESTABLISHES THE SCHOOL BOARD'S ACTUAL KNOWLEDGE OF ALLEGATIONS OF JACK SMITH'S SEXUALLY HARASSING CONDUCT THAT TRIGGER ITS TITLE IX OBLIGATIONS.

The School Board's actual knowledge of the forced nature of the event between Jack Smith and Jane Doe was reinforced via the testimony of several witnesses. Plaintiff's first witness at trial was Victoria Staub, who reported the sexual assault directly to a school official with authority to take corrective action, Assistant Principal Taylor. Staub testified that she told Assistant Principal Taylor the following information:

> I told her that I had been informed that we were – when we were on the bus going down -- going up to Indianapolis, that Jack had asked Jane for a blanket because he was cold, and she had had one because it was an overnight trip. So she covered the two of them with the blanket and then had put his hands down her pants and up her shirt, and she had removed his hands from her body, and then he kept putting them back on her, and he forced her to put her hands on him and pleasure him until he ejaculated into the blanket, and he penetrated her with his fingers.

Trial Tr. 96:17-97:12. Taylor contends that Staub told her about the blanket, Doe touching Smith's penis, and that Doe "really didn't want to do it," but otherwise Taylor denies or claims she does not remember most of Staub's account. As reflected above, Taylor testified that she immediately called Principal Banbury after her Friday evening conversation with Staub and "relayed" the information to him, including that Doe "really didn't want to do it."

Plaintiff's second witness, Aveesh Kachroo, also reported a sexual assault and his account, as shown above, likely made it back to Assistant Principal Taylor soon after it was shared with officials back at Oakton High School. On the first night, only a few hours after the incident, Doe

told Kachroo that Smith sexually assaulted her.  *Id.* at 131:2-132:16.  Kachroo first reported to his math teacher, Laura Kelly, who also testified and confirmed Kachroo's account, stating that Kachroo reported "a friend of his had been forced to do hand stuff with another student while on the bus."  261:21-262:17.  Kelly understood Kachroo's report to be a sexual assault because "[t]he word 'force' was used, which to [Kelly] indicate[d] nonconsensual" actions.  *Id.*

After speaking with Kelly, Kachroo met with Head of Security Wally Baranyk, a female member of Oakton's security team, and Oakton's School Resource Officer Darrell Estess.  The school officials started the meeting by telling Kachroo "that [his] teacher had reported that like [he] had come to her and said that, you know, there was a sexual assault that happened during the trip."  134:17-135:16.  Kachroo told them "my friend had been sexually assaulted on the way to the band trip. And they asked me if it was –what kind of sexual act it was. . . . [I said] that he had forced her hand on his penis. . . . they asked if it was consensual.  And I said, definitely not."  *Id.*  Kachroo remembers specifically using the words "sexual assault."  135:3-16.  After this interview on Friday, Baranyk spoke with Taylor who then finally followed up with Staub.

Kristen Jorgensen testified that her daughter, Emily Jorgensen, on Sunday, March 12, 2017 "told me someone had been assaulted on the bus and that she hadn't had the opportunity to tell me before then, didn't quite know what to do, . . . Doe had been touched inappropriately and forced to do this and it was against her will."  218:21-220:1.  Mrs. Jorgensen immediately sent Dr. VanValkenburg a text message stating that she needed to speak with him.  *Id.*  When Dr. V was not calling Mrs. Jorgensen back promptly, Mrs. Jorgensen sent a text message referencing a prior sexual assault incident, stating we have a similar incident "on our hands or something much worse."  222:2-223:17.  The reference was to an incident where "a boy was accused of assaulting a girl" and both students were band members.  By using the name, Mrs. Jorgensen meant to convey

9

the seriousness to Dr. V, and it worked because he called her back shortly after the text message was sent.  Before Dr. V called back Mrs. Jorgensen, though, Dr. V called Assistant Principal Taylor to tell her about Mrs. Jorgensen's report.  *See* Pl. Ex. 3.  Assistant Principal Taylor instructed Dr. V to take notes of his call with Mrs. Jorgensen.  223:18-224:5.  Those notes were not produced in discovery.

Student witness Brianna Murphy reported a sexual assault directly to Assistant Principal Jennifer Hogan.  Hogan and Baranyk met with Murphy after the Indianapolis band trip and asked her to write a written statement regarding what she knew about the incident between Smith and Doe.  Murphy testified that her written statement, captured on the computer in the security office in a separate screen, said Doe "couldn't eat anything.  She was very quiet, not her normal self," so Murphy asked what was going on and Doe told her that "Jack Smith had caused -- had reached for [Doe's] hand and had made her touch his genitalia without any consent from her."  285:8-286:5.  Hogan read the statement, but her recollection was that "it was very brief" and only said "she had witnessed Jane Doe getting a blanket."  893:18-894:10.  The School Board did not maintain a paper or electronic copy of Murphy's statement.  1135:11-19.  In fact, the computer in the security office was wiped clean, deleting all of its data, approximately five months after this lawsuit was filed, and no backup was made prior to wiping the computer.  *Id.*

Oakton teacher Molly Brady also spoke with Assistant Principal Hogan regarding Doe's report of a sexual assault.  Doe told Brady that a "boy had made a move on her, and his advances weren't welcome."  321:21-324:9.  Brady understood that unwelcome sexual contact was a sexual assault and she felt like she had a responsibility to speak with someone, so she "went immediately to Ms. Hogan."  325:2-22.  Brady testified that she told Hogan what Doe had told her and added that Doe was "an incredibly trustworthy girl."  *Id.*

Lastly, Jane Doe's mother referred to the incident as a sexual assault to school officials. For example, in the March 16 meeting with Assistant Principal Hogan, Doe's mother "characterized it as I attempted – I said, sexual assault – and Hogan cut me off from saying that." 1324:9-13.

### C. THE JURY'S VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE, WHICH RESULTED IN A MISCARRIAGE OF JUSTICE THAT MUST BE REMEDIED BY THE COURT ORDERING A NEW TRIAL.

The jury's verdict finding that the School Board did not have actual knowledge of the alleged sexual harassment by Jack Smith was against the clear weight of the evidence and allowing it to stand would result in a miscarriage of justice.

This is true even when viewing the School Board's testimony in isolation, without inference or credibility assessments. The School Board knew as early as March 9, 2017 when Taylor received a text message from Dr. V that Smith "put himself on" Doe and Doe "wasn't into it," Pl. Ex. 3, and at the latest, when Jane Doe's mother repeatedly told Hogan during their March 17, 2017 meeting that Doe was sexually assaulted. Every email and student report in between also established actual knowledge of an alleged sexual assault that triggered the school's Title IX obligations. Hogan and Taylor both independently testified that they knew it was a potential issue that required a prompt response on Sunday, March 12, 2017. While Plaintiff contends the school knew long before Sunday, based on the School Board's testimony alone, the School Board had actual knowledge of Doe's reported sexual assault. Hogan readily admits Doe told her she did not view the sexual actions to be consensual. *See Dunn v. Harris*, Civil Action No. 94-233, 2002 U.S. Dist. LEXIS 5487, at *18 (W.D. Pa. Mar. 13, 2002) (granting motion for new trial on defendant's own testimony which shows the jury's verdict was against the clear weight of the evidence); *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 832 (E.D. Tenn. 2005) (weighing the

evidence and granting new trial where decisionmaker "effectively admitted he knew exactly what he was doing and that he needed his employer's permission to do it," testimony which contradicted the jury's verdict).

The School Board's own defense shows its actual knowledge. Banbury testified that if Taylor told him "Jane Doe really was not into it," it would have suggested a possible sexual assault and he would have called the police. 690:16-691:3. SRO Darrell Estess was involved because the school recognized a potential crime. 924:7-925:6. The first issue Wally Baranyk addressed with Jane Doe was whether she had a desire to pursue criminal charges against Smith, with a specific reference to battery, which reflects the school's actual knowledge of a potential sexual assault. 1455:6-1456:24; 1730:20-25. The School Board also suggests it vigorously questioned Jack Smith to get to the truth of the allegations. 1063:10-22. The School Board purported to recognize the seriousness and sought out Hogan to conduct the investigation because of her counseling background, and recruited Alyson Calvello to sit silently during Doe's interrogation because it would have supported her during a difficult meeting. 955:15-956:9. It cannot both be true that the school took actions to support Doe because of the seriousness of the allegations, and that it did not know of the seriousness of the allegations. *See Hanover v. Sheridan*, Case No. C-3-96-122, 1999 U.S. Dist. LEXIS 22153, at *7 (S.D. Ohio Jan. 5, 1999) (granting motion for new trial and rejecting defendant's argument that the jury found witness testimony confusing, because it did not change the weight of the evidence under the court's assessment); *Huffman v. New Prime, Inc.*, No. 01-3144-CV-S-ODS-ECF, 2003 U.S. Dist. LEXIS 26204, at *8 (W.D. Mo. Dec. 17, 2003) (granting motion for new trial based on the clear weight of the evidence of defendant's actions after reports of sexual harassment); *King v. Exxon Co., U.S.A.*, 618 F.2d 1111, 1115 (5th Cir. 1980) (upholding grant of new trial where "Plaintiff's uncontradicted testimony clearly indicated that

Exxon never gave any written notice of termination to King, and this fact was readily admitted by all three of Exxon's witnesses at the first trial"); *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 933-34 (5th Cir. 1982) ("If we were considering a directed verdict or a judgment notwithstanding the verdict, we might be required to reverse. But we agree with the district court that the testimony of Ishee, Sumrall, and Young, along with the photographs of the scene, constituted the 'great weight of the evidence', and justified the granting of a new trial.").

The great weight of the evidence in this case shows actual knowledge by the School Board of the allegations of Doe being sexually assaulted prior to its investigation starting on Monday, March 13, 2017.   Based on uncontroverted and incontrovertible documentary evidence and the testimony of the School Board's own witnesses discussed above, the issue of whether the School Board had actual knowledge of Smith's alleged sexual assault of Doe is neither disputed nor disputable in this case. *See Baker v. Advanced Mixer*, No. 92-3365, 1994 U.S. Dist. LEXIS 6035, at *17 (E.D. Pa. May 5, 1994) (granting new trial where defendant "presented no evidence in support of this argument [adopted by the jury], however, but relied solely on inferences drawn from plaintiff's own testimony" which was otherwise unrebutted).

The uncontroverted evidence from school personnel is that during the investigation that started on Monday, March 13, 2017, the School Board gained further knowledge of the alleged sexual harassment.  The School Board witnesses testified that they knew of sexual activity where one of the participants (Doe) reported trying to stop the other (Smith), and told the school directly that she did not believe the activity was consensual.  Assistant Principal Hogan's contemporaneous notes state that Doe told them the sexual activity was not consensual, but the School Board still refused to call it an allegation of sexual assault.  There is no distinction.  Title IX does not allow schools to escape liability by reframing a student's crystal clear allegations with a benign gloss.

There is no evidence from which the jury could have found that Defendant did not have actual knowledge of the alleged sexual harassment by Jack Smith that occurred on March 8.[2]  The jury's verdict cannot stand, and the Court should grant a new trial based on the School Board's own witnesses' testimony and documents.

Moreover, when viewing the full panoply of evidence, the weight of the evidence proving actual knowledge is overwhelming.  In addition to the testimony of the School Board's own witnesses, several other witnesses testified about what the School Board actually knew in regard to the alleged sexual harassment of Doe by Smith.  Victoria Staub testified that she told Taylor that Smith sexually assaulted Doe.  Brianna Murphy testified that she wrote in her written statement, created at the direction of Hogan, that Smith sexually assaulted Doe.  Aveesh Kachroo and Laura Kelly testified that they reported a sexual assault to Head of Security Wally Baranyk, who then soon thereafter called Taylor and spoke to her to convey the information to the highest school official on the band trip.  Head Chaperone Kristen Jorgensen testified that she reported a sexual assault to Dr. V, who told her that he first spoke with Taylor to convey Jorgensen's text message ("[student name] situation or worse") and get advice on how to handle it.  Mrs. Jorgensen's testimony aligned with her daughter Emily's testimony, who heard about the sexual assault directly from Doe, and because Emily knew it was serious, she reported it to her mother as

---

[2]     Defendant appears to have agreed throughout the litigation.  The Board moved for summary judgment on Plaintiff's Title IX claim on the grounds that she supposedly could not prove deliberate indifference and an interference with her educational opportunities, *see* Dkt. #148 at 28-29.  The School Board moved for Judgment as a Matter of Law on the same two questions of deliberate indifference and educational opportunities, and added a motion to cabin liability to actions in the 2016-2017 school year because Jack Smith graduated in June 2017.  *See* Dkt. #306.  The only suggestion by Defendant that Doe did not prove actual knowledge was on the morning of the jury verdict, and it was counsel's argument that the school did not have "objective evidence of a sexual assault" to prove a sexual assault occurred; the School Board did not argue that it was unaware of a reported incident of sexual assault. *See* Trial Tr. at 2184:15-2185:12.  It could not do so credibly; despite a spoliation issue, the school's knowledge is captured plainly in writing.

soon as they were alone.   All of these witnesses (and others) were credible, clear, entirely

consistent, and frankly, quite rare and compelling.

> Starbuck's tsunami-like evidence of his addiction to nicotine cigarettes was
> stronger and more compelling than proof of any contested element of a claim in a
> civil case that I have presided over in the more than two decades . . . While there
> were many contested issues later on in the verdict form on which a decision either
> way would not have surprised me, the jury's finding that Starbuck was *not* addicted
> is the most shocking "O'Henry ending" to any civil jury trial that I am familiar
> with.

*Starbuck v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 3d 1281, 1306-07 (M.D. Fla. 2015) (emphasis

in original).  *See also Hardmon v. Gibson*, Civil Action No. 3:93CV491, 1994 U.S. Dist. LEXIS

15249, at *6 (E.D. Va. July 21, 1994) (Spencer, J.) ("The clear weight of the evidence adduced at

trial, with the exception of the Defendant's testimony, does not support the jury's verdict."); *Rivera*

*v. Rivera*, 262 F. Supp. 2d 1217, 1232 (D. Kan. 2003) ("The court continues to believe that this

evidence remains sufficiently probative . . . However, given the totality of the trial record . . . a

reasonable trier of fact simply could not have found that evidence sufficiently persuasive to

outweigh the far more persuasive testimony of Marco and Kahmann").   "[B]oth the clear weight

and logical force of the evidence—and the interests of justice—require this Court to grant Plaintiff

a new trial."  *Miller v. Prairie Ctr. Muffler, Inc.*, No. 03-2424-DJW, 2005 U.S. Dist. LEXIS 4058,

at *11 (D. Kan. Feb. 22, 2005).

Where, as here, a heavy mountain of evidence shows that the School Board had sufficient

knowledge of numerous facts regarding an alleged sexual assault that occurred on the band trip —

actual knowledge which triggered its Title IX obligations — allowing the verdict to stand would

be a miscarriage of justice.  The Court should grant Plaintiff's motion for a new trial.

## II. THE VERDICT CLEARLY IS BASED ON JUROR CONFUSION REGARDING "ACTUAL KNOWLEDGE," AND THE COURT SHOULD ORDER A NEW TRIAL TO CORRECT THIS MISCARRIAGE OF JUSTICE.

Given the avalanche of evidence to show the School Board knew of allegations of the sexual assault by Jack Smith, there can be no question but that the jury was confused regarding what "actual knowledge" meant. Indeed, the jury asked three separate questions regarding the meaning of this general legal concept. The jury even provided its own conceptual choice of possible definitions for "actual knowledge," as applied to the facts of this case. But the jury did not receive an answer to its specific question trying to clarify its confusion regarding "actual knowledge." A new trial is warranted to correct this prejudicial error resulting in a miscarriage of justice. The Court should grant Plaintiff's motion.

### A. RELEVANT PROCEDURAL HISTORY ON THE ACTUAL KNOWLEDGE INSTRUCTION.

Pursuant to the Court's Scheduling Order, the parties filed proposed jury instructions on July 22, 2019. Defendant proposed the following instruction entitled, "actual knowledge by an appropriate person":

> A school board has actual knowledge of student-on-student sexual harassment only if an "appropriate person" employed by the school board has actual knowledge of the harassing conduct. "Actual knowledge" does not include things that the school official did not know about, even if the school official might have discovered those things through a more thorough investigation. It is not enough to have actual notice of a substantial risk of ongoing harassment; rather, actual knowledge of the sexual harassment is required.

Dkt. #244 at 47. Plaintiff proposed a parallel instruction:

> The School Board has actual notice of student-on-student sexual harassment or assault if a school's principal or assistant principal was aware of the harassment or assault or received a report of it. Defendant has actual notice when it receives one or more reports of sexual harassment or assault from any person, which can include someone who did not witness or experience the harassment or assault. It is the content of the report that is important for purposes of determining "actual notice," not the identity or role of the person reporting.

16

Dkt. #249 at 16.

Although the Fourth Circuit in *Baynard v. Malone* uses the terms synonymously, the Court, over Doe's objections, agreed with the School Board that the Fourth Circuit required the term "actual knowledge" versus "actual notice." *See id.*, 268 F.3d 228, 238, n.9 (4th Cir. 2001)[3]; Trial Tr. at 27:5-14, 1117:24-1118:7. The Court further rejected Plaintiff's argument that the terms themselves are interchangeable and declined to give a derivative of the O'Malley instruction which uses the terms interchangeably, *see* 3C Fed. Jury Prac. & Instr. § 177:36 (6th ed.) ("An educational institution has "actual notice," sometimes called "actual knowledge" of discrimination . . . "); Trial Tr. at 1607:5-24, 1618:3-1619:24; 2165:2-6 (Plaintiff's counsel proposing modified version of O'Malley instruction to conform with *Baynard* while also addressing apparent jury confusion on the definition of "actual knowledge").

Still, Plaintiff continued to request the Court to provide the jury with the phrase "actual notice" in addition to "actual knowledge," or to give a commonsense explanation of the knowledge required to trigger the school's Title IX obligations. Doing so would not have run afoul of *Baynard*. The *Baynard* court rejected the concept of "constructive notice," which was not at issue here because, as shown above, the overwhelming evidence showed that school officials actually knew of the allegations of sexual harassment by Smith, and Doe was not arguing constructive notice. Plaintiff also continued to press for an "actual knowledge is sometimes called actual

---

[3]      The text and footnote 9 from *Baynard* state:
"We agree with the district court that no rational jury could find the *Gebser* standard satisfied here. In the first place, no rational jury could conclude that Malone—the relevant official for purposes of the ACSB's liability under Title IX—had **actual notice** that Lawson was abusing one of his students.[9] . . . [9] We note that a Title IX plaintiff is not required to demonstrate **actual knowledge** that a particular student was being abused. We believe that the **actual notice requirement** could have been satisfied, for example, if Malone had had actual knowledge that Lawson was currently abusing one of his students, even without any indication of which student was being abused."

notice" instruction because she was concerned about jury confusion that could result in the Court

using only the abstract legal concept of "actual knowledge." *See id.* at 1619:25-1622:1 ("What we

are concerned about is the confusion. We're lawyers. [Defendant is] going to argue, we didn't

actually know what happened on the bus. We get them in the room, we can't tell. That's not what

'actual knowledge' means in the case law, and that's why it says – that's why it's 'actual notice'

in some and 'actual knowledge' in others.").

That concern about juror confusion regarding "actual knowledge" quickly became reality.

The jury began deliberations late in the afternoon on Wednesday, August 7, 2019, and over the

course of the next day, apparently after answering Questions 1 and 2 on the Special Verdict Form,

the jury asked three questions about the concept of "actual knowledge."

1. In regard to Question 3, can there be greater clarification regarding what "actual knowledge" means?  Dkt. #325-7 (Jury Question received August 8, 2019 11:50 a.m.).

2. Can Question 3 be answered affirmatively without implying that sexual harassment was "known" by the School Board?  Question 4 posits that "sexual harassment" is known, even though Question 3 asks re: actual knowledge of "alleged sexual harassment."  Dkt. #325-8 (Jury Question received August 8, 2019 5:25 p.m.).

3. We continue to have questions re: actual knowledge. Is actual knowledge: A. A compilation of information about an event. Or . . . B. The conclusion decided based on information provided.  *Id.*

In response to the jury's first question asking for greater clarification on the definition of

"actual knowledge," the Court responded: "Dear Members of the Jury, The Court has received

your questions regarding further defining the term actual knowledge, which appears in Question

Three [of the Special Verdict Form].  Please give the words their ordinary meaning." *See* 2165:2-

17.

That response apparently did not resolve the jurors' confusion regarding the concept of

"actual knowledge" because the jury asked additional questions. *See* Dkt. #325-8

When the jury asked the second and third questions above regarding "actual knowledge" and "known," the Court held a hearing that early evening and asked the parties to file briefs on those two additional questions posed by the jury by 7:30 a.m. on August 9, 2017.  *See* Dkt. #321, 323.  The School Board wanted the jury to be instructed that actual knowledge meant "actual knowledge of sufficient facts to show not only that the harassment occurred but that it rose to the level that violates Title IX," meaning actual knowledge of an established severe, pervasive, and objectively offensive incident of sexual harassment, instead of allegations sufficient to trigger a school's duty to respond under Title IX.  *See* Dkt. #321 at 3-5.  Plaintiff wanted a response that was designed to make it clear to the jury that the school needed actual knowledge of an allegation and noted again that *Baynard* used "actual notice" and "actual knowledge" interchangeably.  *See* Dkt. #323 at 1-5.  Additionally, Plaintiff proposed that the jury "also should be told that the compilation of information about the event on the bus may establish knowledge."  *Id.* at 6.  That is, Plaintiff believed the Court specifically should answer the jury's question regarding the definition of "actual knowledge" by using the jury's own concepts, which elegantly tied the abstract legal concept of "actual knowledge" to the facts of the case in two alternative forms.

At a hearing on August 9, 2017, the Court presented proposed language that answered the jury's Question 2 above (regarding Special Verdict Form Question Nos. 3 and 4).  Plaintiff agreed with the Court's initially drafted language that answered the jury's Question 2 above (regarding Question Nos. 3 and 4 of the Special Verdict Form).  Tr. Trans. 2180:14-18.

But Plaintiff, as she did in her brief, also asked the Court to answer the specific query the jury posed regarding "actual knowledge" in their Question No. 3 above.  Trial Tr. 2180:19-2182:2 (". . . the concept of actual knowledge is as explained in their concept A.  To let them know that it is a compilation of information known to responsible school officials.  They have asked that

specific question. I think they are wanting an answer on it. And we would propose a little bit more guidance in that regard to say that. I understand the Court's concerns about overinstructing, but in this instance the jury has asked a specific question, is it A or is it B, and the law says it is A.").

The Court ultimately answered the jury's question number 2 above by stating, in part, "Question 3 can be answered affirmatively if you find by a preponderance of the evidence that the School Board had actual knowledge of an allegation or allegations that on the March 8, 2017 bus trip Jack Smith sexually harassed Jane Doe." The Court declined Plaintiff's request (indeed, the jury's request) to give the jury additional guidance on what "actual knowledge" meant by using the jury's own formulated concepts applied to the facts of the case. Trial Tr. at 2180:14-18.

Without a concrete, accurate clarification on what "actual knowledge" meant, the jury returned a verdict in favor of the School Board two hours later.

**B. THE COURT SHOULD ORDER A NEW TRIAL DUE TO JUROR CONFUSION OVER A CENTRAL ISSUE OF ACTUAL KNOWLEDGE.**

Failure to instruct jury on an important issue is a well-recognized error justifying a new trial. *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). The Fourth Circuit has long held that "[j]ury instructions should be drawn with reference to the particular facts of the case on trial, and ought not be conveyed merely in boilerplate abstractions. Because abstract instructions that are not adjusted to the facts of a particular case may confuse the jury, it has been held plain error for a [trial court] to fail to relate the evidence to the law." *United States v. Holley*, 502 F.2d 273, 276 (4th Cir. 1974) (internal citations and quotations omitted). *See also Lachman v. Penn. Greyhound Lines*, 160 F.2d 496, 501 (4th Cir. 1947) (reversible error occurred via a facially correct statement of the law in jury instruction because the instruction "did not discuss this abstract statement in connection with the facts of the case and the charge as given was misleading and prejudicial to the plaintiff.").

The Fourth Circuit in *Price v. Glosson Motor Lines, Inc.*, 509 F.2d 1033, 1036-37 (4th Cir. 1975), also made clear that when a jury makes known its difficulty on a central issue a "helpful response is mandatory."  In support of this rule, the Fourth Circuit found support in the Supreme Court's decision in *Bollenbach v. U.S.*, 326 U.S. 607 (1946) and the D.C. Circuit's decision in *Wright v. U.S.*, 250 F.2d 4 (1957).  *See Price*, 509 F.2d at 1037, n.6, cross-referencing 1036, n.4. The portion of *Bollenbach* quoted states:

> Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy. In any event, therefore, the trial judge had no business to be "quite cursory" in the circumstances in which the jury here asked for supplemental instruction.

326 U.S. at 612-13.  The quote from *Wright* states:

> The refusal to answer the juror's question and the denial of the requested instruction [which embodied the juror's requested for explanation of a crucial instruction previously given] constitute reversible error. . . . [I]t is the duty of the judge . . . to provide the jury with light and guidance in the performance of its difficult task.

250 F.2d at 11.  The *Price* Court also found support in and quoted from *Fitzpatrick v. Sooner Oil Co.*, 212 F.2d 548, 551 (10th Cir. 1954):

> When a jury returns to the courtroom with the request for further instruction, the presumption must be that the only uncertainty in the jury's mind is with respect to the matter about which further instruction is sought and the court is <u>required</u> only to fairly answer the question asked by the jury. It is not required to restate the charge as given by the court.

*Price*, 509 F.2d at 1037, n.6 (emphasis added by Fourth Circuit).

Here, the concern expressed in *Holley* that abstract propositions of law could potentially confuse the jury became reality.  Prejudicial error occurred in the Court's response to the first question asked by the jury regarding what "actual knowledge" meant because the Court failed to

give the "actual knowledge is sometimes called actual notice" instruction derived from O'Malley. *Burkett v. United States Postal Serv.*, 32 F. Supp. 2d 877, 881 (N.D.W. Va. 1999) ("the Court concludes that prejudicial error occurred in that this instruction was supported by evidence sufficient for consideration by the jury. The omission to so instruct . . . was likely confusing  . . . resulting in a miscarriage of justice").

The School Board's manipulation of *Baynard* to claim that using the term "actual notice" would be reversible error, when *Baynard* uses the terms interchangeably, was flat wrong and created the prejudicial error resulting in the miscarriage of justice.  *See* Trial Tr. at 1618:3-1619:24. The Fourth Circuit rejected O'Malley's "actual knowledge is actual notice" instruction only to the extent it refers to "substantial risk," a piece Plaintiff proposed be taken out while still giving the jury a proper, explanatory instruction aimed at resolving the jury's confusion.  *Baynard* in no way rejects the term "actual notice;" in fact, it uses "actual notice" and "actual knowledge" interchangeably throughout the majority opinion.  *See, e.g.*, *Baynard*, 268 F.3d at 238-239.

Defendant's use of *Baynard* to remove the term "actual notice" from the jury instructions is a particularly glaring misread given the facts in this case are the exact type of allegations the Fourth Circuit in *Baynard* thought *would trigger* a school's Title IX obligations.  Multiple courts that cite *Baynard* agree that information or a compilation of information about an event which may constitute sexual harassment meets a plaintiff's burden of "actual knowledge" to the school board.

> Plaintiff instead alleges that, prior to Defendant Herre-Bagwell's alleged harassment and abuse of Plaintiff, Defendant Herre-Bagwell "engaged in similar acts and conduct directed toward other students," and that Defendants had notice of "inappropriate conduct" by Defendant Herre-Bagwell. Compl. 4 (Doc. 1). Such allegations are sufficient to survive a motion to dismiss with respect to the actual notice requirement of a Title IX claim.

*G.S. v. Sch. Dist. of Monessen*, Civil Action No. 11-1643, 2012 U.S. Dist. LEXIS 53624, at *11-12 (W.D. Pa. Apr. 17, 2012).  *See also Warren v. Reading Sch. Dist.*, 278 F.3d 163, 173 (3d Cir.

2002) (finding actual knowledge where "Mercado's testimony alone would support a jury finding that Sepulveda had been told that a teacher in her elementary school was taking a student to that teacher's home, and paying the student to engage in physical activity consisting of 'lifting up and down'").

Importantly, the Fourth Circuit said so directly.  Sitting *en banc* in *Jennings v. University of North Carolina*, the Fourth Circuit made it abundantly clear that a school's knowledge of allegations of wrongful conduct is sufficient to meet the actual knowledge prong of a Title IX claim.  In *Jennings*, the plaintiff reported sexual harassment to the school's legal counsel.  The complaints were merely allegations, because like most cases, the complaints started with one person sharing her as yet uncorroborated perspective of harassing behavior.  The *en banc* Fourth Circuit found that the plaintiff's compilation of information reported to appropriate school officials established actual knowledge.

> [Jennings] lodged a complaint in a meeting with Susan Ehringhaus, legal counsel to the University and Assistant to the Chancellor. Jennings "gave [Ehringhaus] a [complete] run-down" about Dorrance's persistence in talking about players' sex lives when the team was assembled for practice or other activities. She reported her feelings of humiliation and discomfort.
> . . .
> Jennings's evidence would allow a jury to find that Ehringhaus had actual knowledge of Dorrance's misconduct.

*Jennings v. Univ. of N.C.*, 482 F.3d 686, 693-94, 702 (4th Cir. 2007).

At bottom, the response to the jury's first question on actual knowledge did not "clear away" with "concrete accuracy" the difficulties the jury was having with the "actual knowledge" concept, to the great prejudice to Doe.  *See Bollenbach*, 326 U.S. at 613.

Indeed, even after the Court's initial response informing the jury to give the words "actual knowledge" their ordinary meaning, the jury remained confused on what this abstract legal concept meant.  The jury formulated specific, additional "questions" regarding what "actual knowledge"

could mean in the circumstances of this case: "We continue to have questions re: actual knowledge. Is actual knowledge: A. A compilation of information about an event. Or . . . B. The conclusion decided based on information provided."  Dkt. #325-8 (ellipsis in original).  This was never answered, despite *Price*'s "mandatory" legal requirement to fairly answer the jury's question to remove jury confusion involving a central issue in the case.

This failure to answer the jury's additional question regarding what constitutes actual knowledge as applied to the facts of this case was prejudicial to Plaintiff.  *Jennings* and the other cases following *Baynard* cited above clearly indicate that a school's knowledge gained from a compilation of information about allegations that may constitute sexual harassment meets a plaintiff's burden to show "actual knowledge."  Here, the jury heard evidence far above the vague contentions that *Baynard* sought to eliminate from Title IX claims; in fact, the evidence in this case is exactly what *Baynard* described would trigger Title IX obligations and potential liability: allegations specific enough to show the School Board had a current, potential sexual assault situation on its hands.  Or, in other words (indeed, words used by Assistant Principal Taylor), the School Board had a "potential issue" that also became an "actual issue."

With such explicit evidence of actual knowledge, the jury's verdict is against the clear weight of the evidence and can only be a result of juror confusion from prejudicially erroneous jury instructions on the issue of actual knowledge. A new trial is warranted based on this separate, independent ground to correct a miscarriage of justice resulting from this fundamental, prejudicial error.

### III. THE FAILURE TO PROVIDE A SPOLIATION INSTRUCTION WAS PREJUDICIAL ERROR REQUIRING A RETRIAL BECAUSE THE JURY COULD HAVE INFERRED THAT THE DESTRUCTION OF CRITICAL EVIDENCE REVEALED ACTUAL KNOWLEDGE.

The Court is well aware of the background on the spoliation issues involving the School Board. There was extensive briefing on the issue in regard to Defendant's Rule 72 objections to Magistrate Judge Nachmanoff's Memorandum Opinion and Order (Dkt. #178), which granted Doe's request for sanctions related to Defendant's spoliation of documents relevant to this case. *See* Dkt. #222-223, #235, #238. In its order granting in part and denying in part Defendant's objections after this briefing and oral argument, the Court ruled that:

> Judge Nachmanoffs Order is detailed and well-reasoned. The Court finds no clear error or any analysis contrary to law in his findings that Defendant had a duty to preserve the documents in question, that the documents existed, and that the documents were relevant.
>
> The Court agrees that for the reasons stated in Judge Nachmanoffs Order spoliation sanctions are warranted, but the Court withholds ruling on what form of jury instruction is the appropriate sanction in this case. The Court will determine the appropriate sanction after it has had the opportunity to hear the evidence on the loss or destruction of the documents that is presented at trial.

Dkt. #253, 1-2.

After hearing all of the evidence at trial, the Court proposed a spoliation instruction and discussed it with counsel immediately before the jury was charged and closing arguments were given. *See* Trial Tr. 1997:5-11, 2015:6-2031:16. The proposed instruction indicated that the School Board had a duty to maintain certain documents and that such documents existed, but were lost or destroyed. The proposed instruction left it up to the jury to determine whether such loss or destruction was willful and, if so, then the jury could invoke the adverse inference regarding the content of the documents.

The evidence presented at trial was in line with the evidence and loss or destruction of documents outlined in Judge Nachmanoff's well-supported and well-reasoned opinion.  Indeed, the Court commented:

> The evidence that's been presented paints a picture of the jury could find easily that the county demonstrated no respect for its own policies and procedures, didn't implement the BHMS system, used a computer to take down the statements and then didn't preserve that information, and tried to clean up the computer and then just throw  it out and -- because it didn't work anymore, that the file was never preserved and was lost, and so there's significant evidence from which a jury could find that they did that willfully.
>
> I'm not saying that they will. I'm leaving it up to them to determine whether that conduct rises to a level of willfulness.

Trial Tr. at 2018:7-24.  Plaintiff agrees with that assessment and does not cite all the testimony to support the Court's own impressions from the evidence presented.

Yet, the Court ultimately declined to provide an adverse inference spoliation instruction because it found that Doe did not suffer sufficient prejudice.  *See id.* at 2028:7-22, 2031:11-15.  It was prejudicial error not to give the instruction and a new trial should be ordered.  As Doe argued during the colloquy regarding the proposed spoliation instruction, evidence of the missing text or email between Banbury and Taylor from their communications over the weekend would have been relevant to the actual knowledge issue but for Defendant's spoliation of the material:

> There was testimony and Mr. Banbury was crossed on it about his reference to the text message with Ms. Taylor. He mentioned those should have been hitting servers. They were on an iPhone provided by the School Board.
>
> He said he didn't produce those. He said he might have been referring to an e-mail. He said no such e-mail was produced. And it's their conversations, Your Honor, about what, what was reported, what do they need to do. And we believe this would be -- what was in there was further evidence of their notice, of their knowledge about what occurred.

*Id.* at 2026:2-12.  Yet, without the adverse inference instruction, the jury did not have the Court's guidance that it would be reasonable to infer that the spoliation of such critically relevant material

helped establish the School Board's actual knowledge.  This was highly prejudicial to Doe and requires a new trial.

Likewise, without the adverse inference instruction, the Court denied Doe the legal benefit of informing the jury of the serious consequences for spoliating key information and how the jury could have viewed such evidence in the context of its assessment of the School Board's actual knowledge of the alleged sexual harassing conduct.  Absent the instruction, when compared to a case in which no evidence of spoliation was presented, the spoliation was of little or no consequence, and Doe suffered clear prejudice.

For example, the jury was not provided an opportunity to infer that the School Board's spoliation of the statements of Jack Smith and Brianna Murphy could establish the School Board's actual knowledge.  The argument regarding prejudice arising from the destruction of Smith's statement is on the record during the spoliation discussion.  *Id.* at 2029:15-2031:10.  As to Murphy's statement, as noted above, Hogan and Baranyk met with Murphy after the Indianapolis band trip and asked her to write a written statement regarding what she knew about the incident between Smith and Doe.  Murphy testified that her written statement, typed on the computer in the security office, said Doe "couldn't eat anything.  She was very quiet, not her normal self," so Murphy asked what was going on and Doe told her that "Jack Smith had caused -- had reached for [Doe's] hand and had made her touch his genitalia without any consent from her."  *Id.* at 285:8-286:5.  Hogan's recollection of Murphy's statement at trial was that "it was very brief" and only said "she had witnessed Jane Doe getting a blanket."  *Id.* at 893:18-894:10.  Hogan, though, testified that she put the statements in a folder and gave them to Taylor.  880:18-881:15.  Yet, the School Board did not maintain a paper or electronic copy of Murphy's or Smith's statement.  *Id.* at 1135:11-19.  In fact, the computer in the security office was wiped approximately five months

after this lawsuit was filed, and no backup was made prior to wiping the computer. *Id.* Obviously, a preserved copy of Murphy's written statement would have allowed Doe's counsel to cross-examine Hogan on her limited recollection of what was in Murphy's statement, which would have allowed Doe to present additional evidence of actual knowledge of a sexual assault by Smith of Doe by Assistant Principal Hogan. But, without the document or an adverse inference instruction arising from its spoliation, prejudice flows to Doe because she did not have the opportunity to conduct such cross-examine or have the jury make an inference that Murphy's contemporaneous written statement would have constituted additional evidence of actual knowledge.

Finally, even if the Court did not instruct on the adverse inference, it should have informed the jury that the Court found that defendant had an duty to maintain the relevant documents (Smith's statement, Doe's statement, Murphy's statement, Banbury's notes of his conversations with Aveesh Kachroo and Laura Kelly, the texts or emails between Principal Banbury and Assistant Principal Taylor) and that such documents existed.

## CONCLUSION

The great weight of the evidence established that the School Board had actual knowledge of alleged sexual harassment by Smith of Doe that occurred on March 8, 2017. The jury's contrary determination constitutes a miscarriage of justice. The Court should grant a new trial based on this ground alone.

Additionally, other prejudicial error requiring a new trial occurred via the jury instruction process, particularly in regard to declining to provide an "actual knowledge is sometimes called actual notice" instruction as proposed and modified from O'Malley, and in failing to clear away the jury's ongoing confusion regarding "actual knowledge" by not answering their specific, additional question that the jury itself proposed as an alternative definition for the term. Prejudicial

error also occurred by failing to instruct the jury on an adverse inference spoliation instruction, or a portion of that instruction, for the reasons stated above.  A new trial is warranted on these grounds as well.

The Court should order a new trial to correct the miscarriage of justice that occurred.

Date: August 20, 2019                    Respectfully submitted,

                                         ATES LAW FIRM, P.C.

                                            /s/ John R. Ates
                                         John R. Ates (VSB #71697)
                                         1800 Diagonal Road, Suite 600
                                         Alexandria, Virginia 22314
                                         703-647-7501 (tel)
                                         703-229-6430 (fax)
                                         j.ates@ateslaw.com

                                         PUBLIC JUSTICE, P.C.

                                            /s/ Adele P. Kimmel
                                         Adele P. Kimmel (admitted *pro hac vice*)
                                         1620 L Street NW, Suite 630
                                         Washington, D.C. 20036
                                         (202) 797-8600 (tel)
                                         (202) 232-7203 (fax)
                                         akimmel@publicjustice.net

                                         CORREIA & PUTH, PLLC

                                            /s/ Linda M. Correia
                                         Linda M. Correia (admitted *pro hac vice*)
                                         Lauren A. Khouri (admitted *pro hac vice*)
                                         1400 16th Street NW, Suite 450
                                         Washington, D.C. 20036
                                          (202) 602-6500 (tel)
                                          (202) 602-6501 (fax)
                                         lcorreia@correiaputh.com
                                         lkhouri@correiaputh.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2019 I filed the foregoing using the CM/ECF system, which will send electronic notice to Defendant's counsel of record:

Sona Rewari
Andrea Calem
Stuart Raphael
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
srewari@huntonak.com
acalem@huntonak.com
sraphael@huntonak.com
*Counsel for Defendant*

/s/ John R. Ates
John R. Ates (VSB #71697)
Ates Law Firm, P.C.
1800 Diagonal Road
Suite 600
Alexandria, Virginia 22314
703-647-7501 Telephone
703-229-6430 Fax
j.ates@ateslaw.com