# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-614 (LOG/MSN) |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S BRIEF IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR A NEW TRIAL

Stuart A. Raphael (VSB No. 30380)
Sona Rewari (VSB No. 47327)
Andrea R. Calem (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (703) 918-4018
srewari@HuntonAK.com
sraphael@HuntonAK.com
acalem@HuntonAK.com

*Counsel for Defendant*
*Fairfax County School Board*

August 30, 2019

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

I.     Background Principles ...................................................................................... 2

     A.     *Davis* and *Baynard* set a high bar for proving "actual knowledge." ...................... 2

     B.     The relevant actors for the "actual knowledge" inquiry are Principal Banbury, Assistant Principal Hogan, and Assistant Principal Taylor. ................................... 4

     C.     The "actual knowledge" issue has been disputed from the outset. ........................ 4

II.     The jury's verdict was neither a miscarriage of justice nor against the clear weight of the evidence. ........................................................................................................................... 5

     A.     Assistant Principal Taylor ...................................................................................... 6

          1.     The Thursday-evening text from Dr. VanValkenburg did not show that Jack Smith had assaulted Plaintiff. ............................................................ 6

          2.     The Friday-afternoon texts from Estess and Sefchick reported a possible "sex act," not an assault. ......................................................................... 7

          3.     Taylor credibly testified that Victoria Staub reported a consensual "hookup," not a sexual assault. ................................................................. 9

          4.     The Sunday-evening text signaled the need for further investigation but was not an allegation of sexual assault. ................................................... 13

     B.     Assistant Principal Hogan credibly testified that Plaintiff did not report a sexual assault. ..................................................................................................................... 15

     C.     Principal Banbury testified unequivocally that no sexual assault was reported to him. ........................................................................................................................ 23

     D.     Fact-intensive actual-knowledge questions are best left to juries to resolve. ....... 24

III.     No error in the jury instructions warrants a new trial. ...................................... 25

     A.     The Court did not err by declining to instruct the jury that "actual knowledge" means "actual notice." ............................................................................................ 25

     B.     The Court's response to the jury's third question was not erroneous. .................. 26

     C.     Any error in the response to the jury's fourth question favored Plaintiff. ............ 26

IV.     The Court did not abuse its discretion in denying an adverse-inference instruction. ....... 29

CONCLUSION ............................................................................................................................... 30

CERTIFICATE OF SERVICE ..................................................................................................... 31

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abasiekong v. City of Shelby*,
    744 F.2d 1055 (4th Cir. 1984) ........................................................................... 2

*Baynard v. Malone*,
    268 F.3d 228 (4th Cir. 2001) ............................................................... 3, 5, 6, 26

*Bollenbach v. United States*,
    326 U.S. 607 (1946)............................................................................................ 29

*Crandell v. N.Y. Coll. of Osteopathic Med.*,
    87 F. Supp. 2d 304 (S.D.N.Y. 2000)................................................................... 3

*Davis v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999)................................................................... 2, 19, 21, 26

*Doe A. v. Green*,
    298 F. Supp. 2d 1025 (D. Nev. 2004).............................................................. 24

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998).................................................................................... 2, 28

*Gordon v. Ottumwa Cmty. Sch. Dist.*,
    115 F. Supp. 2d 1077 (S.D. Iowa 2000) ........................................................ 24

*Hart v. Paint Valley Local Sch. Dist.*,
    No. C2–01–004, 2002 WL 31951264 (S.D. Ohio Nov. 15, 2002) ................... 24

*Hill v. Cundiff*,
    797 F.3d 948 (11th Cir. 2015) ........................................................................... 2

*Huskey v. Ethicon, Inc.*,
    848 F.3d 151 (4th Cir.),
    *cert. denied*, 138 S. Ct. 107 (2017) ................................................................... 1

*Jennings v. Univ. of N.C.*,
    482 F.3d 686 (4th Cir. 2007) ....................................................................... 4, 28

*Lamonaca v. Tread Corp.*,
    157 F. Supp. 3d 507 (W.D. Va. 2016) .............................................................. 1

*Latino v. Kaizer*,
    58 F.3d 310 (7th Cir. 1995) .............................................................................. 2

iv

*Minter v. Wells Fargo Bank, N.A.*,
    762 F.3d 339 (4th Cir. 2014) ...................................................................... 1, 2

*O'Neill v. CP Crystal City, LLC*,
    No. 1:12-cv-868, 2013 WL 12141426 (E.D. Va. Mar. 27, 2013)...................................... 9

*Raedle v. Credit Agricole Indosuez*,
    670 F.3d 411 (2d Cir. 2012)........................................................................ 2

*RF v. S. Country Cent. Sch. Dist.*,
    No. 13-cv-2710, 2016 WL 5349782 (E.D.N.Y. Sept. 23, 2016) ...................................... 28

*Richard P. v. Sch. Dist. of the City of Erie*,
    No. 03-0390, 2006 WL 2847412 (W.D. Pa. Sept. 30, 2006),
    *aff'd*, 254 F. App'x 154 (3d Cir. 2007)................................................................. 24

*Romero v. City of New York*,
    839 F. Supp. 2d 588 (E.D.N.Y. 2012) ............................................................. 28

*Tesoriero v. Syosset Cent. Sch. Dist.*,
    382 F. Supp. 2d 387 (E.D.N.Y. 2005) ............................................................. 24

*Timpanaro v. Hampton Roads Golf Clubs, LC*,
    No. 2:07-cv-593, 2008 WL 11379927 (E.D. Va. Nov. 21, 2008) .................................. 30

*United States v. Hill*,
    927 F.3d 188 (4th Cir. 2019) ......................................................................... 29

*United States v. Meraz-Fugon*,
    No. 1:16-CR-18, 2016 WL 4445753 (E.D. Va. Aug. 22, 2016)....................................... 1

*United States v. Parr*,
    716 F.2d 796 (11th Cir. 1983) ...................................................................... 29

*United States v. Patterson*,
    150 F.3d 382 (4th Cir. 1998) ......................................................................... 29

*Vodusek v. Bayliner Marine Corp.*,
    71 F.3d 148 (4th Cir. 1995) ......................................................................... 29

*Williamson v. Consol. Rail Corp.*,
    926 F.2d 1344 (3d Cir. 1991)........................................................................ 25

*Wyler v. Conn. State Univ. Sys.*,
    100 F. Supp. 3d 182 (D. Conn. 2015) .............................................................. 28

**Statutes**

Title IX of the Education Amendments of 1972,
    86 Stat. 373, 20 U.S.C. §§ 1681–1688...................................................................... passim

Cal. Educ. Code § 67386 (2019).......................................................................... 20

**Constitutional Provisions**

U.S. Const. amend. VII .......................................................................... 2

**Rules**

Fed. R. Civ. P. 50 .......................................................................... 2

Fed. R. Civ. P. 51(c)(1)................................................................... 26

Fed. R. Civ. P. 59 .................................................................... 1, 2

Fed. R. Evid. 606(b) ..................................................................... 28

**Secondary Sources**

BLACK'S LAW DICTIONARY (11th ed. 2019) .......................................................... 5, 21

Kevin O'Malley, Jay E. Grenig & Hon. William C. Lee,
    3C FED. JURY PRAC. & INSTR. § 177:36 ("Actual Knowledge")
    (6th ed. 2011 & Supp. Aug. 2019) ............................................................... 3, 26

## INTRODUCTION

After more than seven days of trial and two days of deliberations, the jury returned a special verdict finding that the School Board did not have "actual knowledge" of Jack Smith's alleged sexual harassment of Jane Doe. That no-actual-knowledge finding was supported by the testimony of the key school administrators, all of whom credibly testified that what was reported to them was not a sexual assault. The evidence was sharply disputed. In particular, Victoria Staub and Assistant Principal Taylor told very different stories of their interactions, but the jury had ample reason to side with Taylor's version of events. The jury also had good reason to find Aveesh Kachroo's account not credible. Where, as here, the evidence was conflicting and the issue hinged on credibility assessments by the jury, the verdict is not against the clear weight of the evidence and is not a miscarriage of justice. Nor can Plaintiff show that any errors in the jury instructions misled the jury. Plaintiff's new-trial motion should be denied.

## ARGUMENT

A district court may grant a new trial under Rule 59(a) only "if the verdict is contrary to the clear weight of the evidence, rests upon false evidence, or will cause a miscarriage of justice." *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 158 (4th Cir.) (citing *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014)), *cert. denied*, 138 S. Ct. 107 (2017). Although a "district court has discretion to grant a new trial . . . the Fourth Circuit has directed that this discretion should be used sparingly." *United States v. Meraz-Fugon*, No. 1:16-CR-18, 2016 WL 4445753, at *2 (E.D. Va. Aug. 22, 2016) (O'Grady, J.). "This discretion should be used only 'where it is demonstrated that the fundamental fairness or integrity of the trial result is *substantially in doubt*.'" *Id.* (citation omitted, emphasis added). It is not enough that the "court may have decided the issues differently if it had been the designated finder of fact." *Lamonaca v. Tread Corp.*, 157 F. Supp. 3d 507, 517 (W.D. Va. 2016). "[A] trial judge should not

1

'denigrate' the jury system by granting a new trial on grounds of insufficient evidence and substituting his own judgment of the facts and witness credibility, particularly when the subject matter of the trial is simple and easily comprehended by a lay jury." *Id.* (quoting *Abasiekong v. City of Shelby*, 744 F.2d 1055, 1059 (4th Cir. 1984)).  Indeed, the Seventh Amendment imposes limits on a court's use of Rule 59 to second-guess the jury's credibility assessments.  *See Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012); *Latino v. Kaizer*, 58 F.3d 310, 314–15, 317 (7th Cir. 1995).[1]  Plaintiff cannot satisfy Rule 59's demanding standard here.

## I.   Background Principles

### A.   *Davis* and *Baynard* set a high bar for proving "actual knowledge."

The Supreme Court established the "actual knowledge" standard for Title IX cases in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).  *Davis* held that "recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to *known acts* of student-on-student sexual harassment . . . ." *Id.* at 646–47 (emphasis added).  To be liable, funding recipients must be "deliberately indifferent to sexual harassment, *of which they have actual knowledge*, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650 (emphasis added).  The funding recipient must have actual knowledge not only of facts showing the harassment, but of facts showing that the harassment rose to the level of severity that violates Title IX.  *Id.*[2]

---

[1] The Fourth Circuit reviews a district court's decision for an abuse of discretion. *Minter*, 762 F.3d at 348.  But where, as here, the party seeking the new trial failed to move for judgment as a matter of law under Rule 50, the Fourth Circuit would affirm this Court's denial of the new-trial motion if "there was *any* evidence to support the jury's verdict." *Id.*

[2] *See also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) ("Title IX is predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation."); *Hill v. Cundiff*, 797 F.3d 948, 968–69 (11th Cir. 2015) (rejecting argument that knowledge of

In *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001), the Fourth Circuit found it "quite clear . . . that Title IX liability may be imposed only upon a showing that school district officials possessed *actual knowledge* of the discriminatory conduct in question." *Id*. at 238 (emphasis added). Notably, the Court specifically rejected the dissent's proposed formulation, under which the actual-knowledge requirement would be "satisfied by actual notice of a *substantial risk* of ongoing sexual abuse." *Id*. at 237–38. That rejected test is essentially the same test in O'Malley's model instruction 177:36,[3] which fails to cite *Baynard* or to note the more demanding standard applied in the Fourth Circuit. *See* Tr. 20:6–13.

The facts of *Baynard* are particularly instructive because they show how hard it is to prove "actual knowledge." There, the evidence was insufficient to show that the school principal, Malone, "was *in fact* aware that a student was being abused." 268 F.3d at 238. Malone had been recently warned by a former student that the teacher, Lawson, had sexually abused him and was a pedophile. *Id*. at 233. The school librarian also told Malone that she had seen Lawson holding the student plaintiff, Baynard, in his lap, with his arms around him and their faces close together. *Id*. Another teacher told Malone that Lawson was rumored to abuse children. *Id*. Nonetheless, the Fourth Circuit held that the evidence failed to show "actual knowledge" that Lawson "was abusing one of his students." *Id*. at 238. "Although Malone

---

harassment alone is sufficient and holding that "a Title IX plaintiff must prove the funding recipient had actual knowledge that the student-on-student sexual harassment was severe, pervasive, and objectively offensive"); *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 321 (S.D.N.Y. 2000) ("In order to be consistent with the goals of Title IX as articulated by *Gebser*, the actual knowledge requirement demands at minimum that the institution have had sufficient notice that it reasonably could have acted to remedy the discrimination that forms the basis of plaintiff's claim.").

[3] *See* Kevin O'Malley, Jay E. Grenig & Hon. William C. Lee, 3C FED. JURY PRAC. & INSTR. § 177:36 ("Actual Knowledge") (6th ed. 2011 & Supp. Aug. 2019).

certainly should have been aware of the *potential* for such abuse . . . , there is no evidence in the record to support a conclusion that Malone was *in fact* aware that a student was being abused." *Id*. *Baynard* teaches that, to satisfy the actual-knowledge requirement, the funding recipient must have actual knowledge of sufficient facts to show a violation of Title IX.

Plaintiff is correct that *Jennings v. University of North Carolina*, 482 F.3d 686 (4th Cir. 2007) (en banc), shows the type of facts that can suffice. But the plaintiff there provided "vivid details of [the coach's] sexual comments about his players when the team was together" and "also reported that the situation was causing her intense feelings of discomfort and humiliation." *Id*. at 700. That was enough to support a jury's finding of actual knowledge. *Id*. at 700–01 (finding that plaintiff's "evidence would allow a jury to find that [the responsible university official] had actual knowledge of [the coach's] misconduct").

### B.   The relevant actors for the "actual knowledge" inquiry are Principal Banbury, Assistant Principal Hogan, and Assistant Principal Taylor.

This Court correctly instructed the jury that "[a] school board has actual knowledge of student-on-student sexual harassment only if an 'appropriate person' employed by the school board has actual knowledge of the harassing conduct," and that, "[i]n this case, the appropriate persons at Oakton High School authorized to take corrective action on behalf of the School Board were Principal John Banbury, Assistant Principal Jennifer Hogan, and Assistant Principal Michelle Taylor." Instrs. 7 & 9, ECF No. 325-14; Tr. 2055:21–2056:6.

### C.   The "actual knowledge" issue has been disputed from the outset.

Contrary to Plaintiff's assertion that the issue was "neither disputed nor disputable," Pl.'s Br. 13, and her claim that the School Board conceded it "throughout the litigation," *id*. at 14 n.2, the "actual knowledge" issue has been contested from the outset. In its answer, the School Board denied Plaintiff's allegations that it had "actual knowledge" of Jack Smith's sexual assault.

4

*Compare* Am. Compl. ¶¶ 106–07, ECF No. 23, *with* Answer ¶¶ 106–07, ECF No. 25.  And at trial, the parties' agreed-issues instruction to the jury—both before and after the presentation of evidence—made clear that the School Board denied actual knowledge of any sexual assault.  *See* ECF No. 280 (joint instruction), Tr. 40:7–15 (opening instruction), 2053:13–21, 2054:23–25 (jury charge).  Plaintiff's proposed special verdict form, ECF No. 311 at 5, which the Court adopted, Tr. 2039:14–20, also included as Question 3 whether the School Board had "actual knowledge."  So Plaintiff herself conceded that the issue was disputed.  And the School Board pointed out in discussions over how to answer the jury's fourth question that the facts concerning the School Board's alleged "actual knowledge" were "hotly disputed."  Tr. 2184:15–2185:9.

If Plaintiff thought that she was entitled to judgment as a matter of law on the actual-knowledge issue, *she* would have moved for summary judgment before trial or for judgment as a matter of law at trial.  She did neither.  The School Board didn't do so either because the evidence on the issue is obviously in conflict.  We show next why the jury had ample evidence to resolve that conflict in the School Board's favor.

## II.    The jury's verdict was neither a miscarriage of justice nor against the clear weight of the evidence.

The evidence on which Plaintiff relies fails to show that Banbury, Hogan, or Taylor had "actual knowledge" that Jack Smith assaulted Plaintiff, or even that she was alleging that an assault had occurred.  At best, the evidence fits instead only in the "constructive notice" or "inquiry notice" box,[4] which is insufficient under *Baynard*.

---

[4] "Constructive notice" means "[n]otice arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of," while "inquiry notice" means "[n]otice attributed to a person when the information would lead an ordinarily prudent person to investigate the matter further."  BLACK'S LAW DICTIONARY 1277–78 (11th ed. 2019) ("Notice").

A.      **Assistant Principal Taylor**

1.      **The Thursday-evening text from Dr. VanValkenburg did not show that Jack Smith had assaulted Plaintiff.**

Plaintiff is wrong that VanValkenburg's Thursday-evening text gave Taylor "actual knowledge" that Jack Smith assaulted Plaintiff, or even that he was alleged to.  That text message read:

> Victoria Staub just told me that there was some "funny bus[iness]" on the bus[.]  Jack Smith "put himself on" Jane Doe or something like that.  Jane Doe was not into it.  Jane Doe told Victoria not to tell anyone, as she's embarrassed.  Please advise.

PX 3; Tr. 560:22–25.  Taken on its own terms, this statement does not say what the "funny business" was, what Staub meant by "put himself on her," or what the "it" was in "Jane Doe was not into *it*."  No one could conclude from this report *what J*ack had done, let alone what remedial measures might be needed.  To be sure, the text might suffice for *inquiry notice*, if that were the standard.  But it did not confer "actual knowledge" of an assault, any more than Malone's being warned that Lawson was a pedophile who had been seen holding Baynard in his lap constituted "actual knowledge" that Lawson was actually molesting Baynard.

The testimony surrounding that text also amply supported the jury's conclusion that it did not establish "actual knowledge."  Taylor testified that she didn't "know what this text message meant at that time."  Tr. 581:16–17.  The statement that Victoria "was not into it" "could mean any number of things"; it depends "upon the context."  Tr. 562:11–16.  Indeed, Taylor had encountered "a report before where a student ha[d] said he ['] put himself on her,['] and it was exactly that.  Watching a bus video, there was a young man that did sit on another female student's lap."  Tr. 581:17–20.  As the School Board pointed out in closing argument, the text told Taylor "there is something you need to look into.  It doesn't tell you there has been a sexual assault."  Tr. 2093:11–13.  And even after *all* of the evidence came in, there were still no facts

6

illuminating what it could mean for Jack to have "put himself on" Plaintiff. "So we still don't

know what was meant by . . . Victoria's words in that text." Tr. 2093:20–22.

> **2.**     **The Friday-afternoon texts from Estess and Sefchick reported a possible "sex act," not an assault.**

The texts from School Resource Officer Estess and Security Specialist Sefchick, shortly

after 2 pm on Friday, told Taylor "no," there was no "emergency"; that she should listen to a

voice mail from Security Specialist Wally Baranyk; and that it involved, "[p]ossibly," a "sex act"

on one of the buses, "no names yet." PX 4; Tr. 575:24–576:15.  Here again, the texts warranted

further inquiry but did not confer "actual knowledge" that Smith sexually assaulted Plaintiff.

Plaintiff's brief tracks her trial strategy.  She tries to use these texts, and Taylor's follow-

on call with Baranyk, to link Aveesh Kachroo's testimony that he reported a "sexual assault"

both to (1) his teacher, Laura Kelly, and (2) Baranyk, Estess, and Sefchick.  Plaintiff speculates

that Kachroo's "sexual assault" report "*likely* made it back to Assistant Principal Taylor soon

after it was shared with officials back at Oakton High School."  Pl.'s Br. 8 (emphasis added).

But the jury had ample evidence to reject that supposition.  First, it was undisputed that

Kachroo never spoke to Taylor, so the only way such a report could have gotten to her was

through Baranyk.  Yet Taylor testified that Baranyk did *not* tell her there had been a "sexual

assault"; the first time she heard Kachroo's story was at trial.  Tr. 571:23–572:8.  Taylor added

that, although she couldn't specifically remember her conversation with Baranyk, "I know

myself and I know my training," and "if a sexual assault in those words had been used in a phone

call to me, then I would remember that." Tr. 572:14–16.

Second, the jury had good reason to find that Kachroo was not credible when he claimed

that he had reported "a sexual assault" to Kelly and to Baranyk, Estess, and Sefchick.  Tr. 135:6–

16.  For starters, Kachroo's contemporaneous texts with Plaintiff do not use that phrase.  PX

82/DX 59.  Moreover, his texts reflected *uncertainty* about what had actually happened.  In one, he told Plaintiff "don't talk to an administrator if you're unsure."  DX 59 at 1383.  In another, he responded to the possibility that Plaintiff's encounter might actually have been "consensual," asking her "it wasn't though, right?"  DX 59 at 1384–85; Tr. 154:4–5.

Kachroo, of course, was Plaintiff's "close friend."  Tr. 128:13–14.  And when pressed on these points at trial—points he knew could undermine her lawsuit—he waffled.  Kachroo said his "it wasn't though, right?" comment was not meant to question Plaintiff's story: "Well, I was implying like, oh, I already know, but like what had been told."  Tr. 154:1–3.  When pressed that it appeared he was "not sure," he answered "I was pretty sure.  I would say I was sure."  Tr. 154:6–7.  These were classic tics and hedges that entitled the jury to doubt his credibility.

The jury also had ample evidence to conclude that Kachroo embellished his story to help his close friend.  At trial, he claimed to have told both Kelly and Baranyk (together with Estess and Sefchick) that the male student (whom he did not name) sexually assaulted his friend, not only forcing her to touch his penis but reaching his hand "up her shirt."  Tr. 131:21–132:6, 134:23–24.  When Kelly testified, however, she never mentioned that Kachroo used the words "sexual assault."  What is more, she recounted nothing about the male student putting his hand up her shirt, only Kachroo's reference to her being "forced" to do "hand stuff."  Tr. 260:1–8.  And while Kachroo had claimed that he had described the details to Kelly, she testified that she did not know what he meant by "hand stuff."  Tr. 264:23–25.[5]

Kachroo's more expansive claim about what he had supposedly told Kelly and the security officers is further belied by the contemporaneous texts from Estess and Sefchick to

---

[5] Plaintiff introduced no evidence that Kelly ever told Taylor, Hogan, or Banbury about her conversation with Kachroo.  And VanValkenburg affirmatively testified that he did not know about any reporting by Kachroo or Kelly.  Tr. 871:8–13.

Taylor reporting *a* "sexual act" on the bus, PX 4, not the multiple acts Kachroo claimed.

Kachroo was impeached on this point during cross-examination, admitting that he failed to

mention in his summary-judgment declaration anything about Jack Smith going up Plaintiff's

shirt.  Tr. 142:1–16.  His declaration recounted that Plaintiff told him only about touching Jack

Smith's penis.  Tr. 142:17–19.  And Kachroo described that as "a"—singular—"sex act," Tr.

142:20–24, the same phrase used by Estess and Sefchick in their texts to Taylor.

Moreover, Kachroo's trial testimony that he was concerned about Plaintiff during the

band trip because she had been sexually assaulted was also belied by the fact that he waited two

days to speak with anyone at school.  Tr. 129:14–131:7.  And even then he declined to tell

anyone the names of Plaintiff or Jack Smith, and he never wrote the statement that he said he

would consider doing over the weekend.  Tr. 146:2–147:2.

All of those things could have led a reasonable jury to discount his testimony.  Indeed,

the School Board specifically argued to the jury that these inconsistencies and others undermined

Kachroo's credibility.  *See* Tr. 2090:6–2092:4.  That call was the jury's to make.  "The reliability

and credibility of all the witnesses were at the heart of the case, and it was squarely within the

province of the jury to assess the witnesses' testimony as to those issues."  *O'Neill v. CP Crystal

City, LLC*, No. 1:12-cv-868, 2013 WL 12141426, at \*2 (E.D. Va. Mar. 27, 2013) (Trenga, J.).

### 3.    Taylor credibly testified that Victoria Staub reported a consensual "hookup," not a sexual assault.

The jurors also heard dramatically conflicting factual accounts from Assistant Principal

Taylor and former Oakton student Victoria Staub about their conversation at the mall on Friday

evening.  The jury had ample reason to find Taylor credible and not Staub.

Plaintiff highlights Staub's claim that she told Taylor that evening that Jack Smith "put

his hands down [Plaintiff's] pants and up her shirt, and *she had removed his hands from her*

*body, and then he kept putting them back on her*, and he *forced* her to put her hands on him and pleasure him until he ejaculated into the blanket, and *he penetrated her with his fingers*." Pl.'s Br. 8 (quoting Tr. 96:21–97:1 (emphasis added)). Plaintiff dismissively says that "Taylor denies or claims that she does not remember most of Staub's account." *Id.* But that does not fairly describe Taylor's unequivocal rejection of Staub's principal claims.

Taylor testified that Staub never said that Jack Smith had "forced" Plaintiff to manually stimulate him. Tr. 590:10–14. According to Taylor, Staub reported "that Jane had touched Jack's penis for a period of time on the bus and didn't really want to do it," but Taylor did *not* "take that to mean that Jack had forced Jane." Tr. 650:19–22. In the mantra Plaintiff's counsel repeats—that Plaintiff "didn't really want to do it"—the key word "it" refers to the "hand job" that Plaintiff performed on Jack Smith. Tr. 592:1. And Taylor recalled Staub's own skepticism about Plaintiff's state of mind; Staub said "Well, I don't know *if* she didn't want to do it, *why* she did it, because if it was me, I would just stand up and say no or not do it." Tr. 588:24–589:1 (emphasis added).

Moreover, Taylor was repeatedly asked and answered that Staub never said Jack Smith had his hands on Plaintiff's body or "removed" his hands from her body. Tr. 589:24–590:9, Tr. 650:23–25. Staub also said nothing "about digital penetration," something Taylor would have remembered if Staub had said it. Tr. 591:6–9, 651:10–12.

Taylor also described Staub's emphasis on Jack's girlfriend. Staub told her that Plaintiff had been interested in Jack the year before, Tr. 591:14–16, and that Staub's "primary concern" was that Jack had a "girlfriend," Tr. 651:1–9; *see also* Tr. 591:12–14. Staub "kept coming back" to that, saying incredulously "can you believe that he had a girlfriend." Tr. 651:7–9.

10

Taylor's credibility was buttressed by the testimony of at least three other witnesses: Hogan, Banbury, and VanValkenburg. Banbury recounted his phone conversation with Taylor that occurred on Friday (March 10), following Taylor's conversation with Staub—and his account was congruent with Taylor's. Tr. 726:19–730:5. Banbury understood Plaintiff's friend to be Taylor's source of information, Tr. 727:12–14. Banbury said that "what was described to me from Michelle Taylor was that Jane Doe gave Jack Smith a hand job." Tr. 727:8–9. Taylor told him the encounter was "consensual," Tr. 727:16, noting that, according to the friend (Staub), Plaintiff and Jack Smith "had hooked up." Tr. 727:23–25. And what the friend (Staub) seemed "very concerned" about was that "Jack Smith had another girlfriend, and that seemed to be the problem" on which she was "focused." Tr. 727:19–21. Banbury added that Taylor reported nothing about Jack Smith putting his hands on Plaintiff's breasts or down her pants. Tr. 728:1–6. Taylor described the encounter to Banbury "solely as the female student manually stimulating the male student's genitals." Tr. 728:7–8. So Banbury, like Taylor, understood the event to be "a consensual encounter," Tr. 728:10–12, not "a sexual assault," Tr. 729:18–24.

Taylor's account was also consistent with VanValkenburg's. He spoke with Taylor after her Friday conversation with Staub and Banbury. VanValkenburg likewise did not think from Staub's description that they were looking at a potential sexual assault. Tr. 818:6–18.

Similarly, Hogan explained that she learned from Taylor on Sunday night (March 12) that the idea that Plaintiff "might not have wanted to be a full participant" came from information provided by the parent (Kristen Jorgensen) that night; it "didn't come from [Taylor's] conversation with Victoria [Staub]." Tr. 899:7–14; *see also* Tr. 1008:16–17 (Hogan testifying "it wasn't until Sunday evening where Ms. Taylor had learned something else").

The jury had good reason to doubt Staub's credibility, and not only because she was Plaintiff's "close friend." Tr. 87:13–14. Staub's trial testimony conflicted with the contemporaneous text sent Thursday evening by VanValkenburg to Taylor, after his own conversation with Staub. That text said that Plaintiff "told Victoria not to tell anyone, as she[']s embarrassed." PX 3; Tr. 561:3–6. Yet Staub denied telling VanValkenburg that Plaintiff "was embarrassed" or that she had told Staub "not to tell anyone." Tr. 106:10–17. And while Staub was Taylor's only source of information that Plaintiff had a prior interest in Jack and that Jack had a girlfriend, Tr. 649:8–16, 650:8–18, Staub testified that she could not remember whether she told Taylor about *either* Jane's prior interest or the girlfriend, Tr. 112:12–113:8.

Staub's recounting of the sexual encounter also differed from Plaintiff's story in material respects that undermined Staub's (and Plaintiff's) credibility. Staub testified that she learned from Plaintiff that Jack Smith "ejaculated" and that "it got on the blanket." Tr. 118:1–8. But Plaintiff told Hogan the following Monday that she was "not sure if he ejaculated." PX 18; Tr. 988:17–21. At trial, Plaintiff said—inconsistently—that she (1) did not "know if he ejaculated," (2) told someone "that he may have made himself ejaculate," (3) "never told anyone that I caused him to ejaculate," and (4) doesn't "think" she told Victoria that he ejaculated. Tr. 1514:7–13. And then when asked (5) "Did you tell Victoria that it got on your blanket," Plaintiff answered "I said it might have gotten on my blanket, but no." Tr. 1514:14–15.

Staub's selective forgetfulness about her contemporaneous focus on Jack Smith's girlfriend also does not jibe with contemporaneous evidence showing Plaintiff's considerable preoccupation with the girlfriend, including (1) the "I HATE HIM" text message that Plaintiff sent upon seeing Jack walk by with his girlfriend, hand in hand, PX 82/DX 59; Tr. 148:8–13; (2) Plaintiff's separately confronting Jack and the girlfriend, one after the other, about Jack's having

12

"cheated" on the girlfriend, Tr. 1060:3–8, 1487:24–1488:7, 1490:8–12; and (3) Hogan's contemporaneous notes reflecting Plaintiff's multiple references to the girlfriend, PX 18.

And despite Staub's claim that she told VanValkenburg on Thursday that she "needed to speak" with Taylor because she was "the highest authoritative figure on the trip," Tr. 94:24–95:5—words jurors usually hear from lawyers, not teenagers—it was *Taylor* who sought out Staub the next day, not the other way around.  Tr. 110:12–18 (Staub), 629:5–6, 639:3–7 (Taylor).

In short, having been instructed by this Court that they were "the sole judges of the credibility of the witnesses and the weight their testimony deserves," Tr. 2046:14–15, the jurors could properly have found that Taylor's testimony on the key disputed facts was consistent with the documentary evidence and the testimony of Banbury, Hogan, and VanValkenburg, and that Staub's contrary testimony was simply not credible.  Indeed, the School Board argued in closing that Taylor's account was more credible precisely because all of the facts that she got from her conversation with Staub were true—about the blanket, about Plaintiff's interest in Jack the previous year, about her stroking his penis, and about Jack's having a girlfriend who went to Langley High School and who was also at the festival.  Tr. 2097:19–2098:2.  Before speaking with Staub, "Taylor didn't know any of those details.  And when Victoria Staub was asked about that . . . she didn't remember saying any of those things to Michelle Taylor."  Tr. 2098:3–6.  The jury was thus well within its rights to find that Taylor "got from that conversation" with Staub that Plaintiff voluntarily stimulated Jack's genitals, and "that puts a very different light on that information of 'she wasn't really into it.'"  Tr. 2098:7–10.

### 4.   The Sunday-evening text signaled the need for further investigation but was not an allegation of sexual assault.

The last item asserted as "actual knowledge" evidence for Taylor is VanValkenburg's Sunday-night text, at 9:10 pm.  It read:

> FYI Kristen Jorgensen has texted me, saying we have an urgent [redacted student name] situation or worse, and she wants me to call her. I'm assuming her daughter told her about [Jack Smith/Jane Doe]. I was not going to respond at this time but thought you should know. If you want me to respond, please tell me what to say.

PX 3; Tr. 599:22–600:2.

The evidence was conflicting about the significance of the reference to the former student "situation." VanValkenburg described him as a special education student with emotional issues. That was the same student who had behaved bizarrely on a band trip, yelling "'Satan is coming to get me." Tr. 805:16–17, 824:11–13. VanValkenburg had not been involved with the investigation of a sexual touching incident involving the same former student, had "only second or third-hand knowledge of what it involved," and did not remember discussing that student with Kristen Jorgensen. Tr. 824:2–10. Significantly, while VanValkenburg understood Jorgensen's reference to connote "some kind of sexual incident," he did *not* think that it meant that a sexual assault had occurred. Tr. 826:13–19.

For her part, Taylor did not speak with Kristen Jorgensen about what the reference meant. Tr. 618:6–8. Taylor had never discussed the former student with Jorgensen. Tr. 659:1–3.[6] But Taylor did not know what Jorgensen knew about the incident and did not know if Jorgensen was suggesting that a sexual assault had occurred. Tr. 608:18–22. Taylor understood the reference to mean that "there was more information that was more concerning and maybe more specific than what I had originally received." Tr. 608:22–25.

---

[6] Taylor recalled the incident with the former student as consisting of his "motorboating" a female classmate—using his mouth on her chest to make the sound of a motorboat, and also poking her stomach and "maybe her bottom." Tr. 660:18–661:1.

14

Here again, the text message constituted only inquiry notice.  Taylor testified that, after she received it, "I knew that there was more information.  *I didn't know what that information was*, but I know by using that student's name that there was potential for more information.  So I knew that we needed to look into it immediately."  Tr. 662:2–6 (emphasis added).  That is why Taylor promptly emailed Banbury and Hogan to put into motion the plan for interviewing Plaintiff at school the next day.  PX 13.  She wrote that, while before there had been a "potential issue on the band trip;" "[a]pparently" now "there was an actual issue."  *Id.*  But Taylor still didn't know what that actual issue might be.

A reasonable jury could conclude that VanValkenburg's Sunday-evening text was insufficient to confer actual knowledge that Smith had sexually assaulted Plaintiff, or even that he was being accused of doing so.  Inquiry notice, yes; actual knowledge, no.

### B.  Assistant Principal Hogan credibly testified that Plaintiff did not report a sexual assault.

We turn next to Assistant Principal Hogan.  She had no involvement in these events until she received Taylor's email on Sunday night.  Hogan promptly called Taylor.  She learned that Taylor had spoken to Staub, who relayed that there was sexual activity on the bus, that Jane at one point had a "crush" on Jack, and that Jane was upset that Jack had a girlfriend.  Tr. 899:2–5.  Hogan understood from Taylor that there was a possibility that something more had happened on the bus than what Taylor had originally thought, and that Plaintiff "*may* not have wanted to be a full participant."  Tr. 897:7–8 (emphasis added).[7]  While Hogan recognized that there was "a possibility" that an assault had occurred, she also knew from her long experience working with students that the facts are often "completely different," and she needed to hear the "details first."

---

[7] As noted above, that information came as a result of outreach from Kristen Jorgensen, not from Victoria Staub.  Tr. 899:11–22.

Tr. 900:4–19.  Plaintiff's counsel has thus overstated and mischaracterized Hogan's testimony in claiming that Hogan "knew she was dealing with a reported sexual assault."  Pl.'s Br. 7.

The only two eyewitnesses to the bus incident were Plaintiff and Jack Smith, and Hogan interviewed both of them at school the next day, Monday, March 13.  Plaintiff never described the incident to Hogan as a "sexual assault."  Those words do not appear either in Hogan's handwritten notes of her two meetings with Plaintiff, PX 18, nor in Plaintiff's own witness statement, PX 16.  In the first meeting, Plaintiff said nothing that Hogan took as an "indication that she had been sexually assaulted."  Tr. 969:2–8; *see also* Tr. 912:1–3.  Plaintiff appeared preoccupied instead with Jack's girlfriend, mentioning her three times.  Tr. 969:9–17.

Plaintiff's description of the bus incident to Hogan also did not indicate that an assault occurred.  Plaintiff said that she initially "tried to block" Jack from touching her, but she thereafter engaged in 20 minutes of mutual touching.  Tr. 970:3–9 ("she said 20 minutes they were both touching"), 971:23–972:3 (attempt to block was "right in the beginning," followed by 20 minutes of touching).  Plaintiff said she felt "stuck in a situation and not quite sure how to get out of."  Tr. 970:10–13; PX 18.  Plaintiff admitted that she "participated in the sexual act," even though "she didn't want to or she didn't know how to get out of that."  Tr. 970:15–16.  Plaintiff did not say she was "afraid of saying no," only that "she didn't know how."  Tr. 970:19–21.  She was specifically asked if she was "forced" to participate, and she answered "no."  Tr. 970:22–23.  She said Jack "did not threaten her."  Tr. 972:4–5.  Hogan understood from this that Plaintiff "did participate but she just didn't know, like, what to do, so she participated."  Tr. 972:8–11.  Hogan stated unequivocally that, during that first interview, "there [was] not one time of her telling me she was afraid, that she was scared, that she tried to block him, that she pulled her hand away."  Tr. 912:1–3.

16

Plaintiff further told Hogan in that first interview that, when she found out the next day

that Jack had a girlfriend from Langley who was also on the trip, "she went and told her what

had happened on the bus because she didn't feel it was right that he was having sexual activity

with her when he had a girlfriend." Tr. 972:21–973:2.  Although Plaintiff's version at trial was

that she did that out of concern for the girlfriend's own "safety," Tr. 1489:11–13, Plaintiff never

expressed such concern to Hogan, Tr. 973:3–5.

Hogan, with Baranyk, then spoke with Jack Smith, whose account corroborated for

Hogan that no sexual assault had occurred.  Jack was told "there was a student that is claiming

that she did not want the sexual activity that happened." Tr. 978:6–8.  Jack responded "yes,

there was touching, but I wasn't forcing anything on her."  Tr. 977:25–978:3; PX 17.  Jack told

Hogan that Plaintiff "moved closer," leaned her head on his shoulder, and put her hand on his

leg.  Tr. 978:9–979:1.  She moved her hand to his penis and stroked him for 10 minutes until he

ejaculated.  Tr. 979:10–19.  Jack also told Hogan he had a hand "in her pants" and on "her

chest."  PX 17; Tr. 979:24–980:4.  He said that Plaintiff never pulled her hand away and never

tried to stop him.  Tr. 978:14–20.

Hogan said that Jack was "stunned" at the suggestion that Plaintiff had not been a

completely willing participant.  Tr. 984:1.  He said "she had her head on my shoulder.  She was

wearing my hat.  She moved closer.  She touched me first."  Tr. 983:21–22.  Jack also

corroborated that Plaintiff had, in fact, confronted his girlfriend the next day.  Tr. 981:16–17.

Hogan then interviewed Plaintiff again and reviewed the statement that she had written in

the interim, PX 16.  Plaintiff had not mentioned in the first interview that she had put her head on

Jack's shoulder, but she now admitted that she did.  Tr. 986:14–24.  Plaintiff's written statement

said that "Jack Smith followed me onto the bus and sat next to me," PX 16, Tr. 987:8–15, but

17

Plaintiff admitted to Hogan that they had in fact arranged to sit together beforehand—Jack had asked her and she said yes, Tr. 987:16–988:8.  She admitted stroking his penis but was not sure if he ejaculated.  Tr. 988:17–21.  She said that she and Jack were "both wrong," he for touching her while having a girlfriend, and she herself "because she didn't want to be in the situation and tried to pull away (once)."  PX 18; Tr. 988:24–989:11.  Hogan also asked about Plaintiff's written statement that she "tried to block it."  PX 18.  Although that might have suggested that the blocking "continued for 20 minutes," Plaintiff said that it happened only "once," at the very beginning.  Tr. 989:16–21; PX 18.  Plaintiff did not describe any "grabbing" of her hand or the use of "any force in moving her hand to his penis."  Tr. 990:1–5.

Plaintiff said "I don't think it was consensual," Tr. 991:4, but she did not communicate to Jack that the continued touching was unwelcome.  The mutual touching continued for 15-20 minutes, she never tried to get up, and she did not try to stop it in any way—she said "she didn't know how."  Tr. 991:6–20.  When Baranyk asked Plaintiff if she wanted to press charges against Smith, she responded no, and Hogan took her reaction to signify that "she felt she was a part of this as well.  Even if she didn't want to, she still participated." Tr. 991:21–992:16.  (Baranyk corroborated Hogan's account, testifying that Plaintiff said "no way" when asked if she wanted to press charges against Smith.  Tr. 1730:20–1731:3.)  Plaintiff also said she was not afraid for her safety and did not fear any further encounter with Jack.  Tr. 994:2–5.

Jack and Plaintiff identified three students who might have information, but none of them had seen the sexual encounter on the bus.  Tr. 998:4–14.  Hogan interviewed two of the student witnesses: Brianna Murphy and Chris Cortese.  Tr. 884:6–12, 926:19–22.  Brianna said she had not witnessed the sexual encounter, Tr. 893:20–894:6, which she confirmed in her own

testimony, Tr. 288:7–12.  And Plaintiff herself confirmed that Chris Cortese "saw nothing because he was asleep."  Tr. 1524:1.

Hogan tried to interview Karoline Davis, but she was not in school that day.  Tr. 927:22–928:1.  Karoline's mother emailed Oakton school officials on Wednesday to say that "It is my understanding that Karoline played no role in the matter and learned about it from one of the students well after the fact."  PX 23.  That was true.  Karoline testified at trial that she was sitting across from Jack and Jane but did not observe what happened and heard only Plaintiff's account afterwards.  Tr. 306:23–308:12.

Hogan concluded—and the jury could find that she was reasonable in doing so—that what Plaintiff reported was not a sexual assault by Jack Smith.  Tr. 915:13–16, 994:12–997:17.  Hogan accepted Plaintiff's statement about her *subjective* state of mind—that she was in a situation that she did not know how to get out of.  Tr. 996:13–15.  But Plaintiff did not communicate to Jack that the sexual touching was unwelcome, and Plaintiff's *objective* behavior—putting her head on his shoulder, moving closer to him, and stroking his penis for 15-20 minutes, signaled to Jack "that she [was] a willing participant."  Tr. 997:3–14.  Hogan believed that she certainly could not show by a preponderance of evidence that Jack had sexually assaulted Plaintiff, which would have triggered his automatic suspension and referral to the Hearings Office to consider expelling him.  Tr. 994:22–996:12.  Hogan, in short, could not find that Jack had reason to think that what happened on the bus was against Plaintiff's will.  Tr. 997:8–21.

Hogan—a seasoned counselor—also dispelled any suggestion that her conclusion resulted from stereotypical thinking.  She was aware that sexual assault victims can sometimes freeze in the moment, and while Hogan recognized that as a "possibility," she didn't think that it

19

happened here—Plaintiff did not describe being frozen during the 15-20-minute encounter, Tr. 996:16–22, during which she continually stroked Jack's penis.  Hogan also knew that the fact that Plaintiff had gotten the blanket and that she was wearing Jack's hat did not signal that she was consenting to sexual activity.  Tr. 996:23–25.  But what Hogan found significant was that Plaintiff had not disclosed those details until Hogan heard them from Jack and then asked her about them; that omission affected Hogan's evaluation of the evidence and supported her conclusion that there was not a preponderance of evidence showing that Jack assaulted Plaintiff. Tr. 997:1–14.  Nonetheless, Hogan "wanted to help her."  Tr. 915:21.  Hogan thought that Plaintiff needed to be able to find her "voice" and advocate for herself; if she had difficulty doing that on the bus when surrounded by so many friends, she would need to learn that critical life skill, particularly as she headed off to college.  Tr. 975:11–19, 1011:23–1012:16.  And Hogan believed that counseling could help.  Tr. 1012:19–1013:7.

A reasonable jury could conclude—and this one did conclude—that what Hogan learned from Plaintiff and Jack Smith simply did not describe a sexual assault.  In reaching that conclusion, the jury could have properly considered that Plaintiff's claim that she did not "think" that the sexual encounter was consensual was premised on her *subjective* belief that she had to give express, verbal, affirmative consent.  Plaintiff testified that "you can't have consent unless the person *explicitly* says yes"; "that's what consent is."  Tr. 1483:19–1484:1 (emphasis added). Kachroo may have encouraged her to think that.  *See* DX 59 (Kachroo texting Plaintiff that "it's only consensual if you were like fine with it"); Tr. 150:13–15.  It is one thing for educational institutions to teach express-consent rules as a best practice; some states have enacted laws to require that.  *E.g.*, Cal. Educ. Code § 67386 (2019).  But it is quite another to say that the failure to obtain express consent when consent is otherwise implied will convert a mutual encounter into

20

a "sexual assault"—a conclusion that would defy the common law. *E.g., Buxton v. Murch*, 457 S.E.2d 81, 84 (Va. 1995) (holding that "consent may be implied from the acts and acquiescence of the parties"); BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "implied consent" as consent "inferred from one's conduct rather than from one's direct expression").

Accepting Plaintiff's express-verbal-consent-required theory would also run counter to the purely objective standard imposed by Title IX in student-on-student harassment cases. *Davis* requires that the acts alleged to constitute harassment be "objectively offensive." *Davis*, 526 U.S. at 651. That means, and this Court so instructed the jury, that the harassment must be "severe, pervasive, and offensive *to a reasonable person* of Jane Doe's sex." Tr. 2054:19-20 (emphasis added). The jury could fairly conclude that it was reasonable for Hogan to think that, even if Jane Doe had not expressly and verbally consented, an objective observer would have concluded that she implicitly consented, or at least that there was no objective evidence of any sexual assault. Here again, Plaintiff's counsel is flat wrong that "[i]t is undisputed that Doe informed . . . Hogan about allegations of a sexual assault." Pl.'s Br. 7. As shown above, that issue was sharply disputed and the crux of what the jury had to resolve.

The jury could likewise have found that Plaintiff had not met her burden of proving the School Board's "actual knowledge," by a preponderance of evidence, based on her mother's complaint to Hogan during their meeting in her office on Thursday (March 16). Hogan testified that the mother was dissatisfied that Jack Smith had not been suspended. Tr. 1010:2–4. The mother told Hogan "*since [Jane] blocked him, that is saying* I don't consent to this, and it's a sexual assault." Tr. 1010:5–7 (emphasis added). That testimony makes clear that the mother's "sexual assault" claim was simply a label that she applied to Plaintiff's statement that she had initially blocked Jack Smith. But Hogan had already heard about that from Jane herself. And as

shown above, the single instance of Jane's blocking Jack's hand at the very outset of their

encounter was followed by 15-20 minutes of mutual sexual touching that required Jane's active

participation, without her objective communication to Jack that she was not a willing participant.

Nor did English teacher Molly Brady report anything new to Hogan on Monday

afternoon, after Hogan had already interviewed Plaintiff and Jack Smith.  Brady testified that she

"can't remember the specifics" of what Plaintiff said happened on the bus, but she thought it was

that Jack "had tried to touch her.  And she had pushed his hand away."  Tr. 323:1–2.  So even

accepting Brady's statement that she "disclosed [to Hogan] what Jane had told me," Tr. 325:13,

Hogan already knew all of that.

Similarly, the emails later in the week of March 13 did not provide any new facts not

already known to Hogan suggesting that a sexual assault had occurred.  On Wednesday, March

16, Counselor Wigfall forwarded separately to Hogan and Taylor an email from student

Jacquelyn Nanko.  Nanko had written "I've heard some[ ]things that happened between two of

my band classmates on the Indianapolis band trip this past weekend.  The girl involved was peer

pressured into something not fully consensual, but she was too afraid to say no after he pulled

her back when she tried to move away."  PX 25/PX 26; *see also* Tr. 673:19–21 (Taylor

forwarded her copy to Hogan).  By the time she got this multiple-layer hearsay report from a

student who was not even on the trip, Hogan had already heard directly from both Jack and Jane;

this email provided no reason to think there were any new facts not already known.  In any case,

Hogan followed up and spoke directly with Wigfall.  Tr. 892:20–23, 1023:13–14.  Similarly,

Robin Moyher's email to Taylor on Friday, March 17 said that her son Evan "was told by [Jane

Doe] about a non-consenting sexual act" on the bus.  PX 30; Tr. 678:18–679:3.  (Plaintiff

testified that Evan was a college student who was dating Nanko, so both of these emails resulted

from what Plaintiff told Evan.  *See* Tr. 1498:4–1499:19.)  But here again, Hogan had already heard Plaintiff's account.  This third-hand report evidenced nothing new.

In short, a reasonable jury could conclude that Plaintiff did not meet her burden to prove by a preponderance of evidence that Hogan had the requisite actual knowledge that Smith had assaulted Plaintiff or that he was claimed to have done so.

### C.   Principal Banbury testified unequivocally that no sexual assault was reported to him.

It is undisputed that Principal Banbury's information about the incident came exclusively from Taylor and Hogan.  Dr. Banbury made clear in his testimony that he took from his conversation with Taylor over the weekend that the encounter was a consensual "hand job" and did not involve any sexual assault.  Tr. 726:25–727:25, 728:7-12.  Indeed, he testified that if anything resembling a sexual assault had been reported, he would have instructed Taylor "to hang up the phone [and] call 911."  Tr. 734:4–10.  Banbury likewise testified that when Hogan reported the results of her investigation, he accepted her conclusion that the encounter was consensual and did not involve a sexual assault.  Tr. 741:18–742:1.  He relied on Hogan's analysis and did not go behind her to look at the underlying evidence; he trusted her judgment. Tr. 742:2–9.  The jury was entitled to credit his testimony.

Plaintiff's only theory for why Banbury had actual knowledge that an assault had occurred is attenuated.  She argues that, in their phone conversation on Friday, Taylor relayed to Banbury information about the reference in VanValkenburg's text (PX 3), attributing to Victoria Staub the statement that Jane "really was not into it."  Pl.'s Br. 12.  Taylor testified, however, that when she spoke to Banbury that Friday, "I don't know if I read it to him or if I summarized it."  Tr. 595:20.  For his part, Banbury denied hearing from Taylor that Jane "really was not into it."  Tr. 690:16–18.  But given Taylor's unequivocal testimony described above that the "it" was

23

the "hand job"—a volitional act—and Taylor's clear testimony that Victoria had not reported

facts suggesting a sexual assault, the jury was entitled to conclude that the "not into it" reference

was not enough to show a sexual-assault allegation.

In short, what Banbury knew was plainly a jury question. And the jury could reasonably

find that Banbury did not have actual knowledge of any sexual-assault allegations, let alone a

sexual assault.

### D.    Fact-intensive actual-knowledge questions are best left to juries to resolve.

This case is not an outlier in turning on complex, conflicting facts surrounding the "actual

knowledge" element of a Title IX claim. Courts in such cases recognize that it is up to the fact-

finder to sort through the facts and to assess witness credibility.[8]

A remarkably similar case makes that point well. *Richard P. v. Sch. Dist. of the City of*

*Erie*, No. 03-0390, 2006 WL 2847412 (W.D. Pa. Sept. 30, 2006), *aff'd*, 254 F. App'x 154 (3d

Cir. 2007). In *Richard P.*, the jury returned a special verdict that the school district did not have

actual knowledge of the plaintiffs' sexual harassment by male students, despite that plaintiffs

presented evidence that they had been sexually assaulted by three older male students and

asserted that an assistant principal was placed on notice of the assaults through various

interactions with students and the plaintiffs' parents. *Id.* at *2, *4–6. The assistant principal

denied knowing about any assaults and provided different characterizations of her interactions

---

[8] Even under the "actual notice of a substantial danger" standard followed by other
circuits, the question of actual notice is often "difficult to define" and "usually a question for the
jury." *Doe A. v. Green*, 298 F. Supp. 2d 1025, 1034 (D. Nev. 2004) (citation omitted); *see, e.g.*,
*Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 397–98 (E.D.N.Y. 2005) (finding
sufficient evidence for triable issue on actual notice that teacher was romantically involved with
his student); *Hart v. Paint Valley Local Sch. Dist.*, No. C2–01–004, 2002 WL 31951264, at *6
(S.D. Ohio Nov. 15, 2002) ("usually question for the jury"); *Gordon v. Ottumwa Cmty. Sch.
Dist.*, 115 F. Supp. 2d 1077, 1082 (S.D. Iowa 2000) (finding on summary judgment that, of three
prior incidents, only one could establish actual notice and thus was issue for jury).

with the parents and witnesses.  *Id.* at *4–6.  Rejecting the plaintiffs' argument that the jury's verdict was against the great weight of the evidence, the district court explained: "It was the province of the jury to evaluate [the assistant principal's] testimony and determine whether she was worthy of belief."  *Id.* at *6.  Because of her testimony alone, "there clearly existed 'a rational basis to support the verdict' as delivered by the jury" and thus it cannot be said that the verdict "'resulted in a miscarriage of justice' or 'cries out to be overturned or shocks our con- science.'"  *Id.* (quoting *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991)).

The same is true here, where not one but *three* administrators *and* the band teacher all gave credible testimony denying actual knowledge that Smith had sexually assaulted Plaintiff or that he was alleged to have done so.  Plaintiff emphasizes her friends' testimony and her own. But the fact that a jury *could* find actual knowledge does not mean that it *must* do so.  There was compelling evidence on the School Board's side that was in conflict with Plaintiff's evidence.  In light of that conflict, the integrity of the jury's decision is not "substantially in doubt" and the jury did not go off the rails in finding that Plaintiff failed to carry her burden of proof.

## III.   No error in the jury instructions warrants a new trial.

None of the three alleged errors in the jury instructions meets the "miscarriage of justice" standard required to grant a new trial.

### A.   The Court did not err by declining to instruct the jury that "actual knowledge" means "actual notice."

Contrary to Plaintiff's argument, this Court did not err by declining to instruct the jury that "actual knowledge" of the sexual assault could be satisfied by "actual notice."  Plaintiff maintains her position that the two phrases are "equivalent," "interchangeable," and "synonymous[]."  Pl.'s Br. 2 ("the jury was not instructed that 'actual knowledge' is *equivalent* to 'actual notice'") (emphasis added); *id*. 17 ("interchangeable" and "synonymous[]").  Indeed,

Plaintiff's amended complaint uses the phrase "actual knowledge," not "actual notice." Am.

Comp. ¶¶ 106–07, ECF No. 23. Having taken those positions, Plaintiff cannot successfully

claim that there was any legal error in declining to use "actual notice" in addition to "actual

knowledge." And assuming for argument's sake there was legal error, it was plainly harmless if

the terms are as equivalent, interchangeable, and synonymous as Plaintiff says.

As the School Board has consistently maintained, however, the word "notice" can be

mischievous, and using "actual notice" could have created a "loophole" to advance theories of

"constructive notice," "inquiry notice," or claims of "should have known," Tr. 19:2–7, 20:9–13;

Def.'s Bench Br. at 4–5, ECF No. 275, theories that were specifically rejected in *Davis* and

*Baynard*. The only plausible explanation for Plaintiff's insistence on using "actual notice" is to

do just that. The Court was right when it concluded that O'Malley's "gets confused" when it

uses the two terms interchangeably. Tr. 1618:14–16. As the School Board pointed out, a person

with an unopened letter in his mailbox arguably has "actual notice" of its contents, but it would

not qualify as "actual knowledge" under *Davis* and *Baynard.* Tr. 18:16–19:1. The Court wisely

avoided that problem by not using the phrase at all.

### B.    The Court's response to the jury's third question was not erroneous.

Contrary to Plaintiff's suggestion that it led to juror confusion, Pl.'s Br. 18, the Court did

not err by instructing the jury, in response to its third question, that the Court should define the

term "actual knowledge," ECF No. 325-7, by "giv[ing] the words their ordinary meaning," ECF

No. 325-12. Plaintiff failed to explain before the instruction was given how it was erroneous and

actually asked the Court to give that instruction if the Court declined Plaintiff's preferred

instruction. Tr. 2165:7–10. So any objection there is waived. Fed. R. Civ. P. 51(c)(1).

### C.    Any error in the response to the jury's fourth question favored Plaintiff.

Finally, Plaintiff argues that a new trial is warranted because of error in the Court's

answer to the jury's fourth question.  ECF Nos. 325-8, 325-13.  The jury's inquiry went to Questions 3 and 4 on the special verdict form.  The jury noted that Question 3 on the form used the phrase "alleged sexual harassment" while Question 4 used "known harassment."  The jury asked if Question 3 can be "answered affirmatively without implying that sexual harassment was 'known' by the School Board?"  ECF No. 325-8.

There is no merit to Plaintiff's argument for a new trial.  For starters, the Court used *Plaintiff's* proposed special verdict form, ECF No. 311, over the School Board's objection.  Tr. 2039:14–15.  So the very discrepancy that led to the jury's question was one for which Plaintiff was responsible.

Second, Plaintiff did not object to the Court's specific response, which told the jury that it should answer Question 3 affirmatively "if you find by a preponderance of the evidence that the School Board had actual knowledge of an allegation or allegations that on the March 8, 2017 bus trip Jack Smith sexually harassed Jane."  ECF No. 325-13.  *See* Tr. 2180:17–18 (Plaintiff's counsel stating: "We would agree with the language the Court has proposed, we think it helps clarify for the jury this issue.").  So any objection there is also waived.

Plaintiff suggested that the Court *could* go further and respond to the example offered by the jury of whether "actual knowledge" is "a compilation of information about an event" or "the conclusion decided based on information provided."  ECF No. 325-8; Tr. 2180:19–2181:10.  But Plaintiff did not claim that it would constitute legal error to fail to do that.  Counsel said only "I don't know . . . whether we need to be a little more explicit," Tr. 2180:22–24, and that it wouldn't be "error" to do that, Tr. 2181:9.  But having failed to contemporaneously object to the Court's actual instruction, Plaintiff cannot complain about it now.

Third, the answer the Court gave was even *more* favorable to Plaintiff than the law

allows.  While certainly *some* allegations of assault or harassment may be sufficient if they

actually alert the funding recipient that sexual harassment or assault has occurred, like the

detailed and specific accusations against the coach in *Jennings*, vague rumors or innuendo alone

are not enough to prove "actual knowledge."[9]  The School Board objected to the Court's

formulation because it failed to "capture the requirement that the knowledge of the appropriate

school officials include both the facts showing that there was harassment and that it was so

severe, pervasive, and . . . objectively offensive as to deny educational opportunities."  Tr.

2182:21–2183:1.  In any case, the jury returned a defense verdict *in spite of* the more lenient

instruction favoring Plaintiff.  So Plaintiff has no ground to complain.

Finally, the fact that the jury came back with its verdict within a couple hours of

receiving the Court's answer—not asking any further questions—also negates any inference of

juror confusion.[10]  Given "the absence of any further inquiry by the jury, and, indeed, the brevity

of the period between submission of the response and the resolution of the verdict, the

---

[9] *See, e.g.*, *RF v. S. Country Cent. Sch. Dist.*, No. 13-cv-2710, 2016 WL 5349782, at *10 (E.D.N.Y. Sept. 23, 2016) (holding that hurried display to teacher by two students of Facebook messages "does not amount to actual knowledge under Title IX"); *Wyler v. Conn. State Univ. Sys.*, 100 F. Supp. 3d 182, 190 (D. Conn. 2015) ("[U]nconfirmed rumors, intimations and . . . suspicions, [are] insufficient to permit a reasonable jury to find actual knowledge under the *Gebser* standard."); *Romero v. City of New York*, 839 F. Supp. 2d 588, 609 (E.D.N.Y. 2012) ("[A]bsent knowledge of discrimination, the NYCDOE is not required to undertake an investigation or implement remedial measures for every instance of an unsubstantiated rumor uttered *among students* about a student's feelings for a teacher, or vice-versa . . . .").

[10] Plaintiff's counsel interviewed one juror on August 22 about the jury's deliberations, at which counsel for the School Board was present.  The Court's order governing that interview made clear that it "will be limited by the provisions of Federal Rule of Evidence 606(b)."  ECF No. 335.  Rule 606(b) renders inadmissible the use of anything from that interview to argue that the jury was confused by the Court's instructions or that it misinterpreted them.  *See* ECF No. 333 at 4–6, 10–13.

supplemental instruction must have eliminated the jury's confusion with 'concrete accuracy.'" *United States v. Parr*, 716 F.2d 796, 810 & n.14 (11th Cir. 1983) (quoting *Bollenbach v. United States*, 326 U.S. 607, 613 (1946)).

## IV. The Court did not abuse its discretion in denying an adverse-inference instruction.

Finally, the Court was right not to give the adverse-inference instruction requested by Plaintiff. That decision is reviewed only for an abuse of discretion. *United States v. Hill*, 927 F.3d 188, 209 (4th Cir. 2019). And a decision *not* to give an instruction is error only "'if the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the [party]'s ability to conduct his defense.'" *Id.* (quoting *United States v. Patterson*, 150 F.3d 382, 388 (4th Cir. 1998)). In this case, Plaintiff cannot satisfy the first or third elements.

An adverse-inference instruction against the School Board for the *unintentional* loss of records would have violated *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995). The Fourth Circuit there held that an "adverse inference about a party's consciousness of the weakness of his case . . . cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party *knew* the evidence was relevant to some issue at trial *and that his willful conduct resulted in its loss or destruction*." *Id.* at 156 (emphasis added). The evidence at trial refuted any such showing. Plaintiff waited more than a year to file suit, and when word finally reached Oakton, the teachers and administrators in this case were all astonished to learn that litigation had arisen. Tr. 1139:3–21. In the meantime, Oakton had undergone a building renovation that resulted in hundreds of boxes of documents being moved. Tr. 1141:4–1143:2. Although a handful of records relating to this incident could not be found— despite multi-week search efforts—there was no evidence that their loss was intentional. The

School Board produced more than 15,000 pages of records.  Tr. 1144:18–1145:3.  Under these facts, granting an adverse-inference instruction would have been error under *Vodusek*.[11]

Nor can Plaintiff show that the absence of the adverse-inference instruction "seriously impaired" her case.  The Court correctly determined that Plaintiff could not show prejudice from the loss of the handful of records in question.  Tr. 2028:8–2029:14, 2031:11–16.  For instance, although Jack Smith's written statement could not be found, Jack Smith actually testified at trial.  Tr. 2029:9–14.  Brianna Murphy's written statement also could not be found, but she too testified, admitting that she had not observed the bus encounter.  Tr. 288:7–12.  Plaintiff has not even offered a hypothesis to show how these or any other records could have proven that the School Board had "actual knowledge" of a sexual assault.  "The Court properly rejected Plaintiff's proffered spoliation jury instruction.  Doing so did not result in a miscarriage of justice and a new trial is not warranted on the basis of this ruling."  *Timpanaro v. Hampton Roads Golf Clubs, LC*, No. 2:07-cv-593, 2008 WL 11379927, at *14 (E.D. Va. Nov. 21, 2008).

### CONCLUSION

The motion for a new trial should be denied.

Respectfully submitted,

FAIRFAX COUNTY SCHOOL BOARD

By:____/s/_____
Stuart A. Raphael (VSB No. 30380)
Sona Rewari (VSB No. 47327)
Andrea R. Calem (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037

___

[11] Ironically, it was Plaintiff who admitted to *intentionally* deleting her texts with a former boyfriend, while the suit was pending, Tr. 1568:1–1569:5, 2024:12–23, despite that those texts were directly relevant to her damages theory that the School Board's conduct impaired her "ability to be intimate with boys," Tr. 6:2.

Telephone: (202) 955-1500
Facsimile: (703) 918-4018
srewari@HuntonAK.com
sraphael@HuntonAK.com
acalem@HuntonAK.com

*Counsel for Defendant*
*Fairfax County School Board*

## CERTIFICATE OF SERVICE

I certify that on August 30, 2019, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

_____
/s/
Stuart A. Raphael (VSB No. 30380)

31